**EXHIBIT # 2**

# BRANCH MANAGEMENT AND EMPLOYMENT AGREEMENT

This Branch Management and Employment Agreement (hereinafter referred to as "Agreement") is entered into at San Ramon, California as of the Effective Date, as that term is defined herein, by and between CMG Mortgage, Inc., a California corporation doing business as Pacific Guarantee Mortgage (hereinafter referred to as "PGM"), and _James W Bowman_ (Name) (hereinafter referred to as "Branch Manager").

## RECITALS

WHEREAS PGM and Branch Manager desire to reduce to writing their understanding and agreement pursuant to which Branch Manager will assist PGM in the management, administration and supervision of the activities of PGM's employees assigned to PGM's branch office located at 500 West 8th Street, Suite 100, Vancouver, WA 98660 ("Branch Office"); and,

WHEREAS PGM and Branch Manager also desire to reduce to writing the terms and conditions of Branch Manager's employment with PGM;

In consideration of the covenants, agreements and representations contained herein, PGM and Branch Manager agree as follows:

1. **PGM.** PGM represents that PGM is duly licensed by all applicable governmental authorities and is doing business as a mortgage broker under the name Pacific Guarantee Mortgage. Concurrently with the execution of this Agreement, PGM will obtain the necessary branch license for the Branch Office.

2. **Employment at Will.** PGM employs Branch Manager and Branch Manager accepts employment with PGM as branch manager of PGM's Branch Office on an at-will basis. Either PGM or Branch Manager may terminate this Agreement with or without cause, and with or without the giving of any reasons therefore, at any time on thirty (30) days notice to the other pursuant to the notice provisions of paragraph 11 herein. The rights and duties set forth in this paragraph may not be modified in any way except pursuant to the terms of paragraph 21 (e) herein.

3. **Licensed Status.** Branch Manager represents that he/she holds all such licenses as required by state and/or federal law to conduct mortgage brokerage activity at PGM's Branch Office, and that he/she has a minimum of three (3) years of full time experience in mortgage brokerage activity gained during the immediately preceding five (5) year period. Branch Manager further represents that while this Agreement is in effect he/she will maintain in good standing each and every such license.

4. **Devotion to PGM's Business.** During the term of this Agreement, all of Branch Manager's time and attention dedicated to mortgage loan brokerage and/or origination shall be devoted solely to the business of PGM at the Branch Office. During the term of this Agreement, Branch Manager shall not engage in any other business duties or pursuits whatsoever, or directly

1 of 11

or indirectly render any services of a business, commercial or professional nature to any other person or organization, whether for compensation or otherwise, without the prior written consent of PGM. During the term of this Agreement, Branch Manager shall not, directly or indirectly, either as an employee, employer, consultant, agent, principal, partner, stockholder, corporate officer, director, or in any other individual or representative capacity, engage or participate in any business that is in competition in any manner whatsoever with the business of PGM

5.　　**Duties of Branch Manager.** Branch Manager shall do and perform all services, acts, or things necessary or advisable to fulfill his/her duties as such, subject to the direction of PGM and to the policies established by it. Pursuant thereto, PGM and Branch Manager intend for Branch Manager to assist PGM in administering reasonable supervision over the activities of all licensed activity at Branch Office, and over the activities of all employees assigned to PGM's Branch Office. "Reasonable supervision" includes, as appropriate, the establishment of policies, rules, procedures and systems to review, oversee, inspect and manage:

a)　　transactions requiring a license;

b)　　documents which may have a material effect upon the rights or obligations of a party to every such transaction;

c)　　filing, storage and maintenance of all documents created in connection with every such transaction;

d)　　the handling of trust funds, (Branch Manager agrees not to establish or use a trust account without the prior written approval of PGM);

e)　　advertising of any service for which a license is required, (Branch Manager agrees that all advertising material must receive written approval from PGM prior to publication);

