1  Alan F. Cohen (State Bar No. 194075)
   **LAW OFFICES OF ALAN F. COHEN**
2  101 Montgomery Street, Suite 2050
   San Francisco, CA  94104
3  415.984.1943 (tel.)
   415.984.1953 (fax)
4  cohenlaw@mindspring.com
5
   Angela M. Xavier (State Bar No. 165152)
6  Attorney At Law
   900 Cherry Avenue, Suite 300
7  San Bruno, CA  94066
   Telephone:  (650) 355-0414
8  Facsimile:   (650) 355-0842
9
   Attorneys for Plaintiffs James W. Bowman, Jr. and
10 Pacific Real Estate Management Company, Inc.

11             **UNITED STATES DISTRICT COURT**

12           NORTHERN DISTRICT OF CALIFORNIA

13             SAN FRANCISCO DIVISION

14 JAMES W. BOWMAN, JR. and PACIFIC       Case No.: C-07-3140-SI
   REAL ESTATE MANAGEMENT
15 COMPANY, INC., a Washington            **DECLARATION OF ALAN F. COHEN IN**
   Corporation                            **SUPPORT OF PLAINTIFFS' MOTION TO**
16                                         **COMPEL PRODUCTION OF DOCUMENTS**
17            Plaintiffs,

18      *v.*

19 CMG MORTGAGE, INC., a California
   Corporation; CMG MORTGAGE, INC.,
20 d/b/a PACIFIC GUARANTEE
   MORTGAGE, CMG MORTGAGE
21 SERVICES, INC., a California
   corporation; CMG MORTGAGE
22 SERVICES, INC., d/b/a PACIFIC
   GUARANTEE MORTGAGE,
23
24        Defendants.
25
26
27      I, Alan F. Cohen , declare:
28

**DECLARATION OF ALAN F. COHEN IN SUPPORT OF MOTION TO COMPEL PRODUCTION**

1.      I am one of the attorneys of record for James W. Bowman, Jr. and Pacific Real Estate Mortgage Company, Inc. (PREMCO), Plaintiffs in this action.  I have personal knowledge of the facts below, and could and would testify competently hereto if called upon to do so.

2.      Before bringing this motion I made every effort to resolve this dispute informally and without involving the Court.  On March 21 I sent the letter attached under Tab C to Defendants' counsel, Joshua Rosenthal of the firm of Medlin & Hargrave.  I received in response the letter attached under Tab D, in which Mr. Rosenthal categorically refused to produce the documents at issue in this motion.

3.      Attached under Tab A is a true and correct copy of Plaintiff's Request for Production of Documents which I propounded to Defendants.

4.      Attached under Tab B is a true and correct copy of Defendants' Response to the Request for Production of Documents.

5.      Attached under Tab C is a true and correct copy of Plaintiff's meet and confer letter, dated March 21, 2008.

6.      Attached under Tab D is a true and correct copy of Defendants' response to Plaintiffs' letter, dated April 3, 2008.

7.      Attached under Tab E is a true and correct copy of HUD Mortgage Letter 00-15

8.      Attached under Tab F is a true and correct copy of one of the Branch Management and Employment Agreements between Defendants and Mr. Bowman.

9.      Attached under Tab G is a true and correct copy of one of the Facilities Agreements between Defendants, on the one hand, and Mr. Bowman and his corporation, PREMCO, on the other.

10.     Attached under Tab H is a true and correct copy of some relevant excerpts from the deposition of Paul Chavez.

11.     There are several other outstanding disputes concerning these Requests not addressed in this motion.  Mr. Rosenthal has withdrawn the objections voiced in his letter to Request No. 13, and has agreed to produce Defendants' corporate by-laws under a protective order to be worked out by the parties.  His letter also states that Defendants will produce

**DECLARATION OF ALAN F. COHEN IN SUPPORT OF MOTION TO COMPEL PRODUCTION**

1   additional documents response to Requests No. 17 and 18, and a privilege log.  Plaintiffs reserve

2   the right to seek additional assistance from the Court to compel production of these documents if

3   they are not forthcoming from Defendants.

4           I declare under penalty of perjury under the laws of the State of California that the

5   foregoing is true and correct.

6

7   Executed this 8th day of May, 2008, at San Francisco, California.

8                                               LAW OFFICES OF ALAN F. COHEN

9

10                                              By _____
                                                    Alan F. Cohen
11                                                  Attorney for Plaintiffs

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

**DECLARATION OF ALAN F. COHEN IN SUPPORT OF MOTION TO COMPEL PRODUCTION**

# Exhibit A

1   Alan F. Cohen (State Bar No. 194075)
    **LAW OFFICES OF ALAN F. COHEN**
2   101 Montgomery Street, Suite 2050
    San Francisco, CA  94104
3   415.984.1943 (tel.)
    415.984.1953 (fax)
4   cohenlaw@mindspring.com
5
6   Angela M. Xavier (State Bar No. 165152)
    900 Cherry Avenue, Suite 300
7   San Bruno, CA  94066
    650.355.0414 (tel.)
8   650.355.0842 (fax)
9   Attorneys for Plaintiffs
10  James W. Bowman, Jr. and Pacific Real Estate
11
                    **UNITED STATES DISTRICT COURT**
12
                  NORTHERN DISTRICT OF CALIFORNIA
13
                     SAN FRANCISCO DIVISION
14

15  JAMES W. BOWMAN, JR. and PACIFIC      Case No.: C-07-3140-SI
    REAL ESTATE MANAGEMENT
16  COMPANY, INC., a Washington           **PLAINTIFF'S REQUEST FOR**
    Corporation                           **PRODUCTION OF DOCUMENTS, SET ONE**
17
18                  Plaintiffs,
19        *v.*
20  CMG MORTGAGE, INC., a California
    Corporation; CMG MORTGAGE, INC.,
21  d/b/a PACIFIC GUARANTEE
    MORTGAGE, CMG MORTGAGE
22  SERVICES, INC., a California corporation;
    CMG MORTGAGE SERVICES, INC., d/b/a
23  PACIFIC GUARANTEE MORTGAGE,
24
25                  Defendants.
26

27  PROPOUNDING PARTY:   PLAINTIFF JAMES W. BOWMAN, JR.

28  RESPONDING PARTIES:  CMG MORTGAGE, INC.; CMG MORTGAGE, INC., d/b/a
                         PACIFIC GUARANTEE MORTGAGE, CMG MORTGAGE

SERVICES, INC.; CMG MORTGAGE SERVICES, INC., d/b/a PACIFIC GUARANTEE MORTGAGE

SET NUMBER:                ONE

Plaintiff James W. Bowman, Jr. ("Plaintiff") hereby requests that Defendants CMG Mortgage, Inc., CMG Mortgage, Inc., d/b/a Pacific Guarantee Mortgage, CMG Mortgage Services, Inc., CMG Mortgage Services, Inc.,  d/b/a Pacific Guarantee Mortgage (collectively, "Defendants") respond to this Request for Production of Documents (the "Request").  Defendant must serve the response within 30 days of the date on which this Request was served, plus any additional amount of time provided for response under FRCP 6.  Within that same time period, Defendant must also produce for examination, inspection, and copying the documents described below.  The responses and documents must be served and produced by 10:00 a.m. at the Law Offices of Alan F. Cohen, 101 Montgomery Street, Suite 2050, San Francisco, California 94104.

In lieu of personal delivery as set forth above, Defendant may comply with this Request by mailing or delivering the response and documents requested to the above address on or before the date specified for production, along with the verification required by statute.

## INSTRUCTIONS

Defendant must produce the documents requested either: (1) as they are kept in the usual course of business; or (2) organized and labeled so as to correspond with each specific request.

If you object to part of a document request and refuse to answer that part, state YOUR objection and answer the remaining portion of that document request.  If you object to the scope or time period of a document request and refuse to answer for that scope or time period, state YOUR objection and answer the document request for the scope or time period you believe is appropriate.

Each copy of a DOCUMENT, regardless of when made, which is not identical to the original by reason of subsequent notation or modification of any kind whatsoever, including notations on the front or back of any of its pages, is a separate DOCUMENT and must be produced.

With respect to any requested document which you refuse to produce in response to these Requests for Production, please state:

1          (a)    the full identity of the document including:

2              (1) date of the document;

3              (2) its title (if ANY);

4              (3) its authors, addressees, recipients or parties;

5              (4) the nature of the document (e.g., letter, memorandum, etc.);

6              (5) the individual or source from whom or which you obtained it; and

7              (6) its present location and identity of its custodian;

8          (b)    whether YOUR objection or refusal is directed to the entire document or

9              part thereof;

10         (c)    if YOUR objection or refusal goes to part of the document, specify the

11             specific part(s) of the document to which YOUR objection or refusal is

12             directed;

13         (d)    the specific factual basis which gives rise to the objection or refusal; and

14         (e)    the specific legal ground on which the objection or refusal is based.

15         If any of the following requested DOCUMENTS cannot be located or produced after

16     exercising due diligence to secure the information, please so state and respond to the extent

17     possible, specifying YOUR inability to respond fully, and stating whatever information you have

18     concerning the non-produced DOCUMENTS.  If YOUR response is qualified in any particular,

19     please set forth the details of such qualification.

20         If any request is defined using a term of art or other terms that Defendant believes to be

21     incorrect but Defendant understands the nature of the document requested, defendant shall

22     produce the document notwithstanding the semantic or definitional error.

23     **DEFINITIONS**

24         The following terms shall have the following meanings:

25     1.   "CMG," "YOU," or "YOUR" refers to Defendants CMG Mortgage, Inc., CMG

26     Mortgage, Inc., d/b/a Pacific Guarantee Mortgage, CMG Mortgage Services, Inc., CMG

27     Mortgage Services, Inc.,  d/b/a Pacific Guarantee Mortgage, individually and collectively,

28     including any of their facilities, offices, locations, divisions, affiliates, subsidiaries, successors,

predecessors, affiliates present or former partners, officers, directors, employees, agents,

attorneys or representatives, and any other persons or entities acting, purporting to act or

authorized to act on their behalf.

2.    "BOWMAN" refers to Plaintiff James W. Bowman, Jr.

3.    "PREMCO" refers to Pacific Real Estate Management Company, Inc.

4.    "PLAINTIFFS" refers to BOWMAN and PREMCO, collectively.

5.    "COMMUNICATION" means the transmission of information of any sort,

including, without limitation, facts, opinions, pictures, images or characters, alphabetic,

mathematic or otherwise, by whatever means, whether written, oral, visual, electronic, digital,

analog or otherwise.

6.    The term "DOCUMENT" incorporates any writing as defined broadly in Evidence

Code § 250, including any typewritten, handwritten, graphic, photographic, printed or otherwise

recorded matter or recording of symbols in tangible form, however produced or reproduced, of

every kind and regardless of where located, which is in YOUR possession, custody, or control,

or in the possession, custody or control of any YOUR servants or agents of YOUR attorneys.

Among other things, DOCUMENTS may consist of electronically recorded information such as

electronic mail ("email"), html files, databases, data processing cards or tapes, computerized

data, computer diskettes, or information otherwise contained on a computer's hard drive, disks or

backup tapes; video tapes, audio tapes, view-graphs, or any information maintained on digital,

electronic, magnetic or other media; any other summary, schedule, memorandum, note,

statement, letter, telegram, interoffice COMMUNICATION, report, diary, worksheet, list, graph,

chart, or index, tape record, partial or complete report of telephone or oral conversation,

transcript or minutes, compilation, tabulation, study, analysis, or other such writing or recording.

The term "DOCUMENT" includes originals, file copies, any other copies, no matter how

prepared, and any drafts prepared in connection with such DOCUMENTS, whether or not used,

as well as the file in which the DOCUMENTS are maintained.

7.    The phrases "RELATE TO" and "RELATING TO" include, but are not limited to,

referring to, alluding to, responding to, concerning, supporting, connected with, commented on,

in respect of, about, regarding, discussing, showing, describing, mentioning, reflecting, analyzing, comprising, constituting, evidencing, memorializing, and pertaining to, or which call into doubt

## REQUESTS FOR PRODUCTION OF DOCUMENTS

**REQUEST NO. 1**

All DOCUMENTS constituting, referring to, or pertaining to agreements of any kind between YOU and BOWMAN, or between YOU and PREMCO.  This request includes all drafts, iterations, versions, modifications, novations, schedules, addenda, and exhibits, along with all documents referring or pertaining to such agreements.

**REQUEST NO. 2**

All DOCUMENTS evidencing, pertaining to, or referring to BOWMAN's compensation and benefits, including all DOCUMENTS used to calculate his compensation.

**REQUEST NO. 3**

All DOCUMENTS evidencing, pertaining to or referring to payments of BOWMAN's wages, including, without limitation, payroll records, accounting records, ledgers, pay stubs, bank deposits and all records YOU are required to create or maintain under California Labor Code § 226 or any other federal or state law.

**REQUEST NO. 4**

All COMMUNICATIONS between YOU and BOWMAN.

**REQUEST NO. 5**

All records of YOUR COMMUNICATIONS with BOWMAN, including all telephone logs, message slips, ACT! for Windows database records, memos, emails or similar DOCUMENTS.

**REQUEST NO. 6**

All DOCUMENTS evidencing, pertaining to, or referring to reserves BOWMAN and

PREMCO were required to maintain in the course of their relationship with YOU.  This request seeks documents evidencing the nature and amount of reserves, the use of those reserves, and all DOCUMENTS evidencing YOUR reasons for requiring the reserves.

**REQUEST NO. 7**

All DOCUMENTS evidencing, pertaining to, or referring to the security deposit(s) YOU received from PLAINTIFFS.

**REQUEST NO. 8**

All DOCUMENTS evidencing, referring to, or pertaining to YOUR accounting of expenses, including facilities expenses, RELATING TO the Vancouver and Federal Way branches.

