**Exhibit A**

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

SAN FRANCISCO
-oOo-

JAMES K. BOWMAN, JR. and
PACIFIC REAL ESTATE MANAGEMENT
COMPANY, INC., a Washington
Corporation,

    Plaintiff,

vs.                        No. C-07-3140-SI

CMG MORTGAGE, a California
Corporation; CMG MORTGAGE, INC,
CMG MORTGAGE SERVICES, INC, a
California corporation; CMG
MORTGAGE SERVICES, INC, d/b/a
PACIFIC GUARANTEE MORTGAGE,
Inclusive

    Defendants.
_____/

**CERTIFIED COPY**

--oOo--

DEPOSITION OF CHRISTOPHER M. GEORGE

TUESDAY, APRIL 29, 2008

Reported by:
ALICE N. HALBERT
CSR 7889, RPR

NANCY SORENSEN
Court Reporting Services
41 Sutter Street, Suite 505
San Francisco, California 94104
(415) 986-4624

1

CHRISTOPHER GEORGE

1  docs and funds loans.
2      Q.  What does "underwrite docs" mean?
3      A.  Underwrite docs means underwrite a loan to
4  make a credit decision, prepare the documentation for
5  the bar or to sign at title, and to fund the loan, once
6  the documents have been signed and all the conditions
7  have been met.
8      Q.  Jim Bowman worked for CMG Mortgage, Inc.; is
9  that correct?
10     A.  Jim Bowman worked for PGM.  Pacific Guarantee
11 Guarantee Mortgage.
12     Q.  What was PGM --
13     A.  It --
14     Q.  -- during the time he worked there?
15     A.  It a dba of CMG Mortgage, Inc.
16     Q.  So he worked for CMG Mortgage, Inc.; isn't
17 that correct?
18     A.  I think I answered that.
19     Q.  The -- you answered that he worked for a dba
20 of CMG Mortgage, Inc. --
21     A.  Correct.
22     Q.  -- is that correct?
23     A.  (Nodding head.)
24     Q.  What was his position with CMG Mortgage, Inc.?
25     A.  Well, he was branch manager for Pacific

25

1    Guarantee Mortgage branch.

2         Q.   Was he an employee of CMG Mortgage, Inc.?

3         A.   Through the dba of Pacific Guarantee Mortgage.

4    Yes.

5         Q.   Was there any relationship between Mr. Bowman

6    and CMG, Inc., other than that as employer and employee?

7         A.   Well, there's no such CMG, Inc.

8         Q.   I mean to CMG Mortgage, Inc.

9         A.   What was your question then again?

10        Q.   Was there any relationship between Mr. Bowman,

11   CMG Mortgage, Inc., other than employer and employee?

12        A.   He's also a loan officer.

13        Q.   That was in his capacity as an employee,

14   though; isn't that correct?

15        A.   Yes.

16        Q.   Okay.  So again, the question is:  Was there

17   any other relationship other than an employer/employee

18   relationship between Mr. Bowman and CMG Mortgage, Inc.?

19        A.   Um, if I understand your question, no.

20        Q.   Is there something that you would like me to

21   clarify in the question that's unclear in some fashion?

22        A.   Not if I understand your question, no.

23        Q.   So he was not a partner; is that correct?

24        A.   That's correct.  He was not a partner at CMG

25   Mortgage, Inc.

26

1        A.   Correct.

2        Q.   And that is another loan that is subject to

3   repurchase; is that correct?

4        A.   That we're aware of at this time.  Yes.

5        Q.   Are there any other repurchases other than the

6   Fraser and Wilkins loans that you attribute to

7   Mr. Bowman's offices?

8        A.   Not that I am aware of.  But we would be on

9   the hook for everyone that he ever originated for

10  repurchasing in the event that there was some form of

11  breach.

12       Q.   And do you think that Mr. Bowman is

13  responsible to CMG for the cost of such repurchase?

14       A.   Well, I think he's responsible for Wilkins and

15  Fraser -- no.  I think Chevez is responsible for Wilkins

16  and Fraser.

17       Q.   Why do you think so?

18       A.   Because they happened while he was with us in

19  our organization.  I think he was aware of how the

20  Branch Management Agreement and how operating these

21  branches were such that they required him to be

22  responsible for repurchase.

23            Um, and last, but not least, I think it's hard

24  to hold him accountability for things that will happen

25  two years from now after he's terminated his agreement.

