Alan F. Cohen (State Bar No. 194075)
**LAW OFFICES OF ALAN F. COHEN**
101 Montgomery Street, Suite 2050
San Francisco, CA 94104
415.984.1943 (tel.)
415.984.1953 (fax)
cohenlaw@mindspring.com

Angela M. Xavier (State Bar No. 165152)
Attorney At Law
900 Cherry Avenue, Suite 300
San Bruno, CA 94066
Telephone: (650) 355-0414
Facsimile: (650) 355-0842

Attorneys for Plaintiffs and Cross-Defendant

**UNITED STATES DISTRICT COURT**

NORTHERN DISTRICT OF CALIFORNIA

SAN FRANCISCO DIVISION

| | |
|---|---|
| JAMES W. BOWMAN, JR. and PACIFIC REAL ESTATE MANAGEMENT COMPANY, INC., a Washington Corporation<br><br>Plaintiffs,<br><br>v.<br><br>CMG MORTGAGE, INC., a California Corporation; CMG MORTGAGE, INC., d/b/a PACIFIC GUARANTEE MORTGAGE, CMG MORTGAGE SERVICES, INC., a California corporation; CMG MORTGAGE SERVICES, INC., d/b/a PACIFIC GUARANTEE MORTGAGE,<br><br>Defendants. | Case No.: C-07-3140-SI<br><br>**DECLARATION OF JAMES W. BOWMAN, JR. IN SUPPORT OF PLAINTIFFS' MOTION FOR SUMMARY ADJUDICATION**<br><br>Date: July 25, 2008<br>Time: 9:00 a.m.<br>Courtroom 10<br>Hon. Susan Illston |
| CMG Mortgage Inc., a California Corporation<br><br>Counter-Claimant,<br><br>v.<br><br>James W. Bowman, Jr., an individual,<br><br>Cross-Defendant. | |

I, James W. Bowman, Jr., declare:

1

CASE NO.: C-07-3140-SI

**DECLARATION OF JAMES W. BOWMAN, JR. ISO MOTION FOR SUMMARY ADJUDICATION**

1. I have personal knowledge of the facts below, and could and would testify competently hereto if called upon to do so.

2. I was hired by Defendant CMG Mortgage, Inc. as a Branch Manager for CMG's Federal Way branch in December 2003. I established and managed this branch, where I and the CMG employees reporting to me brokered loans and/or submitted loans to the in-house bank as an arm of my employer, CMG.

3. Before beginning this job, CMG required me to sign two agreements. I had no input into the terms or conditions of these agreements, which were drafted entirely by CMG, and were presented to me on a take-it-or-leave-it basis. I signed the Federal Way Branch Management and Employment Agreement on or about December 1, 2003. A true and correct copy of this agreement is attached as Exhibit A. Under this agreement, I was to be compensated in part with the net income of the branch, sometimes known as a net branch arrangement.

4. CMG also required me to sign a Facilities Agreement, a true and correct copy of which is attached as Exhibit B. I was told by Kim Callas, CMG's Chief Operating Officer, that this agreement was also a condition of my employment with CMG – in other words, I would not be allowed to become a CMG Branch Manager if I did not enter into the Facilities Agreement. Chris George told me that I would have to use a corporate entity to handle certain Branch expenses. I had formed Pacific Real Estate Management Company, Inc. (PREMCO) previously, and agreed to use PREMCO in the capacity required by CMG.

5. It was, and remains, my understanding that I was signing this agreement in my individual capacity as an employee as well as in that of the president of PREMCO. The agreement did not even have PREMCO's name typed out anywhere; it had to be handwritten in where appropriate. It was my understanding that the agreement was between CMG Mortgage, Inc. and CMG Mortgage Services, Inc., on the one hand, and myself and PREMCO, collectively (the agreement refers to Bowman and PREMCO collectively as "Provider"), on the other hand. I signed twice, once as an employee and again as representative of PREMCO.

6. I signed a second set of agreements when CMG hired me to run a second branch in Vancouver, Washington. Attached as Exhibits C and D are the BMA and Facilities

Agreements for that branch. I was told by CMG that these were the same contracts as the previous two that I signed with CMG and that I was required to sign them in order to manage the Vancouver Branch.

7. I did not have an attorney in the years 2003, 2004, 2005 and 2006. Since I did not have an attorney, I received no independent legal advice as to the legality, meaning and implications of these contracts.

8. I relied on communications with Chris George, President of CMG, along with various CMG employees and CMG's legal counsel that I was assured as to the legitimacy and legality of these contracts.

