David R. Medlin        (SBN 77417)
G. Bradley Hargrave    (SBN 173911)
Joshua A. Rosenthal    (SBN 190284)
MEDLIN & HARGRAVE
A Professional Corporation
One Kaiser Plaza, Suite 1305
Oakland, CA  94612
Telephone:     (510) 832-2900
Facsimile:     (510) 832-2945
E-mail:        *jrosenthal@mhlawcorp.com*

Attorneys for Defendants and Counter-Claimant

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| James W. Bowman, Jr. and Pacific Real Estate Management Company, Inc., a Washington Corporation, | Case No.: C 07 3140 SI |
| Plaintiffs, | OPPOSITION TO PLAINTIFFS' MOTION FOR SUMMARY ADJUDICATION |
| vs. | Date:    July 25, 2008 |
| | Time:    9:00 a.m. |
| CMG Mortgage Inc., a California Corporation; CMG Mortgage, Inc., d/b/a Pacific Guarantee Mortgage, CMG Mortgage Services, Inc., a California Corporation, CMG Mortgage Services, Inc. d/b/a Pacific Guarantee Mortgage, | Dept:    Courtroom 10 |
| | Judge:  Honorable Susan Illston |
| | File date: June 14, 2007 |
| | Trial date: August 25, 2008 |
| Defendants. | |

_____/

CMG Mortgage Inc., a California Corporation

Counter-Claimant,

vs.

James W. Bowman, Jr., an individual,

Cross-Defendant.

_____/

1

2

3

4

# TABLE OF CONTENTS

TABLE OF AUTHORITIES .................................................................................................. ii

I.    INTRODUCTION ........................................................................................................ 1

II.    FACTS ........................................................................................................................ 2

III.    ARGUMENT ............................................................................................................ 10

   A.    Standards For Summary Adjudication. .......................................................... 10

   B.    Defendants Did Not Breach The Facilities Agreements. ............................... 10

       i.    What The Contracts Say. .................................................................... 11

       ii.    How The Contracts Work In Practice. ............................................... 13

   C.    There Is a Genuine Issue as to a Material Fact with Respect to the Thirteenth
         Cause of Action. ............................................................................................. 15

       i.    The Obligations Alleged Are PREMCO's. ........................................ 15

       ii.    Plaintiffs Did Not Produce The Evidence Supporting The Summary
             Adjudication For The Thirteenth Cause of Action In Discovery .............. 16

       iii.    There Is No Foundation For Plaintiffs' "Evidence." ......................... 16

       iv.    The Credit Reports At Issue Were For Loans Bowman Stole From
              CMG. ................................................................................................. 17

       v.    There Is No Liability Under Labor Code Section 2802 As Plaintiffs Have
             Not Incurred An Obligation. .............................................................. 18

   D.    There Is a Genuine Issue of Material Fact with Respect to Bowman's Claim for
         Unpaid Wages. ................................................................................................ 18

       i.    There Were No Net Profits Available For Distribution At The Time
             of Termination. .................................................................................. 19

       ii.    Plaintiffs Are Not Owed Any Compensation For Marketing Credits. ...... 20

       iii.    The Security Deposits/Reserves Are Not Wages. ................................ 22

   E.    There Is a Genuine Issue of Material Fact With Regard To The Breach Of
         Fiduciary Duty Cause Of Action. .................................................................... 24

V.    CONCLUSION ........................................................................................................ 25

i

# TABLE OF AUTHORITIES

## FEDERAL CASES

*Anderson v. Liberty Lobby, Inc.,*
  (1986) 477 U.S. 242 ................................................................................. 11

*Bank of California, N.A. v. Opie,*
  (9th Cir. 1981) 663 F.2d 977 .................................................................... 14

*Calderone v. United States,*
  (6th Cir,. 1986) 799 F.2d 254 ................................................................... 11

*Delbon Radiology v. Turlock Diagnostic Ctr.,*
  (E.D. Ca. 1993) 839 F.Supp.1388 ............................................................ 11

*Eastman Kodak Co. v. Image Technical Services, Inc.,*
  (1992) 504 U.S. 451 ................................................................................. 11

*Fontenot v. Upjohn Co.,*
  (5th Cir, 1986) 780 F.2d 1190 .................................................................. 11

*Nunez v. Superior Oil Co.,*
  (5th Cir. 1978) 872 F.2d 1119 .................................................................. 11

*Wards Co., Inc. v. Stamford Ridgeway Associates,*
  (2nd Cit. 1985) 761 F.2d 117 ................................................................... 11

## STATE CASES

*Bohman v. Berh,*
  (1960) 54 Cal.2d 787 ................................................................................ 14

*Case Herrera, Inc. v. Beydoun,*
  (2004) 32 Cal.4th 336 ............................................................................... 14

*Kendall-Jackson Winery, Ltd. v. Superior Court,*
  (1999) 76 Cal.App.4th 970 ....................................................................... 19

*National Marble Co. V. Bricklayers & Allied Craftsmen,*
  (1986) 184 Cal.App.3d 1057 .................................................................... 14

*Plancarte v. Guardsmark,*
  (2004) 118 Cal.App.4th 640 ..................................................................... 19

*Prachasaisoradej v. Ralphs Grocery Co.,*
  (2007) 42 Cal.4th 217 ............................................................................... 21

## FEDERAL STATUTES

Federal Rules of Civil Procedure 56 (a), ....................................................... 11

1

## STATE STATUTES

2   California Civil Code § 1635 ........................................................................... 14

3   California Labor Code § 400 et seq ......................................................... 25, 26

4   California Labor Code § 2802 .................................................................... 19

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

1    **I.    INTRODUCTION**

2    Plaintiffs seek summary adjudication of issues with respect to a complaint that has not yet

3    been filed.   Assuming, however, that plaintiffs' motion is based upon their proposed second

4    amended complaint, then plaintiffs are seeking summary adjudication of causes of action related to

5    the Facilities Agreements - agreements which are contracts between two corporations, defendant

6    CMG Mortgage, Inc., ("CMG") and plaintiff PREMCO, Inc., ("PREMCO").   These are business-to-

7    business contracts as to which there is certainly a genuine issue of material fact as to whether

8    defendants are in breach.

9    As a critical predicate to this motion, plaintiffs assert that James Bowman ("Bowman")

10   personally incurred expenses, for which he was not reimbursed.   In fact, as Bowman testified in his

11   deposition, PREMCO incurred these expenses, not Bowman.   Bowman merely chose to invest in or

12   loan money to PREMCO.   Bowman Depo., 324:19- 325:5.   Similarly, plaintiffs claim that Bowman

13   personally posted security deposits (also known as reserves) with CMG.   In fact, all security deposits

14   were posted by PREMCO, not Bowman.   As Bowman testified in his deposition, no security deposit

15   was ever paid by a check drawn on, or by a transfer made from, any personal account of his.

16   Bowman Depo., 430:2- 430:23.   Chevez Decl., paras.15-16.   Clearly, there is a genuine issue of

17   material fact as to these claims.

18   Plaintiffs strain to characterize their claims as belonging to Bowman in order that they may

19   bring them within the labor laws.   Since defendants contend, and Bowman's deposition testimony

20   establishes, that his corporation, PREMCO, paid these expenses and posted these security deposits,

21   as a matter of law there can be no breach of fiduciary duty or labor code violation.   Bowman Depo.,

22   324:19- 325:5, 430:2- 430:23.

23   Finally, plaintiffs allege damages for waiting time penalties for a failure to pay final wages

24   related to alleged unpaid Net Profits.   As will be shown, pursuant to the parties' agreements, there

25   were no Net Profits at the end of their relationship due to repurchase demands by investors with

26   respect to loans originated from plaintiffs' branches.   Chevez Decl., paras. 2-4.   Additionally, there

27   were no Net Profits, in large measure, because Bowman wrongfully misappropriated CMG loans in

28   progress ("Pipeline Loans") and redirected them to Sierra Pacific Mortgage, the mortgage banker

1

1    with which Bowman currently has a net branching relationship.  Bowman Depo., 290:24-293:19.

2    Moreover, and in any event, most of the sums in dispute can only be claimed by PREMCO, not

3    Bowman, and thus can not possibly be wages.

4         Clearly, there are genuine issues of material fact with respect to each cause of action as to

5    which plaintiffs seek summary adjudication.  The motion must be denied.