f)　　familiarizing licensed employees ("Loan Agents"), and unlicensed assistants and support personnel, with the requirements of federal and state laws relating to the prohibition of discrimination;

g)　　familiarizing Loan Agents with the requirements of federal and state laws relating to disclosures to be given in connection with mortgage loan transactions;

h)　　regular and consistent reports of licensed activities of all employees;

i)　　ensuring that in every transaction Branch Manager, and every Loan Agent and employee involved in each such transaction, honors all affirmative obligations owed to each client, as required by federal law, state law and/or ethical practices, including but not limited to: the duty of utmost *care, integrity, honesty and loyalty*; the duty to disclose all material loan terms or any other material facts that may affect the decision to borrow and to encumber real property; the duty to maintain *confidentiality*, except to the extent that information must be disclosed to

MAR-27-2006 MON 12:44 PM Pacific Guarantee Mrtg.    FAX NO. 5109707930    P. 19

Case 3:07-cv-03140-SI    Document 9-4    Filed 08/22/2007    Page 4 of 12

a potential lender in order to permit the lender to make an informed and considered decision to extend credit; and the duty to recommend a *competitive* loan product in the right class of loans (e.g., "A", "A-", "B", "C", etc.) when considering the borrower's income and credit history, financial standing and net worth (including the capacity to repay the loan), personal and financial needs, the loan terms requested at the time of application, the type and location of the proposed real property security, the purpose for obtaining the loan, and any time limits the borrower has imposed to receive the loan in question;

j)    assist in ensuring that all Loan Agents serving the Branch Office are properly licensed by any applicable state licensing authority and in good standing throughout the duration of their employment (including such things as timely payment of annual licensing fees and assessments and compliance with continuing education requirements);

k)    assist in ensuring that the Branch Office and its employees function in compliance with all applicable state and federal employment laws including, but not limited to the Federal Fair Labor Standards Act.

Additionally, subject to PGM policies and procedures, Branch Manager shall be responsible for the general management of the Branch Office, consistent with the intent of this Agreement and sound business practices, including but not limited to:

l)    recruiting of employees and support staff;

m)    creation, maintenance and monitoring of relationships with suppliers, vendors, lenders, real estate agents and other settlement service providers to ensure courteous, efficient, legal and ethical conduct of business;

n)    accurate reporting to PGM, in such form and such manner as PGM may require, of all mortgage loan transactions and related financial information as necessary to carry out the terms and covenants of this Agreement;

o)    maintenance of any and all records and other data at the Branch Office for such periods and in such manner as state and/or federal law may require;

p)    locating, securing and arranging for the lease of Branch Facilities as necessary to conduct the business of the Branch Office;

q)    maintenance of all mortgage loan files originated by Branch Office (whether closed, cancelled, withdrawn or denied) on site, or as PGM may otherwise approve, in writing, for such period of time as is required by state and/or federal law. All mortgage loan files are to be delivered to PGM upon termination of this Agreement; and,

r)    primary responsibility for ensuring that all Loan Agents of the Branch Office are duly licensed and in good standing throughout the duration of their employment

(including such things as timely payment of annual licensing fees and assessments and compliance with continuing education requirements).

6. **Duties of PGM.** PGM shall assume responsibility for all accounting and the disbursement of all funds for the operation of the Branch Office. PGM shall forward to Branch Manager a monthly statement of income and expenses of the Branch Office, determined in accordance with the provisions of paragraph 9 below.