**REQUEST NO. 9**

All DOCUMENTS evidencing, referring to, or pertaining to YOUR performance of YOUR obligations under the Facilities Agreements between YOU and PLAINTIFFS.

**REQUEST NO. 10**

All DOCUMENTS evidencing, referring to, or pertaining to YOUR performance of YOUR obligations under the Branch Management agreements between YOU and BOWMAN.

**REQUEST NO. 11**

All charts, diagrams, lists, directories, maps, or other DOCUMENTS showing the organizational and/or management structure for CMG Financial Services, CMG Mortgage, Inc., and CMG Mortgage Services, Inc. from November 2003 to the present.

**REQUEST NO. 12**

All DOCUMENTS constituting, evidencing, or referring to contracts between YOU and the following loan officers:  (a) Jennifer Martinez a/k/a Jennifer Curran; (b) Terry Greenen a/k/a Terry Greenan; and (c) Susan Howsley.

**REQUEST NO. 13**

All articles of incorporation and bylaws for CMG Financial Services, CMG Mortgage, Inc., and CMG Mortgage Services, Inc.

**REQUEST NO. 14**

All COMMUNICATIONS between YOU and one or both of the PLAINTIFFS.

**REQUEST NO. 15**

All DOCUMENTS constituting, evidencing, or pertaining to YOUR business incentive program, which may also have been known as the Marketing Credits Incentive Program, including, without limitation, all check request forms and evidence of all payments YOU made to any branches under the incentive programs.

**REQUEST NO. 16**

All COMMUNICATIONS, declarations or affidavits obtained from Joshua Wilkins or William or Elaine Frazier.

**REQUEST NO. 17**

All DOCUMENTS constituting, evidencing, or pertaining to YOUR policies, procedures, and practices concerning health benefits applicable to employees of the Vancouver and Federal Way branches from November 2003 to the present.

**REQUEST NO. 18**

All DOCUMENTS constituting, evidencing, or pertaining to payment of premiums and any other costs of health benefits for employees of the Vancouver and Federal Way branches from 2004 to the present. This request includes, without limitation, payments made by YOU or by the branches, YOUR accounting and payroll records, and itemized wage statements evidencing deductions from employee wages.

**REQUEST NO. 19**

All DOCUMENTS evidencing, pertaining to, or referring to expenses incurred in operating the Vancouver and Federal Way branches, including, without limitation, invoices or statements received from the branches, requests for payment of expenses, other COMMUNICATIONS, accounting of expenses and related payments, account statements, copies of checks, operations statements, Profit & Loss statements, balance sheets.

**REQUEST NO. 20**

All DOCUMENTS submitted by YOU to HUD, or received by YOU from HUD, RELATING TO the Vancouver or Federal Way branches.

**REQUEST NO. 21**

All DOCUMENTS evidencing, referring to, or pertaining to taxes owed and/or paid for the Vancouver and Federal Way branches.

**REQUEST NO. 22**

All complaints (civil, criminal, arbitral, or administrative) or similar DOCUMENTS in which CMG Mortgage, Inc., CMG Mortgage Services, Inc., Pacific Guarantee Mortgage, CMG Financial Services, or any of YOUR affiliates, subsidiaries, or parent entities are named as parties.

**REQUEST NO. 23**

All DOCUMENTS RELATING TO any federal (including, but not limited to HUD) or state regulatory compliance issues involving CMG Mortgage Inc., CMG Mortgage Service, Inc., Pacific Guarantee Mortgage, and/or CMG Financial Services, or any of YOUR affiliates, subsidiaries, or parent entities.

**REQUEST NO. 24**

All COMMUNICATIONS with the Washington state Department of Financial

1    Institutions from November 2003 to the present.

2    **REQUEST NO. 25**

3         All DOCUMENTS sent to or received from YOUR accounting firm(s) RELATING TO

4    PLAINTIFFS or the Vancouver or Federal Way branches.

5
                                          LAW OFFICES OF ALAN F. COHEN
6

7

8    Dated: December 12, 2007                    By _____
                                                    Alan F. Cohen
9                                                   Attorney for Plaintiff

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

## PROOF OF SERVICE

I, Alan F. Cohen, declare that I am a resident of the State of California, am over the age of eighteen years, and not a party to the within action.  I am a member of the bar of this Court.  My address is 101 Montgomery Street, Ste. 2050, San Francisco, CA 94104.

On the date set forth below I served a true and correct copy of:

**PLAINTIFF'S REQUEST FOR PRODUCTION OF DOCUMENTS, SET ONE**

☒  (FIRST CLASS MAIL) by placing such copy in a sealed envelope postage thereon fully prepaid, with the United States Postal Service for mailing this day from San Francisco, California.

☐  (HAND DELIVERY) by hand delivery on to the party(ies) indicated below:

☐  (FACSIMILE) by consigning such copy to a facsimile operator for transmittal on this date to the party(ies) indicated.

☐  (OVERNIGHT COURIER) by consigning such copy in a sealed envelope postage thereon fully prepared, with the United States Postal Service or an overnight courier for next day delivery to the party(ies) indicated.

I served the above document(s) on the following persons:

David Medlin
Joshua Rosenthal
Medlin & Hargrave
One Kaiser Plaza, Suite 1305
Oakland, CA  94612
jrosenthal@mhlawcorp.com

***Attorneys for Defendants CMG Mortgage, Inc., et al.***

I am readily familiar with my firm's practices for processing of correspondence for delivery according to the instructions indicated above, under which correspondence would be deposited in the mail or other delivery service set forth above on the date below.  The above-referenced  documents were placed for deposit in accordance with the office's practice.  I declare under penalty of perjury under the laws of the State of California that the foregoing is true and correct.  Executed at San Francisco, California on December 14, 2007.

_____
Alan F. Cohen

# Exhibit B

1  David R. Medlin      (SBN 77417)
   G. Bradley Hargrave  (SBN 173911)
2  Joshua A. Rosenthal  (SBN 190284)
   MEDLIN & HARGRAVE
3  A Professional Corporation
   One Kaiser Plaza, Suite 1305
4  Oakland, CA  94612
   Telephone:      (510) 832-2900
5  Facsimile:      (510) 832-2945
   E-mail:      jrosenthal@mhlawcorp.com
6
   Attorneys for Defendants
7

8                    UNITED STATES DISTRICT COURT

9                  NORTHERN DISTRICT OF CALIFORNIA

10 James W. Bowman, Jr. and Pacific Real Estate        Case No.: C 07 3140 SI
   Management Company, Inc., a Washington
11 Corporation,                                        DEFENDANTS' RESPONSE TO
                                                       PLAINTIFFS' REQUEST FOR
12              Plaintiffs,                             PRODUCTION OF DOCUMENTS UNDER
         vs.                                           RULE 34
13
   CMG Mortgage Inc., a California Corporation;
14 CMG Mortgage, Inc., d/b/a Pacific Guarantee
   Mortgage, CMG Mortgage Services, Inc., a
15 California Corporation, CMG Mortgage Services,
   Inc. d/b/a Pacific Guarantee Mortgage,
16
17              Defendants.
   _____/

18       PROPOUNDING PARTY:     James W. Bowman, Jr. and Pacific Real Estate Management

19                              Company, Inc., a Washington Corporation

20       RESPONDING PARTY:      CMG Mortgage Inc., a California Corporation; CMG Mortgage,

21                              Inc., d/b/a Pacific Guarantee Mortgage, CMG Mortgage Services,

22                              Inc., a California Corporation, CMG Mortgage Services, Inc. d/b/a

23                              Pacific Guarantee Mortgage

24       SET NO.:               ONE

25       Responding parties have not fully completed an investigation of the facts relevant to this case,

26 has not completed discovery, and has not completed preparation for trial.  Accordingly, all of the

27 responses contained herein are based only upon such information and documents as are presently

28 ///

                                           1

1  available to and specifically known to the responding parties and disclose only those contentions which

2  presently occur to responding party.

3      It is anticipated that further discovery, independent investigation, legal research and analysis

4  will supply additional facts and add meaning to known facts, as well as establishing entirely new factual

5  conclusions and legal contentions, all of which may lead to substantial additions to, changes in, and/or

6  variations from the contentions herein set forth.

7      Except for explicit facts admitted herein, no incidental or implied admissions are intended

8  hereby.  The fact that responding parties have answered any request should not be taken as an admission

9  that responding parties accept or admit the existence of any facts set forth or assumed by such request,

10  or that such response constitutes admissible evidence.  The fact that responding parties have answered

11  part or all of any request is not intended, and shall not be construed to be a waiver by responding parties

12  of all or any part of any objection to any request made by responding parties.

13      The following responses are given without prejudice to the responding parties' right to produce

14  evidence of any subsequently discovered fact or facts which responding parties may later recall or

15  discover.  Responding parties accordingly reserve the right to change any and all answers herein as

16  additional facts are ascertained, analyses are made, legal research is completed, and contentions are

17  made.  The responses contained herein are made in a good faith effort to supply as much factual

18  information and as much specification of legal contentions as are presently known, but should in no

19  way be utilized to the prejudice of these responding parties in relation to further discovery, research or

20  analysis.

21      Responding parties object to all of the requests to the extent they, or any of them, call for any

22  matter which is protected from discovery as either attorney work product and/or an attorney client

23  communication.  Responding parties will not divulge either attorney work product or attorney client

24  communications.

25      Without prejudice to the above and subject thereto responding party responds as follows:

26  ///

27  ///

28  ///

**REQUEST FOR PRODUCTION NO. 1**

All DOCUMENTS constituting, referring to, or pertaining to agreements of any kind between YOU and BOWMAN, or between YOU and PREMCO. This request includes all drafts, iterations, versions, modifications, novations, schedules, addenda, and exhibits, along with all documents referring or pertaining to such agreements.

**RESPONSE TO REQUEST FOR PRODUCTION NO. 1**

Responding parties will comply with this request by producing all responsive documents in responding parties' possession, custody and control.

**REQUEST FOR PRODUCTION NO. 2**

All DOCUMENTS evidencing, pertaining to, or referring to BOWMAN's compensation and benefits, including all DOCUMENTS used to calculate his compensation.

**RESPONSE TO REQUEST FOR PRODUCTION NO. 2**

Responding parties will comply with this request by producing all responsive documents in responding parties' possession, custody and control.

**REQUEST FOR PRODUCTION NO. 3**

All DOCUMENTS evidencing, pertaining to or referring to payments of BOWMAN's wages, including, without limitation, payroll records, accounting records, ledgers, pay stubs, bank deposits and all records YOU are required to create or maintain under California Labor Code § 226 or any other federal or state law.

**RESPONSE TO REQUEST FOR PRODUCTION NO. 3**

Responding parties will comply with this request by producing all responsive documents in responding parties' possession, custody and control.

**REQUEST FOR PRODUCTION NO. 4**

All COMMUNICATIONS between YOU and BOWMAN.

**RESPONSE TO REQUEST FOR PRODUCTION NO. 4**

Responding parties will comply with this request by producing all responsive documents in responding parties' possession, custody and control.

///

1 **REQUEST FOR PRODUCTION NO. 5**

2     All records of YOUR COMMUNICATIONS with BOWMAN, including all telephone logs,

3 message slips, ACT! for Windows database records, memos, emails or similar DOCUMENTS.

4 **RESPONSE TO REQUEST FOR PRODUCTION NO. 5**

5     Responding parties will comply with this request by producing all responsive documents in

6 responding parties' possession, custody and control.

7 **REQUEST FOR PRODUCTION NO. 6**

8     All DOCUMENTS evidencing, pertaining to, or referring to reserves BOWMAN and PREMCO

9 were required to maintain in the course of their relationship with YOU. This request seeks documents

10 evidencing the nature and amount of reserves, the use of those reserves, and all DOCUMENTS

11 evidencing YOUR reasons for requiring the reserves.

12 **RESPONSE TO REQUEST FOR PRODUCTION NO. 6**

13     Responding parties will comply with this request by producing all responsive documents in

14 responding parties' possession, custody and control.

15 **REQUEST FOR PRODUCTION NO. 7**

16     All DOCUMENTS evidencing, pertaining to, or referring to the security deposit(s) YOU

17 received from PLAINTIFFS.

18 **RESPONSE TO REQUEST FOR PRODUCTION NO. 7**

19     Responding parties will comply with this request by producing all responsive documents in

20 responding parties' possession, custody and control.

21 **REQUEST FOR PRODUCTION NO. 8**

22     All DOCUMENTS evidencing, referring to, or pertaining to YOUR accounting of expenses,

23 including facilities expenses, RELATING TO the Vancouver and Federal Way branches.

24 **RESPONSE TO REQUEST FOR PRODUCTION NO. 8**

25     Responding parties will comply with this request by producing all responsive documents in

26 responding parties' possession, custody and control.

27 ///

28 ///

1  **REQUEST FOR PRODUCTION NO. 9**

2      All DOCUMENTS evidencing, referring to, or pertaining to YOUR performance of YOUR

3  obligations under the Facilities Agreements between YOU and PLAINTIFFS.

4  **RESPONSE TO REQUEST FOR PRODUCTION NO. 9**

5      Responding parties will comply with this request by producing all responsive documents in

6  responding parties' possession, custody and control.

7  **REQUEST FOR PRODUCTION NO. 10**

8      All DOCUMENTS evidencing, referring to, or pertaining to YOUR performance of YOUR

9  obligations under the Branch Management agreements between YOU and BOWMAN.

10 **RESPONSE TO REQUEST FOR PRODUCTION NO. 10**

11     Responding parties will comply with this request by producing all responsive documents in

12 responding parties' possession, custody and control.

13 **REQUEST FOR PRODUCTION NO. 11**

14     All charts, diagrams, lists, directories, maps, or other DOCUMENTS showing the

15 organizational and/or management structure for CMG Financial Services, CMG Mortgage, Inc.,

16 and CMG Mortgage Services, Inc. from November 2003 to the present.