92

```
 1        Q.  Okay.  Just so I understand here, is it your
 2   belief that the branch manager is responsible for costs
 3   incurred by CMG in connection with repurchases where the
 4   request for repurchase arrives while the branch manager
 5   is still employed?
 6        A.  It is while -- actually, I think the
 7   contract -- you'd have to ask David about this.  But I
 8   think the contract calls for any loans that were
 9   originated underneath the branch.
10        Q.  So that could include repurchase requests that
11   come in after the complete agreement?
12        A.  Theoretically, yes.  I believe so.
13        Q.  Okay.  But from your testimony just now, are
14   you drawing a distinction between loans that -- between
15   repurchase requests that come in while the employee is
16   an employee of CMG and afterward?
17        A.  And afterward?  I don't understand your
18   question.
19        Q.  Are you drawing a distinction as to the branch
20   manager's liability for the repurchase cost?
21        A.  It's hard to collect from him.  He's no longer
22   my branch manager.  So it's somewhat of a zero sum gain.
23            If there are expenses associated when he is
24   managing a branch, and that there's cost or losses
25   associated with repurchase, those expenses and costs and
```

93

1  losses would be attributed to his branch while he were
2  my branch.  It's hard to collect them from him if he's
3  no longer my branch.
4      Q.  Do you know in the investor of the Wilkins
5  loans is alleging that there was any sort of fraud?
6      A.  I don't know.
7      Q.  Do you know whether there was a foreclosure in
8  that case?
9      A.  I do know.
10     Q.  And the answer is what?
11     A.  Yes.
12     Q.  Okay.  Has CMG repurchased the Wilkins loan?
13     A.  We have not.  But we are fully intending to.
14     Q.  Is there any time line for when CMG will
15 purchase that loan?
16     A.  We have made some payments to Credit Swiss
17 First Boston, which is the Wilkins investor.  Credit
18 Swiss First Boston is best briefed as CSFB.
19     Q.  You made some payments?
20     A.  To them.
21     Q.  What were these payments for?
22     A.  Repurchasing the Wilkins loan.
23     Q.  Any other loans?
24     A.  There may be a couple of other loans there as
25 well.

1  right?  There were internal expenses, and then, there
2  were external expenses.  Right?
3      A.  Uh-huh.
4      Q.  Okay.  So you're able to allocate the internal
5  expenses against the branch revenues, correct?
6      A.  We are able to allocate the internal expenses
7  against branch revenues.
8      Q.  Right.  What about the external expenses?  How
9  were those handled?  Did the vendors invoice CMG
10 corporate?
11     A.  What external expenses?
12     Q.  Rent, copiers, office supplies, telephone
13 service and utilities?
14     A.  Those expenses would be paid to PREMCO --
15     Q.  Okay.
16     A.  -- which is a separate agreement, the
17 facilities agreement.
18     Q.  We're going to look at the facilities
19 agreement a little bit later.  But I'm just trying to
20 understand how the invoicing works.
21     A.  PREMCO would pay those expenses and seek
22 reimbursement from CMG -- from CMG as we did the
23 accounting.
24     Q.  Okay.  And those expenses would then be
25 invoiced or rather -- strike that.

134

1           Those expenses would be then used to offset
2   revenues to arrive at the branch manager's net income?
3        A.  All expenses would be offset of revenue to
4   come into the net income of the branch.  Correct.
5        Q.  Okay.  So it's your understanding that while
6   Mr. Bowman worked there, PREMCO was primarily
7   responsible for paying these outside expenses; is that
8   correct?
9        A.  If they were listed in the PREMCO facilities
10  agreement, they were being paid by PREMCO.
11       Q.  And then, how would PREMCO be reimbursed?
12       A.  By submitting these expenses to be offset
13  against the expenses of the branch --
14       Q.  Okay.
15       A.  -- the income of the branch.  Pardon me.
16       Q.  Did CMG pay PREMCO on a regular basis?
17       A.  We settled up on a monthly basis.
18       Q.  Were you personally responsible for handling
19  those settling up --
20       A.  No.
21       Q.  -- those transactions?  Who was?
22       A.  Well, at one point, Paul Chevez.  And the rest
23  of the time would have been this organization called --
24  headed by Robert Boliard.  And it's B-O-L-I-A-R-D, I
25  believe.

135

1     Q.  Was this one incident or one communication
2  that you had with Mr. Bowman, or were there other
3  disputes --
4     A.  I think we had a number of conversations
5  before.  So I don't know how many.  It was more then six
6  conversations.  I don't know that all the conversations
7  were something resolving -- regarding some inaccuracy.
8  We had conversations about a lot of different things
9  along the three plus years that he was with us.
10    Q.  Right now, I'm just asked about communications
11 that you had with Mr. Bowman concerning disputes over
12 expenses.
13    A.  I mean, do not know how many there.  We could
14 have had couple of conversations.
15       MR. COHEN:  Why don't we make this next
16 exhibit.
17       (Whereupon Exhibit C
18       was marked for identification.)
19       MR. COHEN:
20    Q.  Can you identify this document?
21    A.  This is the facilities agreement between CMG
22 and Pacific Real Estate Management.
23    Q.  Would you look at the page, please?
24    A.  Yes.
25    Q.  You see there's a signature line for