9. In the second half of 2006, CMG required me to sign two new sets of contracts for the Federal Way Branch Office and the Vancouver Branch Office or else they would terminate my employment. Because I declined to sign the new contracts, CMG sent a Termination Letter to me on December 18th, 2006. The termination date was originally January 18th, 2007 but was later date extended to January 31, 2007.

10. On February 22nd, 2007, Patricia Mitchell of CMG sent me the Statements of Operations for the Federal Way and Vancouver Branch that showed the net income due to me at the time of termination. A true and correct copy of the final Statements of Operations for January 2007 is attached as Exhibit E, showing net income of $31,047 that should have been paid to me as wages. CMG did not pay me the net income from the Federal Way Branch or the Vancouver branch or, for that matter, any other money owed me for January 2007. To this date I have not received this income.

11. On and around the end of January 2007, I submitted Expense Vouchers in the amount of $20,803 to Patricia Mitchell of CMG for the Federal Way Branch and Vancouver Branch "Facilities" expenses that had been advanced by PREMCO and myself on behalf of CMG for January 2007. A true and correct copy of the expense vouchers I submitted for January 2007 is attached as Exhibit F. CMG did not reimburse me the branch expenses for the Federal Way Branch or the Vancouver Branch for the month of January, 2007. I verified with Patricia Mitchell in an e-mail dated February, 27, 2007 that she had received these expense vouchers. I

still have not been reimbursed for any of these expenses, and have not received the 125% "Rental Fee" for that amount.

12.     During my employment with CMG, Chris George informed me that HUD required additional reserves for each branch. CMG increased my reserves requirements for both the Federal Way and Vancouver Branches. At various times during my employment, CMG took part of my net income and added it the reserve accounts. At the time of my termination there was $39,682 in my reserve accounts for the Federal Way and Vancouver Branches. These Reserves are reflected as line items in Exhibit E. To this date CMG has never refunded the Reserves balances to me.

13.     CMG never did not pay me or PREMCO the "rental fee" of 125% of the branch expenses for either the Federal Way Branch or the Vancouver Branch.

14.     In January, 2007, Kern Lewis, Marketing Director of CMG, requested that I provide invoices showing marketing and advertising expenses that I had paid for during the year of 2006. Upon receipt of these invoices, Mr. Lewis informed me that I would get an additional check for marketing credits. In January, 2007, I submitted invoices for marketing and advertising expenses that I had paid for in the year 2006. I was told by Patricia Mitchell and Kern Lewis that I was due a sum over $12,000.00 and that the check request had been completed and given to Paul Chevez, CFO of CMG. CMG did not issue the check that they agreed was owed to me nor did CMG pay or reimburse me for the marketing credits from 2006 that was due to me in January 2007.

15.     During the course of my employment with CMG, the net income due me from the Federal Way Branch and the Vancouver Branch was calculated on the Statement of Operations for each branch at the end of each month and paid to me or PREMCO on or around the 15th of the following month. Normally, the Statement of Operations from the prior month is e-mailed to the branch managers on the 14th of the following month and the checks are received by the branch managers on the 15th of the following month a day after receipt of the Statements of Operation.

16. Beginning on or around and after February 14th, 2007, I sent e-mails and made phone calls to CMG asking where the Statement of Operations were for the Federal Way and Vancouver branches. Because I did not receive the net income checks, expense checks, marketing credit check, and Reserves checks, I asked Patricia Mitchell for help getting me these checks and the Statements of Operations. I continued to call and e-mail CMG's corporate office to request my income checks and the Statements of Operation for several days. I received no e-mail response from CMG until a week later. During that time, Patricia Mitchell said that Paul Chevez was to have called me to explain why CMG did not send me any checks.

17. On or around February 21, 2007, when I finally spoke to Mr. Chevez several days after the due dates, he informed me that CMG and the "Executive Management Committee" upon advice from legal counsel had stopped Patricia Mitchell from sending me any of my income checks because of a loan that was requested to be repurchased on February 9th, 2007. Since this event had nothing to do with my prior month income and was not an expense of the branch, I asked Mr. Chevez to send me the Statements of Operations and the checks.