6    **II.    FACTS**

7         Plaintiffs' motion, indeed plaintiffs' entire action, depends largely upon obfuscation of facts,

8    and an intentional confusion of the various business relationships between the parties.

9         The core business relationship at issue is a common one in the mortgage industry, known and

10   referred to as a net branching relationship.  A net branching relationship is typically a three party

11   relationship wherein: (1) a mortgage loan originator (the net branch operator), such as Bowman; and

12   (2) a business entity under the net branch operator's control (such as PREMCO), together, enter into

13   a business relationship with (3) a larger company (typically a mortgage banker, i.e., a mortgage

14   lender) such as CMG.  The relationship allows the net branch operator (Bowman) to essentially be in

15   business for himself, while enjoying advantages attendant to being associated with a much larger

16   entity.  Accordingly, in a net branching relationship, the net branch operator enjoys all of the net

17   profits of the net branch.  The incentive for the mortgage banker (CMG), is the opportunity to

18   expand its ability to make loans, i.e., to "bank" loans, and thereby generate income for itself from

19   the sale of those loans into the secondary market.

20        Bowman was a net branch operator long before he associated with CMG, and is a net branch

21   operator even today.  Before associating with CMG, Bowman was a net branch operator for

22   Mortgage Market, a division of Prism Financial.  Exhibit 17,  Bowman Depo., 460:5-461:5..  Prism

23   was acquired by RBC Mortgage of California ("RBC"), a wholly owned subsidiary of the Royal

24   Bank of Canada.  RBC conducted its net branching operations as Pacific Guarantee Mortgage

25   ("PGM").  Bowman was a net branch operator for PGM.[1]  Bowman Depo., 21:7-13.  After RBC

26   ceased its net branching operations, Bowman became a net branch operator for Citybank.  Bowman

27   Depo., 20:19-21:6. Thereafter, in December of 2003, Bowman became a net branch operator for

28

---

[1]   RBC sold its net branching operation, Pacific Guarantee Mortgage, to CMG.

2

1  CMG.  Bowman Depo., 22:18-23:2.  After leaving CMG, Bowman became, and still is today, a net

2  branch operator for Sierra Pacific Mortgage. Bowman Depo., 23:12-17.  Each of these net branching

3  operations conducted business in substantially the same way.[2]  Bowman Depo., 23:3-5.

4        In each case Bowman used his corporation, PREMCO, to provide "facilities."    Bowman

5  Depo., 27:7-16.  "Facilities," in net branching, refers to office space and the furniture, fixtures and

6  equipment needed to run a mortgage brokerage office.  Exhibit B to Bowman Decl., page 1, para

7  1.2.  PREMCO has held the lease for each of the various office space(s) out of which Bowman has

8  operated his business.  Rosenthal Decl., para. 3.  As with CMG, in each case PREMCO sub-leased

9  that office space to the mortgage banker.  Additionally, PREMCO has always owned or leased the

10  furniture, fixtures and equipment which Bowman has used to operate his business.  Bowman Depo.,

11  54:1-4.   As with CMG, in each case PREMCO sub-leased that same furniture, fixtures and

12  equipment to the mortgage banker.    Plaintiff assert, at page 11, line 19 of their brief, an illegal

13  contract because it is "unlawful" under HUD guidelines.  First, in support of this position plaintiffs

14  attach a Mortgage Letter which has been cancelled by HUD.  Second, the Facilities Agreement is not

15  contrary to HUD's guidelines.  Third, a violation of HUD guidelines, even if it did exist, would not

16  render the Facilities Agreement, or any other contract, "illegal".  Fourth, there is no private right of

17  action under HUD guidelines.

18        Accordingly, in each instance, as with CMG, Bowman has "worn several hats" in the parties'

19  business relationship: (1) he was a loan officer, originating loans in exchange for a commission,

20  Chevez Decl., para. 12, Exhibit 12; (2) he was a net branch operator, managing one or more branch

21  offices in exchange for receipt of 100% of the net profits realized from the business operations of

22  those branches, Exhibits A & C to Bowman Decl.; and, (3) he was the owner/operator of PREMCO,

23  the holder of Facilities (an office lease, and furniture, fixtures and equipment necessary to own and

24  operate a mortgage business), which Facilities PREMCO has sub-leased.   Exhibits B & D to

25  Bowman Decl.   In the case of CMG, the parties' three different business relationships were

26

27        [2]  In each instance, Bowman has conducted his business as Pacific Trust Lending, as he does today.  He has
never conducted business as Mortgage Market, as Prism, as RBC, as Pacific Guarantee Mortgage, as PGM or as CMG.

28  His business cards have always, and do today, say Pacific Trust Lending.  The name on his office door has always been,
and is today, Pacific Trust Lending.  He is in business for himself.  Bowman Depo., 82:19-85:10.

3

1  evidenced by three different contracts.

2      The first contractual relationship was a Broker-Loan Originator Employment Agreement.

3  Chevez Decl., para. 12, Exhibit 12.  Pursuant to this agreement, Bowman received a commission for

4  each loan which he personally originated.  It is undisputed that Bowman was paid a commission for

5  every loan he closed while associated with CMG.  Indeed, during his three years with CMG,

6  Bowman $296,762.73, just in commissions.  Mitchell Decl., para.8.

7      The parties' second contractual relationship was evidenced by a Branch Management and

8  Employment Agreement ("BMA").  Pursuant to this agreement, Bowman was to receive additional

9  compensation in the form of 100% of the Net Profits (a defined term) realized from all business

10  operations of his net branches.[3]  Exhibits A & C to Bowman Decl.  Of course, pursuant to the

11  parties' agreement, Bowman was only to receive Net Profits to the extent there actually were Net

12  Profits.

13      The parties' third contractual relationship was evidenced by a Facilities Agreement.

14  Pursuant to this agreement, PREMCO was to sub-lease to CMG the Facilities, i.e., the office space,

15  furniture, fixtures and equipment needed to operate Bowman's branches.[4]  Exhibits B & D to

16  Bowman Decl.

17      These three contracts were entered into together.  When read together, especially in the

18  context of industry practices with respect to net branching, their intent is clear.  And, to the extent

19  there is any ambiguity in the agreements, the parties' consistent practices, and unwavering conduct

20  over the course of three years clearly establishes the parties' true intent and actual understanding.

21      Together, the three contracts contemplate that the loan originators at Bowman's branches,[5]

22  including Bowman, will arrange mortgage loans for borrowers.  The income derived from such loan

23  originations is considered Gross Income.  From Gross Income, Expenses are deducted to determine

24  _____

25      [3]  Bowman actually entered into two identical BMAs, one for each of his two branch offices, known
    respectively as the Federal Way branch (branch #455) and the Vancouver branch (branch #457).  Exhibits A & C,
    respectively, to the Bowman Decl.

26

27      [4]  As with the BMAs, Bowman and PREMCO actually entered into two identical Facilities Agreements, one for
    each of Bowman's two branch offices, Federal Way and Vancouver.  Exhibits B & D, respectively, to the Bowman Decl.

28      [5]  It is important to note that Bowman considered himself the "owner" of these branches. See Rosenthal Decl.,
    para. 6, Exhibit 6.

OPPOSITION TO PLAINTIFFS' MOTION FOR SUMMARY ADJUDICATION C 07 3140 SI
M:\CMG\85-0706-02 Bowman\Motion\Plaintiff's MSA 06.23.2008\Opposition\Opposition.07.07.08.wpd

1    Net Profit.  Net Profit, if any, is paid to the net branch operator, i.e., Bowman.  Exhibits A & C, to

2    the Bowman Decl., page 4-5, para, 9.