7. **Compliance with Laws, Regulations and Policies.** PGM and Branch Manager each acknowledge that state and federal law impose certain obligations on PGM with regard to the supervision, employment and compensation of any person who acts on behalf of PGM in furtherance of licensed mortgage brokerage activity. PGM shall review and supervise the activities of Branch Manager as required by law, and as more particularly set forth above, Branch Manager shall assist PGM in carrying out its supervisory obligations. However, this Agreement shall not be construed as, and is not intended as, PGM's relinquishment of overall responsibility for the supervision of the acts of Loan Agents and other employees assigned to the Branch Office. Branch Manager agrees to comply with all federal, state and local laws, rules, regulations, policies and procedures to which PGM and/or Branch Manager are subject as a result of engaging in mortgage brokerage activity, including without limitation, those of HUD and guidelines of Fannie Mae, Freddie Mac and other investors. Branch Manager agrees to provide to borrowers and potential borrowers such disclosures, in such form and in such manner as PGM, in its sole discretion, shall require from time to time. The parties understand and agree that changes in federal, state and/or local laws, rules, regulations, policies and procedures may necessitate, in PGM's sole discretion, future amendment of this Agreement in order to maintain full compliance. Accordingly, such amendments may be made by notice given in accordance with the provisions of paragraph 11 below. Any such amendment shall become a part of this Agreement thirty (30) days after notice.

8. **Errors and Omissions Insurance.** PGM shall obtain and keep in place professional liability insurance in such amounts and subject to such deductibles, endorsements, exceptions and exclusions as PGM, in its sole discretion, shall deem appropriate. The proportionate costs of such insurance attributable to PGM's Branch Office shall be considered an expense of operations in the calculation of Net Profits, as that term is defined herein.

9. **Compensation.** As compensation for the services to be rendered by Branch Manager hereunder, PGM shall pay Branch Manager one hundred percent (100%) of all Net Profits realized from the operation of the Branch Office. The term "Net Profits," as used herein, shall be determined by deducting Expenses from Gross Income, in conformity with mortgage industry accounting practices and in accordance with sound accounting principles. The term "Gross Income" shall mean all income earned and derived from the Branch Office. The term "Expenses" shall mean all operating expenses of the Branch Office, including those items of Expense identified elsewhere in this Agreement and including but not limited to the following:

a) rent, copiers, office supplies, telephone service and utilities;

b) commissions, salaries, payroll costs and expenses, and benefits of all employees, including but not limited to commissions paid to Branch Manager in his/her capacity as a Loan Agent;

c) all costs incurred by PGM in connection with the repurchase, by reason of fraud, of any loans originated by the Branch Office. Such costs may include, without limitation, disputes or settlements involving demands to repurchase loans;

d) loss or costs, including reasonable attorneys' fees and court costs arising out of suits, actions, audits, foreclosures, or legal proceedings of any nature, related directly or indirectly to the activities or operations of the Branch Office;

e) all costs incurred by PGM in connection with Early Pay-offs or Early Payment Defaults, by reason of fraud, of any loans originated by the Branch Office;

f) all costs (including up-front fees) to lock and/or extend locked loans; and,

g) monthly shortages resulting from, but not limited to, non-collection of fees paid for credit reports, appraisals, etc.

Additionally, as set forth in Schedule A, which schedule is incorporated herein, there shall be other fees and expenses associated with Branch Office loan activity which shall be treated as Expenses. The parties understand and agree that Schedule A is subject to amendment by PGM by notice given in accordance with the provisions of paragraph 11 below. Any such amendment shall become a part of this Agreement thirty (30) days after notice.

Net Profits for any one month shall be paid to Branch Manager on the 30th day following the last day of that month. All such payments to Branch Manager shall be considered an Expense of the Branch Office.

10. **No solicitation.** After termination of this Agreement, Branch Manager shall not solicit PGM's prospective or existing clients or customers based upon PGM-generated leads obtained during the term of this Agreement, nor may he/she solicit any client or customer with existing contractual obligations to PGM. Furthermore, after termination of this Agreement, Branch Manager shall not solicit Branch Office personnel in accordance with paragraph 21(s) of this Agreement.

Nothing contained in this paragraph is intended to preclude Branch Manager from purchasing and/or developing, at his/her own cost and expense, customer lists which shall be considered the separate property of Branch Manager and not subject to the provisions of this paragraph 10.