17 **RESPONSE TO REQUEST FOR PRODUCTION NO. 11**

18     Objection on the ground that the request seeks information that is not relevant to the dispute and

19 not likely to lead to the further discovery of admissible evidence.  Objection on the ground that the

20 request is overbroad and unduly burdensome and harassing.  Objection on the ground that the request is

21 unduly invasive of the responding parties' privacy.

22 **REQUEST FOR PRODUCTION NO. 12**

23     All DOCUMENTS constituting, evidencing, or referring to contracts between YOU and the

24 following loan officers: (a) Jennifer Martinez a/k/a Jennifer Curran; (b) Terry Greenen a/k/a Terry

25 Greenan; and (c) Susan Howsley.

26 **RESPONSE TO REQUEST FOR PRODUCTION NO. 12**

27     Objection on the ground that the request is unduly invasive of the privacy rights of third parties.

28 Notwithstanding and subject to the foregoing: Responding parties will comply with this request by

DEFENDANTS' RESPONSE TO PLAINTIFFS' REQUEST FOR PRODUCTION OF DOCUMENTS C 07 3140 SI
M:\CMG\85-0706-02 Bowman\Discovery\response to f.Set 1 - insp.dem.wpd

1   producing all responsive documents in responding parties' possession, custody and control.

2   **REQUEST FOR PRODUCTION NO. 13**

3        All articles of incorporation and bylaws for CMG Financial Services, CMG Mortgage,

4   Inc., and CMG Mortgage Services, Inc.

5   **RESPONSE TO REQUEST FOR PRODUCTION NO. 13**

6        With respect to the request for the articles of incorporation, responding parties will comply with

7   this request by producing the articles of incorporation for CMG Mortgage, Inc.  With respect to the

8   request of documents sought in the request: Objection on the ground that the request seeks information

9   that is not relevant to the dispute and not likely to lead to the further discovery of admissible evidence.

10  Objection on the ground that the request is overbroad and unduly burdensome and harassing.  Objection

11  on the ground that the request is unduly invasive of the responding parties' privacy.

12  **REQUEST FOR PRODUCTION NO. 14**

13       All COMMUNICATIONS between YOU and one or both of the PLAINTIFFS.

14  **RESPONSE TO REQUEST FOR PRODUCTION NO. 14**

15       Responding parties will comply with this request by producing all responsive documents in

16  responding parties' possession, custody and control.

17  **REQUEST FOR PRODUCTION NO. 15**

18       All DOCUMENTS constituting, evidencing, or pertaining to YOUR business incentive

19  program, which may also have been known as the Marketing Credits Incentive Program, including,

20  without limitation, all check request forms and evidence of all payments YOU made to any branches

21  under the incentive programs.

22  **RESPONSE TO REQUEST FOR PRODUCTION NO. 15**

23       Responding parties will comply with this request by producing all responsive documents in

24  responding parties' possession, custody and control.

25  **REQUEST FOR PRODUCTION NO. 16**

26       All COMMUNICATIONS, declarations or affidavits obtained from Joshua Wilkins or

27  William or Elaine Frazier.

28  ///

DEFENDANTS' RESPONSE TO PLAINTIFFS' REQUEST FOR PRODUCTION OF DOCUMENTS C 07 3140 SI
M:\CMG\85-0706-02 Bowman\Discovery\response to f Set 1 - insp dem.wpd

1  **RESPONSE TO REQUEST FOR PRODUCTION NO. 16**

2      After diligent searches and reasonable inquiries, responding party is unable to comply with this

3  request because no such documents exist.

4  **REQUEST FOR PRODUCTION NO. 17**

5      All DOCUMENTS constituting, evidencing, or pertaining to YOUR policies, procedures, and

6  practices concerning health benefits applicable to employees of the Vancouver and Federal Way

7  branches from November 2003 to the present.

8  **RESPONSE TO REQUEST FOR PRODUCTION NO. 17**

9      Responding parties will comply with this request by producing all responsive documents in

10  responding parties' possession, custody and control.

11  **REQUEST FOR PRODUCTION NO. 18**

12      All DOCUMENTS constituting, evidencing, or pertaining to payment of premiums and any

13  other costs of health benefits for employees of the Vancouver and Federal Way branches from 2004 to

14  the present. This request includes, without limitation, payments made by YOU or by the branches,

15  YOUR accounting and payroll records, and itemized wage statements evidencing deductions from

16  employee wages.

17  **RESPONSE TO REQUEST FOR PRODUCTION NO. 18**

18      Responding parties will comply with this request by producing all responsive documents in

19  responding parties' possession, custody and control.

20  **REQUEST FOR PRODUCTION NO. 19**

21      All DOCUMENTS evidencing, pertaining to, or referring to expenses incurred in operating the

22  Vancouver and Federal Way branches, including, without limitation, invoices or statements received

23  from the branches, requests for payment of expenses, other COMMUNICATIONS, accounting of

24  expenses and related payments, account statements, copies of checks, operations statements, Profit &

25  Loss statements, balance sheets.

26  **RESPONSE TO REQUEST FOR PRODUCTION NO. 19**

27      Responding parties will comply with this request by producing all responsive documents in

28  responding parties' possession, custody and control.

1   **REQUEST FOR PRODUCTION NO. 20**

2      All DOCUMENTS submitted by YOU to HUD, or received by YOU from HUD, RELATING

3   TO the Vancouver or Federal Way branches.

4   **RESPONSE TO REQUEST FOR PRODUCTION NO. 20**

5      After diligent searches and reasonable inquiries, responding party is unable to comply with this

6   request because no such documents exist.

7   **REQUEST FOR PRODUCTION NO. 21**

8      All DOCUMENTS evidencing, referring to, or pertaining to taxes owed and/or paid for

9   the Vancouver and Federal Way branches.

10   **RESPONSE TO REQUEST FOR PRODUCTION NO. 21**

11      Responding parties will comply with this request by producing all responsive documents in

12   responding parties' possession, custody and control.

13   **REQUEST FOR PRODUCTION NO. 22**

14      All complaints (civil, criminal, arbitral, or administrative) or similar DOCUMENTS in which

15   CMG Mortgage, Inc., CMG Mortgage Services, Inc., Pacific Guarantee Mortgage, CMG Financial

16   Services, or any of YOUR affiliates, subsidiaries, or parent entities are named as parties.

17   **RESPONSE TO REQUEST FOR PRODUCTION NO. 22**

18      Objection on the ground that the request seeks information that is not relevant to the dispute and

19   not likely to lead to the further discovery of admissible evidence.  Objection on the ground that the

20   request is overbroad and unduly burdensome and harassing.

21   **REQUEST FOR PRODUCTION NO. 23**

22      All DOCUMENTS RELATING TO any federal (including, but not limited to HUD) or state

23   regulatory compliance issues involving CMG Mortgage Inc., CMG Mortgage Service, Inc., Pacific

24   Guarantee Mortgage, and/or CMG Financial Services, or any of YOUR affiliates, subsidiaries, or parent

25   entities.

26   **RESPONSE TO REQUEST FOR PRODUCTION NO. 23**

27      Objection on the ground that the request seeks information that is not relevant to the dispute and

28   not likely to lead to the further discovery of admissible evidence.  Objection on the ground that the

DEFENDANTS' RESPONSE TO PLAINTIFFS' REQUEST FOR PRODUCTION OF DOCUMENTS C 07 3140 SI

M:\CMG\85-0706-02 Bowman\Discovery\response to f Set 1 - insp dem.wpd

1 | request is overbroad and unduly burdensome and harassing.  Notwithstanding and subject to the

2 | foregoing, responding parties will comply with this request by producing all responsive documents

3 | related to the Vancouver and Federal Way branches.

4 | **REQUEST FOR PRODUCTION NO. 24**

5 | All DOCUMENTS RELATING TO any federal (including, but not limited to HUD) or state

6 | regulatory compliance issues involving CMG Mortgage Inc., CMG Mortgage Service, Inc., Pacific

7 | Guarantee Mortgage, and/or CMG Financial Services, or any of YOUR affiliates, subsidiaries, or parent

8 | entities.

9 | **RESPONSE TO REQUEST FOR PRODUCTION NO. 24**

10 | Objection on the ground that the request seeks information that is not relevant to the dispute and

11 | not likely to lead to the further discovery of admissible evidence.  Objection on the ground that the

12 | request is overbroad and unduly burdensome and harassing.   Notwithstanding and subject to the

13 | foregoing, responding parties will comply with this request by producing all responsive documents

14 | related to the Vancouver and Federal Way branches.

15 | **REQUEST FOR PRODUCTION NO. 25**

16 | All DOCUMENTS sent to or received from YOUR accounting firm(s) RELATING TO

17 | PLAINTIFFS or the Vancouver or Federal Way branches.

18 | **RESPONSE TO REQUEST FOR PRODUCTION NO. 25**

19 | Responding parties will comply with this request by producing all responsive documents in

20 | responding parties' possession, custody and control.

21 |

22 | Date: January 17, 2008                                 MEDLIN & HARGRAVE

A PROFESSIONAL CORPORATION

24 |

25 | By: _____

Joshua A. Rosenthal,

26 | Attorneys for Defendants

27 |

28 |

9

1

## PROOF OF SERVICE BY MAIL

2      I am over the age of eighteen years and not a party to the within action. My business address is

3  One Kaiser Plaza, Suite 1305, Oakland, California 94612, which business is located in the county where

4  the mailing described below took place.

5      I am readily familiar with my employer's business practice for collection and processing of

6  correspondence for mailing with the United States Postal Service. On the date set forth below, at my

7  place of business in Oakland, California, I served the within:

8      **DEFENDANTS' RESPONSE TO PLAINTIFFS' REQUEST FOR PRODUCTION OF DOCUMENTS UNDER RULE 34**

9

10  by placing a true copy thereof enclosed in a sealed envelope, with postage fully prepaid, for collection

11  and mailing with the United States Postal Service where it would be deposited with the United States

12  Postal Service that same day in the ordinary course of business, addressed as follows:

13  Angela M. Xavier                Alan F. Cohen
      Attorney At Law                101 Montgomery Street, Suite 2050

14  900 Cherry Avenue, Suite 300        San Francisco, CA 94104
      San Bruno, CA 94583

15

16      I certify and declare under penalty of perjury under the laws of the State of California that the

17  foregoing is true and correct. Executed on January 17, 2008, at Oakland, California.

18

19                             Xinh Truong

20

21

22

23

24

25

26

27

28

# Exhibit C

L A W   O F F I C E S   O F
# ALAN F. COHEN

101 MONTGOMERY STREET
SUITE 2050
SAN FRANCISCO, CA 94104
TEL: 415.984.1943
FAX: 415.984.1953
cohenlaw@mindspring.com

March 21, 2008

**<u>Via U.S. Mail and email</u>**

Joshua Rosenthal
Medlin & Hargrave, P.C.
One Kaiser Plaza, Suite 1305
Oakland CA 94612

Re:     **Meet and Confer Regarding Defendants' Inadequate Response to Request for Production of Documents**

   *Bowman v. CMG et al.*, **Case No. C 07 3140 SI**

Dear Mr. Rosenthal:

I have reviewed Defendants' responses to Plaintiffs' Request for Production of Documents, Set One, and the documents Defendants have produced to date. The responses and production are inadequate in several respects and must be supplemented in order to comply with Defendants' obligations under the FRCP. I write in an attempt to meet and confer prior to filing motions to compel and for sanctions, in hopes that Defendants will be willing to strike their inappropriate objections and provide fully compliant responses to the written requests, all documents responsive to Plaintiffs' document requests, and a privilege log setting forth all documents that have been withheld.

   Below, I will identify the responses which Plaintiffs deem to be inadequate and the reasons why further responses are required. Should Defendants fail to respond appropriately to these discovery requests, Plaintiffs will have no choice but to file a motion to compel further responses, and for sanctions to compensate them for the costs stemming from Defendants' misuse of the discovery process.

   Please respond to this letter by **March 28, 2008** with specific commitments to address each of the infirmities identified below by a date certain within three weeks from the date of this letter. If we have not received a response by March 28, we will be forced to assume that Defendants have no interest in informally resolving these disputes and will proceed accordingly.

A.     **Defendants' Improper Objections**

   1.     **Request for Production No. 11**

   This request sought charts, diagrams, etc. showing the organization and/or management structure for CMG Financial Services, CMG Mortgage, Inc. and CMG Mortgage Services, Inc. from November 2003 to the present. Defendants objected to the

request on three grounds:  1) not likely to lead to the discovery of admissible evidence; 2) overbroad and unduly burdensome and harassing; 3) unduly invasive of responding parties' privacy.  None of these objections has merit.  Moreover, we now know that such charts exist because Mr. Chevez testified to their existence.

Plaintiffs have sued several CMG entities under their own corporate names, as well as "d/b/a" names under which CMG does business.  Plaintiff is entitled to know the relationship between these entities, to determine which one(s) are liable, whether they are indeed separate entities, whether there are corporate alter egos involved, the entities' ownership and management structure, which individuals or entities would be "managing agents" for the purposes of seeking punitive damages, which witnesses and evidence should be sought in discovery or to appear at trial, etc.  Defendants' objection is baseless and obstructionist and must be withdrawn.

Second, Defendants' objection for overbreadth is likewise improper for the same reasons noted above:  if the request is within the scope of discovery, it cannot be overbroad.  Even if it the request were overbroad, Defendants should produce those documents which are properly the subject matter of discovery and state with specificity how the remainder are outside the scope.  Nor have Defendants made any showing that responding with a few charts or diagrams could be "unduly burdensome and harassing."

Finally, the request does not implicate any right of privacy, and Defendants' bare objection, unsupported by either fact or legal rationale, does not provide a basis for withholding plainly discoverable documents.