137

```
 1  back and forth between Jim and Paul's group.
 2       Q.   What -- well, strike that.
 3            In that same paragraph, it says:
 4               "This security
 5            deposit is intended to
 6            secure any and all
 7            obligations of Jim Bowman
 8            and/or PREMCO to PGM."
 9                Do you see that?
10       A.   Yes.
11       Q.   "Whether arising out
12            of this agreement or
13            otherwise".
14       A.   Yes.  I see that.
15       Q.   What obligations did PREMCO have to CMG?
16       A.   Well, they're listed here.  Their office
17  space, office furniture, fax machine, common area,
18  telephones.  That kind of thing.
19       Q.   You don't have to read through it.  You can
20  just refer to this section.
21       A.   Okay.
22       Q.   It might make this a little bit easier..
23            Is it your contention that PREMCO breached any
24  of its obligation under this agreement?
25       A.   Did PREMCO breach any of its obligations?  No.
```

```
 1   As near as I can tell, I believe they supplied the items
 2   listed here.
 3        Q.  Okay.  CMG is still holding some portion of
 4   the security deposit under this agreement; isn't that
 5   correct?
 6        A.  Yes.  We are.
 7        Q.  So are you holding that to secure some sort of
 8   obligation?
 9        A.  Um, we're holding it against expenses relative
10   to the branch.
11        Q.  Okay.  Or -- well, it says you can --
12   according to this agreement:
13              "This security
14         deposit is intended to
15         secure any and all
16         obligations of Jim Bowman
17         and/or Pacific Real Estate
18         Management."
19              You've stated that PREMCO has -- well,
20   let me rephrase it, because I didn't quite ask it like
21   this.
22        New question.  Does PREMCO have any
23   obligations to CMG that you're aware of?
24        A.  Um, I believe it is -- um, it has obligations
25   in terms of the security deposits.
```

144

 1          Q.   Does PREMCO owe CMG any money?

 2          A.   Outside of these security deposits?

 3          Q.   We're not talking about the security deposits.

 4   As of this moment, does PREMCO owe CMG any money?

 5          MR. MEDLIN:   Well, objection.  You can't tell

 6   him how he has to answer the question.  He just told you

 7   that PREMCO has an obligation to provide this security

 8   deposit.  And then, you say, "Well, ignore that now."

 9          MR. COHEN:   No.

10          MR. MEDLIN:   And then, you asked him something

11   else.

12          MR. COHEN:   No.

13          MR. MEDLIN:   So he has --

14          MR. COHEN:   No.

15          MR. MEDLIN:   So he answered your question

16   whether you like it or not.

17          MR. COHEN:   No.  I clarified the question.

18          MR. MEDLIN:   No.  You --

19          MR. COHEN:   I'm not asking him to do anything

20   other than --

21          MR. MEDLIN:   Okay.

22          MR. COHEN:   -- ask the question -- answer the

23   question that's being asked, which is are there any

24   obligations from PREMCO to CMG that you believe are

25   outstanding?

1          THE WITNESS:  Other than the security
2  deposits, no.
3          MR. COHEN:
4     Q.  So why hasn't PREMCO received the security
5  deposits back?
6     A.  Because they're outstanding.
7     Q.  In what way?
8     A.  Based on the expenses associated with the
9  branch.
10    Q.  Okay.  Well, is that -- are those PREMCO's
11 responsibilities -- responsibility or Mr. Bowman's
12 responsibility?
13    A.  They're PREMCO's responsibility in terms of
14 reserves.
15    Q.  Well, we'll talk about reserves in a minute.
16 But I am trying to understand your answer.  I'm not
17 trying to do anything coercive here.
18        What is the obligation that PREMCO has which
19 is causing you to hold onto its security deposit?
20    A.  The obligation is through the loans that we
21 were talking about earlier, the Wilkins', referred to,
22 as well as the Fraser repurchase.
23    Q.  Where is there any agreement that gives PREMCO
24 the responsibility for paying those expenses?
25        MR. MEDLIN:  Other than this?

1  questions or comments about it, he had an opportunity to
2  ask questions about it.  Sure.
3      Q.  Did he the opportunity to alter any of the
4  terms of this agreement?
5      A.  I don't think so.
6      Q.  And he had to sign this agreement as a
7  condition of his employment as branch manager; is that
8  correct?
9      A.  We would have to have an agreement in place
10 for him to work at our organization.  Yes.
11     Q.  By "an agreement," you mean a facilities
12 agreement?
13     A.  A facilities' agreement.
14     Q.  Okay.
15     A.  Yes.
16     Q.  Can you tell us whether all the branch
17 managers entered into -- all the CMG branch managers
18 enter into a facilities's agreement like this?
19     A.   CMG branch managers?
20     Q.  Correct.
21     A.  No.  Not all CMG branch managers enter into
22 agreements like this one.
23     Q.  What's the disconnect here?
24     A.  You're asking CMG, and as I told you before,
25 we operate under Pacific guarantee, PGM.

151