18. On or about February 22nd, 2007, Patricia Mitchell sent me the Statements of Operations via e-mail for both the Federal Way and Vancouver Branches for the month of January, 2007 that showed how much CMG calculated that I should have received on February 15th, 2007 for the net income and the reimbursement for the reserves; however, the Marketing Credits were not included nor were the checks sent. I asked Mr. Chevez several times when I was going to be paid and I informed him that I had many expenses that I needed to pay. Mr. Chevez stated that he would speak to legal counsel and that he would try to get my expenses reimbursed. After being stone-walled by Mr. Chevez for over a week, I asked if Chris George ultimately made the decision to refuse to pay and reimburse me the money that CMG owed to me. Mr. Chevez told me that indeed it was Chris George who made the decision.

19. Around the end of February 2007, after speaking to Paul Chevez, I called Chris George several times and explained to him that he owed me the money from the Statements of Operation, Reserves, Expenses, and Marketing Credits. I emphasized that I needed my money and had to pay my expenses. I explained to Mr. George that his refusal to pay me affected not

only my obligations to pay the expenses of the two branches but my family's financial obligations as well. Mr. George promised to speak to legal counsel and at least get my expenses reimbursed. When Mr. George failed to call me at a pre-arranged time, I called him three more times. Mr. George stopped returning my phone calls. After that, I sent several letters and faxes to CMG and to CMG's legal counsel, Medlin and Hargrave, over the next several weeks requesting that we discuss the payment of my income. CMG did not respond to any of them until after I filed a lawsuit against them approximately four months later in June, 2007.

20. I relied on CMG's expertise to accurately and legally perform all the accounting functions for the Federal Way and the Vancouver Branches.

21. After CMG refused to pay me in February 2007, I reviewed all of my Statements of Operations. Upon review of my contracts and the past accounting practices, I discovered several areas of accounting malfeasance whereby CMG had failed to pay me 125% of the branch expenses for both the Federal Way and Vancouver Branch. CMG had reduced net income by deducting excessive benefits paid to employees such as health care and an employer 401(k) matching plan. CMG had reduced by net income by deducting CMG owed corporate taxes and deducting state fines imposed on CMG. CMG had reduced my net income by over paying commission to some employees. As a result, I have had to retain a CPA to analyze and assess these additional damages.

22. To this date, I have not been paid my net income, I have not been reimbursed for the branch expenses, I have not received a check for the Marketing Credits, and I have not received a reimbursement check for my reserves. Consequently, I have lost time and opportunity and I have been forced to borrow tens of thousands of dollars and cash in my retirement accounts to cover these losses and pay the tremendous amount of money required to pursue the recovery of all the income owed to me from CMG.

23. I was required to offer a personal guaranty under some of the contracts the branches I managed entered into with vendors. Attached as Exhibit G is a true and correct copy of one of these contracts, along with notices from the vendor and collection agencies trying to collect CMG's debts from me.

24. CMG funded loans on a daily basis. As the loans are sold on the secondary market the credit lines (warehouse lines of credit) become available and the 3% of money CMG put down on the average loan is paid back to CMG. This means that they could use the same 3% several times over each month (potentially daily) as the loans are funded and sold as soon as possible. Consequently, this money come enable CMG to funds tens of millions of dollars of loans each year. Among other things, this saves them thousands of dollars in interest.

25. During the time that I worked for CMG, PREMCO had no function other than as a conduit for payments to CMG vendors and for receiving payments from CMG. PREMCO had no business, no employees, paid no salaries, and received no income other than from CMG-related payments. Until late 2005, virtually all the money PREMCO used to pay for the CMG branch "Facilities" expenses came from my wage payments from CMG, which I deposited into PREMCO's bank account. Even after CMG began issuing my net income checks directly to PREMCO in October and November 2005, I had to subsidize PREMCO from other income or from credit lines to pay CMG Facilities expenses. PREMCO was obligated to pay the rent on the offices leased for CMG in Federal Way and Vancouver, as well as numerous vendor agreements on behalf of CMG.

26. During my employment with CMG, I, along with PREMCO, incurred at least $987,325 in Facilities expenses for the CMG branches I managed. Attached as Exhibit H is a true and correct copy of expense vouchers submitted to CMG since November 2005, when I first was provided the expense voucher form. I can attest that the remaining tally comes from PREMCO's bookkeeping software and is correct.

27. The Rental Fee under the Facilities Agreement is equal to 125% of the actual Facilities costs incurred, which comes out to $1,234,157. The total distributions I received from CMG under the BMA and FA amounted to $1,179,270, whether characterized as net income, facilities costs, facilities reimbursements, or otherwise.

I declare under penalty of perjury under the laws of the State of California that the foregoing is true and correct.

Executed this 23rd day of June, 2008, at San Francisco, California.

/s/ James W. Bowman, Jr.
James W. Bowman, Jr.