3        Gross Income is defined in the BMA as "all income earned and derived from the Branch

4    Office."  Exhibits A & C, to the Bowman Decl., page 4, para, 9.  The branch office "earns" income

5    via the various broker fees and commissions paid by lenders in connection with the origination of

6    loans.  The parties never considered income realized by CMG in the secondary market to be part of

7    Gross Income.[6]  Chevez Decl., para. 5; Bowman Depo., 388:1-8.

8        Expenses are defined in the BMA as "all operating expenses of the Branch Office . . .

9    including, but not limited to the following: (a) rent, copiers, office supplies, telephone service and

10   utilities; (b) commissions, salaries, payroll costs and expenses, and benefits of all employees and

11   loan agents, including but not limited to commissions paid to Branch Manager in his/her capacity as

12   a loan agent . . . ."  Exhibits A & C, to the Bowman Decl.  Essentially, these specifically itemized

13   expenses consist of three components: (1) Facilities (from the Facilities Agreement), i.e., office

14   space, furniture, fixtures and equipment; (2) commissions paid to loan originators (including

15   Bowman); and, (3) payroll costs and administrative expenses.

16       Each month during the parties' relationship CMG provided plaintiffs with a Statement of

17   Operations and Income Statement.  Chevez Decl., para. 6.  The statements would set forth the Gross

18   Income of Bowman's Branches (Federal Way and Vancouver) and some of the Expenses.

19   Specifically, the payroll costs and administrative expenses would be set forth on the statements to

20   arrive at a number referred to by the parties as Net Income (not Net Profit).[7]  The Net Income was

21   the total cash on hand which was available for distribution.  Chevez Decl., para. 6.  At Bowman's

22

23       [6]  When CMG "banks" a loan, i.e., when it acts as a lender, it thereafter sells that loan into the secondary

24   market, hopefully for a profit, but sometimes at a loss.  This is known and referred to as secondary market income (or loss).  It is undisputed that neither plaintiff ever acted as a lender.  It is undisputed that neither plaintiff ever "sold" any mortgage into the secondary market.  It is undisputed that during the course of their relationship, each month CMG

25   provided plaintiffs with a detailed accounting (Statement of Operations) of all income and expenses for the Federal Way and Vancouver branches.  Chevez Depo., para. 5.  It is undisputed that these accountings never once included secondary

26   market income, or loss.  Indeed, Bowman testified that he never understood (or expected) that he was entitled to any portion of CMG's secondary market income (or loss) until after the parties' relationship ended and this dispute erupted.

27   Bowman Depo., 384:5-385:6.

28       [7]  The distinction between Net *Income* and Net *Profit* is an important one, intentional confusion of which, serves as the basis for the bulk of plaintiffs' claims.

5

1  option, this Net Income, i.e., this cash on hand, was available to be used to pay PREMCO for
2  Facilities or, if Bowman preferred, the Net Income (cash on hand) could be distributed entirely to
3  Bowman as Net Profits.  Chevez Decl., para. 6.

4       If Bowman elected to have the Net Income paid to PREMCO, CMG required that PREMCO
5  first submit an Expense Voucher itemizing each of the various components of the actual cost
6  incurred by PREMCO to provide the various Facilities, as set forth in the Facilities Agreement.
7  Chevez Decl., para. 6.  Then, pursuant to the Facilities Agreement, to the extent of Net Income (i.e.,
8  to the extent of cash on hand), Bowman could elect to have PREMCO paid up to 125% of the
9  amount PREMCO had submitted on its Expense Voucher.  Mitchell Decl., paras. 3-4.  Such payment
10 was considered an Expense, for purposes of calculating Net Profit.  Exhibit A & C to Bowman
11 Decl., pages 4-5, para. 9.  Accordingly, to the extent there was any Net Profit after a payment to
12 PREMCO for Facilities, that remaining cash, the Net Profit, was available to be paid to Bowman,
13 pursuant to the BMA.  Mitchell Decl., para. 4.

14      During the first two years of the parties' relationship, Bowman directed that all Net Income
15 be paid to himself each month as Net Profits.  Chevez Decl., para. 7.  In other words, Bowman
16 directed that all cash on hand be paid to himself as Net Profits.  Bowman Depo., 359:19-360:22.  For
17 whatever reason, Bowman decided that PREMCO should not be paid anything.  Accordingly, at
18 Bowman's direction, from the beginning of the parties' relationship in December of 2003, through
19 October of 2005, no payments were made to PREMCO.  Chevez Decl., para. 7.  During this period
20 all Net Income was paid to Bowman as Net Profits.  From CMG's perspective it was irrelevant how
21 the money was distributed.  All of the Net Income was cash on hand for Bowman's branches to be
22 paid as he directed, either to his corporation, or to himself, or any combination thereof.  Chevez
23 Decl., para. 7.

24      Beginning in October of 2005, Bowman directed that the Net Income be paid first to
25 PREMCO, as Facilities.  Bowman Depo., 360:23-361:22.  Accordingly, in October of 2005, to the
26 extent of Net Income (i.e., to the extent of cash on hand), an amount equal to 125% of the Expense
27 Voucher submitted that month by PREMCO, was paid to PREMCO for Facilities.  Mitchell Decl.,
28 para. 4.  Pursuant to the parties' contracts (and, consistent conduct, prior to any dispute), this

6

1    payment to PREMCO was an Expense, payment of which reduced Net Profits by that amount.

2    Exhibit A and C to Bowman Decl., page 5, para. 9(a).

3           From and after October of 2005, at Bowman's direction, CMG was instructed to first use the

4    Net Income from Bowman's branches to pay PREMCO up to 125% of the Expense Voucher it had

5    submitted.  Many months, the Net Income was not sufficient to pay 125% of the Expense Voucher.

6    Mitchell Decl., para. 4.  Accordingly, in those months, at Bowman's direction, all Net Income (i.e.,

7    all available cash on hand) was paid to PREMCO.  Any remaining amounts on the Expense Voucher

8    were carried forward into the next month.  Mitchell Decl., para. 4. Occasionally, in a good month,

9    the Net Income was sufficient to pay 125% of the accumulated Expense Vouchers to PREMCO,

10   with money left over.  Mitchell Decl., para. 4. This, of course, meant that there were Net Profits that

11   month.  Mitchell Decl., para. 4.  Accordingly, in those months, the Net Profit was then paid to

12   Bowman.  So, for example, in June of 2006, at Bowman's direction, $37,662.08 was paid to

13   PREMCO for Facilities, i.e., 125% of the accumulated Expense Vouchers to that date, leaving

14   remaining cash on hand (i.e., Net Profit) of $9,256.11, which Net Profit was paid to Bowman.[8]

15   Mitchell Decl., para. 4.  In March of 2006, for example, the Net Income was less than the Expenses

16   and thus the Facilities reimbursement was only the amount of Net Income and the remainder was

17   rolled in to the next month. Mitchell Decl., para. 6.

18          Throughout the parties' relationship, each month, without fail, all available Net Income, i.e.,

19   all cash on hand, for Bowman's branches was distributed, as he directed, to himself as Net Profits, to

20   PREMCO as Facilities or some combination thereof.  Chevez Decl., para. 9.  It is indisputable that,

21   except for the last month of the parties' relationship (which will be addressed below), 100% of all

22   Net Income from Bowman's branches was distributed, at his direction.  Chevez Decl., para. 8.

23   Accordingly, pursuant to Bowman's direction, a total of $677,009.25 was distributed to him as Net

24   Profits, and an additional $459,156.83 was distributed to PREMCO as Facilities.  Mitchell Decl.,

25   para. 5.  Putting this together with his $296,762.73 in commission income, in three years Bowman,

26

27   _____

28   [8]  In December 2005, January 2006, February 2006, June 2006, and July 2006 there were Net Profits remaining,
     after payment to PREMCO of 125% of the accumulated Expense Vouchers it had submitted.  In each of these months,
     those Net Profits were paid to Bowman.  See Exhibit 18.

                                                        7

1  and/or his corporation, were paid in excess of $1,400,000, a yearly average of more than $478,000.

2  Mitchell Decl., para. 8.

3      The simple truth is that, in reality, the parties have but one dispute, over one month - the last

4  month of their relationship.  In that last month, Bowman contends his branches had Net Income of

5  $31,047, as reported on the Statement of Operations for that month.  CMG contends the amount is

6  $15,245.41, as ongoing expenses incurred prior to the termination were reflected in subsequent

7  accountings.  Mitchell Decl., para. 7, Exhibits 21 & 22.  It is undisputed that CMG held reserves

8  (collected from PREMCO, not Bowman) totaling $39,682.00.  It is undisputed that Bowman's

9  branches had earned "marketing credits" (available to offset future marketing of CMG products)

10 totaling $12,306.00.   And, it is undisputed that CMG had pending repurchase demands from

11 investors, with respect to two loans originated from Bowman's branches totaling $536,941.56.[9]

12 Chevez Decl., paras. 3-4, Exhibits 8-11.

13      Additionally, during this last month, Bowman had an obligation under the BMA to close all

14 loans, started prior to 5:00 p.m. on the date of termination, with CMG after termination.  Exhibits A

15 & C to Bowman Decl., page 9, para. 20.  These are referred to as Pipeline Loans.  However,

16 Bowman did not close these loans with CMG, and instead closed them with his new business

17 partner, Sierra Pacific Mortgage, Inc.  Bowman Depo., 290:24-293:19.  Rosenthal Decl., para. 4.