11. **Notices.** Any notice required or permitted under this Agreement shall be in writing, delivered to the party at the address set forth for such party below, and shall be deemed effectively delivered upon (i) personal delivery, (ii) one (1) day after deposit for overnight delivery with Federal Express or a comparable national express courier, or (iii) two (2) days after

deposit in the United States mail, by first-class mail, postage prepaid. Notices shall be delivered to the parties at the following addresses:

| *If to PGM:* | *If to Branch Manager:* |
|---|---|
| Teresa Ones<br>Pacific Guarantee Mortgage<br>c/o CMG Mortgage, Inc.<br>3160 Crow Canyon Road, Suite 350<br>San Ramon, CA 94583 | *Jim Bowman* (signature)<br>Pacific Trust Lending<br>500 West 8th Street<br>Suite 100<br>Vancouver, WA 98660 |

A party may designate another address for notice purposes upon written notice thereof pursuant to the provisions of this paragraph.

12. **Indemnity.**

a) Branch Manager shall indemnify, defend, and hold PGM, its officers, directors, shareholders, parents, subsidiaries and affiliates, and their respective successors and assigns, harmless from and against any and all liability, claims, losses, costs, expenses, penalties, fines, forfeitures, judgments, or damages, including reasonable attorneys' fees and court costs, arising out of or in connection with any fraud, willful misconduct or knowing violation of law of Branch Manager.

b) PGM shall indemnify Branch Manager for all that Branch Manager loses in direct consequence of the discharge of his/her duties as such, or which result from his/her obedience to the directions of PGM, even though unlawful, unless Branch Manager, at the time of obeying such directions believed them to be unlawful. However, this paragraph shall not, in any respect, release or exempt Branch Manager from his/her duties under paragraph 5 of this Agreement, nor from his/her independent obligation(s) pursuant to his/her licensed status.

13. **Mandatory Negotiation, Mediation and Arbitration.** The parties will attempt in good faith to resolve through negotiation any dispute, claim or controversy arising out of or relating to this Agreement. Either party may initiate negotiations by providing written notice in letter form to the other party, in accordance with the provisions of paragraph 11 above. Such notice shall set forth the subject of the dispute and the relief requested. The recipient of such notice will respond in writing within five (5) days with a statement of his/her/its position on and recommended solution to the dispute. If the dispute is not resolved by this exchange of correspondence, the representatives of each party with full settlement authority will meet at a mutually agreeable time and place within ten (10) days of the date of the initial notice in order to exchange relevant information and perspectives, and to attempt to resolve the dispute. If the dispute is not resolved by these negotiations, the matter will be submitted to JAMS, or its successor, for mediation in accordance with the terms of this paragraph 13.

Either party may commence mediation by providing to JAMS and the other party a written request for mediation, pursuant to the provisions of paragraph 11 above. Such request shall set forth the subject of the dispute and the relief requested. The parties will cooperate with

6 of 11

JAMS and with one another in selecting a mediator from JAMS' panel of neutrals, and in scheduling the mediation proceedings. The parties covenant that they will participate in the mediation in good faith, and that they will share equally in its costs. All offers, promises, conduct and statements, whether oral or written, made in the course of the mediation by any of the parties, their agents, employees, experts and attorneys, and by the mediator or any JAMS employees, are confidential, privileged, and inadmissible for any purpose, including impeachment, in any arbitration or other proceeding involving the parties, provided that evidence that is otherwise admissible or discoverable shall not be rendered inadmissible or non-discoverable as a result of its use in the mediation.