## 2.    Request for Production No. 13

This request sought articles of incorporation and bylaws for three CMG entities. Defendants interposed the same objections addressed above as to Request No. 11, and those objections fail for the same reasons.  Plaintiffs are entitled to determine whether they have sued the appropriate entities and the relationships between those entities.  *See, e.g., Chambers v. Capital Cities/ABC,* 154 F.R.D. 63 (S.D.N.Y.1994) (in employment case, defendants required to respond to discovery requests dealing with parent company as well as with subsidiary which was plaintiff's direct employer; if particular requests were in fact burdensome in specific ways and resulting dispute could not be resolved between counsel, relief could be requested from magistrate judge).

Plaintiffs are also entitled to the corporations' bylaws on numerous grounds:  to determine which individuals or aspects of the corporations were responsible for particular functions; to determine who had authority for corporate acts, including entering into (and performing under) contracts in the corporation's name; the number of directors, tenure, and qualifications; the titles of corporate officers; the fiscal year of the corporation; rules on the approval of contracts and payments; whether the corporations abided by corporate formalities or otherwise stand for more than the alter ego of another entity or person; etc.  These are standard items sought in discovery and there is no legitimate basis for withholding either the articles or the bylaws.

## 3.    Request for Production No. 22

This request sought documents relating to complaints (civil, criminal, arbitral, or

administrative) in which CMG and related entities were parties.  Defendants objected to the request *in toto*.  Defendants have not produced a privilege log that would support its objection that the request is overbroad and unduly burdensome and harassing.  Please do so.  Plaintiffs note that the objection that request is burdensome is valid only when that burden is so great that the responding party can demonstrate that injustice will result.  *West Pico Furniture Co. v. Superior Ct.* (1961) 56 Cal. 2d 407, 418.

The request is well within the scope of discovery in that the parties or attorneys of parties in such other actions may have information likely to lead to the discovery of admissible evidence in this matter.  It also may be the case that CMG may have litigated issues to conclusion that are present in this case, in which event Defendants may be collaterally estopped from relitigating those issues in the instant action.  Defendants have not articulated any cognizable basis for withholding this information.

4.      **Request for Production No. 23**

This request sought documents relating to regulatory compliance issues involving Defendants and/or affiliated entities.  Again, Defendants objected on the grounds that the request was not likely to lead to the discovery of admissible evidence and was overbroad, unduly burdensome and harassing.  Again, the scope of discovery is much broader that Defendants seem to believe; the legality of Defendants' net branch arrangement with Plaintiffs is governed in part by HUD regulations, and Defendants' witness, Paul Chevez, repeatedly referred to CMG's compliance department when asked who would have the most knowledge about topics relevant to the pleadings.  Again, Defendants have made no showing – either by stating facts, legal rationale, or providing a privilege log – that would demonstrate that responding to this request would be unduly burdensome or harassing.

5.      **Defendants' responses that it will produce "responsive" documents**

As to the remaining requests, Defendants stated that they will produce "responsive" documents.  This answer is noncompliant because it does not serve to give notice to Plaintiffs as to whether responsive documents exist, or which documents Plaintiff asserts are "responsive."  The Federal Rules are very clear that a more definite response is required:  "The response shall state, **with respect to each item or category**, that inspection and related activities **will** be permitted as requested, unless the request is objected to"  FRCP 34(b) (emphasis added).  The very response given by Defendants is singled out by the leading treatise as inadequate:

> Ambiguous responses are a common source of discovery disputes. *E.g.,*
> agreeing to produce 'responsive documents' creates an ambiguity as to
> whether some documents are being withheld on the basis of objections.
> Avoid the problem by either agreeing to produce 'all documents
> requested in the demand' or specifying the particular documents and
> records that will be produced.

Schwarzer, Tashima, Wagstaffe, *California Practice Guide: Federal Civil Procedure Before Trial* (Rutter 2007) § 11:1912.1 ("Rutter").  Defendants' obligation is simple:  they must state that they will either produce all documents requested, state that they cannot comply because a diligent search and reasonable inquiry reveal that they have no responsive documents within their possession, custody or control, or state that they

object to the request.  As noted below, if the request is objectionable, Defendants are still required to identify responsive documents in a privilege log.

Accordingly, Defendants must amend their response to give a definite answer to each request as whether or not they will produce the requested documents.

**B.    Defendants' Failure to Produce Responsive Documents**

Despite a promise to comply, Defendants have not produced numerous documents in response to the following requests.  These include the following:

**1.    Request for Production Nos. 6 and 7**

Defendants have not produced any documents showing how they accounted for, invested, applied, or otherwise handled the reserves taken from Mr. Bowman.  For that matter, we have not received any documents that relate in any way to those reserves, including those that might shed light on the nature of the reserve/security deposit requirements or the reasons (stated or otherwise) those reserves were required. Defendants must produce all accounting records, bank statements, and <u>all</u> other records relating to these funds.  It is not a defense to production to now argue that some documents relating to these funds might otherwise be private; since Defendants did not object to the requests on the grounds of privacy (or any other grounds) they have waived any such objections.[1]

**2.    Request for Production Nos. 8 and 9**

Defendants did not produce any documents showing that they paid expenses of the Vancouver and Federal Way branches.  We did not receive any bank or accounting records, nor any checks or check registers, that demonstrate any payments made for expenses.  If the only such records that exist are the copies of checks issued to Jim Bowman labeled as Facilities, please inform us of that fact.

Regarding Request No. 9, we have not received any documents evidencing any performance by Defendants under the Facilities Agreement.  Again, if Defendants did not perform any obligations under these agreements, please so state.  If I am mistaken on this point, please either produce additional documents or inform me of how the documents you have produced to date demonstrate performance.

**3.    Request for Production No. 15**

Defendants have not produced any documents relating to their marketing credits incentive program.  You have not produced documents evidencing how the program worked, what policies and procedures governed its function, how Mr. Bowman's credits under the program were administered, calculated, and accounted for, which individuals were responsible for which functions, etc.

**4.    Request for Production No. 17**

Defendants have not produced any documents relating to the subject matter of this request: "documents constituting, evidencing, or pertaining to your policies,

---

[1] Since Mr. Chevez testified that all reserves were commingled with CMG operating funds and "warehouse" accounts, <u>all records relating to these accounts must be produced</u>.

procedures and practices concerning health benefits." It was not a sufficient response to produce a list of employee with benefits. You are required to respond to the request as written.

5.    **Request for Production No. 18**

CMG produced copies of payroll records and statements of operations that are responsive to this request. However, we have not received any documents evidencing payments of premiums or the costs of health or other benefits. Please provide all correspondence, accounting, and other documents maintained by CMG and/or exchanged with the benefit provider(s) and plan administrators. If CMG is the plan administrator, please provide all documents in your possession, custody, or control relating to the health benefits provided to Branch employees from 2004 to the present.

C.    **Documents Revealed by Mr. Chevez at Deposition**

At his deposition, Mr. Chevez revealed the existence of numerous responsive documents that have not been produced. Defendants have an ongoing obligation to supplement or correct their production with any responsive documents. Fed. R. Civ. Proc. 26(e) (duty to supplement or correct prior disclosures or discovery responses arises "if the party learns that in some material respect the disclosure or response is incomplete or incorrect.").

Among other things, Mr. Chevez revealed the existence of email correspondence between himself and Debbie Peterson regarding "legal issues" arising out of Mr. Bowmans' branches; Datatrack entries regarding loans which have been subject to repurchase requests, including notes entered into those entries by Defendants' employees suggesting fraud; documents reflecting negotiations over whether and how much to pay investors in response to such repurchase requests; and bank statements and other records from CMG's GMAC and Wells Fargo accounts reflecting Mr. Bowmans' security deposits/reserves (as well as Wells Fargo's predecessors and other relevant accounts). All of these must be produced.

D.    **Privilege Log**

We have not received a privilege log describing with particularity those documents otherwise responsive to Plaintiffs' requests but withheld on the basis of privilege or objection. Please produce a privilege log within the timeframe set forth below for production of an amended response and additional documents.

**Conclusion**

Defendants' production and response to Plaintiffs' requests are seriously noncompliant. To avoid a motion to compel further responses, production of documents, and for sanctions, Defendants must respond to this letter by March 28 with a promise to bring each of the above infirmities into compliance by a date certain within three weeks of this letter. This includes producing all responsive documents at this address by no later than such date.

In the interests of saving you resources and making this process easier for Defendants, you may produce these documents in .pdf form if you wish, burned onto

Re: *Bowman v. CMG et al.*
March 21, 2008
Page 6

CD-ROM(s), so long as they are capable of viewing via Adobe Acrobat.

      I see no reason for bringing discovery disputes to the Court if they can be avoided by reasonable counsel, but Plaintiffs will not shy from such disputes and will promptly file the appropriate motions and seek sanctions if Defendants will not voluntarily comply with their discovery obligations.

      I look forward to your prompt reply.

Sincerely,

Alan F. Cohen

**Exhibit D**



MEDLIN &
HARGRAVE
A PROFESSIONAL CORPORATION

JOSHUA A. ROSENTHAL
*jrosenthal@mhlawcorp.com*

April 3, 2008

*Via Facsimile & U.S. Mail*

Alan F. Cohen
101 Montgomery Street, Suite 2050
San Francisco, CA 94104

  Re: *Pacific Real Estate Man. Company, Inc. et al. v. CMG Mortgage, Inc. et al.*
    *U.S. District Court, Northern District of California*
    *Case No.: C07-3140 MEJ*

Dear Mr. Cohen:

  This letter is in response to your meet and confer letter of March 21, 2008. I will respond point by point to your letter.

Request 11.

  As you know, corporations have a right to privacy. Roberts v Gulf Oil Corp. (1983) 147 Cal. App. 3d 770, 796. This right to privacy is to be balanced with the need for the document sought in discovery. Davis v. Superior Court (1992) 7 Cal. App. 4th 1008, 1014. There is no need for the documents requested. There are no alter ego allegations. CMG will stipulate that all of the entities sued are the entities liable to plaintiffs, if any liability there is. There is no reason that plaintiffs need discovery regarding all of CMG's business structure for purposes of this accounting action.

Request 13

  In light of this lawsuit, there is no conceivable need for the corporate by-laws of CMG. Defendants will stipulate that plaintiff has named all conceivable corporate entities that could be liable to your clients, if any liability exists. For the reasons stated in the objection and stated in the response to Request 11, the by-laws will not be produced. We have produced the articles of incorporation of CMG Mortgage, Inc. which is the entity that contracted with your clients. We have located the articles of incorporation for CMG Financial Services, Inc. and CMG Mortgage Services, Inc. and are producing them.

**MEDLIN & HARGRAVE**
*A Professional Corporation*

---

Alan Cohen
Re: *Pacific Real Estate Management Company, Inc. et al v. CMG Mortgage, Inc. et al.*
April 3, 2008
Page 2

Request 22

This demand seeks every lawsuit or administrative complaint against CMG without any limitation to subject matter or time period. Thus, it seeks information that could not conceivably be relevant to the subject matter of this lawsuit. CMG does business in many states. A foreclosure lawsuit in Georgia, for example, in which CMG made the loan and then sold it 5 years ago, was named as a defendant because it appears on title but has no interest in the loan would be a responsive document to this overbroad request. However, it would not be relevant to this dispute. Further, the burden of having to sift through years worth of documents to find all of these irrelevant documents outweighs any utility they may have. Columbia Broadcasting System, Inc. v. Superior Court (1968) 263 Cal. App. 2d 12, 19. Finally, it is harassing for plaintiffs to seek documents from CMG that exist in the public record. It is just as easy for plaintiffs to obtain these documents. Calcor Space Facility, Inc. v. Superior Court (1997) 53 Cal. App. 4th 216, 225.

Request 23

For the same reasons listed in the response to Request 22, this request is overbroad and seeks irrelevant information. First of all, this is essentially an accounting/failure to pay wages claim. Thus, a blanket request for documents related to regulatory "issues" (whatever that may mean) without any limitation as to time and subject matter seeks completely irrelevant information. A regulatory "issue" could include a letter of inquiry from an investigator in Illinois about a failure to pay the proper amount for a corporate filing from 7 years ago, for example. This would be responsive to the overbroad request yet completely irrelevant. It would also take a tremendous amount of time and energy to obtain all of these documents over the many years CMG has done business. The utility of all documents related to all regulatory "issues" is non existent, in light of the nature of this claim. It is clearly just a harassing request in an attempt to dig up dirt on CMG.

Form of Response

The documents that CMG provided are all documents in its possession, custody or control that are responsive to the individual requests. The response spells that out. CMG will not be amending its answers. However, by this letter, I am providing the unnecessary clarification that you are requesting.

**MEDLIN & HARGRAVE**
*A Professional Corporation*

―――――――――――――

Alan Cohen
Re: *Pacific Real Estate Management Company, Inc. et al v. CMG Mortgage, Inc. et al.*
April 3, 2008
Page 3

Allegation Regarding Not Full Compliance With Responses

You claim that the documents provided by defendants are not all responsive documents to the requests.

Request 6 seeks documents referring to reserves that Bowman was required to maintain. In addition to other documents that refer to the reserves, the accountings provided demonstrate the reserve requirement and how it changed over time. The request does not seek bank account records related to where the actual funds may have been deposited or may currently reside.

Request 7 seeks all documents related to the security deposit received by Bowman. That also does not seek or include private CMG bank account information. The documents provided were responsive - namely the accountings that indicated how the security deposit/reserves changed over time.

If you are seeking CMG general bank account information, these requests do not specifically seek it. You can propound a separate request specifically asking for that information and CMG will object to that specific request. However, these requests do not seek that information.