18 CMG has been damaged as a result of Bowman's breach of the BMA.  But for Bowman's breach,

19 income that would have been earned by the branches could have been used to offset expenses,

20 possibly resulting in Net Profits.  Chevez Decl., para. 17.  Instead, Bowman engaged in self-help and

21 wrongfully diverted to, and closed the Pipeline Loans with another entity.  Having redirected income

22 from Pipeline Loans which otherwise would have been net branch Income (offsetting Expenses),

23 having closed those Pipeline Loans elsewhere, having accepted for himself the resulting income

24 from those Pipeline Loans, effectively Bowman now seeks to recover that same income from CMG,

25 by seeking to recover Expenses which, of course, were not paid by plaintiffs.  To make matters

26

27      [9] Among other things, CMG is contractually required to repurchase from investors (to whom it sells loans into the secondary market) loans in which the borrower and/or mortgage broker has committed some form of fraud and/or

28 loans in which the borrower has defaulted on one or more of the borrower's early monthly payment obligations.  This occurred with respect to two loans originated by Bowman's branches, the Frazier loan and the Wilkins loan.

8

1   worse, the credit report "obligations" submitted in support of the 13th cause of action (documents not
2   previously produced in discovery) are for credit reports that other parties paid for in order to obtain
3   the Pipeline Loans which Bowman misappropriated from CMG.   Chevez Decl., para. 11;
4   Declaration of Felecia Bowers.   Thus, this is not just a counter-claim by CMG, it directly affects the
5   claims made by plaintiffs.

6        The ultimate dispute between the parties is that CMG contends: (1) that the repurchase
7   demands totaling $536,941.56, should be considered an Expense; and, (2) the marketing credits have
8   no cash value (rather, they are what their name suggests, "credits" to be applied to future marketing
9   by plaintiffs of CMG products).   Chevez Decl., para. 13.   Bowman disputes these contentions and
10  maintains that the repurchase demands are not an Expense, and that the marketing credits should be
11  converted to cash.   The difference in the parties' positions creates the following result:

|  *CMG's Position:* |  |  *Bowman's Position:* |  |
| --- | --- | --- | --- |
| Net Income | $ 15,245.41 | Net Income | $ 31,047.00 |
| Reserves | $ 39,682.00 | Reserves | $ 39,682.00 |
| Sub-Total | $ 54,927.41 | Marketing Credits | $ 12,306.00 |
| Repurchase Demands | ($536,941.56) |  |  |
| Net Loss | ($482,013.15) | Total | $ 83,035.00 |

18       This is where the dispute began - clearly a point upon which reasonable people could differ.
19  However, rather than address this dispute, and the relatively small numbers truly at issue, plaintiffs
20  are attempting to exploit the complexity of net branching in order to "engineer" the much larger,
21  albeit completely disingenuous claims which are the subject of this motion.   Accordingly, plaintiffs
22  have intentionally confused (and, misled the court), as to the terms Net Income and Net Profit.   And,
23  plaintiffs have even been reduced to taking the position that Bowman's own corporation, PREMCO,
24  is a sham.[10]   Without such desperate actions, plaintiffs' claims can not begin to approach the multi-
25  million dollar level which plaintiffs would have this court believe is at issue.

26

27      [10]  Of course, PREMCO was in existence for many years before its association with CMG, owning and leasing
28   facilities for Bowman's many net branch operations before he joined CMG.   Bowman Depo., 21:7-27:16., 54:1-4. And, even today, PREMCO is leasing office space for Bowman's current net branching relationship with Sierra Pacific Mortgage.   Rosenthal Decl, para. 5,  Exhibit 4.

9

III.    **ARGUMENT**

    A.    **Standards For Summary Adjudication.**

       Plaintiffs did not provide any authority for the relief they are seeking.  However a motion for summary judgment/adjudication can only be granted if there is no genuine issue of any material fact in a particular claim and the moving party is entitled to judgment as a matter of law as to that claim. F.R.C.P. 56 (a),(b).  The moving party has the burden of persuasion and must demonstrate that there is no triable issue as to the matters alleged in its own pleadings.  <u>Calderone v. United States</u> (6th Cir,. 1986) 799 F.2d 254, 259.  This requires the moving party to establish beyond controversy every essential element of its claim.  <u>Fontenot v. Upjohn Co.</u> (5th Cir, 1986) 780 F.2d 1190, 1194. Additionally, inferences drawn from the evidence must be viewed in a light most favorable to the non-moving party.  <u>Eastman Kodak Co. v. Image Technical Services, Inc.</u> (1992) 504 U.S. 451, 456. Summary adjudication is a drastic remedy and is to be granted cautiously.  <u>Anderson v. Liberty Lobby, Inc.</u> (1986) 477 U.S. 242, 255.

       Finally, while questions of law are appropriate for summary adjudication, <u>Delbon Radiology v. Turlock Diagnostic Ctr.</u> (E.D. Ca. 1993) 839 F. Supp. 1388, 1391, questions of fact are not. <u>Nunez v. Superior Oil Co.</u> (5th Cir. 1978) 872 F.2d 1119, 1126.   Summary adjudication is improper where contractual language is susceptible of at least two reasonable interpretations because a material issue of fact exists as to the parties' intent.  <u>Wards Co., Inc. v. Stamford Ridgeway Assocs.</u> (2nd Cit. 1985) 761 F.2d 117, 120.  As will be demonstrated herein, the characterizations of the money which plaintiffs claim to be owed involves a difference in interpretation of contracts. Plaintiffs claim that the contracts require that all money be paid to Bowman as wages, and defendants claim that the money in dispute is an expense owing to PREMCO, if to anyone.  The parties' interpretation of the contracts, and the prior acts of the parties in conformity with the contracts, is what defines the appropriate characterization of the money in dispute.  Since there is a genuine issue as to the parties' intent, this motion cannot be granted.

    B.    **Defendants Did Not Breach The Facilities Agreements.**

       Plaintiffs' assert two alternate theories of how the Facilities Agreements were allegedly breached.  First, plaintiffs claim that the Facilities expenses were never paid by CMG. Alternatively,

10

1  plaintiffs claim that only the last month of Facilities were not paid.[11]

2      The first "factual" theory is easy to dispute, as Bowman testified that he elected not to

3  receive Facilities reimbursements through October of 2005.  Bowman Depo., 359:19-360:22.  After

4  October of 2005, Bowman elected to have Facilities paid to PREMCO, as indicated by the monthly

5  facilities checks to PREMCO, starting in October of 2005.  Mitchell Decl., para. 5; Exhibit 19.

6      The second "factual" theory is as easily disputed.  The consistent actions of the parties in the

7  implementation of the contracts at issue was that there must be Net Income (i.e., cash available for

8  distribution) in order for there to be any reimbursement of Facilities.  Chevez Decl., paras. 6, 7 & 9;

9  Mitchell Decl., paras. 2, 3, 4 & 6.  For the last month, expenses exceeded income, i.e., there was no

10  Net Income.  Chevez Decl., para. 4.  Accordingly, there was no Facilities reimbursement.

11      Finally, to the extent that plaintiffs are seeking relief for any unpaid expenses incurred prior

12  to June of 2006, any such claim is barred by the provisions of the Facilities Agreements that require

13  that all actions related to the contract be brought within one year of their accrual.  Exhibits A & C to

14  Bowman Decl., para. 21(s); Exhibit B & D to Bowman Decl., para. 5.4.  To the extent that plaintiffs

15  are seeking damages outside of that one year period, all such claims are barred by the very terms of

16  the contracts plaintiffs seek to summarily enforce.

17          **i.      What The Contracts Say.**

18      Working together, the contracts contemplate that PREMCO would submit an invoice to

19  CMG each month for facilities expenses (i.e., Expense Vouchers).  Chevez Decl., para. 10.

20  PREMCO was to be reimbursed at the rate of 125% of the submitted Expense Voucher.  Chevez

21  Decl., para. 10.  This extra 25% served at least two  purposes.  One - it was a limited tax benefit for

22  the net branch operator (Bowman), allowing him to receive cash distributions to his corporation as

23  reimbursement for expenses, as opposed to personal W-2 income.  Two - the extra 25% was

24  intended to compensate PREMCO for securing the Facilities and leasing them back to CMG on a

25  month to month basis.  Chevez Decl., para. 10.  The Facilities, including the office leases and the

26  furniture, fixtures and equipment necessary to operate the branches, were leased to, or owned by

27  _____

28      [11]  That plaintiffs assert alternative factual claims, of itself, demonstrates the existence of a dispute as to a
genuine issue of material fact.