Either party may initiate arbitration in accordance with this paragraph 13 by filing a written demand for arbitration at any time following the initial mediation session or forty-five (45) days after the date of filing the written request for mediation, whichever occurs first. The mediation may continue after the commencement of arbitration if the parties so desire. Unless otherwise agreed by the parties, the mediator shall be disqualified from serving as arbitrator in the case. It is the intent of the parties to this Agreement that any and every dispute, claim or controversy arising out of or relating to this Agreement or the breach, termination, enforcement, interpretation or validity thereof, which can not be resolved by negotiation and/or mediation, be resolved by binding arbitration. This includes, but is not limited to the determination of the scope or applicability of this agreement to arbitrate. Arbitration shall be conducted in San Francisco, California, before a sole arbitrator, in accordance with the laws of the State of California for agreements made in and to be performed in California. The arbitration shall be administered by JAMS pursuant to its Comprehensive Arbitration Rules and Procedures. Judgment on the Award may be entered in any court having jurisdiction. Branch Manager may seek to obtain a waiver of the costs associated with the initiation and maintenance of the arbitration, to the extent such costs: 1) are in excess of the costs of bringing and maintaining an equivalent court action; and, 2) to the extent such costs exceed Branch Manager's ability to pay. The arbitrator shall, in the Award, allocate all of the costs of the arbitration and the mediation, including the fees of the arbitrator and the reasonable attorneys' fees of the prevailing party, against the party who did not prevail.

The provisions of this paragraph 13 may be enforced by any court having jurisdiction, and the party seeking enforcement shall be entitled to an award of all costs, fees and expenses, including attorneys' fees, to be paid by the party against whom enforcement is ordered.

14.    **Proprietary Information.** All loan files, records, documents, lists, rate sheets, product guidelines, investor/secondary market information, databases, trade secrets (as defined in paragraph 21(o)), manuals (including policies and procedures), training manuals, forms, marketing materials, hardware and software obtained from PGM, and similar items relating to the business of PGM, (collectively "Proprietary Information") whether prepared by Branch Manager or otherwise, coming into the possession of the Branch Office, its personnel and/or Branch Manager during the term of this Agreement shall be, and remain, the exclusive property of PGM.

Nothing contained in this paragraph is intended to preclude Branch Manager from purchasing, at his/her own cost and expense, databases, marketing materials, hardware and/or

software, which shall be considered the separate property of Branch Manager and not subject to the provisions of this paragraph 14.

15. **Branch Facilities.** "Branch Facilities" shall include, but not be limited to office space, office furniture, telephone systems and business equipment. Branch Manager shall arrange for the execution by PGM of a month-to-month lease for appropriate Branch Facilities for a Fair Market Rent. "Fair Market Rent" shall mean a fixed monthly amount that does not vary with the volume or the value of mortgage loans originated by the Branch Office, and that is no more than the fair market rent paid by other similar businesses for comparable facilities, under comparable terms and conditions, in the geographic area in which the Branch Office is located.

16. **Name.** The Branch Office shall conduct business under the name Pacific Guarantee Mortgage, or such other name as PGM shall approve in advance, in writing. Branch Manager acknowledges and agrees that the name Pacific Guarantee Mortgage, and any and all derivations thereof, including but not limited to PGM trade names, trademarks and/or logos used in the conduct of the business of the Branch Office, are proprietary and belong exclusively to PGM. Upon termination of this Agreement for any reason, Branch Manager shall cease to use, in any manner, the name Pacific Guarantee Mortgage, and all derivations thereof, together with all PGM trade names, trademarks and logos, and during the term of this Agreement, shall acquire no license, proprietary rights to, or interest in them, or in any derivations thereof.

17. **Solicitation of Mortgage Loans in Other States.** Branch Manager shall limit solicitation of mortgage loan brokerage activity by Branch Manager and Branch Office personnel to the state in which the Branch Office is located, unless Branch Manager first receives the prior written approval of PGM. Such approval shall be subject to reasonable conditions, including but not limited to the requirement that PGM and all affected Branch Office personnel currently hold such licenses as are necessary for the subject state and that Branch Manager and the affected personnel demonstrate a thorough familiarity with such state's laws and regulations related to loan solicitation and mortgage loan origination. Notwithstanding the foregoing, Branch Manager and the Branch Office may utilize PGM's National Service Center, in PGM's sole discretion.