Requests 8 & 9

CMG produced documents responsive to your request, as you acknowledged. CMG does not have to further attest to the sufficiency of the response. Additionally, CMG does not, in an inspection demand response or a meet and confer response, have to explain how accounting records and reimbursement checks demonstrate how CMG has complied with its obligations under the facilities agreements.

Request 15

CMG has complied with this request. Please see CMG001437-001440, in addition to other documents that address the allocation of said credits.

Requests 17 & 18

CMG is in the process of gathering additional responsive documents.

**MEDLIN & HARGRAVE**
*A Professional Corporation*

---

Alan Cohen
Re: *Pacific Real Estate Management Company, Inc. et al v. CMG Mortgage, Inc. et al.*
April 3, 2008
Page 4

      Privilege Log

      CMG has not objected to any discovery on any privilege ground.   CMG has objected on the basis of its right to privacy, which is not technically a privilege.  However, in the interest of compromise and because it does not involve much effort, CMG will provide a privilege log of the few documents that it has withheld on the basis of privacy.  Those documents are the by-laws of the corporations and the organizational charts.  The privilege log will include general identifying information about those documents.  However, the reason for not producing them is that stated in the objections - that CMG's right to privacy outweighs any possible relevance these documents could have.  Before you go any further with attempting to compel production of these documents I would recommend you complete the deposition of Chris George and see if he provides you with the information you are looking for.

      Documents Referred to at Paul Chevez's Deposition

      After further review, Mr. Chevez was able to locate additional documents that were mentioned at his deposition and which will be produced.

      With this letter, defendants are producing Bates Stamp Nos. 002224-02237.  If you have any questions, please do not hesitate to contact me.

                Sincerely,

                Joshua A. Rosenthal

JAR:xt
cohen.05.jar.wpd

cc:    Angela Xavier
        Client

# Exhibit E

**U.S. DEPARTMENT OF HOUSING AND URBAN DEVELOPMENT**
WASHINGTON, D.C. 20410-8000

May 1, 2000

OFFICE OF THE ASSISTANT SECRETARY
FOR HOUSING-FEDERAL HOUSING COMMISSIONER

Mortgagee Letter 00-15

To:     ALL APPROVED MORTGAGEES

Subject:     Prohibited Branch Arrangements

It has come to the Department's attention that some HUD/FHA approved mortgagees are engaging in prohibited types of "branch office" arrangements. There have been growing numbers of arrangements referred to as "net branches." Some of these are allowable and some are not. This reflects the fact that the industry does not have a universal definition for the term "net branch." Accordingly, this letter provides further guidance and clarification regarding the Department's requirements for branch offices of HUD/FHA approved mortgagees.

The Department has learned that some HUD/FHA approved mortgagees are engaged in the practice of taking on an existing, separate mortgage company or broker as a branch and allowing that separate entity to originate insured mortgages under the approved mortgagee's HUD Mortgagee Number. Some mortgagees refer to this arrangement as a "net branch." This, however, constitutes a prohibited net branch arrangement. The Department has also noted advertisements in trade publications touting such prohibited "net branching" arrangements as a way for independent brokers to originate FHA mortgages without meeting HUD's application and asset requirements.

Paragraph 1-2 of the Mortgagee Approval Handbook 4060.1 Rev-1 specifies that HUD/FHA insured mortgages may only be originated, serviced, purchased, held, or sold by mortgagees that have been approved by HUD/FHA. Approved mortgagees are permitted to conduct such activities from branch offices. However, separate entities may not operate as "branches" of a HUD/FHA approved mortgagee and if the separate entity lacks HUD/FHA approval, its mortgages constitute third party originations which violate Departmental requirements. If the separate entity was purchased and merged into the approved mortgagee in compliance with applicable state law(s), the approved mortgagee must provide a copy of the merger documents and state license(s) to HUD's Lender Approval and Recertification Division, 451 Seventh Street SW, Room B133-P3214, Washington, DC 20410.

In contrast to the arrangements described above, another common example of a net branch arrangement is one wherein the branch manager's compensation is based upon the "net" profit of the branch. The HUD/FHA approved mortgagee collects the revenue from the branch, pays the branch expenses, and then pays the branch manager the remaining revenues, if any, as a commission. Such an arrangement is, essentially, an alternative compensation program for the branch manager and is an acceptable branch arrangement if all other branch requirements are met.

2

Paragraph 2-17 of the Mortgagee Approval Handbook 4060.1 Rev-1 requires a HUD/FHA approved mortgagee to pay all of its operating expenses including the compensation of all employees of its main and branch offices. Other operating expenses that must be paid by the HUD/FHA approved mortgagee include, but are not limited to, equipment, furniture, office rent, and other similar expenses incurred in operating a mortgage lending business. Thus, the distinction between an acceptable and unacceptable alternative branch compensation plan is not whether the manager's or any other employee's compensation is related to the profits generated by the branch. Rather, it is whether the operating expenses are paid by the HUD/FHA approved mortgagee. If the expenses are paid by the HUD/FHA approved mortgagee, the arrangement is acceptable. If, however, the expenses are paid by the branch manager from a personal or non-mortgagee account (or by some third party), the arrangement is prohibited and a true branch does not exist.

As part of on-site mortgagee monitoring reviews, the Department has obtained "employment" agreements executed by HUD/FHA approved mortgagees and their "net branches." A number of the provisions in these agreements violate Departmental branch requirements. For example, there are provisions that:

o    require all contractual relationships with vendors such as leases, telephones, utilities, and advertising to be in the name of the "employee" (branch) and not in the name of the HUD/FHA approved mortgagee.

o    require the "employee" (branch) to indemnify the HUD/FHA approved mortgagee if it incurs damages from any apparent, express, or implied agency representation by or through the "employee's" (branch's) actions.

o    require the "employee" (branch) to issue a personal check to cover operating expenses if funds are not available from an operating account.

These provisions violate Paragraphs 1-2, 2-13, 2-17, and 3-2B of the Mortgagee Approval Handbook 4060.1 Rev-1. Taken as a whole, such provisions seem designed to maintain a clear separation between the HUD/FHA approved mortgagees and their so-called "branches," which is inconsistent with the close supervisory control over all employees mandated by the handbook.

The Department believes that the origination of insured mortgages by lenders that have not received HUD/FHA approval increases the risk to the FHA insurance funds and to the public. Accordingly, mortgagees found to be in violation may be subject to the full range of HUD sanctions.

Sincerely,


William C. Apgar
Assistant Secretary for Housing-
    Federal Housing Commissioner

# Exhibit F

MAR-27-2006 MON 12:41 PM Pacific Guarantee Mrtg.          FAX NO. 5109707930          P. 01

Case 3:07-cv-03140-SI   Document 32   Filed 06/20/2008   Page 2 of 13

#455

## BRANCH MANAGEMENT AND EMPLOYMENT AGREEMENT

This Branch Management and Employment Agreement (hereinafter referred to as "Agreement") is entered into as of the Effective Date, as that term is defined herein, by and between CMG Mortgage, Inc., a California corporation doing business as Pacific Guarantee Mortgage (hereinafter referred to as "PGM"), and Jim Bowman (hereinafter referred to as "Branch Manager").

## RECITALS

WHEREAS PGM and Branch Manager desire to reduce to writing their understanding and agreement pursuant to which Branch Manager will assist PGM in the management, administration and supervision of activities of its staff and employees, and the activities of all unlicensed assistants and support personnel, at PGM's branch office located at 2505 South 320th Street, Suite 260 Federal Way, WA 98003 ("Branch Office"); and,

WHEREAS PGM and Branch Manager also desire to reduce to writing the terms and conditions of Branch Manager's employment with PGM;

In consideration of the covenants, agreements and representations contained herein, PGM and Branch Manager agree as follows:

1.     **PGM.** PGM represents that PGM is duly licensed by all applicable governmental authorities and is doing business as a mortgage broker under the name Pacific Guarantee Mortgage. Concurrently with the execution of this Agreement, PGM will obtain the necessary branch license for the Branch Office.

2.     **Employment at Will.** PGM employs Branch Manager and Branch Manager accepts employment with PGM as branch manager of PGM's Branch Office. Either PGM or Branch Manager may terminate this Agreement in accordance with the provisions of paragraph 19 herein, or with or without cause, at any time on thirty (30) days notice to the other pursuant to the notice provisions of paragraph 12 herein. The rights and duties set forth in this paragraph may not be modified in any way except pursuant to the terms of paragraph 21 (e) herein.

3.     **Licensed Status.** Branch Manager represents that he/she holds all such licenses as required by state and/or federal law to conduct mortgage brokerage activity at PGM's Branch Office, and that he/she has a minimum of three (3) years of full time experience in mortgage brokerage activity gained during the immediately preceding five (5) year period. Branch Manager further represents that while this Agreement is in effect he/she will maintain in good standing each and every such license.

4.     **Devotion to PGM's Business.** During the term of this Agreement, all of Branch Manager's time and attention dedicated to mortgage loan brokerage and/or origination, shall be devoted solely to the business of PGM at the Branch Office. During the term of this Agreement, Branch Manager shall not engage in any other business duties or pursuits whatsoever, or directly or indirectly render any services of a business, commercial or professional nature to any other person or organization, whether for compensation or otherwise, without the prior written consent

Page 1 of 12

MAR-27-2006 MON 12:41 PM Pacific Guarantee Mrtg.    FAX NO. 5109707930    P. 02

Case 3:07-cv-03140-SI   Document 48-2   Filed 06/20/2008   Page 43 of 71

of PGM. During the term of this Agreement, Branch Manager shall not, directly or indirectly, either as an employee, employer, consultant, agent, principal, partner, stockholder, corporate officer, director, or in any other individual or representative capacity, engage or participate in any business that is in competition in any manner whatsoever with the business of PGM

    **5.**    **Duties of Branch Manager.** Branch Manager shall do and perform all services, acts, or things necessary or advisable to fulfill his/her duties as such, subject to the direction of PGM and to the policies established by it. Pursuant thereto, PGM and Branch Manager intend for Branch Manager to assist PGM in administering reasonable supervision over the activities of all licensed activity at Branch Office, and over the activities of unlicensed assistants and support personnel, assigned to PGM's Branch Office. "Reasonable supervision" includes, as appropriate, the establishment of policies, rules, procedures and systems to review, oversee, inspect and manage:

    a)    transactions requiring a license;

    b)    documents which may have a material effect upon the rights or obligations of a party to every such transaction;

    c)    filing, storage and maintenance of all documents created in connection with every such transaction;

    d)    the handling of trust funds, (Branch Manager agrees not to establish or use a trust account unless approved by PGM, in advance, and in writing);

    e)    advertising of any service for which a license is required, (Branch Manager agrees that all advertising material must be approved by PGM, in advance, and in writing);

    f)    familiarizing licensed employees, and unlicensed assistants and support personnel, with the requirements of federal and state laws relating to the prohibition of discrimination;

    g)    familiarizing licensed employees with the requirements of federal and state laws relating to disclosures to be given in connection with mortgage loan transactions;

    h)    regular and consistent reports of licensed activities of all employees;

    i)    ensuring that in every transaction Branch Manager, and every employee associate involved in each such transaction, honors all affirmative obligations owed to each client, as required by federal law, state law and/or ethical practices, including but not limited to: the duty of utmost *care, integrity, honesty and loyalty*; the duty to disclose all material loan terms or any other material facts that may affect the decision to borrow and to encumber real property; the duty to maintain *confidentiality*, except to the extent that information must be disclosed to a potential lender in order to permit the lender to make an informed and considered

MAR-27-2006 MON 12:41 PM Pacific Guarantee Mrtg.          FAX NO. 5109707930          P. 03

Case 3:07-cv-03140-SI   Document 48-2   Filed 06/20/2008   Page 44 of 71

decision to extend credit; and the duty to recommend a *competitive* loan product in the right class of loans (e.g., "A", "A-", "B", "C", etc.) when considering the borrower's income and credit history, financial standing and net worth (including the capacity to repay the loan), personal and financial needs, the loan terms requested at the time of application, the type and location of the proposed real property security, the purpose for obtaining the loan, and any time limits the borrower has imposed to receive the loan in question;

j)      assist in ensuring that all independent contractors serving the Branch Office are properly licensed by any applicable state licensing authority and in good standing throughout the duration of their employment (including such things as timely payment of annual licensing fees and assessments and compliance with continuing education requirements);

k)      assist in ensuring that Branch Office and its employees function in compliance with all applicable state and federal employment laws including, but not limited to the Federal Fair Labor Standards Act.

Additionally, subject to PGM policies and procedures, Branch Manager shall be responsible for the general management of the Branch Office, consistent with the intent of this Agreement and sound business practices, including but not limited to:

a)      recruiting of employees and support staff;

b)      creation, maintenance and monitoring of relationships with suppliers, vendors, lenders, real estate agents and other settlement service providers to ensure courtesy, efficient, legal and ethical conduct of business;

c)      accurate reporting to PGM, in such form and such manner as PGM may require, of all mortgage loan transactions and related financial information as necessary to carry out the terms and covenants of this Agreement;

d)      maintenance of any and all records and other data at the Branch Office for such periods and in such manner as state and/or federal law may require;

e)      locating, securing and arranging for the lease of Branch Facilities as necessary to conduct the business of the Branch Office;

f)      maintenance of all mortgage loan files originated by Branch Office (whether closed, cancelled, withdrawn or denied) on site, or as PGM may otherwise approve, in writing, for such period of time as required by state and/or federal law. All mortgage loan files are to be delivered to PGM upon termination of this Agreement; and,

g)      primary responsibility to ensure that all employees of Branch Office are covered under the scope of all applicable state licensing requirements for loan originators

MAR-27-2006 MON 12:42 PM Pacific Guarantee Mrtg.     FAX NO. 5109707930          P. 04

Case 3:07-cv-03140-SI     Document 46-2     Filed 08/22/2007     Page 5 of 13 71

and are duly licensed and in good standing throughout the duration of their employment (including such things as timely payment of annual licensing fees and assessments and compliance with continuing education requirements).