11

1  PREMCO.  Rosenthal Decl., para. 3, Exhibit 2.  To the extent of Net Income, PREMCO was to

2  realize a 25% profit.  That way, if the relationship terminated, CMG could walk away from all

3  obligations, on one month's notice.  Chevez Decl., para. 10.  And, Bowman, through PREMCO,

4  could continue to control the Facilities and operate his business in the same location even after

5  leaving CMG, just as he had done with Mortgage Market, Prism, RBC and PGM, and just as he

6  continues to do today with Sierra Pacific Mortgage.  Bowman Depo., 21:7-27:16., 54:1-4.

7       As explained above, each month CMG would provide plaintiffs with a Statement of

8  Operations and Income Statement identifying the Net Income of the Federal Way and Vancouver

9  branches.  Chevez Decl., para. 6.  Until October of 2005, Bowman wanted all of the Net Income to

10 be paid to himself as W-2 income, i.e., wages.  Bowman Depo., 360:17-22.  Thus, during this time

11 PREMCO did not submit Expense Vouchers to CMG, and no part of the Net Income was paid to

12 PREMCO as a Facilities reimbursement.  Mitchell Decl., para. 5.  Bowman Depo., 359:19-360:22.

13 All Net Income was paid to Bowman as Net Profits.  Mitchell Decl., para. 5.  However, beginning in

14 October of 2005, PREMCO began submitting Expense Vouchers.  Mitchell Decl., para. 5.  Bowman

15 Depo., 359:19-360:22.  Beginning with the first of these Expense Vouchers, and continuously

16 thereafter, to the extent there was Net Income, CMG would pay PREMCO up to 125% of the

17 accrued Expense Vouchers submitted by PREMCO.  Any remaining Net Income, by definition (as

18 set forth in the BMA), constituted Net Profits and was paid to Bowman as W-2 income.  Mitchell

19 Decl., para. 4.

20       In January of 2007, the last month of the parties' association, there was not sufficient Net

21 Income to satisfy all Expenses.  Chevez Decl., para. 4.  As explained in Section II above, the

22 Expenses were increased significantly, i.e., by $536,941.56, as a result of two repurchase demands

23 on loans originated by Bowman's branches.  Since Expenses exceeded Net Income, by express

24 definition and by virtue of the parties' actions for every month of their three year relationship, there

25 were no Net Profits that month.  Indeed, the Expenses in January of 2007 were so great that the

26 reserves/security deposits were completely subsumed, as well as any marketing expense credits (to

27 the extent, if any, that PREMCO was entitled to them - as they were only to be offset from

28 marketing expenses for CMG products).  Chevez Decl., para. 4.  Accordingly, as contemplated by

1   the contracts, and consistent with the parties' actual conduct, there was no cash available for

2   payment of Facilities expenses.    There was no breach of contract.    There simply were no funds

3   available to pay any Facilities expenses.

4                    **ii.    How The Contracts Work In Practice.**

5       A court must interpret a contract to give effect to the mutual intentions of the parties.    Civ.

6   Code § 1635; *see* <u>National Marble Co. V. Bricklayers & Allied Craftsmen</u> (1986) 184 Cal. App. 3d

7   1057, 1067.    When the contract at issue is ambiguous or uncertain, the practical construction placed

8   on the contract by the parties, before any controversy arose as to its meaning, affords one of the

9   most reliable intent of the parties.    <u>Bohman v. Berh</u> (1960) 54 Cal.2d 787, 795.[12]

10      The contracts are not ambiguous.    They state that Net Profits are to be calculated by

11  subtracting Expenses from Gross Income.    Thus, to the extent of Net Income (as reported on the

12  monthly Statements of Operation) PREMCO was reimbursed for Facilities expenses, when it

13  (Bowman) elected to submit Expense Vouchers.    Exhibits A & C to Bowman Decl., pages 4-5, para.

14  9.

15      As stated in the Declaration of Patricia Mitchell, a CMG employee in the accounting

16  department, the way the distributions worked in the parties' day to day operations was that the Net

17  Income would be computed as the revenue of the branch (broker fees, YSP's and processing/

18  administrative fees to the branch) less the costs of sales - things such as payment for appraisals and

19  payments of commissions to loan agents.    Mitchell Decl., para. 2-4.    Then, other expenses paid by

20  CMG would be deducted - such as taxes paid as a result of branch activity, insurance paid for the

21  branch and personnel costs (secretaries, other hourly wages, etc.).    The resulting number is Net

22  Income.    Mitchell Decl., para. 2-4.    Then, the submitted facilities expenses (Expense Vouchers)

23  were accounted for.    When PREMCO submitted an invoice for the facilities (an Expense Voucher)

24  CMG multiplied that amount by 125%, pursuant to the Facilities Agreement.    Mitchell Decl., para.

25  3.    Then, if there were outstanding unpaid Expenses from the previous month, these would be rolled

26

27          [12]  In diversity actions, such as this one, the state law creating the right sued upon governs issues such as the
    elements of the action, measure of damages and applicable defenses.    <u>Bank of California, N.A. v. Opie</u> (9th Cir. 1981)

28  663 F.2d 977, 980.    The use of extrinsic evidence to determine the intent of the parties is parol evidence, which is a rule
    of substantive law and not a rule of evidence.    <u>Case Herrera, Inc. v. Beydoun</u> (2004) 32 Cal.4th 336, 343.

1  over into the next month and added to that month's Facilities expenses to determine the total

2  Facilities expense.  Mitchell Decl., paras. 3-4.  Then, if the Net Income was less than the total

3  Facilities expense, PREMCO would receive a check for the Net Income amount and the difference

4  would be rolled over as a Facilities expense into the next month.  Mitchell Decl., para. 4.  If the Net

5  Income was more than the total Facilities expense, the total Facilities expense would be paid to

6  PREMCO, and the remainder would be paid as a Net Profit distribution to Bowman.  Mitchell Decl.,

7  para. 4.

8       For example, in the March, 2006 Statement of Operations the revenue was $64,407.30.  The

9  costs of sales was $30,155.76.  The revenue less the costs of sales was $34,251.54 - this was

10 considered the Gross Profit.  Expenses of $10,199.88 were then subtracted from the Gross Profit to

11 arrive at Net Income available for distribution of $24,051.66.  PREMCO had submitted an Expense

12 Voucher for Facilities reimbursement of $16,823.56.  CMG then multiplied that amount by 125% to

13 arrive at $21,029.45.  CMG then added the unreimbursed expenses from the previous month of

14 $7,765.25, for a total of Facilities expenses of $28,794.70.  However, the Net Income available for

15 distribution that month was less than the total Facilities expenses.  Thus, CMG distributed the total

16 available Net Income of $24,051.66 as facilities reimbursement to PREMCO, and rolled $4,7430.04

17 over into April of 2006.  According to Ms. Mitchell, who did all of the accounting for the branches,

18 this is how it worked every month.  Mitchell Decl., para 6, Exhibit 20.  Not once during the entire

19 relationship between plaintiffs and CMG did Bowman ever complain about the way the expenses

20 and income were calculated and offset.

21      The consistent pattern of the parties indicates that Facilities expenses are only reimbursed to

22 the extent that there is income to pay for the expenses.  For each month in which there was not

23 sufficient income to pay expenses (which was most months), the outstanding expenses were rolled

24 over into the next month and the next month's combined (accumulated) facilities expenses were then

25 paid that month, to the extent there was actually sufficient income in that month.  Mitchell Decl.,

26 para. 4.  Ordinarily, after a branch is terminated there are sufficient security deposits/reserves to pay

27 most, if not all Facilities expenses.  Moreover, ordinarily, after a branch is terminated, there will be

28 at least some income to pay towards Facilities expenses, in the form of income from Pipeline Loans.