18. **Authority to Contract.** Branch Manager shall have no authority to enter into any agreement in the name of PGM. Branch Manager agrees to indemnify and hold PGM harmless from and against any and all liability arising out of any agreement entered into without the prior written consent of PGM. This covenant of indemnity shall include all costs of defense, including reasonable attorney's fees, for any such claim asserted.

19. **Events of Default/Termination.** Without limiting the at-will nature of Branch Manager's employment, this Agreement shall terminate immediately upon any of the following events or for any of the following causes:

a) following notice of a material breach of any covenant, condition, representation of contractual obligation of a party, given by the party that is or could be adversely affected thereby, provided said breach remains uncured for a period of ten (10) days following such written notice of said breach;

b) in the event of insolvency, bankruptcy or receivership of either party; or,

c) in the event of Branch Manager's fraud, intentional breach of duty to a client or knowing violation of law.

Upon termination of this Agreement for any reason, Branch Manager shall promptly return to PGM all originals and copies of all Proprietary Information obtained by Branch Manager from PGM. Branch Manager acknowledges and agrees that all such materials are the sole and exclusive property of PGM, and agrees not to utilize such materials for any purpose other than as contemplated by this Agreement, or at all upon termination.

20. **Status of Loans in Process at Termination.** Except in the case of termination for Branch Manager's fraud, intentional breach of duty to a client or knowing violation of law, and subject to any applicable law to the contrary, any mortgage loans which are in process or which have been originated by the Branch Office, up to and including any mortgage loans originated through 5:00 p.m., on the day of termination of this Agreement, shall be processed, submitted and closed by PGM. Branch Manager shall receive compensation related thereto in accordance with the terms of this Agreement, as if such loans had been closed prior to termination, provided that all loan files and other PGM property have been returned to PGM. All rights of Branch Manager to compensation under this Agreement shall immediately terminate in the event of termination of this Agreement by reason of Branch Manager's fraud, intentional breach of duty to a client or knowing violation of law.

21. **Miscellaneous.**

a) **Effective Date.** The "Effective Date" of this Agreement shall be the date that it is signed by PGM.

b) **Assignment.** PGM shall have the right to assign its rights and duties under this Agreement to any party without the consent of Branch Manager. Any such assignee of PGM shall be an intended third-party beneficiary of the representations, warranties, covenants, agreements and remedies contained herein. Branch Manager shall have no right to assign his/her rights or duties under this Agreement without PGM's prior written consent, which may be withheld by PGM in its sole discretion.

c) **Choice of Law.** This Agreement shall be governed by and construed under the laws of the State of California, without regard to its conflicts of laws principles.

d) **Integration.** This Agreement is the entire agreement between the parties regarding the subject matter and supersedes any prior oral or written agreement among them regarding the subject matter contained herein. However, this Agreement shall not amend or supersede the terms and conditions of any Loan Origination or other Employment Agreement in effect between Branch Manager and PGM.

e) **Amendment.** Except as set forth herein, this Agreement may not be amended or modified orally and no provision of this Agreement may be waived or amended except in a writing which makes reference to this Agreement and which is signed by PGM.

f) **Severability.** If a court of competent jurisdiction finds any provision in this Agreement to be invalid, illegal, or otherwise unenforceable, that determination will not affect any other provision of this Agreement. The invalid provision will be severed from this Agreement and all remaining provisions will continue to be of full force and effect.

g) **Interpretation.** Any ambiguities in this Agreement will not be strictly construed against the drafter of the language concerned but will be resolved by applying the most reasonable interpretation under the circumstances giving full consideration to the intentions of the parties at the time of contracting. This Agreement will not be construed against any party by reason of its preparation.