      6.    **Duties of PGM.** PGM shall assume responsibility for all accounting and the disbursement of all funds for the operation of the Branch Office. PGM shall forward to Branch Manager a monthly statement of income and expenses of the Branch Office, determined in accordance with the provisions of paragraph 9 below. In addition, PGM shall have those other and further duties and responsibilities set forth on Schedule A attached hereto and incorporated herein. The parties understand and agree that said schedule is subject to amendment by PGM by notice given in accordance with the provisions of paragraph 11 below. Any such amendment shall become a part of this Agreement thirty (30) days after notice.

      7.    **Compliance with Laws, Regulations and Policies.** PGM and Branch Manager each acknowledge that state and federal law impose certain obligations on PGM with regard to the supervision, employment and compensation of any person who acts on behalf of PGM in furtherance of licensed activity. PGM shall review and supervise the activities of Branch Manager as required by law, and as more particularly set forth above. Branch Manager shall assist PGM in carrying out its supervisory obligations. However, this Agreement shall not be construed as, and is not intended as, PGM's relinquishment of overall responsibility for the supervision of the acts of salesperson associates licensed to PGM. Branch Manager agrees to comply with all federal, state and local laws, rules, regulations, policies and procedures to which PGM and/or Branch Manager are subject as a result of engaging in mortgage brokerage activity, including without limitation, those of HUD and guidelines of Fannie Mae, Freddie Mac and other investors. Branch Manager agrees to provide to borrowers and potential borrowers such disclosures, in such form and in such manner as PGM, in its sole discretion, shall require from time to time. The parties understand and agree that changes in federal, state and/or local laws, rules, regulations, policies and procedures may necessitate, in PGM's sole discretion, future amendment of this Agreement in order to maintain full compliance. Accordingly, such amendments may be made by notice given in accordance with the provisions of paragraph 11 below. Any such amendment shall become a part of this Agreement thirty (30) days after notice.

      8.    **Errors and Omissions Insurance.** PGM shall obtain and keep in place professional liability insurance in such amounts and subject to such deductibles, endorsements, exceptions and exclusions as PGM, in its sole discretion, shall deem appropriate. The proportionate costs of such insurance attributable to PGM's Branch Office shall be considered an expense of operations in the calculation of Net Profits, as that term is defined herein.

      9.    **Compensation.** As compensation for the services to be rendered by Branch Manager hereunder, PGM shall pay Branch Manager one hundred percent (100%) of all Net Profits realized from the operation of the Branch Office. The term "Net Profits," as used herein, shall mean Net Income from operations after Expenses but before taxes, in conformity with mortgage industry accounting practices, all as determined according to sound accounting principles. Net Income shall be determined by deducting Expenses from Gross Income. The term "Gross Income" shall mean all income earned and derived from the Branch Office. The

MAR-27-2006 MON 12:42 PM Pacific Guarantee Mrtg.     FAX NO: 5109707930          P. 05

Case 3:07-cv-03140-SI   Document 43-2   Filed 06/20/2008   Page 46 of 71

term "Expenses" shall mean all operating expenses of the Branch Office, including those items of Expense identified elsewhere in this Agreement and including but not limited to the following:

    a)    rent, copiers, office supplies, telephone service and utilities;

    b)    commissions, salaries, payroll costs and expenses, and benefits of all employees and loan agents, including but not limited to commissions paid to Branch Manager in his/her capacity as a loan agent;

    c)    all costs incurred by PGM in connection with the repurchase, by reason of fraud, of any loans originated by the Branch Office. Such costs may include, without limitation, disputes or settlements involving demands to repurchase loans;

    d)    loss or costs, including reasonable attorneys' fees arising out of suits, actions, audits, foreclosures, or legal proceedings of any nature, arising out of the activities or operations of the Branch Office;

    e)    all costs incurred by PGM in connection with Early Pay-offs or Early Payment Defaults, by reason of fraud, of any loans originated by the Branch Office;

    f)    all costs (including up-front fees) to lock and/or extend locked loans; and,

    g)    monthly shortages resulting from, but not limited to, non-collection of fees paid for credit reports, appraisals, etc.

Additionally, as set forth in Schedule B, which schedule is incorporated herein, there shall be other fees and expenses associated with Branch Office loan activity which shall be treated as Expenses. The parties understand and agree that Schedule B is subject to amendment by PGM by notice given in accordance with the provisions of paragraph 11 below. Any such amendment shall become a part of this Agreement thirty (30) days after notice.

Net Profits for any one month shall be paid to Branch Manager, or Branch Manager's designee, on the 30th day following the last day of that month. All such payments to Branch Manager shall be considered an Expense of the Branch Office.

    **10.**    **No solicitation.** After termination of this Agreement, Branch Manager shall not solicit PGM's prospective or existing clients or customers based upon PGM-generated leads obtained during the term of this Agreement, nor may he/she solicit any client or customer with existing contractual obligations to PGM. Furthermore, after termination of this Agreement, Branch Manager shall not solicit Branch Office personnel in accordance with paragraph 21(v) of this Agreement.

Nothing contained in this paragraph is intended to preclude Branch Manager from purchasing and/or developing, at his/her own cost and expense, customer lists which shall be considered the separate property of Branch Manager and not subject to the provisions of this paragraph 10.

**11.    Notices.** Any notice required or permitted under this Agreement shall be in writing, delivered to the party at the address set forth for such party below, and shall be deemed effectively delivered upon (i) personal delivery, (ii) one (1) day after deposit for overnight delivery with Federal Express or a comparable national express courier, or (iii) two (2) days after deposit in the United States mail, by first-class mail, postage prepaid. Notices shall be delivered to the parties at the following addresses:

*If to PGM:*

Christopher M. George
Pacific Guarantee Mortgage
c/o CMG Mortgage Services, Inc.
3160 Crow Canyon Road, Suite 350
San Ramon, CA 94583

*If to Branch Manager:*

Jim Bowman
Pacific Guarantee Mortgage
2505 South 320th Street, Suite 260
Federal Way, WA 98003

A party may designate another address for notice purposes upon written notice thereof pursuant to the provisions of this paragraph.

**12.    Indemnity.**

a) Branch Manager shall indemnify, defend, and hold PGM, its officers, directors, shareholders and affiliates, and their respective successors and assigns, harmless from and against any and all liability, claims, losses, costs, expenses, penalties, fines, forfeitures, judgments, or damages, including reasonable attorneys' fees and court costs, arising out of or in connection with any fraud or willful misconduct of Branch Manager.

b) PGM shall indemnify Branch Manager for all that Branch Manager loses in direct consequence of the discharge of his/her duties as such, or which result from his/her obedience to the directions of PGM, even though unlawful, unless Branch Manager, at the time of obeying such directions believed them to be unlawful. However, this paragraph shall not, in any respect, release or exempt Branch Manager from his/her duties under paragraph 7 of this Agreement, nor from his/her independent obligation(s) pursuant to his/her status as a licensed real estate broker/salesperson.

**13.    Mandatory Negotiation, Mediation and Arbitration.** The parties will attempt in good faith to resolve through negotiation any dispute, claim or controversy arising out of or relating to this Agreement. Either party may initiate negotiations by providing written notice in letter form to the other party, in accordance with the provisions of paragraph 11 above. Such notice shall set forth the subject of the dispute and the relief requested. The recipient of such notice will respond in writing within five days with a statement of its position on and recommended solution to the dispute. If the dispute is not resolved by this exchange of correspondence, the representatives of each party with full settlement authority will meet at a mutually agreeable time and place within ten days of the date of the initial notice in order to exchange relevant information and perspectives, and to attempt to resolve the dispute. If the

MAR-27-2006 MON 12:42 PM Pacific Guarantee Mrtg.          FAX NO. 5109707930                P. 07

Case 3:07-cv-03140-SI   Document 4832   Filed 08/22/2008   Page 48 of 71

dispute is not resolved by these negotiations, the matter will be submitted to JAMS, or its successor, for mediation in accordance with the terms of this paragraph 13.

Either party may commence mediation by providing to JAMS and the other party a written request for mediation, pursuant to the provisions of paragraph 11 above. Such request shall set forth the subject of the dispute and the relief requested. The parties will cooperate with JAMS and with one another in selecting a mediator from JAMS' panel of neutrals, and in scheduling the mediation proceedings. The parties covenant that they will participate in the mediation in good faith, and that they will share equally in its costs. All offers, promises, conduct and statements, whether oral or written, made in the course of the mediation by any of the parties, their agents, employees, experts and attorneys, and by the mediator or any JAMS employees, are confidential, privileged, and inadmissible for any purpose, including impeachment, in any arbitration or other proceeding involving the parties, provided that evidence that is otherwise admissible or discoverable shall not be rendered inadmissible or non-discoverable as a result of its use in the mediation.

Either party may initiate arbitration in accordance with this paragraph 13 by filing a written demand for arbitration at any time following the initial mediation session or 45 days after the date of filing the written request for mediation, whichever occurs first. The mediation may continue after the commencement of arbitration if the parties so desire. Unless otherwise agreed by the parties, the mediator shall be disqualified from serving as arbitrator in the case. It is the intent of the parties to this Agreement that any and every dispute, claim or controversy arising out of or relating to this Agreement or the breach, termination, enforcement, interpretation or validity thereof, which can not be resolved by negotiation and/or mediation, be resolved by binding arbitration. This includes, but is not limited to the determination of the scope or applicability of this agreement to arbitrate. Arbitration shall be conducted in San Francisco, California, before a sole arbitrator, in accordance with the laws of the State of California for agreements made in and to be performed in California. The arbitration shall be administered by JAMS pursuant to its Comprehensive Arbitration Rules and Procedures. Judgment on the Award may be entered in any court having jurisdiction. The arbitrator shall, in the Award, allocate all of the costs of the arbitration and the mediation, including the fees of the arbitrator and the reasonable attorneys' fees of the prevailing party, against the party who did not prevail.

The provisions of this paragraph 13 may be enforced by any court having jurisdiction, and the party seeking enforcement shall be entitled to an award of all costs, fees and expenses, including attorneys' fees, to be paid by the party against whom enforcement is ordered.

14.    **Proprietary Information.** All loan files, records, documents, lists, rate sheets, product guidelines, investor/secondary market information, databases, trade secrets (as defined in paragraph 21(q)), manuals (including policies and procedures), training manuals, forms, marketing materials, hardware and software obtained from PGM, and similar items relating to the business of PGM, (collectively "Proprietary Information") whether prepared by Branch Manager or otherwise, coming into the possession of the Branch Office, its personnel and/or Branch Manager during the term of this Agreement shall be, and remain, the exclusive property of PGM.

Nothing contained in this paragraph is intended to preclude Branch Manager from purchasing, at his/her own cost and expense, databases, marketing materials, hardware and/or software, which shall be considered the separate property of Branch Manager and not subject to the provisions of this paragraph 14.

15.   **Branch Facilities.** "Branch Facilities" shall include, but not be limited to office space, furnishing and business equipment. Branch Manager shall arrange for the execution by PGM of a month-to-month lease for appropriate Branch Facilities for a Fair Market Rent. "Fair Market Rent" shall mean a fixed monthly amount that does not vary with the volume or the value of mortgage loans originated by the Branch Office, and that is no more than the fair market rent paid by other similar businesses for comparable facilities in the geographic area in which the Branch Office is located.

16.   **Name.** The Branch Office shall conduct business under the name Pacific Guarantee Mortgage, or such other name as PGM shall approve in advance, in writing. Branch Manager acknowledges and agrees that the name Pacific Guarantee Mortgage, and any and all derivations thereof, including but not limited to PGM trade names, trademarks and/or logos used in the conduct of the business of the Branch Office, are proprietary and belong exclusively to PGM. Upon termination of this Agreement for any reason, Branch Manager shall cease to use, in any manner, the name Pacific Guarantee Mortgage, and all derivations thereof, together with all PGM trade names, trademarks and logos, and during the term of this Agreement, shall acquire no license, proprietary rights to, or interest in them, or in any derivations thereof.

17.   **Solicitation of Mortgage Loans in Other States.** Branch Manager shall limit solicitation of mortgage loan activity by Branch Manager and Branch Office personnel to the state in which the Branch Office is located, unless Branch Manager first receives the prior written approval of PGM. Such approval shall be subject to reasonable conditions, including but not limited to the requirement that PGM and all affected Branch Office personnel currently hold such licenses as necessary for the subject state and that Branch Manager and the affected personnel demonstrate a thorough familiarity with such state's laws and regulations related to loan solicitation and mortgage loan origination.

18.   **Authority to Contract.** Branch Manager shall have no authority to enter into any agreement in the name of PGM. Branch Manager agrees to indemnify and hold PGM harmless from and against any and all liability arising out of any agreement entered into without the prior written consent of PGM. This covenant of indemnity shall include all costs of defense, including reasonable attorney's fees, for any such claim asserted.

19.   **Events of Default/Termination.** This Agreement shall terminate upon any of the following events or for any of the following causes:

a)  Immediately following notice of a material breach of any covenant, condition, representation of contractual obligation of a party, given by the party that is or could be adversely affected thereby; provided said breach remains uncured for a period of ten (10) days following such written notice of said breach;

MAR-27-2006 MON 12:43 PM Pacific Guarantee Mrtg.    FAX NO. 5109707930    P. 09

Case 3:07-cv-03140-SI    Document 9-32    Filed 08/22/2008    Page 50 of 71

b)  Immediately in the event of insolvency, bankruptcy or receivership of either party; or,

c)  Immediately in the event of Branch Manager's fraud or intentional breach of duty to a client.