14

1  Chevez Decl., para. 17.

2      In plaintiffs' case, there would have been income to offset expenses if Bowman had closed

3  his Pipeline Loans with CMG as he was contractually obligated to do, as opposed to

4  misappropriating the files and closing them with Sierra Pacific Mortgage.  Chevez Decl., para. 17,

5  Rosenthal Decl., para. 4.  As stated by Bowman in his deposition and alleged by CMG in its counter-

6  claim, Bowman did not close Pipeline Loans with CMG - per his contract.  Bowman Depo., 290:24-

7  293:19.  Thus, the income from at least 11 loans that should have closed with CMG would have

8  been available to cover expenses had Bowman not breached the BMAs by taking Pipeline Loans

9  belonging to his employer.  Chevez Decl., para. 17.   Since Bowman was not closing Pipeline Loans

10  with CMG, there was no additional income generated by the branches to offset the expenses of the

11  branches.    Nevertheless, since there was no income to pay for the expenses because of the

12  $536,941.56 in repurchase demands, there was no facilities reimbursement for the final month.

13  Chevez Decl., paras. 3-4.  This was the mutual intent of the parties as demonstrated by their previous

14  course of action.  Thus, there is a genuine issue of material fact with respect to the alleged breach of

15  the Facility Agreements.

16      **C.    There Is a Genuine Issue as to a Material Fact with Respect to the Thirteenth
          Cause of Action.**

17      **i.    The Obligations Alleged Are PREMCO's.**

18

19      Plaintiffs claim that CMG violated California Labor Code Section 2802 by requiring

20  Bowman to reimburse CMG for expenses.  However, as the contracts state and the parties practiced,

21  the expenses were to be paid by PREMCO, not by Bowman the employee.  Also, it is important to

22  understand the expenses that make up the example being used by plaintiffs.  Bowman is claiming

23  that CMG required him to personally incur expenses.  However, the expense that he now claims he

24  had to personally incur was in fact an expense that he previously claimed was incurred by

25  PREMCO.  Exhibit H to Bowman Decl.  The expense reimbursement form clearly states that this

26  was an expense incurred by PREMCO and an expense for which PREMCO was seeking

27  reimbursement.  Thus, it is a bit mendacious, to say the least, for Bowman to represent to this court

28  that he personally incurred this expense, the only documentary evidence for which clearly

1 demonstrates that in fact PREMCO incurred this expense.

2     The expenses of the branches were obligations of PREMCO entered into by PREMCO, like

3 the leases for the Federal Way and Vancouver facilities, for example.  Rosenthal Decl., para. 3,

4 Exhibit 2.   Moreover, and very importantly, Bowman testified in his deposition that he never

5 directly paid for expenses related to the business.  Bowman Depo., 324:19- 325:5, 430:2- 430:23.

6 He would pay money to PREMCO and it would pay for the expense.  This is not an employee

7 paying for an expense.  This an individual investing in his corporation, and a corporation paying its

8 obligations.

9         **ii.**      **Plaintiffs Did Not Produce The Evidence Supporting The Summary**
                           **Adjudication For The Thirteenth Cause of Action In Discovery.**

10

11     The expenses in question that Bowman claims are ones for which he is personally

12 responsible are credit reports pulled for borrowers in January of 2007.  Plaintiffs' Exhibit G - last

13 page.  Plaintiffs never produced these documents (all of Exhibit G)  in response to discovery or as

14 part of their initial disclosure - although they clearly have had them since December of 2007 and

15 January of 2008.  Thus, defendants were not able to conduct discovery on these documents which

16 make up plaintiffs' claims.   Accordingly, defendants are respectfully requesting that these

17 documents not be allowed as evidence in this motion and the motion with respect to the 13th cause of

18 action be denied.

19         **iii.**      **There Is No Foundation For Plaintiffs' "Evidence."**

20     The letters requesting payment are unclear as to what obligations they apply.  It is unclear

21 whether the letters requesting payment are in any way related to the February, 2007 statement.  The

22 letters could be related to bills incurred by plaintiffs after termination, once they were no longer

23 connected with CMG.  One of the documents indicates that there are 16 pages to a fax with the

24 billing.  However, conveniently, plaintiffs did not attach 16 pages.  Presumably, there would be an

25 itemized bill that lists the names of the borrowers for whom the credit reports were pulled and the

26 dates they pulled so one could reference them with other evidence that has been previously

27 produced in this matter.  Thus, plaintiffs have not produced any credible evidence to support this

28 cause of action.  They have produced documents they kept hidden in discovery so defendants could

16

1   not even question plaintiffs about the documents.  Plaintiffs have not even bothered to provide an

2   adequate foundation so that defendants or the court can determine whether the documents are

3   admissible evidence.  And, plaintiffs have omitted documents referenced in their own exhibit, so

4   they have not even produced a complete document (and have not even bothered to notify counsel, or

5   the court, of their selective editing of proffered evidence).

6           **iv.    The Credit Reports At Issue Were For Loans Bowman Misappropriated**
                     **From CMG.**

7

8           Even if plaintiffs could overcome these significant evidentiary problems, the fact remains

9   that the subject credit reports are for Pipeline Loans which Bowman misappropriated from CMG.

10          As stated above, plaintiffs make no effort to explain what these documents are.  There is

11  good reason for the lack of explanation when it is considered what plaintiffs are seeking.  Plaintiffs

12  would have the court believe that plaintiffs incurred bills for pulling credit reports for borrowers and

13  then not pay for the credit reports.  However, the bill that plaintiffs produced in Exhibit G is for

14  January of 2007.  As alleged in the counter-claim, admitted by Bowman during his deposition and

15  evidenced by the documents produced pursuant to subpoena to Sierra Pacific Mortgage, Inc.,

16  Bowman pulled ___**11**___ credit reports prior to February of 2007, for loans which he closed with Sierra

17  Pacific Mortgage.  See Declaration of Felicia Bowers.[13]

18          Pursuant to the BMA between CMG and Bowman, all loans started prior to termination must

19  be closed with CMG after termination, i.e., Pipeline Loans.  Exhibits A & C to Bowman Decl., page

20  9, para. 20.  Typically, the first step in the loan process is the pulling of a credit report.  Chevez

21  Decl., para. 11.  The dates of the credit reports indicates that these loans started prior to plaintiffs'

22  termination.  And, the closing statements provided by Sierra Pacific Mortgage indicate that these

23  Pipeline Loans were closed after January 31, 2007, with Sierra Pacific Mortgage.  Rosenthal Decl.,

24  para. 4, Exhibit 3.  Also, the closing statements indicate as to most of the loans that there is either no

25  charge for a credit report or the charge for the credit report was paid to plaintiffs.  This means that,

26  in the case of a "no charge" for a credit report, plaintiffs decided not to recovery the charge for the

27  _____

28          [13]  This declaration indicates that 11 credit report were pulled prior to February of 2007, all by First American
        Credco.

                                                    17

1  credit report from the borrower.  In the case of plaintiffs being paid for the credit report, it means

2  that plaintiffs took the money for the credit report out of the loan proceeds and did not apply it to the

3  bill in Exhibit G.  Chevez Decl., para. 11.  Either way, it means that plaintiffs are seeking summary

4  adjudication on a cause of action related to charges for credit reports that were paid by other people

5  for Pipeline Loans that Bowman misappropriated from CMG.  This is the ultimate insult and creates

6  a genuine dispute as to a material fact as to whether the reimbursement being claimed is even

7  reimbursement to which plaintiffs are entitled.   It certainly creates a genuine issue of material fact

8  to support defendants unclean hands affirmative defense. <u>Kendall-Jackson Winery, Ltd. v. Superior</u>

9  <u>Court</u> (1999) 76 Cal. App. 4th 970, 980.  Certainly plaintiffs aren't entitled to reimbursement for

10  credit reports that they have already been reimbursed for, for credit reports for which they chose not

11  to seek reimbursement from the borrower, for credit reports purchased without CMG's permission

12  or credit report purchased for Pipeline Loans taken by Bowman.

13           **v.    There Is No Liability Under Labor Code Section 2802 As Plaintiffs Have
                    Not Incurred An Obligation.**

14

15           Finally, there is no indication from the evidence produced that Bowman has incurred liability

16  for the expenses related to the bills.  Labor Code Section 2802 requires an employer to indemnify an

17  employee for losses and expenses related to the discharge of their duties.  This includes the payment

18  of a judgment against the employee and the payment of attorney's fees and costs if the employee is

19  sued and has to pay to defend himself or herself. <u>Plancarte v. Guardsmark</u> (2004) 118 Cal. App. 4th

20  640, 647-648.  In the case at bar, Bowman has not paid the bills attached to Exhibit G.  Thus, he has

21  not incurred any expenditure or loss.  The letters demanding payment are made out to Bowman as

22  well as PREMCO.  There is no indication that the company seeking the money is or will be seeking

23  the money from Bowman, the employee.  There is no declaration from the collection company, San

24  Diego Credit Company, or the company that provided the credit reports, First American Credco,

25  indicating its intentions with respect to this bill.  The bottom line is that Exhibit G, which is the only

26  evidence provided in support of the summary adjudication motion with respect to the 13th cause of

27  action, is completely inadequate.