h) **No Third Party Beneficiaries.** Except as expressly set forth in paragraph 21 (b), above, this Agreement has been made by, and is made solely for the benefit of Branch Manager and PGM, and PGM's successors and permitted assigns. Except as expressly set forth in paragraph 21 (b), above, nothing in this Agreement is intended to confer any rights or remedies under or because of this Agreement on any persons or entities other than the parties to it and their respective successors and permitted assigns. Nothing in this Agreement is intended to relieve or discharge the obligation or liability of any third person or entity to any party to this Agreement.

i) **Waiver.** No waiver of any provision of this Agreement or consent to any action shall constitute a waiver of any other provision of this Agreement or consent to any other action. No waiver or consent shall constitute a continuing waiver or consent, or commit a party to provide a future waiver.

j) **Further Assurances.** Branch Manager shall execute and deliver any and all additional papers, documents and other assurances and shall do any and all acts and things reasonably necessary in connection with his/her performance of his/her obligations hereunder to carry out the intent of this Agreement.

k) **Captions.** All captions and headings in this Agreement are for reference only and may not be used in the interpretation of this Agreement or any related document.

l) **Counterparts.** This Agreement may be executed in counterparts, each of which shall constitute an original, but all of which together shall constitute one and the same instrument. The parties agree that a signed copy of this Agreement transmitted by one party to the other by facsimile transmission shall be binding upon the sending party to the same extent as a signed original of this Agreement.

m) **Survival Upon Termination.** Branch Manager's representations, warranties, covenants and other obligations and agreements contained in this Agreement, including without limitation Branch Manager's indemnification obligations, shall survive any termination of this Agreement.

10 of 11

n) **Non-exclusive Remedies.** No remedy under this Agreement is exclusive of any other available remedy, but each remedy is cumulative and is in addition to other remedies given under this Agreement or existing in law or in equity.

o) **Confidentiality.** Each party understands, acknowledges and agrees that certain trade secrets and customer lists exist which are wholly owned and controlled by the other. These shall be referred to herein collectively as "Trade Secrets." As used herein, the term "Trade Secrets" shall have that meaning attributed to it by California Civil Code Section 3426.1 and at common law. All Trade Secrets, however maintained, shall be and remain the exclusive property of the originator thereof. Each party agrees not to disclose any of the other's Trade Secrets, directly or indirectly, or use them in any way, either during the term of this Agreement or at any time thereafter, except as required in the course of performance of this Agreement.

p) **Statute of Limitations.** Any action arising under this Agreement or because of its breach must be commenced within one year after the cause of action accrues.

q) **No Partnership or Joint Venture Intended.** PGM and Branch Manager intend that, to the maximum extent permissible by law, this Agreement shall not be construed as a partnership and/or joint venture.

r) **Regulatory Compliance.** PGM and Branch Manager recognize the importance of full compliance at all times with all state and federal laws, rules and regulations governing mortgage loan origination. Accordingly, notwithstanding anything to the contrary contained elsewhere herein, the parties recognize and agree that PGM retains the right to amend this Agreement as necessary, in its reasonable discretion, to ensure full compliance with all state and federal laws, rules and regulations. Any such amendment shall become a part of this Agreement thirty (30) days after notice thereof is given in accordance with paragraph 11 above.

s) **Anti-Poaching.** Branch Manager agrees not to solicit or in any way entice to leave, interview, hire or contract, either directly or indirectly, with any employees or independent contractors affiliated with PGM, or any of its affiliates, during the term of this Agreement, and for a period of two (2) years following termination of this Agreement.

t) **Signatures.** The undersigned persons represent that they are authorized and have the legal capacity to enter into this Agreement.

Dated:_____

**CMG Mortgage, Inc., doing business as Pacific Guarantee Mortgage**

By:_____
Christopher M. George, President

Dated: 6/3d/04

**Branch Manager**

By: [signature]
Name (print): James W Bowman

11 of 11

BMA.DOC.01 Rev. 6-7-04.doc