Upon termination of this Agreement for any reason, Branch Manager shall promptly return to PGM all originals and copies of all Proprietary Information obtained by Branch Manager from PGM.  Branch Manager acknowledges and agrees that all such materials are the sole and exclusive property of PGM, and agrees not to utilize such materials for any purpose other than as contemplated by this Agreement, or at all upon termination.

20.    **Status of Loans in Process at Termination.**  Except in the case of termination for Branch Manager's fraud or intentional breach of duty to a client, and subject to any applicable law to the contrary, any mortgage loans which are in process or which have been originated by the Branch Office, up to and including any mortgage loans originated through 5:00 p.m., on the day of termination of this Agreement, shall be processed, submitted and closed by PGM.  Branch Manager shall receive compensation related thereto in accordance with the terms of this Agreement, as if such loans had been closed prior to termination, provided that all loan files and other PGM property have been returned to PGM.  All rights of Branch Manager to compensation under this Agreement shall immediately terminate in the event of termination of this Agreement by reason of Branch Manager's fraud or intentional breach of duty to a client.

21.    **Miscellaneous.**

a.  **Effective Date.**  The "Effective Date" of this Agreement shall be the date that it is signed by PGM.

b.  **Assignment.**  PGM shall have the right to assign its rights and duties under this Agreement to any party without the consent of Branch Manager.  Any such assignee of PGM shall be an intended third-party beneficiary of the representations, warranties, covenants, agreements and remedies contained herein.  Branch Manager shall have no right to assign his/her rights or duties under this Agreement without PGM's prior written consent, which may be withheld by PGM in its sole discretion.

c.  **Choice of Law.**  This Agreement shall be governed by and construed under the laws of the State of California, without regard to conflicts of laws principles.

d.  **Integration.**  This Agreement is the entire agreement between the parties regarding the subject matter and supersedes any prior oral or written agreement among them regarding the subject matter contained herein.

e.  **Amendment.**  Except as set forth herein, this Agreement may not be amended or modified orally and no provision of this Agreement may be waived or amended except in a writing which makes reference to this Agreement and which is signed by PGM.

MAR-27-2006 MON 12:43 PM Pacific Guarantee Mrtg.      FAX NO. 5109707930           P. 10

Case 3:07-cv-03140-SI    Document 94-2    Filed 08/22/2008   Page 15 of 71

**f. Severability.** If a court of competent jurisdiction finds any provision in this Agreement to be invalid, illegal, or otherwise unenforceable, that determination will not affect any other provision of this Agreement. The invalid provision will be severed from this Agreement and all remaining provisions will continue to be of full force and effect.

**g. Interpretation.** Any ambiguities in this Agreement will not be strictly construed against the drafter of the language concerned but will be resolved by applying the most reasonable interpretation under the circumstances giving full consideration to the intentions of the parties at the time of contracting. This Agreement will not be construed against any party by reason of its preparation.

**h. No Third Party Beneficiaries.** Except as expressly set forth in paragraph 21 (b), above, this Agreement has been made by, and is made solely for the benefit of Branch Manager and PGM, and PGM's successors and permitted assigns. Except as expressly set forth in paragraph 21 (b), above, nothing in this Agreement is intended to confer any rights or remedies under or because of this Agreement on any persons or entities other than the parties to it and their respective successors and permitted assigns. Nothing in this Agreement is intended to relieve or discharge the obligation or liability of any third person or entity to any party to this Agreement.

**i. Waiver.** No waiver of any provision of this Agreement or consent to any action shall constitute a waiver of any other provision of this Agreement or consent to any other action. No waiver or consent shall constitute a continuing waiver or consent, or commit a party to provide a future waiver.

**j. Further Assurances.** Branch Manager shall execute and deliver any and all additional papers, documents and other assurances and shall do any and all acts and things reasonably necessary in connection with his/her performance of his/her obligations hereunder to carry out the intent of this Agreement.

**k. Captions.** All captions and headings in this Agreement are for reference only and may not be used in the interpretation of this Agreement or any related document.

**l. Counterparts.** This Agreement may be executed in counterparts, each of which shall constitute an original, but all of which together shall constitute one and the same instrument. The parties agree that a signed copy of this Agreement transmitted by one party to the other by facsimile transmission shall be binding upon the sending party to the same extent as a signed original of this Agreement.

**m. Attorneys' Fees.** In the event that any action or arbitration is brought by either party to enforce the terms of this Agreement, the prevailing party shall be entitled to reasonable attorneys' fees and costs.

**n. Venue.** PGM and Branch Manager agree that the proper venue for any legal action brought under this Agreement is either the County of Contra Costa, California or the United States District Court for the Northern District of California, as appropriate.

MAR-27-2006 MON 12:43 PM Pacific Guarantee Mrtg.       FAX NO. 5109707930           P. 11

Case 3:07-cv-03140-SI    Document 46-2    Filed 08/22/2008    Page 52 of 71

**o. Survival Upon Termination.** Branch Manager's representations, warranties, covenants and other obligations and agreements contained in this Agreement, including without limitation Branch Manager's indemnification obligations, shall survive any termination of this Agreement.

**p. Non-exclusive Remedies.** No remedy under this Agreement is exclusive of any other available remedy, but each remedy is cumulative and is in addition to other remedies given under this Agreement or existing in law or in equity.

**q. Confidentiality.** Each party understands, acknowledges and agrees that certain trade secrets and customer lists exist which are wholly owned and controlled by the other. These shall be referred to herein collectively as "trade secrets" and consist of information and materials that are valuable and not generally known by such party's competitors. All trade secrets, however maintained, shall be and remain the exclusive property of the originator thereof. Each party agrees not to disclose any of the other's trade secrets, directly or indirectly, or use them in any way, either during the term of this Agreement or at any time thereafter, except as required in the course of performance of this Agreement.

**r. Offset.** Amounts past due and owing by Branch Manager to PGM under this Agreement may, at PGM's option and in its sole discretion, be offset by PGM against any payments or other indebtedness then or thereafter owed by PGM to Branch Manager.

**s. Statute of Limitations.** Any action arising under this Agreement or because of its breach must be commenced within one year after the cause of action accrues.

**t. No Partnership or Joint Venture Intended.** PGM and Branch Manager intend that, to the maximum extent permissible by law, this Agreement shall not be construed as a partnership and/or joint venture.

**u. Regulatory Compliance.** PGM and Branch Manager recognize the importance of full compliance at all times with all state and federal laws, rules and regulations governing mortgage loan origination. Accordingly, notwithstanding anything to the contrary contained elsewhere herein, the parties recognize and agree that PGM retains the right to amend this Agreement as necessary, in its reasonable discretion, to ensure full compliance with all state and federal laws, rules and regulations. Any such amendment shall become a part of this Agreement thirty (30) days after notice thereof is given in accordance with paragraph 11 above.

**v. Anti-Poaching.** Branch Manager agrees not to solicit or in any way entice to leave, interview, hire or contract, either directly or indirectly, with any employees or independent contractors affiliated with PGM, or any of its affiliates, during the term of this Agreement, and for a period of two (2) years following termination of this Agreement.

**w. Jury Trial.** Pursuant to the provisions of paragraph 14 above, Branch Manager and PGM each agree to waive trial by jury in any action or proceeding arising out of this Agreement.

Page 11 of 12

MAR-27-2006 MON 12:43 PM Pacific Guarantee Mrtg.     FAX NO. 5109707930          P. 12
Case 3:07-cv-03140-SI     Document 48-2     Filed 08/22/2007     Page 13 of 13
Case 3:07-cv-03140-SI     Document 9-3     Filed 05/09/2008     Page 53 of 71

   **x. Condition Precedent.** It is understood and agreed that the respective rights, duties and obligations of the parties hereto are expressly made subject to and conditioned upon the completion of the transaction by and between PGM and RBC, which transaction is expected to conclude on or about June 30, 2003. PGM will notify Jim Bowman once said transaction is concluded.

   IN WITNESS WHEREOF, the undersigned have executed this Agreement at San Ramon, California.

Dated: _____          Dated: __12/1/03__

**CMG Mortgage Services, Inc., doing**          **Branch Manager**
**business as Pacific Guarantee Mortgage**

By: _____          By: _____
   Christopher M. George, President          Jim Bowman

Page 12 of 12

**Exhibit G**

MAR-27-2006 MON 12:43 PM Pacific Guarantee Mrtg.          FAX NO. 5109707930                    P. 13

Case 3:07-cv-04413-SI   Document 49-5   Filed 05/22/2008   Page 55 of 71

# FACILITIES AGREEMENT

This Facilities and Equipment Rental Agreement ("Agreement") is entered into effective July 1, 2003, by and between CMG Mortgage Services, Inc., a California corporation doing business as Pacific Guarantee Mortgage ("PGM") and Jim Bowman and Pacific Real Estate Management (collectively "Provider"), at San Ramon, California.

Whereas, PGM is engaged in business as a mortgage broker;

Whereas, PGM intends to operate a branch office at 2505 South 320th Street, Suite 260 Federal Way, WA 98003 (the "Branch Office");

Whereas, PGM desires to secure facilities, equipment, services, supplies and office space sufficient to operate the Branch Office; and,

Whereas, Provider desires to provide such facilities, equipment, services, supplies and office space,

Now, therefore, in consideration of the mutual covenants and agreements contained herein, and for other good and valuable consideration, the receipt and sufficiency of which is hereby acknowledged, it is hereby agreed as follows:

## Article I
## Items Supplied by Provider

**1.1  Office Space.** Provider, as master tenant, hereby subleases to PGM the Leased Premises described and identified in the Master Lease attached hereto as Exhibit A.

**1.2  Facilities and Equipment.** Provider hereby agrees to provide to PGM the facilities and equipment identified in Exhibit B attached hereto and incorporated herein, which shall include one or more of the following, as reasonably necessary to conduct the business of the Branch Office in a responsible business manner:

a.   Office furniture, including desks, chairs and tables;
b.   Office equipment, including computers, printers and typewriters;
c.   Facsimile machines and photocopiers;
d.   Common area and reception furniture; and,
e.   Telephone equipment and handsets.

**1.3  Services and Supplies.** Provider hereby agrees to provide to PGM the services and supplies identified in Exhibit C attached hereto and incorporated herein, which shall include the following:

C:\My Documents\New Net Branches\Jim Bowman\Facilities-Net CA-06.12.03.doc

Page 1 of 4

MAR-27-2006 MON 12:44 PM Pacific Guarantee Mrtg.    FAX NO. 5109707930    P. 14

Case: 07-cv-03404-SI   Document 49-2   Filed 05/22/2008   Page 56 of 71

a.    All computer, printer and typewriter supplies, including but not limited to software and hardware maintenance and upgrade, printer toner and supplies, and typewriter ribbons and supplies;

b.    Facsimile and photocopier supplies, including but not limited to toner and paper; and,

c.    Maintenance and repair of items (a) - (e), inclusive, of the preceding paragraph 1.2, as reasonably needed.

**1.4 Changes in Items Supplied.** The parties reserve the right to increase, decrease or modify the facilities, equipment, services and supplies which are the subject of this Agreement.

**1.5 Insurance.** PGM shall obtain and maintain, at its sole cost and expense, such fire, theft, liability, hazard and other insurance on the Leased Premises and the facilities, equipment, services and supplies which are a subject of this Agreement, as reasonably necessary to provide coverage for all risks of loss or damage and all liability for use thereof.

**1.6. Facilities.** All office space, facilities, equipment, services, supplies and insurance referred to in sections 1.1 through 1.5, inclusive, of this Article I shall be referred to herein, collectively, as the "Facilities."

## Article II
## Security Deposit

**2.1 Security Deposit.** As a material consideration for PGM's agreement to enter into this Agreement, Provider agrees concurrently with the execution of this Agreement to deposit with PGM a security deposit in the sum of $ 10,724.00 . This security deposit is intended to secure any and all obligations of Jim Bowman and/or *Pacific Real Estate Mngt* to PGM, whether arising out of this Agreement or otherwise. Said security deposit, to the extent not used in accordance with the provisions of this Article II, shall be returned to Provider, without interest, within sixty (60) days following the termination of this Agreement.

**2.2 Use of Security Deposit.** By signature below Jim Bowman and *Pacific Real Estate Mngt* each authorize and instruct PGM, at its option and in its sole discretion, to use all, or any part of the security deposit, to satisfy any indebtedness now or hereafter owed by Jim Bowman and/or *Pacific Real Estate Mngt* to PGM, to the maximum extent permitted by law.

## Article III
## Term of Agreement

**3.1 Term.** The term of this Agreement shall be one (1) month from the above date and shall continue for successive one (1) month terms unless written notice of an election not to so renew for a successive one (1) month term is given by one party to the other party at least thirty (30) days prior to the commencement of the next successive one (1) month term.

C:\My Documents\New Net Branches\Jim Bowman\Facilities-Net CA-06.12.03.doc

Page 2 of 4

## Article IV
## Rental

**4.1 Rent.** As rent for the Facilities provided by Provider, PGM shall pay a monthly Rental Fee equal to one hundred twenty-five percent (125%) of Provider's actual cost of providing the Facilities which are the subject of this Agreement, in accordance with a schedule to be provided by Provider. As soon as commercially reasonable following the close of each month, Provider shall provide to PGM a schedule which itemizes, in accordance with generally accepted accounting principles, all costs incurred by Provider that month in providing the Facilities. The monthly Rental Fee for each month shall be due on the 15th day following PGM's receipt of such schedule.

## Article V
## Miscellaneous

**5.1 Choice of Law.** This Agreement shall be governed by and construed under the laws of the State of California, without regard to conflicts of laws principles.

**5.2 Integration.** This Agreement is the entire agreement between the parties regarding the subject matter and supersedes any prior oral or written agreement among them regarding the subject matter contained herein.

**5.3 Venue.** The parties agree that the proper venue for any legal action brought under this Agreement is either the County of Contra Costa, California or the United States District Court for the Northern District of California, as appropriate.