28

**D.    There Is a Genuine Issue of Material Fact with Respect to Bowman's Claim for Unpaid Wages.**

Plaintiffs claim that there is no distinction between PREMCO and Bowman. Thus, Bowman claims any money allegedly owed to PREMCO is in fact owed to him individually, and is wages. However, just because Bowman is willing to dispose of his corporation when it suits him does not mean that money in a business to business dispute becomes wages.

Bowman claims that three different payments were not made to him personally and constitute unpaid wages to him - unpaid net profits, unpaid marketing credits and unreimbursed reserves. The simple explanation is that due to the outstanding expenses of the branches at issue, there were no Net Profits to distribute. As to the marketing credits and reserves - they were subsumed by the expenses related to the branches. Moreover, to the extent these expenses were to be paid at all, they would have gone to PREMCO, not to Bowman as wages.

**i.    There Were No Net Profits Available For Distribution At The Time of Termination.**

The net profit that plaintiff claims is due to him is not yet profit and will likely never be net profit. The dictionary definition of net profit is "actual revenue after expenses in a given period of time." Webster's New Millennium™ Dictionary of English, Preview Edition (v 0.9.7).[14] The common understanding and definition of net profit takes into consideration the fact that net profit is revenue less expenses. The BMAs at issue state that the computation of net profit includes all revenue of the branches. Exhibits A & C to the Bowman Decl., page 4, para. 9. "The term 'Net Profits,' as used herein, shall be determined by deducting Expenses from Gross Income." Exhibits A & C to the Bowman Decl., page 4, para. 9. The term 'Expenses' shall mean all operating expenses of the Branch Office, including those items of Expense identified elsewhere in this Agreement and including but not limited to the following:" Exhibits A & C to the Bowman Decl., page 4, para. 9.[15] The contracts, without limitation, list examples of items that could be considered

---

[14] Retrieved July 01, 2008, from Dictionary.com website: http://dictionary.reference.com/ browse/net profit.

[15] This is a common definition of net profits. Rosenthal Decl., para. 5. Exhibit 5, para. 4(a)(4).

19

1   expenses.  The list includes rent and copiers, which plaintiffs don't seem to object to in this motion.

2   However, it also includes loss or costs, including reasonable attorneys' fees and court costs arising

3   out of suits, actions, audits, foreclosures or legal proceedings of any nature, related directly or

4   indirectly to the activities or operations of the Branch Office.  Exhibit C to the Bowman Decl., page

5   5, para. 9(d).

6          At or around the end of 2006 and the beginning of 2007, CMG received repurchase demands

7   for loans originated in Bowman's branches.  One was from Aurora Loan Services and one was from

8   Credit Suisse Bank.  Chevez Decl., paras. 3 & 4, Exhibits 9 & 11.  CMG has an obligation to

9   repurchase these loans from these investors, pursuant to its contracts with the investors.  The total

10  amount of the repurchase demand is $536,941.56.  That means that CMG owes $536,941.56 to

11  investors as a result of the activities of Bowman's branches.  The contract specifies that this type of

12  item is an expense to be offset against income, before arriving at net profits.  Thus, the $31,047 in

13  income that Bowman claims as "net profits" ($15,245.41 as net income, as alleged by CMG) is

14  offset by the $536,941.56 in expenses attributable to the branches.[16]  Chevez Decl., para. 4.

15         Bowman may not claim that his "wages" cannot be offset by CMG's expenses related to the

16  branches.  Such profit sharing arrangements are clearly appropriate.  In <u>Prachasaisoradej v. Ralphs</u>

17  <u>Grocery Co.</u> (2007) 42 Cal4th 217, the California Supreme Court upheld a profit sharing plan, such

18  as this one, which factors the employer's expenses as well as its income.  In <u>Ralphs</u>, management

19  employees were promised compensation in addition to regular wages.  Profits were calculated after

20  deducting ordinary business expenses, including workers' compensation costs, cash and

21  merchandise losses, as well as third party tort claims and other expenses over which the employees

22  had no control.  The deductions were held not to violate California statutes prohibiting deduction of

23  business losses and expenses in calculating wages due.  <u>Id.</u>, at 236-243.

24         **ii.     Plaintiffs Are Not Owed Any Compensation For Marketing Credits.**

25         Bowman received compensation as a loan officer for loans he personally closed.  Chevez

26

27         [16] Plaintiffs claim, without any support, that Bowman is required to indemnify CMG for CMG's business losses.  However, that is completely incorrect and without support.  Indemnification would allow CMG to go after Bowman for the $536,941.56 loss related to the repurchase demands.  CMG is not doing that and the contracts do not

28  allow it.  However, the net profits, by definition, allow for the loss attributable to the branch to be offset from the income attributable to the branch.

1   Decl., para. 12, Exhibit 12.  In addition to that income, he was to receive net profits, if any

2   existed.  As explained above, there were no net profits to distribute at the time of his termination,

3   and to this date, because of the claims of the investors for the Wilkins and Frazier loans,

4   originated by Bowman's branches.  Thus, there is a genuine dispute as to a material fact with

5   respect to plaintiffs' claim of unpaid wages.  Namely, that there were no additional wages to

6   distribute because there was no profit.  Chevez Decl., para. 4.

7          Bowman claims that he is owed money for marketing credits as wages.  However, the

8   documentation he provides in support of the proposition demonstrates that the marketing credits,

9   if owed to any entity, are owed to PREMCO as a expense set off, not wages to Bowman.    The

10  email from Kern Lewis talks about marketing credits due to Pacific Trust Lending (Exhibit E to

11  Cohen Decl.) and the deposition testimony of Patricia Mitchell states that the marketing credits

12  were due to Pacific Trust Lending (Exhibit C to Cohen Decl., 176:7-11).  Further, CMG Chief

13  Financial Officer Paul Chevez testified that Marketing Credits are treated as a "negative"

14  expense.  This means that if a branch has any marketing credits, they are subtracted from existing

15  expenses.  This net expense calculation will then be used to offset income to reach net profits.

16  Chevez Depo., 200:17-201:13, Chevez Decl., para. 13.  This is an offset of expenses - not unpaid

17  wages.

18         Plaintiffs ignore the distinction between expenses and profits.  Net profits, if any exist, are

19  in addition to wages earned by Bowman in his capacity as a loan officer.  Bowman was paid

20  $134,945.25 in loan commission wages in 2004, $101,600.85 in 2005 and $60,216.63 in 2006.

21  Mitchell Decl., para. 8.  The marketing credits are specifically not treated as money in the pocket

22  of the net branch operator.  They are what the name says - credits for expenses.

23         CMG encourages branches to bank loans through CMG, instead of brokering the loans to

24  other lenders, because CMG only makes money through banked loans.  Exhibit E to Cohen Decl.

25  Thus, it set up a program that assigned credits according to the (CMG) banked volume of a

26  branch's loan activity.  The credits are specifically to be used for marketing purposes.  It is not

27  money that goes to the branch manager as wages.  It is only a potential offset for a branch's

28  expenditures for marketing.  Chevez Decl., para. 13.  CMG was under no obligation to convert

21

1  the credits into cash value.  It was going to do so for the benefit of PREMCO, if the expenses of

2  the branches were less than the income.  However, if the cash value of the marketing credits were

3  converted it would still be less than the $536,941.56 in repurchase demands.  Additionally, there

4  is no evidence that CMG has any obligation to convert the marketing credits into cash.  Just

5  because there is an email where CMG considered doing so does not mean that it is required to do

6  so.  Since plaintiff was terminated, his branches did not use the marketing credits for their

7  intended purpose - marketing for CMG.  Thus, plaintiffs are not entitled to anything for the

8  marketing credits.

9      Additionally, in plaintiffs' blurring of expenses and profits it draws the conclusion that if

10  something is an expense, and that expense is used to offset income and thus lower net profits,

11  therefore it is income to Bowman.  Expenses are handled through the Facility Agreements.  The

12  marketing credits were to be used to lower expenses, to the extent there were marketing expenses.