**5.4 Statute of Limitations.** Any action arising under this Agreement or because of its breach much be commenced within one year after the cause of action accrues.

**5.5 No Partnership or Joint Venture Intended.** Provider and PGM intend that, to the maximum extent permissible by law, this Agreement shall not be construed as a partnership and/or joint venture.

**5.6 Arbitration.** Any dispute, claim or controversy arising out of or relating to this Agreement or the breach, termination, enforcement, interpretation or validity thereof, including determination of the scope or applicability of this arbitration provision, shall be determined by arbitration in San Francisco, California, before a sole arbitrator, in accordance with the laws of the State of California for agreements made in and to be performed in that state. The arbitration shall be administered by JAMS pursuant to its Streamlined Arbitration Rules and Procedures.

MAR-27-2006 MON 12:44 PM Pacific Guarantee Mrtg.    FAX NO. 5109707930    P. 16

Case 3:07-cv-03140-SI   Document 49-5   Filed 08/29/2008   Page 58 of 71

IN WITNESS WHEREOF, the undersigned have executed this Agreement at San Ramon, California.

PGM:                                    Provider

Dated: _____               Dated: _12/1/03_____

**CMG Mortgage Services, Inc., doing business as Pacific Guarantee Mortgage**

By: _____                  By: _____
    Christopher M. George, President        Jim Brian Bowman
                                            *Branch Manager*

Provider

Dated: _12/1/03_____

PACIFIC REAL ESTATE MANAGEMENT, INC.

By: _____ President

# Exhibit H

```
 1                    ---o0o---

 2                AFTERNOON SESSION

 3               EXAMINATION (RESUMED)

 4   BY MR. COHEN:

 5   Q.        Ready?

 6   A.        I believe so, yes.

 7   Q.        Okay.  What documents reflect the reserves that

 8   CMG withheld from Mr. Bowman?

 9   A.        What documents?

10             MR. ROSENTHAL:  I'm going to --

11             THE WITNESS:  Well, I wouldn't say withheld,

12   but.

13             MR. ROSENTHAL:  That was going to be my

14   objection.

15             THE WITNESS:  Yeah.  I was going to say the

16   documents that show what security deposits are still on

17   reserve or what reserves are still there at this point

18   are the Financial Statements.

19   BY MR. COHEN:

20   Q.        Which Financial Statements?

21   A.        The branch Financial Statements for his

22   branches.

23   Q.        Is there a current Financial Statement or are

24   we dating back to monthly statements from the very

25   beginning of 2007?
```

```
 1   A.        I'm discussing the Financial Statements from --

 2   yeah, at the time of his termination.

 3   Q.        Okay.  What other records reflect where the

 4   reserves are now?

 5   A.        I'm not sure I understand the point.

 6   Q.        Well, CMG is holding these reserves somewhere;

 7   is that correct?

 8   A.        Uhm-hmm.

 9   Q.        In a bank account?

10   A.        There's -- well, it's along with, yes, other --

11   other moneys.

12   Q.        Okay.  So what account are these reserves being

13   held in?

14   A.        We have reserves held in several accounts, but

15   I would say the most likely place for the reserves being

16   held are in our GMAC Warehouse Bank called Excess Cash

17   Account.

18   Q.        Are they earmarked in any way?  Is there a --

19   well, let me.  Let me start again.

20             Is there a separate account for the reserves?

21   A.        No.

22   Q.        They are thrown into what sort of an account?

23   Is it a general operating account?

24   A.        It's an operating account, yes.

25   Q.        And where is this bank?
```

| | | |
|---|---|---|
| 1 | A. | Yeah. |
| 2 | Q. | The document speaks for itself. |
| 3 | A. | Okay. |
| 4 | Q. | I'm trying to see what your -- |
| 5 | A. | Okay.  Then I'm okay with that. |
| 6 | Q. | -- what your understanding of -- |
| 7 | A. | My understanding of the document would be that |

8    if there is an expense or costs that are associated with

9    Mr. Bowman's branches, that that -- the security deposit

10   as it's stated, I guess, can be used to offset those

11   expenses.

12   Q.        The reserves that are kept in the GMAC bank

13   account that you told us about earlier, is that an

14   interest bearing account?

15   A.        No.

16   Q.        What sort of account is it?

17   A.        It's an operating account we use -- we utilize

18   the funds for several purposes to -- when funding loans,

19   our warehouse provider funds a percentage of the loan

20   amount and they use our -- some of those funds to fund

21   the balance due to a title company to close the loan.

22            Also when the loan is sold to an investor and

23   proceeds are sent to our warehouse bank, the warehouse

24   bank deducts what they've advanced on that loan and they

25   give us the profits, and that goes into that account so

```
 1    there's money flowing in and out of that account.
 2              When we need to utilize funds to operate our
 3    company, we wire funds out of the account to our other
 4    operating bank locally.
 5    Q.        And that's the account that you store these
 6    reserves in; is that correct?
 7    A.        That's the account that would be able to --
 8    yeah, that would have funds for the deposits.
 9    Q.        I'm not an accountant.  I understand that
10    stores is not the best word in that situation.
11    A.        Sure.  Sure.
12    Q.        But that's where you deposit the reserves; is
13    that correct?
14    A.        No.
15    Q.        No?
16    A.        No.
17    Q.        Okay.  Where are the reserves deposited?
18    A.        They -- well, again, if a check is provided by
19    a branch manager, then that -- that deposit would go into
20    our operating account locally.
21    Q.        Locally, meaning what?
22    A.        Locally, meaning, well, it was Bay Bank of
23    Commerce.  It was bought out.  It's now Mt. Diablo Bank
24    of Commerce, and then it was bought out and is now
25    officially Wells Fargo, but the main operating account
```

1    that we use for our checking.

2    Q.        That's where the reserves were -- are

3    deposited?

4    A.        Well, again, if we receive a check, that

5    normally is where it would be deposited.  We utilize

6    those funds, and at times can wire from that account to

7    our GMAC Warehouse account, if needed, so money gets

8    transferred around at times.

9    Q.        Okay.  Well --

10   A.        But the initial deposit I would say would

11   initially go into our operating account locally.

12             THE COURT REPORTER:  Our operating?

13             THE WITNESS:  Our operating account locally.

14   Sorry about that.

15   BY MR. COHEN:

16   Q.        Okay.  As far as you know, then the initial

17   security deposit that you received from Mr. Bowman would

18   have gone into your local operating account; is that

19   correct?

20   A.        Again, I don't know if we received a check from

21   him, but if we did, in my estimation, it would go into

22   that main operating account locally.

23   Q.        Okay.  Now, would they stay in the operating

24   account or would those funds be put into some other sort

25   of account?

1    A.        They could be put around to different sources.

2    Different places.  I'm sorry.

3    Q.        Would it be your standard practice to have this

4    money sitting in the operating account for -- since

5    Mr. Bowman signed this Agreement in 2004?

6    A.        In the same account?  I'm sorry.  Is that your

7    question?

8    Q.        Yes.

9    A.        No.  I would say probably it's not in the same

10   account at that point.

11   Q.        Okay.  And where would this money have gone to

12   after being deposited into that account?

13   A.        It could have been processed and sent to our

14   GMAC warehouse account, where that's the account we keep

15   most of our funds in.

16   Q.        Is that your standard practice then when you

17   receive money for reserves, that you forward this account

18   to the warehouse account?

19   A.        No.

20   Q.        I'm sorry.  Just so the record is clear, that

21   you forward these reserves to the warehouse account?

22   A.        No.  Standard is all the money that goes into

23   the account we utilize the funds for operation of

24   business and things, and part of operation of business is

25   moving the funds to our warehouse lines, and again, we

1    like to try to keep as much funds in our warehouse lines

2    as possible, so we keep smaller balances in our operating

3    account locally.

4    Q.        So the reserves were actually commingled with

5    operating -- with your operating account; is that

6    correct?

7              MR. ROSENTHAL:  I'm going to object as to --

8    vague and ambiguous as to commingled.

9              THE WITNESS:  Uhm-hmm.

10   BY MR. COHEN:

11   Q.        Well, I don't think it's vague, but if there's

12   some misunderstanding, then maybe you can explain that to

13   me.

14   A.        Well, define commingled.

15   Q.        The reserves or security deposits were

16   deposited into an operating account; is that correct?

17   A.        That is correct.

18   Q.        And then these are used for operating expenses

19   of the business; is that correct?

20   A.        Operating, yes.  It also includes payment of

21   commissions to the branches and it's used for, yeah, all

22   operations, I guess.

23   Q.        They are not maintained in some sort of a trust

24   account?

25   A.        No.

1   Q.        Or an escrow or anything like that?

2   A.        No.

3   Q.        Did CMG use Mr. Bowman's deposits or reserves

4   to pay CMG's operating expenses?

5   A.        I don't know exactly the money of his that went

6   in, if it did.  Again I don't know if we received checks

7   or how it was set up.  And I could not tell you that it

8   exactly went to pay or if it went to pay for anything.

9   Again, if his -- any deposit check, any reserve check,

10  along with other checks all go into the operating

11  account, so I couldn't say his exact funds were used for

12  what -- for which purposes.

13  Q.        And it's your practice to put as much of this

14  money from the operating account into the warehouse

15  account.  Is that what you testified to?

16  A.        I think I testified that all -- most of our

17  funds we try to put into the warehouse account, correct.

18  Q.        And would you tell me again what this warehouse

19  account is used for?

20  A.        It's a cash account that we utilize at our

21  warehouse bank to -- if funds are needed for a funding

22  through our Mortgage Banking Division, then those funds

23  are transferred to the title company to help close that

24  loan.  And then again funds come back in when loans are

25  purchased and we receive wires, and after paying off the

```
 1    warehouse bank, what they advanced, the -- if there's
 2    profits left over, it goes into that account also.
 3    Q.        And then you --
 4    A.        It's one account.
 5    Q.        And then you do that over and over again?
 6    A.        We do that over and over again, yes.
 7    Q.        All right.  Thank you.
 8              Are you required to maintain any specific
 9    amount of money in this warehouse account?
10    A.        Are we required to?  I don't believe so, no.
11    Q.        And my question is both as to either a
12    government regulation or the requirements of any
13    investors or other entities you do business with.
14    A.        No.
15    Q.        Okay.  The more money that you put into the
16    warehouse account, the better able you are to make loans;
17    is that correct?
18    A.        I don't know if I'd classify it that way, but
19    if --
20    Q.        Maybe you --
21    A.        -- we have funds available in there to help
22    fund loans, you know.
23    Q.        Well, maybe you could state it a little more
24    artfully than I can.
25    A.        Okay.
```

```
 1    Q.        It's in CMG's interest to maximize the amount
 2    of money it has in the warehouse account; is that
 3    correct?
 4    A.        I would say yes, it is.
 5    Q.        Okay.  And why is that?
 6    A.        Because it -- we have the availability as we're
 7    funding loans to not have to wire out of our own local
 8    operating account.  They can utilize the funds from the
 9    warehouse bank's account, and then the warehouse bank
10    sends it all in one wire.
11    Q.        It's one -- I'm not understanding this one wire
12    business.
13    A.        Sure.
14    Q.        What do you mean by that?
15    A.        One wire at a title.  So if I can give an
16    example, if we're funding a loan to a title company and
17    the loan amount is a hundred thousand dollars -- and
18    again this is just an example -- the warehouse bank will
19    usually advance $99,000 off of our line of credit, and
20    then take the rest of the money that needs to be wired to
21    title to close the loan, including the broker's
22    commission or other fees or anything that needs to be
23    sent to title to close the loan.  They take that from our
24    cash account, our operating account there, combine it
25    together and send one wire.
```

```
 1              So if the title company needs $102,000 to close

 2     that transaction, they'll advance $99,000 from our line

 3     of credit, and they'll take 3,000 from that cash account

 4     and put it together and wire out $102,000 to the title

 5     company.

 6     Q.       Does the amount of money you have in the

 7     warehouse account affect your line of credit?

 8     A.       No, I don't believe it does.

 9     Q.       Okay.  What is the line of credit secured by?

10     A.       A personal guarantee by Mr. George, and the --

11     the security instruments for the loans themselves.

12     Q.       Those would be the mortgages?

13     A.       Yes.

14     Q.       Is that correct?

15     A.       Right.

16     Q.       It sounds to me like CMG is using Mr. Bowman's

17     reserve to fund loans.  Is that correct?

18     A.       No, I don't think that's correct.

19     Q.       Why not?

20     A.       I think that we have -- again, it's -- it's

21     hard to say what exact dollars is used for what, but I

22     would say we have sufficient cash to fund our loans.  We

23     have sufficient reserves or excess cash, or whatever you

24     want to call it, for the reserves of the branches.

25     Q.       We, meaning CMG?
```

```
 1   A.          CMG.  I'm sorry.  Yes.

 2   Q.          So what you're saying is regardless of whether

 3   you have the reserves or not, you have sufficient funds?

 4   Is that what your point was?

 5   A.          I believe so, yes.

 6   Q.          Okay.  It also sounds to me like CMG is using

 7   Mr. Bowman's reserves to pay operating expenses.  Is that

 8   correct?

 9   A.          Again, I would go the same answer I used last

10   time.

11   Q.          Okay.  Which is that CMG has enough resources

12   that it does not need to apply those reserves.  Is that

13   correct?

14   A.          What I'm seeing is I don't think that we

15   definitively said if you gave us a check for $10,000,

16   that we spent that $10,000 on operating expenses.  I

17   think what I've said is that we have sufficient amount --

18   sufficient funds to cover reserves and utilize funds to

19   operate our business.

20   Q.          Okay.  Are your funds in these operating -- in

21   the operating account segregated in any way from the

22   reserve funds placed in the operating account?

23   A.          No.

24               MR. ROSENTHAL:  You mean CMG funds, I'm

25   assuming.
```