13  Chevez Decl., para. 13.  Through the course and scope of the business relationship between the

14  parties, marketing expenses were paid for by PREMCO and submitted for reimbursement by

15  PREMCO.  Exhibit H to Bowman Decl..[17]  The marketing credit plan was intended to offset those

16  specific marketing expenses.  Thus, to the extent that they were owed and not paid, they were not

17  paid to PREMCO.  They are not wages owed to Bowman, they are allegedly unpaid expense

18  reimbursements to PREMCO.  Just because failure to apply an expense credit affects profits does

19  not turn an expense credit to a corporation into wages owed to an employee (not that the

20  marketing expense is owed at all).

21              **iii.    The Security Deposits/Reserves Are Not Wages.**

22      The Facility Agreements require PREMCO, the facilities provider, to deposit a security

23  deposit (the contract refers to the money as a security deposit, the accountings refer to it as

24  reserves - but it is the same thing).  The purpose of the security deposit is to cover 2 months

25  payroll expenses.  Since payroll to all employees of the branches must be paid each month,

26  regardless of income, the security deposit was established as an amount that covered the payroll

27

28  [17]  These are the expense vouchers submitted by PREMCO.  They list marketing expenses as expense reimbursement sought by PREMCO - signs, business cards, advertising, yellow pages advertisements, etc.  See all pages and specifically 1-6 of Exhibit H.

OPPOSITION TO PLAINTIFFS' MOTION FOR SUMMARY ADJUDICATION C 07 3140 SI
M:\CMG\85-0706-02 Bowman\Motion\Plaintiff's MSA 06.23.2008\Opposition\Opposition.07.07.08.wpd

1   expenses for a branch that stopped performing or had to be terminated.  Chevez Decl., para. 14.

2   Since the contracts may be terminated on 30 days notice, the security deposit is calculated as the

3   payroll expenses that would likely have to be paid until the termination is complete.  However, it

4   can be used to offset any expense at any time.  Exhibits B & D to Bowman Decl., Para 2.2.  It can

5   be periodically increased or decreased, depending on the payroll expenses of the previous quarter.

6   At the time of plaintiffs' termination, plaintiffs claim that there were unpaid reserves.  Bowman

7   claims he paid the reserves, not PREMCO, and thereby seeks to transform this claim into one for

8   unpaid wages.

9         First, neither PREMCO nor Bowman paid any money as security deposits at the outset of

10  the business relationship, as the Facility Agreements state.  The Vancouver Facility Agreement

11  states that plaintiffs will pay $10,724.00 in security deposits.  Exhibit B to Bowman Decl., page

12  2.  However, that money was never paid as a lump sum.  Bowman told CMG that PREMCO did

13  not have the money at the outset and asked if CMG could add the money as expenses when the

14  branch began earning money.  Chevez Decl., para. 15.  Thus, CMG charged security deposits as

15  expenses, as an accommodation.  Chevez Decl., para. 15-16. Exhibit 15.

16        At the end of the relationship, as stated above, the expenses of the branches were in excess

17  of $536,941.56 due to the repurchase demands.  Chevez Decl., para. 4.  Thus, the security

18  deposits were used to cover the expenses of the branches related to the loans.  CMG will take a

19  loss on the rest of these expenses that exceeded the branch income and security deposits.

20        Plaintiffs are using the same analysis that any expenses under the Facility Agreements that

21  are used to compute net profits, must be wages to Bowman.  However, that is not how net profits

22  work.  The security deposits were held by CMG as an offset of expenses.  Thus, there is no

23  connection between net profits and the security deposits.  The security deposits are not wages.  If

24  anything, they are a dispute between PREMCO and CMG under the Facilities Agreements.

25        Finally, Bowman is claiming that his corporation is a sham, only set up and used at

26  CMG's demand for purposes of the business arrangement of the parties.  Bowman makes this

27  argument in an attempt to convert security deposits allegedly owed to PREMCO into security

28  deposits allegedly owed to Bowman as wages.  Bowman claims he paid the security deposits at

23

1   issue because he and his corporation both signed the Facilities Agreements.  First, plaintiffs

2   withhold from the court the fact that the corporation has been around and used by Bowman for

3   many years prior to the relationship with CMG (and for the same purpose - providing facilities to

4   loan originators).  And, plaintiffs fail to advise the court that the corporation is to this day being

5   used for the exact same purpose in plaintiffs' net branching relationship with Sierra Pacific

6   Mortgage.    Bowman Depo., 21:7-27:16, 54:1-4, Exhibit 4.    Plaintiff cannot claim that his

7   corporation is a sham, defraud CMG into entering into a contract with such a corporation and then

8   demand that monies alleging owing to that corporation be considered his wages because of the

9   apparent fraud perpetrated by his "sham" corporation.  Regardless, it simply isn't true.  PREMCO

10  is a real corporation and is the party attached to the security deposit/reserves issue.

11          Second, plaintiffs cite to no law that says that if an individual signs an agreement along

12  with a corporation he owns, that the agreement is now solely with the individual.[18]   Bowman

13  signed the Facilities Agreements  because he was the president of PREMCO.  A corporation is an

14  entity that only acts through people.  Thus, he signed it.  That doesn't mean that any debts and

15  obligations of the corporation are now solely the debts and obligations of the individual who also

16  signed the agreement.

17          **E.      There Is a Genuine Issue of Material Fact With Regard To The Breach Of
                      Fiduciary Duty Cause Of Action.**

18

19          Plaintiffs claim that since the security deposit was paid by Bowman the employee (not a

20  security deposit paid by a business) that it was a cash bond and CMG violated Labor Code

21  Sections 400 et seq.  First, plaintiffs are trying to have it both ways.  They are claiming that the

22  security deposits are unpaid wages and also claiming that the security deposits are a bond.

23  Plaintiffs can't have it both ways.  Either it was unpaid wages or it was money that employee

24  Bowman was required to front that was not segregated in a savings account.  It can't be both.[19]  If

25

26  _____

27      [18]   Bowman also is a signatory to the sub-lease with his current employer Sierra Pacific Mortgage.  Exhibit 4.

28      [19]   Of course, as explained above, it is neither.  The security deposits/reserves were an obligation of PREMCO,
    were deducted as an expense (from net income which otherwise would have been paid to PREMCO) and, refunds of the
    same (before this dispute arose) were paid to PREMCO, not Bowman, without objection.

                                                            24

1  Bowman was required to front the money, then it wasn't wages.  If it was wages, then it can't be a

2  cash bond he was forced to front to CMG.

3  ///

4      As stated in the previous section, we don't have to get to the breach of fiduciary duty

5  argument because the security deposits were not provided by Bowman.  They were added to the

6  expenses of the branch under the Facilities Agreements as the relationship went forward.  Chevez

7  Decl., para. 16, Exhibit 15.  The relationship of the parties over the course of the three year

8  relationship dictated that PREMCO paid for expenses and was reimbursed when there was

9  sufficient income.  Bowman even testified that he never directly paid business expenses, but he

10  would put the money into PREMCO and PREMCO would pay the expenses.  Bowman Depo.,

11  324:19-325:5, 430:2- 430:23.  Further, the security deposits were not taken from the net profit on

12  the balance sheet - they were always deducted as expenses to arrive at net profits.  Chevez Decl.,

13  15-16.  Additionally, Bowman was told how they were computed and received the Statements of

14  Operations every month.  Chevez Decl., 14, Exhibit 14.  Whenever there was a deduction or

15  addition for reserves, Bowman would see it and accepted the accounting.

16      In conclusion, the security deposits were not put up by Bowman the employee.  They were

17  added to expenses, which were the responsibility of PREMCO under the Facilities Agreements.

18  Thus, there is no violation of Labor Code Sections 400 et seq., there was no obligation to

19  segregate the funds and account for them and there was no breach of a fiduciary duty because

20  there was no fiduciary duty between CMG and PREMCO.

21  **V.    CONCLUSION**

22      For the above stated reasons, there are genuine issues of material fact as to all of the

23  causes of action as to which plaintiffs seek summary adjudication.  Thus, defendants respectfully

24  request that the motion be denied.

25  Date:   July 7, 2008        **MEDLIN& HARGRAVE**
                    A PROFESSIONAL CORPORATION

26

27

28                    /s/_____
                    Joshua A. Rosenthal,
                    Attorneys for Defendants and Counter-Claimant

25