1  David R. Medlin       (SBN 77417)
   G. Bradley Hargrave   (SBN 173911)
2  Joshua A. Rosenthal   (SBN 190284)
   MEDLIN & HARGRAVE
3  A Professional Corporation
   One Kaiser Plaza, Suite 1305
4  Oakland, CA  94612
   Telephone:    (510) 832-2900
5  Facsimile:     (510) 832-2945
   E-mail:        jrosenthal@mhlawcorp.com
6
   Attorneys for Defendants
7

8                    UNITED STATES DISTRICT COURT

9                  NORTHERN DISTRICT OF CALIFORNIA

10 James W. Bowman, Jr. and Pacific Real Estate        Case No.: C 07 3140 SI
   Management Company, Inc., a Washington
11 Corporation,

12                    Plaintiffs,                      DECLARATION OF ATTORNEY JOSHUA
                  vs.                                  A. ROSENTHAL IN SUPPORT OF
13                                                     OPPOSITION TO MOTION FOR
   CMG Mortgage Inc., a California Corporation;        SUMMARY ADJUDICATION
14 CMG Mortgage, Inc., d/b/a Pacific Guarantee
   Mortgage, CMG Mortgage Services, Inc., a           Date:   July 25, 2008
15 California Corporation, CMG Mortgage Services,      Time:   9:00 a.m.
   Inc. d/b/a Pacific Guarantee Mortgage,             Dept:   Courtroom 10
16                                                     Judge:  Honorable Susan Illston
                   Defendants.
17 _____/          File date: June 14, 2007
                                                       Trial date: August 25, 2008
18 CMG Mortgage Inc., a California Corporation

19                    Counter-Claimant,

20
                  vs.
21
   James W. Bowman, Jr., an individual,
22

23                    Cross-Defendant.
   _____/
24

   **DECLARATION OF JOSHUA A. ROSENTHAL**
25
          I, Joshua A. Rosenthal, declare:
26
          1.      I am an attorney at law duly licensed to practice before this court and an attorney with
27
   Medlin & Hargrave, a P.C.
28
                                       1

1    2.    On March 18, 2008 and June 24, 2008, David Medlin took the deposition of plaintiff

2  James Bowman, president of plaintiff Pacific Real Estate Management, Inc.  Attached hereto as

3  Exhibit 1 is a true and correct copy of excerpts from the court reporter's transcript of his deposition.

4    3.    Attached hereto and marked as Exhibit 2, is a true and correct copy of the leases

5  provided to defendants on January 17, 2008, in response to defendants inspection demand to

6  plaintiffs.

7    4.    Attached hereto and marked as Exhibit 3, collectively , are loan documents

8  received from Sierra Pacific Mortgage, Inc. ("Sierra Pacific") in response to a subpoena.  The

9  subpoena sought all loan files closed by plaintiffs with Sierra Pacific within the two month period

10 after separation from CMG.  The declaration of the custodian of records constitutes the last pages of

11 this exhibit.  The identifying information of the borrowers was redacted.  Each loan is identified by

12 number, 1-29.  These closing statements and loan applications indicate when a loan was closed.

13 Taken in conjunction with the declaration of Felecia Bowers of Sierra Pacific, it shows that at least

14 11 loans were started prior to January 31, 2007, prior to plaintiffs' termination - as indicated by the

15 credit report date.  The closing statements as to those 11 loans indicate that they closed with Sierra

16 Pacific, and not CMG, after plaintiffs' termination.

17    5.    Attached hereto and marked as Exhibits 4 & 5, filed under seal pursuant to the

18 protective order entered into in this matter, are true and correct copies of PREMCO and Bowman's

19 facilities sub-lease with Sierra Pacific and the branch manager agreement produced by plaintiffs.

20    6.    Attached hereto and marked as Exhibit 6, is a true and correct copy of an email

21 produced by Bowman in discovery as P325.

22    7.    On March 18, 2008, Alan Cohen took the deposition of Paul Chevez, Chief Financial

23 Officer for CMG Mortgage, Inc. Attached hereto as Exhibit 7 is a true and correct copy of excerpts

24 from the court reporter's transcript of his deposition.

25    8.    Attached hereto and marked as Exhibit 17, is a true and correct copy of plaintiff

26 Bowman's employment application submitted to CMG and produced in discovery in this matter.

27

28

                                        2

1        I declare under penalty of perjury under the laws of the United States that the foregoing is

2    true and correct, and if sworn as a witness, I could and would testify competently thereto.

3        Executed at Oakland, California, on July 7, 2008.

4

5                                     /s/

6                                  Joshua A. Rosenthal

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

DECLARATION OF JOSHUA A. ROSENTHAL IN SUPPORT OF OPPOSITION TO MOTION FOR SUMMARY
ADJUDICATION  C 07 3140 SI
M:\CMG\85-0706-02 Bowman\Motion\Plaintiff's MSA 06.23.2008\Opposition\dec of jar.wpd

# EXHIBIT 1

1              UNITED STATES DISTRICT COURT
2            NORTHERN DISTRICT OF CALIFORNIA
3                    - - -
4   JAMES W. BOWMAN, Jr. and        )
    PACIFIC REAL ESTATE             )
5   MANAGEMENT COMPANY, INC., a     )      CERTIFIED COPY
    Washington Corporation,         )
6                                   )
                  Plaintiffs,       )
7   vs.                             )      No.  C 07 34140 SI
                                    )
8   CMG MORTGAGE, INC., a           )
    California Corporation; CMG     )
9   MORTGAGE, INC., d/b/a PACIFIC)
    GUARANTEE MORTGAGE, CMG         )
10  MORTGAGE SERVICES, INC., a      )
    California Corporation, CMG     )
11  MORTGAGE SERVICES, INC.,        )
    d/b/a PACIFIC GUARANTEE         )
12  MORTGAGE,                       )
                                    )
13                Defendants.       )
    _____)
14
15
                    DEPOSITION OF
16
                 JAMES W. BOWMAN, Jr.
17
                 OAKLAND, CALIFORNIA
18
                  APRIL 30th, 2008
19
20
21
    ATKINSON-BAKER, INC.
22  COURT REPORTERS
    (800) 288-3376
23  www.depo.com
24  REPORTED BY: JOAN F. MARTIN, CSR NO. 6036
25  FILE NO.: A203D59

1

1              UNITED STATES DISTRICT COURT
2            NORTHERN DISTRICT OF CALIFORNIA
3                    - - -
4   JAMES W. BOWMAN, JR; and        )
    PACIFIC REAL ESTATE MANAGEMENT)
5   COMPANY, INC., a Washington    )
    Corporation,                   )
6                                  )
                Plaintiffs,        )
7                                  )
    vs.                            )    No. C 07 34140 SI
8                                  )
    CMG MORTGAGE, INC., a          )
9   California Corporation; CMG    )
    MORTGAGE, INC., dba PACIFIC    )
10  GUARANTEE MORTGAGE; CMG        )
    MORTGAGE SERVICES, INC., a     )
11  California Corporation; CMG    )
    MORTGAGE SERVICES, INC., dba   )
12  PACIFIC GUARANTEE MORTGAGE,    )
                                   )
13              Defendants.        )
    ------------------------------

14
15                    DEPOSITION OF
16                 JAMES W. BOWMAN, JR.
17                     VOLUME II
18                 OAKLAND, CALIFORNIA
19                TUESDAY, JUNE 24, 2008
20
21  ATKINSON-BAKER, INC.
    COURT REPORTERS
22  (800) 288-3376
    www.depo.com
23
24  REPORTED BY:    Lisa D. Graham, RPR, CSR No. 8196
25  FILE NO:  A2056D2

1       MR. COHEN:  Objection.  Vague.

2           Do you know what he means by a net branch

3   operator?

4       MR. MEDLIN:  Well.

5       MR. COHEN:  Maybe --

6       MR. MEDLIN:  No.

7       MR. COHEN:  -- you can define that for us.

8       MR. MEDLIN:  No, I don't want to define it.  I want

9   to know if he considered himself to be whatever that is.

10      Q.  Did you consider yourself to be a net branch

11  operator?

12          He either did or he didn't.

13      MR. COHEN:  Objection.  That's vague and ambiguous.

14          If you understand the question, you can answer

15  it.

16      THE WITNESS:  Well, what do you consider a net

17  branch --

18      MR. MEDLIN:  Q.  No, it's not what I do.  I want to

19  know whether, at any time while you were associated with

20  Citybank, did you consider yourself to be a net branch

21  operator?

22      MR. COHEN:  Same objection.  It's vague and

23  ambiguous.  I don't know what that means.

24      MR. MEDLIN:  Q.  Well?  Did you not?  I guess you

25  didn't.  So while you were there, you did not think you

1  were a net branch operator?

2      A.  Yes.  Actually, I would characterize it as a

3  net branch operator.

4      Q.  Okay.  So while you were at Citybank, you

5  considered yourself to be a net branch operator?

6      A.  Yes.

7      Q.  Okay.  When you were -- just before that, when

8  you were with Pacific Guarantee Mortgage from '99 to

9  '03, did you consider yourself to be a net branch

10 operator?

11     MR. COHEN:  Same objection.  It's vague and

12 ambiguous.

13     THE WITNESS:  I would say yes.

14     MR. MEDLIN:  Q.  Okay.  You -- how long were you

15 with Citybank?

16     A.  Approximately five months.

17     Q.  So sometime in late 2003 is when you left

18 Citybank and went to PGM, a dba of CMG Mortgage, Inc.

19 Is that right?

20     A.  Correct.

21     Q.  And at CMG Mortgage, Inc. did you consider

22 yourself to be a net branch operator?

23     MR. COHEN:  Objection.  Vague and ambiguous.

24     THE WITNESS:  We were considered net branches.

25 Yes.

1      MR. MEDLIN:  Q.  And you were there until January
2  31 of '07, is that correct?
3      A.   That is correct.
4      Q.   And from there you went to Sierra Pacific
5  Mortgage, is that correct?
6      A.   Correct.
7      Q.   And do you consider yourself to be a net branch
8  of Sierra Pacific Mortgage?
9      MR. COHEN:  Objection.  Vague and ambiguous.
10     THE WITNESS:  I consider myself to be a branch
11  manager.
12     MR. MEDLIN:  Q.  So you are not in a net branching
13  relationship at Sierra Pacific?
14     MR. COHEN:  Objection.  Vague.
15     THE WITNESS:  I'm not sure I know the definition of
16  net branch anymore, since it seems to have changed over
17  time.
18     MR. MEDLIN:  Q.  Okay.  When you were at Pacific
19  Guarantee Mortgage, what did you -- how would you define
20  the -- a net branch operator?
21     A.   Well, I actually would just define it as a
22  branch manager.  My role was the branch manager for CMG,
23  to operate a branch in which I received the net profits.
24     Q.   Okay.
25     A.   That's how I define it.  The net branch

1   operator would be the branch manager, who was an

2   employee of CMG Mortgage.

3       Q.  Okay.  And are you in that kind of relationship

4   today at Sierra Pacific?

5       A.  I would say it was similar.

6       Q.  In what ways is it different now?

7       A.  Contractually, they don't have the same

8   agreements.

9       Q.  But you -- so you're not sure if you're a net

10  branch operator today?

11      A.  We don't use the term.

12      Q.  Okay.  But would you -- I'm just trying to

13  understand what you think in your mind.  Do you consider

14  yourself to be a net branch operator at Sierra Pacific?

15      MR. COHEN:  The question is vague and ambiguous.

16      THE WITNESS:  I consider myself to be the branch

17  manager.

18      MR. MEDLIN:  Q.  Would it be accurate to say --

19      A.  And I receive a net income.

20      Q.  So would you then agree with this statement,

21  you are not a net branch operator at Sierra Pacific?

22      MR. COHEN:  Objection.

23      MR. MEDLIN:  Q.  Is that a true statement?

24      MR. COHEN:  Objection.  Vague and ambiguous.

25      THE WITNESS:  I actually think that's probably a

1  legal question.  I don't know how to answer that.

2      MR. MEDLIN:  Q.  So you don't know one way or the

3  other?

4      A.  I don't know.

5      Q.  Are you familiar with a company by the name of

6  Pacific Real Estate Management?

7      A.  Yes.

8      Q.  Okay.

9      A.  Well, not that name.

10     Q.  Okay.

11     A.  Specifically.

12     Q.  Is there a name close to that?

13     A.  Actually, there are a lot of names close to

14 that.

15     Q.  Okay.  Of the companies you're familiar with?

16     A.  Well, I -- yes.

17     Q.  Okay.  Do you own an interest in any company

18 with a name similar to that?

19     A.  Do you know -- well, those three words are in

20 the name of a company I own.

21     Q.  And what is the name of the company you own?

22     A.  Pacific Real Estate Management Company, Inc.

23     Q.  And when was Pacific Real Estate Management

24 Company, Inc. formed?

25     A.  In 1999.

1    Q.   And what -- were you the founder of the

2  company?

3       A.   Yes.

4       Q.   Okay.  And what was the business of Pacific

5  Real Estate Management Company, Inc. in 1999 when it was

6  initially formed?

7       A.   Management services.

8       Q.   What kind of management services?

9       A.   Any kind.

10      Q.   Okay.  Were they in a particular business area,

11  field?

12      A.   No.

13      Q.   Any kind of management at all?

14      A.   (Indicating affirmatively.)

15      Q.   And to whom did Pacific Real Estate Management

16  Company services provide management services?

17      A.   I would say -- I don't know who they provided

18  management services to.

19      Q.   Do you know?

20      A.   No, I don't.

21      Q.   Okay.  The name "real estate management"

22  suggests to me that it had something to do with

23  management of real estate.  Is that not accurate?

24      A.   That's not accurate.

25      Q.   Okay.  Are you the sole shareholder of Pacific

1    Real Estate Management Company?

2        A.   No.

3        Q.   Who are the other shareholders?

4        A.   There is only one other.

5        Q.   And who would that be?

6        A.   Steve Knudsen.

7        Q.   Could you spell Mr. Knudsen's last name for me?

8        A.   K-n-e -- I'm sorry.  K-n-u-d-s-e-n.

9        Q.   Okay.  And do you have a familial relationship

10   with Mr. Knudsen?

11       A.   No.

12       Q.   Has he -- was he an original shareholder with

13   yourself?

14       A.   No.

15       Q.   When did he acquire his interest?

16       A.   2000.

17       Q.   Are there any other shareholders of the company

18   other than yourself and Mr. Knudsen?

19       A.   No.

20       Q.   Do you hold any offices with the company?

21       A.   What does that mean?

22       Q.   Are you an officer of the company?

23       A.   Oh.  Yes.  I'm president.

24       Q.   Okay.  Have you always been its president?

25       A.   Yes.

1    Q.  Does Mr. Knudsen hold any offices?

2    A.  I'm sure he does.  Without seeing the filing, I

3    can't remember the title.

4    Q.  Are there any other officers, other than

5    yourself and Mr. Knudsen?

6    A.  No, there is not.

7    Q.  Okay.  Did Pacific Real Estate Management

8    Company ever have any business relationships with RBC?

9    A.  What do you mean by business relationship?

10   Q.  I mean any kind of business relationship.  Did

11   they do business with Pacific Guarantee Mortgage when it

12   was owned by the Royal Bank of Canada?

13   A.  I guess, yes.

14   Q.  And what kind of business did those two

15   companies do with each other?

16   A.  We signed a contract to provide facilities.

17   Q.  Okay.  So Pacific Real Estate Management

18   Company signed a contract with RBC Mortgage, dba Pacific

19   Guarantee Mortgage, to provide facilities; is that a

20   correct statement?

21   A.  Without looking at the document, I can't say

22   for sure what the name of the entities was it signed

23   contracts with.

24   Q.  Okay.  So you don't know who Pacific Real

25   Estate Mortgage Company, Inc. signed a contract with?

1    Is that a correct statement?

2        A.   That's not the correct name of the company.

3        Q.   Okay.  May I call it PREMCO?

4        A.   Yes, you may.

5        Q.   Okay.  So now let me try again.  So you don't

6    know with what company PREMCO signed this contract in

7    1999?

8        A.   Well, I don't know the entity that was actually

9    on the contract.  Without looking at the contract, I

10   don't recall.

11       Q.   But do you know who you did business with?

12       MR. COHEN:  Objection.  Vague as to time.

13       MR. MEDLIN:  Q.  In 1999.

14       A.   In 1999.  Well, I know we were doing -- the

15   contracts were signed with some entity of Pacific

16   Guarantee Mortgage, but I don't know what entity that

17   was.

18       Q.   Okay.  So -- all right.  So sometime in 1999

19   PREMCO signed a contract to provide facilities to

20   Pacific Guarantee Mortgage in some form, a dba of RBC?

21       A.   I don't believe that's correct.

22       Q.   Okay.  What is correct?

23       MR. COHEN:  Objection.  Vague.

24       MR. MEDLIN:  Q.  This is not -- this is not rocket

25   science.  I'm just trying to understand.  I can't ask

1    A.  Commissions paid to loan officers.

2    Q.  That's it?

3    A.  Staff salaries.  Third-party charges.  Without

4  looking at a P&L from that time period, I can't recall

5  anything else specifically.

6    Q.  Okay.  How about the payments that were paid to

7  PREMCO, were those considered to be an expense?

8    A.  Not that I'm aware of.

9    Q.  Okay.  All right.  So as you sit here today,

10  the expenses you recall being deducted from income to

11  arrive at net profits were commissions paid to loan

12  officers, staff salaries and third-party charges?

13    A.  (Indicating affirmatively.)

14    Q.  Is that correct?

15    A.  That's correct.

16    Q.  And as you sit here today, you cannot recall

17  any others?

18    A.  I'm sure there were others, I just don't recall

19  specifically what they labeled them as on the profit and

20  loss statement.

21    Q.  But do you recall what they were conceptually,

22  then?

23    A.  Could have been some insurance.

24    Q.  How about rent, was that considered an expense?

25    A.  No.

 1      Q.  So the cost of operating the facility -- the
 2  cost of the lease expense and the cost of the facilities
 3  was not deducted?

 4      A.  No.  Well, again, I have to look at a profit
 5  and loss statement.  But if I recall, I don't remember
 6  seeing a line item for rent on the profit and loss
 7  statement specifically.

 8      Q.  Okay.

 9      A.  So I'm not sure how they accounted for that.

10      Q.  Okay.  Do you remember who the landlord, the
11  owner of the property at 1010 South 336th Street was?

12      A.  The owner of the -- no, I don't know who the
13  owner of the property was.

14      Q.  Was it PREMCO?

15      A.  No.

16      Q.  Was PREMCO a tenant?

17      A.  Yes.

18      Q.  And PREMCO then subleased to Pacific Guarantee
19  Mortgage?

20      A.  Yes.

21      Q.  And was PREMCO the tenant at Kent-Kangley Road?

22      A.  Yes.

23      Q.  Was PREMCO also tenant at 320th Street in
24  Federal Way?

25      A.  Yes.

1     Q.  Did the facilities that PREMCO provided, the

2  office furniture and equipment, did PREMCO own that

3  office furniture and equipment?

4     A.  Yes.

5     Q.  So let me just ask --

6     A.  Let me back.  It could have been myself

7  personally and PREMCO together.

8     Q.  Okay.

9     MR. COHEN:  Just a second, David.

10         I want to remind the witness not to guess.  So

11  when you say "could have been," we don't know, when you

12  say that, if you're guessing or not.  So try to restrict

13  your answers to what you can recall.  Because I'm sure

14  counsel doesn't want your speculation.

15     THE WITNESS:  Then I would not know for sure what

16  was owned by PREMCO at that time.

17     MR. MEDLIN:  Q.  Okay.  Do you believe that PREMCO

18  owned any of the office equipment?

19     A.  Yes.

20     Q.  At least some of the office equipment at 1010

21  South 336th Street was owned by PREMCO?

22     A.  Yes.

23     Q.  And was at least some of the office equipment

24  at Kent-Kangley Road owned by PREMCO?

25     A.  Yes.

1    Q.   And was at least some of the office equipment

2  at 320th Street owned by PREMCO?

3      A.   Yes.

4      Q.   Okay.   Let's talk about these components of

5  income that you told me about a few minutes ago.

6          The first component you told me about was loan

7  origination fees.   Tell me what that means.   What is a

8  loan origination fee?

9      A.   A fee charged to a borrower on a loan

10  transaction.

11     Q.   Okay.   Would it include anything else other

12  than what you've told me?

13     A.   No, I don't think so.

14     Q.   What is a processing fee?

15     A.   It's a fee charged to a borrower on a mortgage

16  loan.

17     Q.   Okay.   Would it be anything else other than

18  what you've told me?

19     A.   No.

20     Q.   Okay.   What is a service release premium?

21     A.   Service release premium is a premium received

22  by a lender when they sell a loan on the secondary

23  market.

24     Q.   Okay.   Would there be anything else included

25  within the term "service release premium" other than

55

1   what you've told me?

2       A.   I can't -- I couldn't expand upon that because

3   I'm not an expert in the secondary market.

4       Q.   No, no.  I understand that.  You used the term.

5   I'm just trying to understand what you meant when you

6   used those words.  And have you told me what you meant

7   when you used those words?

8       A.   Yes.

9       Q.   When you used the words "yield spread premium,"

10  what were you referring to?

11      A.   That's an additional compensation from the

12  lender for rate above par.

13      Q.   Okay.  And is that a compensation paid by the

14  lender to the broker?

15      A.   Yes.

16      Q.   The release premium, on the other hand, you

17  told me was a fee paid by an investor to a lender?

18      A.   It could also be paid to the broker.

19      Q.   Okay.  Is it your understanding that the

20  service release premium is being paid for releasing the

21  servicing?

22      A.   I don't understand, beyond what I explained,

23  what that means.

24      Q.   So you don't know what the fee is being paid

25  for, you just know that it's a fee being paid by an

56

```
 1      A.  Yes.

 2      Q.  Has it, each quarter, generated a profit and

 3   loss statement?

 4      A.  No.

 5      Q.  Has it each year?

 6      A.  (Gestures.)

 7      Q.  You once again don't know?

 8      A.  Don't know.  I can't --

 9      Q.  Who would know that?

10      A.  I would be the best source of that information.

11      Q.  Oh.  That's sad, isn't it?  Where are the

12   profit and loss statements maintained?

13      A.  In my corporate office.

14      Q.  Where is that?

15      A.  In Federal Way.

16      Q.  What's the address?

17      A.  What's the address.  It is 36 -- no, take that

18   back.  I can't think of the address.  We're on 336th .

19   Street in Federal Way.  Not -- I'm sorry.  909 South

20   336th Street.

21      Q.  How long have you been at that location?

22      A.  A little over a year.

23      Q.  And where were you immediately prior to that?

24      A.  The 320th location.

25      Q.  Okay.  Is Pacific Trust Lending a corporation?
```

81

```
 1        A.   Yes, it is.

 2        Q.   And who are the owners of Pacific Trust

 3   Lending?

 4        A.   Me.

 5        Q.   Anyone else?

 6        A.   No.

 7        Q.   When was Pacific Trust Lending formed?

 8        A.   Within the last year.

 9        Q.   Have you ever done business under the name

10   Pacific Trust Lending prior to the formation of the

11   corporation?

12        A.   No, I have not.

13        Q.   Have you ever had business cards which had the

14   words "Pacific Trust Lending" on them prior to the

15   formation of that corporation?

16        A.   Yes.

17        Q.   When did you first have such business cards?

18        A.   1999.

19        Q.   Between 1999 and 2003, when you were working

20   for Pacific Guarantee Mortgage, did your various offices

21   that you told me about that you worked at have a sign on

22   the door that said Pacific Guarantee Mortgage?

23        A.   No.

24        Q.   Did they have a sign on the door that said

25   Pacific Trust Lending?
```

1          A.    Yes.

2          Q.    And from 1999 to the present, all of the

3    offices you have worked at are the 1010 South 336th

4    Street location, the Kent-Kangley Road location, the

5    320th Street in Federal Way location, and the 909 South

6    336th Street location, is that correct?

7          A.    Correct.

8          Q.    And each of those locations has had a sign on

9    the door that says Pacific Trust Lending?

10         A.    Yes.

11         Q.    And during that period of time, while you were

12   working at each of those locations, you had business

13   cards, personally, that said Pacific Trust Lending?

14         A.    Yes.

15         Q.    And did you have letterhead in each -- during

16   that entire period of time, for each of those locations,

17   which said Pacific Trust Lending?

18         A.    Yes.

19         Q.    Did you, at these times, from 1999 to the

20   present, ever have any form of advertising which had the

21   words on it, "Pacific Trust Lending"?

22         A.    Yes.

23         Q.    What forms of advertising?

24         A.    Well, print advertising.  Flyers.

25         Q.    Anything else?

83

1     A.  I'm not sure what other type of advertising I
2   could do.

3     Q.  Okay.  Did you ever have a newspaper add?

4     A.  Well, I would say that was print advertising.

5     Q.  Okay.  So print would include -- I see.  You
6   said flyers and print.  I'm slow, but I get there.

7         Did you ever have a Web site which said
8   "Pacific Trust Lending"?

9     A.  Yes, I do.

10    Q.  When did you first have such a Web site?

11    A.  I don't recall.

12    Q.  Did you have it when you were associated with
13  CMG Mortgage, Inc.?

14    A.  Yes, I did.

15    Q.  Did you have it at any time when you were
16  associated with Pacific Guarantee Mortgage between '99
17  and 2003?

18    A.  Yes, I did.

19    Q.  When you were at Citybank -- I like that,
20  Citybank with a Y -- did you have letterhead that said
21  Pacific Trust Lending?

22    A.  Yes.

23    Q.  And did you have business cards that had
24  Pacific Trust Lending?

25    A.  Yes.

1     Q.  And did you have advertising that said "Pacific

2  Trust Lending"?

3     A.  I don't recall if we even did advertising in

4  that five-month period or not.  So I don't know.

5     Q.  Do you know if you had a Web site that said

6  "Pacific Trust Lending" during that time?

7     A.  Yes.

8     Q.  And did you have a sign on the door that said

9  "Pacific Trust Lending"?

10     A.  Yes.

11     Q.  Does Pacific Trust Lending have any officers,

12  the corporation?

13     A.  Myself.

14     Q.  Anyone else?

15     A.  No.

16     Q.  And is your title president?

17     A.  Yes.

18     Q.  Does Pacific Trust Lending have any employees?

19     A.  No.

20     Q.  What is the business of Pacific Trust Lending?

21     A.  I haven't done anything with Pacific Trust

22  Lending.

23     Q.  So it has no -- it's inactive?

24     A.  Right.  I just formed the corporation.

25     Q.  Okay.  Has it -- and it's not entered into any

1    contracts or business arrangements of any kind?

2        A.   Correct.

3        Q.   Today you're employed at Sierra Pacific

4    Mortgage, is that correct?

5        A.   That is correct.

6        Q.   And your office is at 909 South 336th Street,

7    is that correct?

8        A.   Correct.

9        Q.   And has PREMCO entered into any kind of

10   arrangement, contract or agreement of any kind with

11   Sierra Pacific?

12       A.   No.

13       Q.   Does PREMCO provide facilities to Sierra

14   Pacific?

15       A.   No.

16       Q.   Does anyone provide facilities to Sierra

17   Pacific, to your knowledge?

18       A.   Yeah.   I'm sure.

19       Q.   That you know of?

20       A.   Define facilities, for this.

21       Q.   Well, I meant what you told me they were, back

22   up here, when we were talking about your contract

23   between PREMCO and Pacific Guarantee Mortgage.  It was a

24   copier, computers, office equipment and office space.

25       A.   There is no facilities agreement that I know of

1   loan officer and myself, and affirmed by Chris George.

2       Q.   Okay.

3       Q.   So would that be true with the dollar ranges

4   for different commission rates?  Would that have been

5   negotiated between you and the loan originator and then

6   confirmed by Chris?

7       A.   Yes.

8       Q.   In the case of the loan originator agreement

9   you signed, with whom did you negotiate the commission

10  rates?

11      MR. COHEN:  Objection.  You mean the form that he

12  signed on his own behalf as an employee?

13      MR. MEDLIN:  Q.  Yes.

14      MR. COHEN:  Because --

15      THE WITNESS:  As a loan originator?

16      MR. MEDLIN:  Right.

17      MR. COHEN:  Not as a branch manager.

18      MR. MEDLIN:  Yes.

19      THE WITNESS:  Myself.

20      MR. MEDLIN:  Q.  You negotiated with yourself.

21      MR. COHEN:  Who won?

22      THE WITNESS:  I don't think I won, actually.  I

23  think the other guy.

24      MR. MEDLIN:  Q.  Was it a long, drawn-out

25  negotiation?  So you decided?

1      A.   Yes.   I filled it in for myself and signed it.

2      Q.   And you filled in the dollar ranges for

3  yourself?

4      A.   No, I actually used the same dollar ranges, I

5  believe, on all the documents.  Or something similar.

6      Q.   Even for yourself?

7      A.   Yes.

8      Q.   Before you signed it, did you read the contract

9  listed in here?

10     A.   I don't remember.

11     Q.   I would like to ask you to look at Page 6.   In

12  particular, there's a Paragraph 8, which is broken down

13  into subparagraphs, and I would like to draw your

14  attention to Paragraph 8.3 which is entitled "Loan

15  Files."  Do you see that?

16     A.   I see that.

17     Q.   Did you read that paragraph before you signed

18  the contract you signed?

19     A.   I don't recall.

20     Q.   Okay.  Did you know, at any time while you were

21  employed at CMG, that the terms as set forth in 8.3 were

22  included in the contract?

23     A.   Yeah.   I believe I understood that.

24     Q.   Okay.  So you understood, before you terminated

25  your relationship with CMG, that all loan files, whether

1  pending or closed, were to be returned to CMG?

2      A.   Again, I didn't terminate the relationship with

3  CMG.  CMG terminated the relationship with me.

4      Q.   Okay.  I apologize.  I wasn't trying to put

5  words in your mouth.

6      A.   I just want to be clear.  I don't know.

7      Q.   That's fair.  Let me see if I can reword the

8  question.

9      A.   Okay.

10      Q.   At the time your relationship with CMG ended,

11  you understood that you were to return all loan files to

12  CMG, whether pending or closed?

13      A.   Yes.

14      Q.   You understood that "pending" referred to

15  pipeline loans?

16      A.   Not necessarily, but...

17      MR. COHEN:  But what?

18      THE WITNESS:  Well, I mean, pending -- well, I

19  guess it could be the same thing as pipeline.  Yeah, I

20  don't see why not.

21      MR. COHEN:  You don't have to agree with him just

22  because he's asking you a question.

23      MR. MEDLIN:  And I'm charming as hell.

24      MR. COHEN:  Well, there's that, too.  So if you

25  want to clarify -- David, would you mind if I ask him to

1 | clarify his answer?

2 |     MR. MEDLIN: Of course not.

3 |     THE WITNESS: By pending, do you -- is pipeline and

4 | pending the same meaning to you?

5 |     MR. MEDLIN: Q. Sir, that's one rule I do have. I

6 | ask the questions.

7 |     MR. COHEN: Would you ask a fresh question for the

8 | witness, please?

9 |     MR. MEDLIN: Q. You understood, on the last day of

10 | your employment with CMG, that you were required to

11 | return all loan files to CMG, including pipeline loans?

12 |     A. Yes.

13 |     Q. Okay. Is there any particular reason you did

14 | not return the pipeline loan files to CMG?

15 |     A. Yes.

16 |     Q. What is that reason?

17 |     A. Because on or about January 31st I called Kim

18 | Callas about a loan that was in process with CMG. It

19 | was a home ownership accelerator loan. And she told me

20 | -- I was in the Vancouver branch. She told me I had to

21 | submit that -- or it might have been February 1st.

22 | Because I asked specifically, as I understand the

23 | contract, I am to close all loans, up to 5:00 p.m. on

24 | the date of termination, with CMG. So I had every

25 | intention to do that.

1              And there was a loan that was already submitted

2   to CMG.  And Kim Callas instructed me that I had to

3   submit all my loans through Sierra Pacific.

4        Q.   Okay.  So it's your testimony that Kim Callas

5   instructed you not to turn over the pipeline loans?

6        A.   No.  It was --

7        MR. COHEN:  Objection.  That misstates the

8   testimony.

9        THE WITNESS:  I was going to clarify.  That's not

10  what I said.  I was to submit all the loans through

11  Sierra Pacific.

12       MR. MEDLIN:  Q.  And did you understand -- pardon

13  me.  Did you understand that to be an instruction not to

14  turn over the pipeline loan files?

15       A.   Yes.

16       Q.   Did you understand that Kim Callas was taking

17  the position that CMG was not interested in the income

18  to be generated from those files?

19       A.   No, I didn't.

20       MR. COHEN:  Objection.  Misstates the testimony.

21       THE WITNESS:  Yeah.  I didn't understand that to be

22  an issue at all.

23       MR. MEDLIN:  Q.  Well, you understood from the

24  conversation that she was not taking the position that

25  CMG was entitled to that income?

1          MR. COHEN:  Objection.  That misstates the

2     testimony as well.

3          THE WITNESS:  No.  That nothing --

4          MR. COHEN:  Can I finish before you start your

5     answer?  Thank you.

6          THE WITNESS:  Sorry.

7          MR. MEDLIN:  Are you done yet, Alan?

8          MR. COHEN:  All done.

9          MR. MEDLIN:  Q.  Well, at the end of that telephone

10    conversation, you understood that Kim Callas was

11    effectively telling you, pick up the pending loan files

12    and take them with you?

13         MR. COHEN:  Objection.  That misstates the

14    testimony.

15         THE WITNESS:  That's not what I said.  It was

16    really simple.  I was supposed to submit the loans

17    through Sierra Pacific.

18         MR. MEDLIN:  Q.  And if you submit them through

19    Sierra Pacific, you're not submitting them through CMG?

20         A.  No.  Not necessarily.

21         Q.  Okay.  How can you submit them through Sierra

22    Pacific and through CMG?

23         A.  Because we were entering -- so immediately

24    after that, I asked for an approval for us to be a

25    wholesale broker with Sierra Pacific with CMG, so that

1  record, that I could recall.

2      Q    And by "PGM," per our agreement in the

3  first session you're referring, are you not, to --

4      A    To RBC.

5      Q    -- RBC Mortgage?

6      A    Yes.

7      Q    Yes.  And when we refer to "CMG," we're

8  referring to CMG including its PGM operations?

9      A    Correct.

10     Q    I just want to make sure we're still on the

11 same page there.

12     A    Yeah.

13     Q    So based on how things had worked at PGM,

14 you understood that you were going to be required to

15 pay some expenses of the branch out of your personal

16 net income?

17     A    Correct.

18     Q    And what expenses of the branch did you

19 expect to pay from your personal net income?

20     A    Well, the rent, copiers, office supplies,

21 telephone service; that sort of expenses -- those

22 sort of expenses.

23     Q    So all of the expenses; is that correct?

24     A    No, I didn't expect to pay the commissions

25 and salaries and payrolls and benefits out of that.

1    Q    So your understanding when you signed
2   Exhibit 2 was that the commissions and salaries of
3   loan officers and staff in the branch would be
4   deducted from the gross income, that that would
5   result in net profit; is that correct?
6        A    Right.
7        Q    And that the net profit would be paid to
8   you as a salary?
9        A    Yes.
10       Q    And that you were required to take your
11  salary, or the net salary that you received, and pay
12  the rent for the office space and the costs of
13  furniture, fixtures and equipment; is that correct?
14       A    Yes.
15       Q    And is that what happened?
16       A    That is what happened.
17       Q    Did PREMCO pay the rent ever?
18       A    Yes.
19       Q    So PREMCO paid the rent. Did you also
20  personally pay the rent?
21       A    Well, yes. I had to put my net income and
22  salary into the PREMCO account to pay the rent; so
23  in effect I was paying the rent.
24       Q    So what happened was, you took your net
25  salary and used some portion of it to fund PREMCO;

1  is that correct?

2      A      Right, that's correct.

3      Q      And then PREMCO paid the rent and other

4  expenses you've described?

5      A      Correct.

6      Q      And you were the sole owner of PREMCO at

7  that time; is that correct?

8      A      No.

9      Q      Oh, that's right.  Who else owned it?

10     A      Steve Knudsen.

11     Q      And what percentage did Steve Knudsen own?

12     A      Anywhere from 15 to 7 -- or I should say --

13  I'm saying it backwards.  7 and a half to 15 percent

14  I think it was.

15     Q      Did it vary or is that the range you

16  understood it to be?

17     A      It varied.  It started at 15 but went to 7

18  and a half percent when I put more capital into the

19  account.

20     Q      And did Mr. Knudsen also put money into

21  PREMCO?

22     A      He had loaned me money that I gave him

23  credit back as stock even though I repaid him.

24     Q      So he did effectively put money into

25  PREMCO?

```
 1              MR. COHEN:  Objection; that misstates the
 2   testimony.
 3              THE WITNESS:  I don't recall if he put any
 4   money into PREMCO directly, no.
 5              MR. MEDLIN:  Q.  At this time -- and when
 6   I'm taking about "this time," I'm talking about when
 7   you were working for CMG.
 8        A    Oh, no.
 9        Q    So during the time you were working for
10   CMG, he did not put any money into PREMCO; is that
11   correct?
12        A    That's correct.
13        Q    During the time that you were working for
14   CMG, did PREMCO have any sources of income other
15   than its contract with CMG?
16        A    No.
17        Q    Did it have any salaries that it paid?
18        A    No.
19        Q    It had no employees?
20        A    Right, which I talked about last
21   deposition.
22        Q    And it had no other forms of business?
23        A    Right.
24        Q    And since you left CMG, does PREMCO have
25   any business it operates it at?
```

1   legal counsel and get back to me.

2       Q    What else did he say?

3       A    I don't recall because I was -- The focus

4   of my conversation, or at least that's what I was

5   most focused on, was receiving my income.

6       Q    And did you tell Chris anything in this

7   conversation other than what you've told me?

8       A    I probably did, but I don't recall.

9       Q    So have you told me everything you can

10  recall that was said by you or by Chris in this

11  conversation?

12      A    That I recall, yes.

13      Q    If I understood your testimony, Chris

14  George told you in this telephone call that he would

15  see about getting at least the expenses to you; did

16  I say that correctly?

17      A    Yes.

18      Q    What did you understand that to be

19  referring to?

20      A    That would have been the expense voucher

21  amounts that I had submitted.

22      Q    Would you look again at Exhibit 7.  And at

23  the first entry here where it says "I went through

24  more receipts"; do you see that line: "Hi Kern, I

25  went through more receipts and faxed you a total of

358

```
 1  24,000"?
 2       A    Yes.
 3       Q    Do you see that?
 4       A    Yes.
 5       Q    At the end of that, in the second sentence
 6  it says "All of which were included in my monthly
 7  expense vouchers"; do you see that?
 8       A    Yes.
 9       Q    Can you tell me what you were referring to
10  when you wrote the words "my monthly expense
11  vouchers"?
12       A    Yeah, the monthly expense vouchers that I
13  sent to CMG.
14       Q    Can you describe those for me please, what
15  those were?
16       A    You want to know what's -- what figures,
17  what items went into the expense voucher, the form
18  of the voucher?
19       Q    I want to know what an expense voucher is
20  in general.
21       A    Well, it was something created by CMG.
22  It's a form piece of paper, eight-and-a-half by 11,
23  that says I think something like "Monthly Expenses"
24  or "Expense Voucher" on the heading, and then an
25  itemization of some of the branch costs that I
```

1   provided receipts and invoices and faxed to CMG.

2       Q    And you did that each month?

3       A    No.

4       Q    How often would you do that?

5       A    I didn't start doing it till November of

6   2005, October or November 2005.

7       Q    And thereafter did you do it each month?

8       A    Yes.

9       Q    Why did you not do it before then?

10      A    Well, based on my original understanding

11  that I was supposed to receive personally the net

12  income from the branch, as I talked about earlier in

13  the deposition, and it was an option to submit or

14  not those expenses.

15      Q    So prior to October --

16      A    It was not required.  Sorry.

17      Q    Prior to October or November, submission of

18  expense vouchers was an option; is that correct?

19      A    That's the way I understood it.

20      Q    And you elected not to exercise that

21  option; is that correct?

22      A    I didn't -- I guess I elected not to, yes.

23      Q    And why did you begin in October or

24  November to submit expense vouchers?

25      A    Because I received a phone call from -- or

1  e-mail from somebody in the accounting department
2  who said that it was too difficult for them to cut
3  me a check personally through the payroll for
4  accounting purposes and taxing, and whatever they --
5  whatever the problem was that made it difficult for
6  CMG's accounting to pay me that way, they said I
7  have to get paid directly through PREMCO.

8      Q    So is it accurate to state then that
9  beginning at that time in October or November of
10  2005, the submission of monthly expense vouchers was
11  no longer optional?

12      A    That's the way I understood it if I wanted
13  to get paid.

14      Q    So prior to October or November of 2005,
15  you understood submission of monthly expense
16  vouchers was optional and starting in November or
17  October of 2005 you understood it to be mandatory;
18  is that correct?

19      A    Well, nobody said it was mandatory, but
20  they said "If you want to get paid through PREMCO,
21  you have to submit these"; so I took that as a
22  requirement, yes.

23      Q    Was there any other reason other than what
24  you've told me for your beginning to submit monthly
25  expense vouchers in October or November of 2005?

1    A    Not that I recall.

2    Q    Was there a tax motivation, an income tax

3  motivation?

4    A    No.  Well, let me back up.  I don't know if

5  there was a tax motivation, but CMG said because of

6  the taxing of the income that it was too difficult

7  to do the tax exemption than it was to cut a check

8  separately to PREMCO.  That I didn't understand, but

9  I agreed with it because CMG is the expert in the

10  accounting department and I was not.

11    Q    Let me ask you a different question then.

12  For you, was there a tax, income tax motivation to

13  begin submitting monthly expense vouchers and being

14  paid through PREMCO starting in October or November

15  of 2005?

16    A    No.  I didn't initiate it at all; it wasn't

17  based on anything I thought about.

18    Q    Were your checks that you -- You did

19  receive net profit checks from CMG prior to October

20  or November of 2005, you personally?

21    A    Yes.

22    Q    And those were paid to you through payroll,

23  were they not?

24    A    Not all of them were that I recall.  I

25  would say most of the time that was the case.

1       A       For the month of April 2004, yes.

2       Q       And was that the revenue of the branch from

3    all income sources?

4       A       No.

5       Q       What income sources were not included in

6    this revenue that should have been?

7       A       Well, per the contract, if we read the

8    contract, and I know this is open to interpretation,

9    but the contract says "all income derived"; and

10   additional income derived from the branch operations

11   would have been the service release premiums sold

12   when the loans were sold on the secondary market.

13   So that income would not have been included in here.

14      Q       So let's break that down a little bit.  You

15   understand the words "service release premium" to

16   mean income earned in the secondary market?

17      A       Yes.

18      Q       And you believe those to be identical?

19             MR. COHEN:   I don't understand your

20   question, David.

21             MR. MEDLIN:   Q.  Do you believe the terms

22   "service release premium" and "income in the

23   secondary market" to be identical, the same thing?

24      A       I think the service release premium is part

25   of the income generated when loans are sold on the

1  secondary market, yes.

2     Q    Is it your opinion that that's 100-percent

3  of the income generated in the secondary market?

4     A    That I don't know.

5     Q    Is it your contention that 100-percent of

6  the income generated in the secondary market should

7  have been included within revenue for the branch?

8          MR. COHEN:   I'm going to object to the

9  extent it calls for legal conclusion.

10         You can answer as to your understanding of

11 the contract.

12         THE WITNESS:   Well, my understanding of the

13 contract today, yes.

14         MR. MEDLIN:   Q.   So your understanding

15 today is that any service release premiums earned in

16 connection with a loan originated at your branch

17 should have been included within the revenue for

18 your branch?

19    A    Yes, as I read the contract.

20    Q    And it's your understanding today that in

21 addition to that any additional income, if any,

22 earned in the secondary market in connection with a

23 loan originated at your branch, should have been

24 included within the revenue for your branch?

25    A    It certainly reads that way in the

1  contract.

2      Q      That's your understanding?

3      A      That's my understanding.

4      Q      When did you obtain that understanding?

5      A      After my termination and reviewing it with

6  attorneys.

7          MR. COHEN:  I'm going to caution the

8  witness, just a second, not to discuss your

9  communications with counsel.

10          THE WITNESS:  Okay.

11          MR. MEDLIN:  Q.  Well, in April of 2004 was

12  it your understanding that you were to -- that

13  service release premiums were to be included within

14  the revenue for your branch?

15      A      My entire understanding of the contract

16  derived from my faith in CMG and the counsel they

17  provided in writing those contracts.  I had no other

18  understanding except for what I was told and what

19  was communicated to me.

20      Q      Were you told that the service -- Well, let

21  me back up and ask the same question again because

22  I'd like you to answer that question.

23          Was it your understanding in April of 2004

24  that service release premiums derived from loans

25  originated at your branch were to be included within

1  revenue?

2      A    I understood -- my understanding was that

3  CMG would do the accounting and account for all the

4  net income.  So I understood that they were

5  accounting for all the net income at that time.

6      Q    Okay.

7      A    Yeah.

8      Q    Let me ask you the same question again

9  because I want you to listen carefully because I

10 want you to answer the question I'm asking.

11          Did you understand in April of 2004, was it

12 your understanding at that time, that service

13 release premiums were to be included within the

14 revenue for your branch?

15     A    I understood that if all income, if that

16 was derived -- if that was derived, then I

17 understood that to include that; but if it wasn't

18 derived, then I didn't understand that.

19     Q    Well, let me ask you this:  Did you know

20 what a service release premium -- Did you have the

21 same understanding of what a service release premium

22 is in April of 2004 as you do today?

23     A    I'm not sure; I don't recall if it's the

24 same today as it was then.  I don't know.

25     Q    So when you looked at this, do you -- in

 1  April of 2004, did you see the words "service
 2  release premium"?
 3      A    No.
 4      Q    Did you ask anybody why service release
 5  premiums were not included?
 6      A    No.
 7      Q    But you had an expectation in April of 2004
 8  that they would be included; is that correct?
 9      A    My expectation is that all the income was
10  accounted for.
11      Q    Did you have any expectation with respect
12  to service release premiums specifically in April of
13  2004?
14      A    I can't say I did.
15      Q    Let's talk about secondary, other secondary
16  market income.
17      A    Okay.
18      Q    In April of 2004 did you -- was it your
19  understanding that all secondary market income
20  derived from loans originated at your branch were to
21  be included within revenue?
22      A    Now I only understood what was communicated
23  on here because I was relying on CMG.  So if they
24  didn't account for it, I didn't have knowledge of
25  it.

1    Q    So you didn't know one way or the other in

2  April of 2004 whether or not secondary market income

3  was supposed to be included within revenue for your

4  branch?

5    A    That's true.

6    Q    At PGM was all secondary market income

7  included within revenue for your branch?

8    A    I don't recall.

9    Q    At Sierra Pacific mortgage is all secondary

10  market income derived from loans originated at your

11  branch included within revenue?

12    A    In what form?

13    Q    In any form.

14    A    Well, I'm sure they have accounting for

15  their secondary market revenue, yes.

16    Q    No, that's not my question, sir.  At Sierra

17  Pacific Mortgage where you work today --

18    A    Yes?

19    Q    -- is all income that Sierra Pacific

20  Mortgage realizes from secondary market transactions

21  involving loans originated at your branches included

22  within revenue?

23        MR. COHEN:  Objection to the extent it

24  calls for speculation.  You can answer as to your

25  knowledge.

```
 1              THE WITNESS:  I'm sure it is included in
 2   revenue.
 3              MR. MEDLIN:  Q.  For your branch?
 4        A    For my branch, no.
 5        Q    It's not included within that?
 6        A    Not that I recall.
 7        Q    At CityBank Mortgage, with a Y --
 8        A    It's just CityBank; they were actually a
 9   bank, so they --
10        Q    At CityBank with a Y --
11        A    With a Y.
12        Q    -- was all secondary market income included
13   within revenue for your branch?
14        A    Not that I recall.
15        Q    Did you have an understanding in -- Let's
16   continue to look at Exhibit 13 please.  Do you see
17   in the middle of the page it has the words "Gross
18   Profit"?
19        A    Yes.
20        Q    And in this instance on April 30, 2004 the
21   gross profit was $50,000 -- pardon me, $50,067.53;
22   do you see that?
23        A    Yes.
24        Q    What did you understand in April of 2004
25   that to be?
```

1          MR. MEDLIN:  Q.  Is it -- You don't know
2   what "hedging" is then?
3       A    I don't understand what you said, no.
4       Q    Do you know what "hedging" is?
5       A    No, I'm not entirely clear.
6       Q    What is your understanding; what do you
7   know about hedging in the secondary market?
8       A    Well, since it's all speculative I guess,
9   I'd rather not -- I'd rather hear the explanation
10  from you.
11      Q    No, no, no.
12      A    I don't understand.
13      Q    I'm entitled to know what you know.  What
14  is your understanding of hedging in the secondary
15  market?
16      A    I think it's just an event that occurs when
17  loans are locked and priced and then sold.  There is
18  a period of time where, before they're transferred,
19  whether or not they were guaranteed delivery or
20  nonguaranteed.  That's I think, and I could be
21  completely wrong.
22      Q    But you've told me what you understand
23  about hedging?
24      A    About selling -- Well, I don't know.  I
25  guess I really don't know what hedging means, if I

                                                    429

1  think about it.

2      Q    Could I refer you back to Exhibit 3 please,

3  and particularly I'd like to refer you to page two

4  and to the middle of the page that we've already

5  talked a little bit about, Article II of the

6  "Security Deposit"; do you see that?

7      A    I see that.

8      Q    And the security deposit amount that has

9  been written in there is $10,724; do you see that?

10     A    Yes.

11     Q    Did you write a personal check for that

12  security deposit?

13     A    I don't recall.

14     Q    Did you ever write any personal checks to

15  CMG?

16     A    I don't recall.

17     Q    Did you ever transfer money from a personal

18  account to CMG for this security deposit or any

19  other security deposit?

20     A    Not that I know of, no.

21     Q    Did you ever transfer money to CMG from a

22  personal account for any reason?

23     A    I don't think so.

24     Q    Does Angela Zavier work as a loan officer

25  at your office today?

```
1      A     No.

2      Q     Has she ever?

3      A     She did at one time with Sierra Pacific.

4      Q     With Sierra Pacific?

5      A     Yes.

6      Q     For how long?

7      A     I don't know.

8      Q     Do you know what period of time at all?

9            MR. COHEN:  You know, hold on a second.  It

10   seems to me that this is a question about

11   Ms. Zavier's private employment rights, and I don't

12   see the direct relevance to any issue in this case.

13   Can you tell us --

14           MR. MEDLIN:  No, if --

15           MR. COHEN:  Give us some sort of an offer

16   of proof.

17           MR. MEDLIN:  No, if I knew that, I wouldn't

18   have to do discovery; that's what I'm doing, is I'm

19   trying to learn what involvement she had at Sierra

20   Pacific.

21           MR. COHEN:  Well, that doesn't seem to be

22   relevant to this case, so I'm going to instruct the

23   witness not to answer that question.

24           MR. MEDLIN:  You understand of course it's

25   discovery relevance we're talking about here.  And
```

431

1    A    Yes.

2    Q    And at the bottom, "Reason for leaving,"

3  you wrote the reason for leaving was "Net branch";

4  do you see that?

5    A    Yes.

6    Q    Can you explain to me why "net branch" was

7  your reason for leaving Pacific Trust Lending?

8    A    No, I cannot.

9    Q    You continued to do business as Pacific

10  Trust Lending even after you joined CMG; correct?

11    A    Well, I never did business as Pacific Trust

12  Lending but CMG did, yes.

13    Q    Yes.  The office you worked out on Federal

14  Way did business as Pacific Trust Lending during the

15  time you worked for CMG; correct?

16    A    Yes.

17    Q    And before you worked for CMG, the business

18  was Pacific Trust Lending?

19    A    The business was registered, yes, as

20  Pacific Trust Lending.

21    Q    And after you left it was Pacific Trust

22  Lending?

23    A    Yes.

24    Q    Let's talk about Mortgage Market; do you

25  see that at the bottom part?

1       A       Yes.

2       Q       And the reason for leaving there, you wrote

3   in "net branch" as well?

4       A       Right.

5       Q       What did you mean by that?

6       A       That's what I started to explain the first

7   time, and I apologize.  Well, Mortgage Market was

8   affiliated with, or was -- Or actually at that time

9   they were not part of RBC.  They were part of Prism

10  Financial, who also owned Pacific Guarantee

11  Mortgage, and they had a net branching arrangement

12  or opportunity.  And so I went from one part of

13  Prism to another part of Prism to do net branching.

14      Q       Let's move back up to where it says

15  "Pacific Trust Lending."  Is that section, since it

16  says -- I note that it says the dates of employment

17  were from "September 15, '99 to present"; do you see

18  that?

19      A       Yes.

20      Q       They actually were the dates of your

21  employment at RBC, were they not?

22      A       Well, after RBC -- Well, it was Prism

23  acquired by RBC, but we've been referring to it as

24  RBC, so.

25      Q       For the entire period?

1     A    Yes.

2     Q    And your reason for leaving there was

3 because they terminated their net branching setup;

4 is that correct?

5     A    Yes, that was my understanding.

6     Q    And just quickly, if we can turn to the

7 last page of this exhibit; is that your signature

8 where it says "Applicant's signature"?

9     A    Yes.

10    Q    Has Chris George ever told you that the

11 Department of Housing and Urban Development required

12 you to contribute reserves?

13    A    Yes.

14    Q    Has anyone else at CMG told you that?

15    A    I know it was just a topic of discussion in

16 conference calls, so whoever was on the conference

17 call may have discussed it; and the list would be on

18 the conference call minutes I believe.

19    Q    How many conference calls did you

20 participate in where someone at CMG told you that

21 HUD -- You understand if I say "HUD" I mean the

22 Department of Housing and Urban Development?

23    A    Yes.

24    Q    On how many conference calls did you

25 participate where someone at CMG told you that HUD

# EXHIBIT 2

# LEASE AGREEMENT

LEASE AGREEMENT ("LEASE") made as of the _28th_ day of January, 2002, between Primestar Investment Corp., a Washington corporation ("LANDLORD"), with an address at 2505 South 320th Street, Suite 101, Federal Way WA 98003; and Pacific Real Estate Management Co., Inc., a Washington corporation ("TENANT") with an address at 12911 SE Kent-Langley Rd, Kent, WA 98031

Landlord and Tenant Agree that:

ARTICLE 1. LEASE SUMMARY:
The following summary of a limited number of the provisions of this Lease is provided simply for convenient reference. This Lease must be reviewed carefully in its entirety to ascertain the provisions of this Lease. In no event shall any portion of this summary limit or affect the application of any other provision of this Lease.

1.01. TERM: Five years.

1.02. OFFICE AREA: a) 2,903 square feet of gross leasable floor area within the second Floor of the Project (as such term is defined in Section [2.01] of this Lease), which is approximately 60 feet long and 60 feet wide.

1.03. MINIMUM RENT: a). Office Rent shall be $3,858.57 for the first twelve calendar month based on the Minimum Rent per square foot per annum at $15.95 with CPI escalation set at 3% per annum in the subsequent years as laid down in Section 8.02. (E) below.

1.04. OPERATING EXPENSES: Tenant's Pro Rata Share (as such term is defined in Section 8.03 of this Lease), is estimated to be $1,330.54 per month for the first 12 months.

1.07. SECURITY DEPOSIT: Amount equal to one month Rent; ("CASH SECURITY").

1.08. PREPAID RENT: Cash Deposit paid equal to two months Rent shall be prepaid on the signing of this Lease, to be applied to the first and last months of the Lease. (Total Rent Per Month = 3,792.11 + 1,307.62 x 2 =$10,199.42
3855 57 + 1330.54 x    $ 10 378.22

ARTICLE 2. LEASE/USE OF OFFICE:
2.01. PROJECT DEFINED: "PROJECT" shall mean the land owned or leased by Landlord, in the City of Federal Way, King County, Washington, currently known as Federal Way Center, and more particularly described on Exhibit "A" of this Lease, the building(s) and

LEASE - 1

P1371

improvement(s) located on the land, the fixtures (excluding the tenants' trade fixtures), and all personal property located on and used by the Landlord in the operation, maintenance, repair or replacement of the building(s), improvement(s), fixtures and personal property. A site plan of the Project showing its current configuration is annexed to this Lease as **Exhibit "B".**

2.02. OFFICE DEFINED: **"OFFICE"** shall mean the part of the Project which is leased to Tenant. The location of the Office is depicted on the floor plan attached as **Exhibit "C"** to this Lease. The approximate dimensions of the Office are set forth in Section [1.02] of this Lease. The Office does not include any property not shown as part of the Office on Exhibit "C", including without limitation intended: any basement, balcony or terrace; the land underneath the Office; any demising or exterior wall except the interior surface; any area more than nine feet above the finished floor of the Office; or any portion of the Office consisting of slab, ceiling, roof, partition, duct, wall or otherwise not open space of the Office, which is now or later reasonably required by Landlord to install, maintain, repair or replace, pipes, conduits, lines and wires to furnish utilities and other services to the Project.

2.03. LEASE: Landlord leases the Office to Tenant and Tenant hires and takes the Office from Landlord, subject to and in accordance with all the provisions of this Lease.

2.04. USE/TRADE NAME: Tenant shall use the Office:

(A) Solely for commercial offices. Without limiting the application of the preceding sentence, Tenant shall not use the Office in any manner which would (i) violate any prohibition, restriction or limitation in any instrument presently encumbering the Project; or (ii) any use which would materially adversely affect the image of the Project as a wholesome place for families to visit, including by way of example only, for the operation or to assist in the operation of escort service, telephone sex service or internet pronography service; or (iii) any display or depiction of graphic violence, nudity or sex.

(B) During the entire term of this Lease solely under the name PACIFIC REAL ESTATE MANAGEMENT COMPANY, INC.  provided, however, that after 30 days prior notice to Landlord, Tenant shall have the right without Landlord's prior consent, to do business in the Office under any other trade name specified in the notice.

ARTICLE 3. TERM:

The term of this Lease shall be for a period of five years (unless sooner terminated in accordance with the provisions of this Lease). The term of this Lease shall begin on the earliest of the following dates (**"COMMENCEMENT DATE"**): (i) the latest of the following dates (**"OUTSIDE COMMENCEMENT DATE"**): (a) the date Tenant receives a fully executed copy of this Lease; (b) the date which is five days after the date Landlord gives Tenant notice that the Office is Ready for Occupancy (as such term is defined in Section 5.04 of this

LEASE - 2

Lease); (c) March 1, 2002; or (ii) the date the Tenant opens the Office for business. If the Commencement Date does not occur within sixty (60) days after the full execution of this Lease, then Landlord shall have the right to terminate this Lease by giving notice of termination before the Commencement Date, unless Landlord has wilfully failed to make the Office Ready for Occupancy. The term of this Lease shall end on the earlier of the following dates ("**TERMINATION DATE**"): (i) fifth year anniversary of the Commencement Date; or (ii) the date the term of this Lease is sooner terminated in accordance with the provisions of this Lease.

ARTICLE 4. Intentionally Deleted

ARTICLE 5. LANDLORD'S CONSTRUCTION:

5.01. IMPROVEMENTS DEFINED: "**IMPROVEMENTS**" shall mean all tangible property which is not land, currency, commercial paper, or inventory. Improvements include without limitation intended, all buildings, improvements, fixtures, trade fixtures, equipment, furnishings, furniture, wall and floor coverings, signs and decorations.

5.02. LANDLORD IMPROVEMENTS: Landlord shall provide the Improvements ("**LANDLORD IMPROVEMENTS**"), if any, which Landlord is obligated to construct or install pursuant to the provisions of **Exhibit "E"** of this Lease. Landlord Improvements shall be completed substantially in accordance with the applicable provisions of Exhibit "E" and any work order signed by Landlord and Tenant. The Office is an existing commercial office in an existing office building. Except for any Landlord Improvements specified in Exhibit "E",  the Office is offered for lease in its current condition, "AS IS" with all existing faults and defects, patent and latent. Except for any representations and warranties specified in this Lease, Landlord makes no representations or warranties with respect to the condition of the Office or the Project, express or implied and hereby disclaims any representation or warranty which might be implied.

5.03. Intentionally deleted

5.04. READY FOR OCCUPANCY/WAIVER: The Office shall be deemed ready for occupancy ("**READY FOR OCCUPANCY**") on the later of: (i) February 1, 2002; or (ii) on the date that the  Landlord Improvements (but only those which can be completed without the completion of any work which Tenant is obligated to perform) are ~~substantially~~ completed. ~~In the event Tenant takes possession of the Office and fails to give Landlord prompt notice of any Landlord Improvements which are either not completed, or improperly completed, Landlord shall be relieved of any obligation to complete, replace or repair Landlord Improvements.~~ If there is any delay in the completion of Landlord Improvements as a result of any acts or omissions of Tenant, the Office shall be deemed Ready for Occupancy on the date the Office would have been Ready for Occupancy, but for such acts or omissions of Tenant.

LEASE - 3

5.05. OCCUPANCY IS EVIDENCE: If Tenant occupies the Office; then in any action or proceeding it shall be presumed that the Office was on the date of occupancy in good condition and repair and that Landlord fulfilled all of its obligations under this Lease which were required to be fulfilled on or prior to the date of Tenant's occupancy. [Except those items noted by Tenant.}

ARTICLE 6: TENANT'S CONSTRUCTION AND ALTERATIONS:

6.01.  Intentionally Deleted

6.02. OTHER IMPROVEMENTS: Tenant shall install or construct any improvements and other property necessary for the conduct of its business, which are not specifically described on Exhibit "E" of this Lease.

6.04. LANDLORD'S CONSENT: Tenant shall not install or construct any improvements in the Office or the Project, nor make any alterations to the Office, without obtaining the prior written consent of Landlord. However, without Landlord's consent, Tenant shall have the right to make alterations within the Office if: (i) the alterations will not: (a) be visible to anyone from the exterior of the Office; nor (b) reduce the value of the Office; nor (c) reduce the utility of the Office; nor (d) involve any structural alteration or affect any structural component of the Office or the Project; nor (e) affect or involve any utility system; and (ii) the total cost of all alterations performed within a twelve (12) calendar month period does not exceed $2,500.00  No request for Landlord's consent shall be made without furnishing Landlord with detailed  plans and specifications of the Improvements and alterations.

6.05. BONDS: If this Lease obligates Tenant to provide or maintain a Security Deposit, then Tenant shall not commence the installation or construction of Tenant improvements or any other improvements or  alterations, unless and until Tenant furnishes Landlord with payment and performance bonds, in form, amount and from surety acceptable to Landlord, naming Landlord and Tenant as the coinsureds, and insuring that the proposed work will be completed free and clear of any liens.

6.06. LIENS: Tenant shall not cause or permit the creation, existence, recording or filing, of any mechanic's lien, materialman's lien or similar lien, arising out of the performance of any labor or service or the provision of any material in connection with the Office. Nor shall Tenant  cause or permit the creation, existence, recording or filing of any other lien, security interest or encumbrance of any nature whatsoever, which may adversely affect or constitute a breach by  Landlord, or the holder of any deed of trust or mortgage, or the landlord under any ground or other underlying lease encumbering the Project, or any part thereof, under any such deed of trust, mortgage or lease.

LEASE - 4

## ARTICLE 7. LANDLORD'S ARCHITECT/ENGINEER:

7.01. APPROVALS/DETERMINATIONS: Whenever any consent or approval may be sought by Tenant for the installation or construction of any Tenant Improvements, Improvements, or alterations; or any dispute may arise concerning the completion of Landlord Improvements, or the physical damage of a Casualty or Condemnation (as such terms are defined in Sections [15.01 and16.01] of this Lease), or the reconstruction of the Office after Casualty or Condemnation, in the sole discretion of Landlord, the approval or consent shall be given or withheld and/or such issue shall be determined by any registered architect or licensed professional engineer (collectively "ARBITER") selected by Landlord and Tenant. The Arbiter need not be registered or licensed in the jurisdiction in which the Project is located. The fees and expenses of the Arbiter shall be borne equally by Landlord and Tenant. Tenant shall pay its share of such fees and expenses to Landlord or its designee within ten days after demand by Landlord. The decision of the Arbiter shall be Final and Binding (as such term is defined in Section [7.02] below).

7.02. FINAL AND BINDING DEFINED: "FINAL AND BINDING" shall mean a decision or determination which (i) is not subject to any judicial review or appeal whatsoever, other than by writ of certiorari or its equivalent, to determine if the decision or determination was arbitrary or capricious or in violation of Law; and (ii) shall be presumed correct in any action or proceeding.

## ARTICLE 8. RENT PAYABLE TO LANDLORD:

### 8.01. GENERALLY:

"RENT" shall mean all moneys which Tenant is obligated to pay under the provisions of this Lease, regardless of their characterization, including without limitation intended, minimum rent; Pro Rata Share of Operating Expenses, insurance charges and real estate taxes; late charges, liquidated damages, and attorneys' fees. All Rent shall be paid in legal currency of the United States, to Landlord, or its designee, at the address of Landlord set forth in the first paragraph of this Lease, or any other place designated by Landlord, without offset or reduction on account of any claim whatsoever. Landlord may require the payment of Rent by electronic funds transfer by giving Tenant sixty (60) days prior notice specifying how the transfers will be made and requesting Tenant provide specific information to effect the automatic monthly electronic transfer of funds to Landlord's designated account. Tenant shall provide the requested information within thirty (30) days after Landlord's request.

### 8.02. MINIMUM RENT:

(A) Beginning on the Commencement Date and continuing through and including the Termination Date, Tenant shall pay Minimum Rent (as such term is defined in Section 8.02 (B) of this Article), in advance, on the first day of each calendar month during the term of this Lease. Each payment of Minimum Rent shall be made without prior notice of or demand for payment. In the event the Commencement Date or Termination Date

LEASE - 5

P1375

is not the first day of a calendar month, the Minimum Rent for such calendar month shall be prorated on a per diem basis. (Your handwritten comment does not apply to this paragraph but applies to Paragraph 8.08 related to LATE CHARGES.)

3858.5

(B) **MINIMUM RENT** for each and every month during the first 12 calendar months of the term of this Lease shall be 3,792.11. This amount for the first year of the Lease is based on the rental rate of $15.95 per square foot per annum for the approximately gross leasable floor area of 2,853 square feet; thereafter, with annual CPI escalation set at a maximum of 3% for the remainder of the term as laid down in Section 8.02. (E) below.

~A03

(C) "LEASE YEAR" shall mean a period of 12 consecutive calendar months. However, the first and last Lease Year may be less than 12 complete calendar months. The first Lease Year shall begin on the Commencement Date and end on the 31st day of December in the same calendar year that the term of this Lease begins. Each succeeding Lease Year shall begin on the first day of January and end on the 31st day of December. If the Termination Date is a date other than the 31st day of December, the last Lease Year shall be less than 12 complete calendar months.

(E) Despite any other provision of this Section to the contrary, the Minimum Rent shall be increased on the first day of the 13th month during the Lease term and on each one year anniversary thereof ("**CPI ADJUSTMENT DATE**"), to reflect any Consumer Price Increase.

"**CONSUMER PRICE INDEX INCREASE**" shall mean an increase in Rent made in proportion to any decrease, but not any increase in the purchasing power of the United States dollar, by reference to the Consumer Price Index All Urban Consumers (CPI-U) U.S. City Average All Items (1982-84'100) (the "**PRICE INDEX**") published by the Bureau of Labor Statistics of the U.S. Department of Labor, or a successor or substitute index selected by Landlord and appropriately adjusted by Landlord. A Consumer Price Index Increase shall be computed as follows:

(i) The Price Index figure for the month of November during each year shall be compared to the Price Index figure for the month of November in the immediately preceding calendar year, and the applicable Rent shall be increased, if at all, for the 12 months immediately following the next succeeding CPI Adjustment Date by an amount equal to the percentage increase (rounded off to the nearest whole percent) between the Price Index figure for the month of November in the immediately preceding calendar year, and the Price Index figure for the month of November in the current Lease Year, multiplied by the applicable Rent payable during the current calendar year (and in the event the Rent for the current calendar year was reduced or abated for any reason or the Lease term did not begin on January 1st; then nevertheless for the purposes of this section (i), the applicable Rent payable for the current calendar year shall be deemed payable in full for a complete calendar year.

LEASE - 6

(ii) By way of example only: Assuming that the Commencement Date of this Lease was June 1, 1994; the Minimum Rent for the first 12 months of the Lease term were $100.00 per month; the Price Index figure for the month of November, 1993 was 300; and the Price Index figure for the month of November, 1994 was 315.2; the Minimum Rent for the 12 months immediately following the first CPI Adjustment Date would be increased as follows: the percentage of increase of the Price Index figure for November, 1994 (315.2) above the Price Index figure for November, 1993 (300), would be five percent (5.00%) (rounded off to the nearest whole percent). The Minimum Rent for the first calendar year (1994) is deemed to be $1,200.00 (even though the Minimum Rent payable during the 1994 calendar year were actually only $700.00); multiplied by five percent (5.00%), the Minimum Rent for the 12 months immediately following the first CPI Adjustment Date would be $1,260.00.

8.03. PRO RATA SHARE:

(A) "PRO RATA SHARE" shall mean a fraction, with the Office Area as the numerator and the Project Area (as such term is defined in Section 8.03(C) of this Lease) as the denominator. For the purpose of this Lease, Tenants Pro Rate share of all operating expense shall be 3.83% of the total Operating Expenses as defined in Section 8.07 of this Lease.

(B) The dimensions and square footage of the gross leasable floor area within the Office were determined by measuring from the center of demising walls, except where the wall is an end or exterior wall, in which case the measurement was made to the exterior side of the wall), without any deduction for any area within the Office, including by way of example only: elevator shafts, columns, stairs, fire escapes, lobbies, electric or other utility closets, rest rooms, hallways.

(C) "PROJECT AREA" shall mean the square footage of the gross leasable floor area within the building(s) within the Project, but excluding: (i) any parking garages or other free-standing structures designed for parking vehicles, and (ii) all interior Common Area. The Project Area as of the date of this Lease is 75,751 square feet.

8.04. REAL ESTATE TAXES:  [Included in OPERATING EXPENSES in 8.07]

(A) Tenant shall pay its Pro Rata Share of all taxes and assessments (collectively "REAL ESTATE TAXES") of every nature whatsoever (including without limitation intended, ordinary, extraordinary, general and special), levied, assessed or imposed upon the Project or any part thereof, or which becomes a lien against the Project or any part thereof. Real Estate Taxes include without limitation intended (i) all assessments and charges imposed by any Government (as such term is defined in Section 8.04(B) of this Lease), or pursuant to any Law whatsoever; and (ii) any tax, regardless of its characterization, which may be levied or imposed upon Landlord or the Rent, in lieu of, or in addition to any other tax which would otherwise constitute Real Estate Taxes. In

LEASE - 7

P1377

the case of assessments which can be paid in installments without the imposition of any penalty, only the installments (together with any interest payable by reason of payment in installments) which accrue during the Lease term shall be included in Real Estate Taxes. Real Estate Taxes shall not include: (i) any assessments levied for either (a) any new construction in or expansion of the Project, or (b) which are required for any new construction in or expansion of the Project; and  (ii) any transfer, inheritance, estate, income (subject to Tenant's obligation to pay to Landlord the amount of any tax specifically levied on the Rent), corporate or franchise tax.

(B) Based upon estimates made by Landlord at any time and from time to time, Tenant shall pay an estimated amount of its Pro Rata Share of Real Estate Taxes ("**ESTIMATED TAX REIMBURSEMENT**") in advance, on the first day of each calendar month during the term of this Lease. In the event Landlord determines at any time, and from time to time, that Tenant's actual Pro Rata Share of Real Estate Taxes exceeds the Estimated Tax Reimbursement, Tenant shall pay the amount of the deficiency ("**TAX UNDERPAYMENT**") to Landlord or its designee, within <u>60 days</u> after demand by Landlord. In the event the Estimated Tax Reimbursements for any Lease Year exceed Tenant's actual Pro Rata Share of Real Estate Taxes, Tenant shall be credited the amount of such overpayment ~~against the succeeding Estimated Tax Reimbursement(s) due. If the Lease term expires before the credit is exhausted, the unexhausted portion of the credit shall be refunded to Tenant within 30 days after the later of the date (i) the term of this Lease expires, or (ii) of Tenant's request for the refund. The actual amount of Tenant's Pro Rata Share of Real Estate Taxes shall be determined separately for each Lease Year.~~ within 60 days No



(B) "**GOVERNMENT**" shall mean all federal, state, county, municipal and other governments; and governmental and quasi-governmental branches, authorities, districts, courts, tribunals, boards, agencies, departments, commissions, officers, judges, agents, employees, and other instrumentalities.

(C) "**LAW**" shall mean all law; and all statutes, ordinances, regulations, rules, orders, judgments, and other requirements of the Government.

(D) Tenant shall also pay to Landlord upon demand by Landlord, the entire amount of any Real Estate Taxes due as a result of any inventory in the Office and any improvements constructed or installed in the Office. {Landlord pays all property and property improvement taxes, Tenant pays personal property taxes on equipment, fixtures and inventory owned by Tenant.}

(E) Tenant shall pay at least ten days before the date due all taxes levied, assessed or imposed upon any personal property owned, installed or used by Tenant. Within 20 days after a request from Landlord, Tenant shall furnish Landlord with proof of payment reasonably satisfactory to Landlord. {Landlord pays all property and property improvement taxes, Tenant

LEASE - 8

pays personal property taxes on equipment ,fixtures and inventory owned by Tenant.}

### 8.05. TAX APPEALS:  [Included in OPERATING EXPENSES 8.07]

(A) Landlord shall have the right at any time and from time to time, to effect any action or proceeding whatsoever ("**TAX APPEAL**"), challenging any determination of the amount of the assessed value of the Project, or any part of the Project, for the purposes of Real Estate Taxes. For this purpose Landlord may retain such attorneys, appraisers and other persons and entities as Landlord may deem appropriate. Tenant shall cooperate with Landlord in the preparation, commencement, prosecution and appeal of any Tax Appeal.

(B) In the event Landlord shall successfully prosecute any Tax Appeal, Tenant shall pay to Landlord or its designees, within 60 days after demand by Landlord, Tenant's Pro Rata Share of all costs and expenses incurred by Landlord in connection with such Tax Appeal, including without limitation intended, all Litigation Expenses (as such term is defined in Section 8.05(C) of this Lease). [Over the remaining term of the lease provided the costs above do not exceed the savings.]

(C) "**LITIGATION EXPENSES**" shall mean all costs and expenses whatsoever, paid or incurred by a party under this Lease, in anticipation of, or during the prosecution, appeal, settlement or enforcement of any action or proceeding whatsoever. Litigation Expenses shall include without limitation intended, the amounts of judgments, awards and settlements; attorneys' fees and disbursements; expert witness', title search, title commitment, title insurance, stenographers', transcript, filing, printing, copying, marshals', sheriffs', and process servers' fees.

(D) If as a result of a successful Tax Appeal, there shall be a Real Estate Tax overpayment, Tenant's Pro Rata Share of the excess payment will be credited against the succeeding payments of Estimated Tax Reimbursement(s) due. If the Lease term expires before the credit is exhausted, the unexhausted portion of the credit shall be refunded to Tenant within 30 days after the later  of the date (i) the term of this Lease expires, or (ii) of Tenant's request for the refund.

8.06. PROJECT'S INSURANCE:    [Included in    OPERATING EXPENSES 8.07] Tenant shall pay its Pro Rata Share of the cost of the Project's Insurance (as such term is defined in Section [9.03 (A)] of this Lease). Based upon estimates made by Landlord at any time and from time to time, Tenant shall pay an estimated amount of its Pro Rata Share of the cost of the Project's Insurance ("**ESTIMATED INSURANCE  REIMBURSEMENT**"), in advance, on the first day of each calendar month during the term of this Lease. In the event Landlord determines at any time and from time to time, that Tenant's actual Pro Rata Share of the cost of the Project's Insurance exceeds the Estimated Insurance Reimbursement, Tenant shall pay the amount of the deficiency ("**INSURANCE UNDERPAYMENT**") to

LEASE - 9

Landlord or its designee, within <u>60 days</u> after demand by Landlord throughout the remaining term of the Lease.. In the event the Estimated Insurance Reimbursements for any Lease Year exceed Tenant's actual Pro Rata Share of the cost of the Project's Insurance, Tenant shall be credited the amount of such overpayment against the succeeding Estimated Insurance Reimbursement(s) due. If the Lease term expires before the credit is exhausted, the unexhausted portion of the credit shall be refunded to Tenant within 30 days after the later of the date (i) the term of this Lease expires, or (ii) of Tenant's request for the refund. The actual amount of Tenant's Pro Rata Share of the cost of the Project's Insurance shall be determined separately for each Lease Year.

**8.07. OPERATING EXPENSES: [See ESTMATED COMMON CHARGE 8.07 (C) Page 12 which applies to PACIFIC REAL ESTATE MANAGEMENT COMPANY, INC. ]**

(A) Tenant shall pay its Pro Rata Share of all reasonable costs and expenses of every nature whatsoever, paid or incurred by Landlord, in the operation, management, maintenance, repair, and replacement of the Project ("**OPERATING EXPENSES**"). Operating Expenses shall include without limitation intended, all costs and expenses of: janitorial services for the Project including the Office, Monday through Friday, federal and State holidays excluded, at the same or greater level of service as the Landlord has customarily provided to all tenants of the Building; elevator maintenance, repairs and replacements; management; snow removal; landscaping; re-paving; striping; painting; cleaning and replacing flooring; sewage and Refuse (as such term is defined in Section 12.05 of this Lease) removal; traffic and parking enforcement and control; security; pest and vermin control; compensation and benefits of employees;   fire protection; supplies; insurance, including without limitation intended, public liability and property damage insurance; personal property taxes; charges and rents for Utilities (as such term is defined in Section [8.07(E)] of this Lease); compliance with applicable Law; licenses, permits and other fees; parking area surcharges and levies; a fee for the administration of the Project in an amount equal to 5.00 percent of the total of all rent, attorneys' fees', accountants' and other professionals' fees; and the cost of any financing of any equipment for the Project.

(B) The Operating Expenses shall not include any of the following costs or expenses:

(i) Costs incurred in connection with the initial construction or design of the Project or, any expansion of the Project, or the construction of additional buildings or structures on any part of the Project, or to repair, change, improve, replace or correct defects in the original construction, expansion or design of the Project or any buildings or structures on any part of the Project

(ii) Capital replacements, expansions, additions, improvements and repairs; provided, however, that: (a) the cost of capital replacements and repairs shall be amortized over the useful life of the replacements and repairs using straight line depreciation, and the amount amortized each year, together with interest on the unamortized balance at the rate of interest

LEASE - 10

payable on the first mortgage or deed of trust encumbering the Project shall be included within Operating Expenses; and (b) the cost of capital expansions, additions and improvements included in the Operating Expenses shall be limited to those which will improve the operating efficiency of the Project or reduce the Operating Expenses or which may be required by any provision or application of Law not in effect as of the date of this Lease.

(iii) Costs that are or are required to be reimbursed to Landlord (other than through pro-rated absorption of such costs by a majority of the tenants in the Project, and costs required to be reimbursed which are not collectible for any reason except Landlord's negligence), including without limitation costs covered by insurance that Landlord acquires or is obligated to provide under this Lease (but reasonable deductibles shall be included in the Operating Expenses) or pursuant to warranties made for the benefit of Landlord or costs reimbursed to Landlord pursuant to provisions in leases with other tenants (except for such "pro-rated" cost provisions, and costs required to be reimbursed which are not collectible for any reason except Landlord's negligence);

(iv) Landlord's administrative and overhead expenses not incurred directly in operating, maintaining, repairing or replacing the Project;

(v)    Costs incurred by reason of Landlord's negligence or breach of any legal obligation (including any obligation of Landlord under any lease in the Project);

(vi)    Costs, including (without limitation) any professional fees, commissions, remodeling costs or court costs, incurred in connection with the enforcement of leases with other tenants of the Project , or obtaining or retaining tenants for the Project;

(vii)    Management fees in excess of five percent of the rents and other charges collected from the tenants of the Project;

(viii)    Amounts paid to persons or entities related to Landlord in excess of the fair market value of services or materials provided in exchange;

(ix)    Costs of achieving compliance with any environmental or other law or regulation applicable to the Project which was in effect as of the date of this Lease;

(x)    Amounts payable under or in connection with Landlord's mortgage, deed of trust, ground lease or other financing or refinancing arrangements;

(xi)    Depreciation of or reserves for replacement of any of Landlord's assets.

(xii).    Costs incurred in advertising or promoting the Project for any purpose, including (without limitation) sale of the Project;

LEASE - 11

(xiii)   Costs, fines or penalties incurred due to violation by Landlord of any applicable Law.

(xiv)   Costs of sculpture, paintings, or other objects of art installed in or on the Project.

(xv)   Wages, salaries or other compensation or costs incurred  for (a) any managerial or executive employees or agents of Landlord (exclusive of that portion attributable to the operation, management, maintenance, repair and replacement of the Project); or (b) any persons employed in commercial concessions operated by Landlord.

(xvi) Increases in insurance premiums attributable to hazardous conditions, uses or activities of other tenants or occupants of the Project.

(C) Based upon estimates made by Landlord, at any time and from time to time, Tenant shall pay an estimated amount of its Pro Rata Share of the Operating Expenses ("**ESTIMATED COMMON CHARGE**"), in advance, on the first day of each calendar month during the term of this Lease. For the purpose of this Lease, Landlord and Tenant agree that Tenant shall pay an annual amount equal to $5.50 per square foot of the gross leaseable floor area comprising Office for the first year of the Lease; this amount shall be paid monthly at the rate of $1,330.54. Commencing with the first anniversary of the Commencement Date, the annual amount will be the tenants pro rata share as verified by the annual budget and documentation of the actual expenses. In addition, all expenses relating to the Operating Expenses are to be subject  to review by the tenant within 30 days of annual change if any.

(D) "**COMMON AREA**" shall mean all property constituting the Project (including without limitation intended, the foundations, roofs, walls, columns and other structural elements; signs; parking areas; roads; malls; sidewalks; curbs; unpaved areas; rooms; halls; stairs, ramps and other conveyances; and Utility systems), except the offices in the Project.

(E) "**UTILITIES**" shall mean all utilities, including without limitation intended, telephone, public address, electric, gas, water, sewage, drainage, heating, air conditioning, ventilation, and cable television.


8.08. LATE CHARGES:
In the event Landlord or its designee does not receive full payment of Rent on or before the date the payment is due; then within five (5) days after due date, Tenant shall pay a late charge, in an amount equal to the greater of (i) $50.00; or (ii) 5.00 percent of the amount overdue.

8.09. INTEREST AT DEFAULT RATE: In the event Landlord  or its designee does not receive full payment of Rent on or before the date it is due; then within thirty (30) days after due date  to the date it is paid, Tenant shall pay interest at a rate equal to the lesser of ("**DEFAULT**

LEASE - 12

RATE") (i) 10 percent per year; or (ii) the highest legal rate in the jurisdiction in which the Project is located.

### 8.10. BAD CHECK FEES:

In the event a check or draft tendered by Tenant in payment of Rent is not paid by the drawee upon initial presentation, for any reason whatsoever; then within ten (10) days after demand by Landlord or its designee, Tenant shall pay a bad check charge in the amount of $25.00.

### 8.11. AMOUNTS PAID BY LANDLORD:

In the event the Landlord incurs or pays any cost or expense whatsoever, as a result of (i) a Default (as such term is defined in Section [23] of this Lease); and/or (ii) any actual or apparent emergency arising out of a breach in the performance of any of Tenant's obligations under this Lease; and/or (iii) Landlord's election to take such action as Landlord may deem appropriate to: (a) cure such Default, or (b) mitigate the damages or potential damages arising from such breach, if there is an actual or apparent emergency, which action may be taken without notice to Tenant in the case of any actual or apparent emergency; then within 20 days after demand by Landlord, Tenant shall reimburse Landlord for all such reasonable costs and expenses (including without limitation intended, the reasonable cost and expense of any work performed by any employee of Landlord or its agent).

### 8.12. NET RENT:

This Lease is a "Net Lease." The Rent due under this Lease shall be "Net Rent." Except for those obligations which Landlord expressly agrees to perform at its sole cost and expense, Landlord shall not be obligated to incur or pay any cost or expense in connection with the Office or the Project. Tenant shall perform all of its obligations under this Lease at its sole cost and expense.

### 8.13. RENT TAX:

In the event any Government levies, imposes or charges any tax whatsoever, on account of the Project, the interest of Landlord in the Project, this Lease, Tenant, or the Rent, and the amount of such tax is not an obligation of Tenant under any other provision of this Lease, within ten days after demand by Landlord, Tenant shall remit its Pro Rata Share of such tax to Landlord (and in the event Tenant's Pro Rata Share would not fully reimburse Landlord for the amount of such tax which is fairly attributable to this Lease, Tenant shall pay its fair share).

### ARTICLE 9. INSURANCE:

### 9.01. MUTUAL WAIVER OF CLAIMS:

Despite any other provision of this Lease to the contrary, Landlord and Tenant hereby waive any rights each may have against the other as a result of any loss or damage caused to the respective party and its property, the Office and the Project, arising from any risk covered by casualty insurance with "all-perils" coverage ("CASUALTY INSURANCE") in the jurisdiction in which the Project is located. Landlord and Tenant shall cause their respective Casualty

LEASE - 13

Insurance and any other policies covering loss by fire and/or causes covered by all-perils coverage, to provide that the insurer waives ("**WAIVER OF SUBROGATION**") all rights of recovery by way of subrogation against the other party to this Lease, in connection with any loss covered by any such policies. However, in the event the Waiver of Subrogation can only be obtained by the payment of an additional premium over and above the premium for insurance without the Waiver of Subrogation, (i) the party seeking to obtain the insurance shall give the other party notice of such additional premium and request that the other party pay such premium; and (ii) the other party shall have ten days after the giving of such notice to either (a) place such insurance with another insurer which is reasonably satisfactory to the party which gave the notice, without such additional premium, or (b) agree to pay such additional premium (in the case of Tenant, Tenant's Pro Rata Share). In the event that either Landlord or Tenant cannot obtain the Waiver of Subrogation, or either Landlord or Tenant cannot obtain the Waiver of Subrogation without additional premium and the other party fails to fulfill the requirements of clause (a) or (b) of the immediately preceding sentence, this Section 9.01 shall be deemed deleted and of no force or effect while such conditions persist.

### 9.02. TENANT'S INSURANCE:

(A) Tenant shall maintain the following insurance coverage, commencing on the date Tenant is given access to the Office and continuing through the Termination Date and the date Tenant fulfills all of its obligations under Article [33] of this Lease:

### (i) PUBLIC LIABILITY AND PROPERTY DAMAGE:

Comprehensive bodily injury liability insurance with combined single limits of not less than $1,000,000., covering any and all liability of Tenant for bodily injury, death or property damage occurring in or about the Project, portions of which may be provided under a so called "umbrella" or "excess liability" policy. In the event that Tenant is unable to obtain such coverage Tenant shall obtain commercial general liability and property damage insurance for bodily injury, death or property damage occurring in or about the Project, with combined single limits of at least $1,000,000. In the case of bodily injury, death or property damage; portions of which may be provided under a so-called "umbrella" or "excess liability" policy. In addition, in the event that Tenant is fails to obtain liability insurance policies on an "occurrence basis" Tenant shall obtain extension policies commonly referred to as "tail" policies at least 30 days prior to the expiration of any policy which will not be renewed. All extension policies (a) shall include coverage for all claims made after the date, of the policy not renewed, regardless of the date such claims are made; and (b) shall have limits equal to or greater than the policies which are not being renewed. All liability policies shall specifically insure performance of the agreement of Tenant, to indemnify Landlord, set forth in Section [32.01] of this Lease, as it relates to liability for injury to or death of persons and damage to property. [As you know the difference in the premium is minimal]

### (ii) TENANT IMPROVEMENTS AND INVENTORY:

Casualty Insurance covering all of Tenant Improvements (except any improvements and fixtures which are covered by the Project's Insurance), inventory and other personal property in or about

LEASE - 14

the Office from time to time, in an amount not less than the full replacement cost, without any deduction for depreciation during the term of this Lease. If Tenant is required to provide or maintain a Security Deposit under this Lease; then all the proceeds of such insurance shall be held by Tenant as a trust fund for the benefit of Landlord, to be applied to pay the costs and expenses of repair and replacement of any property damaged or destroyed before being applied for any other purpose.

(iii) PLATE GLASS/BOILER:
Insurance, or self-Insurance if Tenant is not required to provide nor maintain a Security Deposit under this Lease ("**CREDIT TENANT**"), against breakage of, or damage to all plate glass in and about the Office, and insurance on any boiler, furnace or air conditioning system, in or about the Office, with broad form coverage in an amount not less than the full replacement cost, without any deduction for depreciation during the term of this Lease.

(iv) OTHER INSURANCE/LIMITS: Not sooner than the fifth anniversary of the Commencement Date and not more often than once every five years during term of this Lease, Landlord shall have the right to increase the limits and types of insurance coverage which Tenant is required to obtain and maintain, by giving Tenant notice of such increase in limits or coverage. Any such increase in limits or coverage shall be applicable to the immediately succeeding renewal or replacement liability insurance policy, provided, however, that if the term of the then current policy is longer than one year, any such increase shall be applicable to the insurance coverage in effect on and after the first anniversary that notice of such increase in limits or coverage is given. Landlord's right to increase the limits or types of insurance coverage is limited to such limits and types of coverage as the holder of any first mortgage or deed of trust encumbering the Project may reasonably require; provided such mortgagee is a bank, savings and loan association, trust company, life insurance company, national broker-dealer, corporation whose securities are listed on the New York Stock Exchange, Inc., or a pension fund with a net worth in excess of $10,000,000 ("**INSTITUTIONAL LENDER**"); or in the event that there is no such first mortgagee or deed of trust holder, such other insurance coverages and such higher limits as may be required by any Institutional Lender then holding or servicing mortgage or deed of trust loans secured by comparable commercial property in the Seattle Metropolitan Area in State of Washington.

(B) OWNER'S CONTINGENT OR PROTECTIVE LIABILITY INSURANCE:
Prior to commencing the installation or construction of Improvements, or alterations, Tenant shall procure; and during the entire period of time that Tenant installs or constructs Improvements, or alters the Office, Tenant shall maintain; owner's contingent or protective liability insurance, covering all claims not covered by the public liability and property damage insurance required by Section [9.02(A)(i)] of this Lease.

(C) INSURERS/POLICIES:
All insurance which Tenant is obligated to maintain, shall be issued by insurance companies authorized to do business in the jurisdiction in which the Project is located, which have a "Best's Letter Rating" of not less than "A" ("Excellent"), with no adverse "Rating Modifier," and a

LEASE - 15

"Financial Size Category" of not less than "Class X" (or their then current equivalents) in the most current "Best's Key Rating Guide" or the equivalent in a substitute or successor publication selected by Landlord. All insurance policies shall: (i) in form and substance be reasonably satisfactory to Landlord, unless Tenant is a Credit Tenant in which case all insurance policies shall comply with each applicable provision of this Lease; (ii) be written as primary policy coverage, not contributing with, or in excess of any coverage carried by Landlord or another; (iii) name Landlord, any mortgagee and any other person designated by Landlord as additional insureds; (iv) except as otherwise provided for in Section 9.01 of this Article, contain in each policy covering loss or damage to property, an express waiver of the right of subrogation against Landlord; (v) contain a provision that although Landlord is named as an insured, it shall nevertheless be entitled to recover under the policy for any loss suffered as a result of the acts or omissions of the Tenant; and (vi) contain a provision that the insurer shall give Landlord at least 30 days prior written notice of any termination or lapse of insurance coverage, reduction in insurance coverage, or material change in the terms of insurance. Original policies of all required insurance (or certificates satisfactory to Landlord), together with proof of payment of the premiums, shall be delivered to Landlord prior to the date that Tenant is given access to the Office. Thereafter, at least 30 days prior to the termination or lapse of any original, renewal or replacement coverage, original renewal or replacement policies (or certificates satisfactory to Landlord), together with proof of payment of the premiums, shall be delivered to Landlord.

## 9.03. PROJECT'S INSURANCE:

(A) Landlord shall at all times during the term of this Lease, to the extent obtainable, at the sole cost and expense of Tenant and other tenants of the Project, procure and maintain Casualty Insurance (and insurance against such other hazards as Landlord may deem appropriate) covering the Project; rent loss insurance; broad form boiler and machinery insurance; and insurance on vehicles and equipment (collectively **"PROJECT'S INSURANCE"**), with such limits and with such insurers as Landlord may deem appropriate. The Casualty Insurance coverage shall be no less than an amount sufficient to avoid coinsurance.

(B) Tenant shall not at any time during the term of this Lease keep or permit any Improvements or inventory in or about the Project, or do anything in or about the Project, which would increase the premium of, or nullify any of the Project's Insurance or any other insurance obtained by Landlord. Within ten days after demand by Landlord, Tenant shall pay any premium surcharge or increase arising out of any act or omission of Tenant contrary to the prohibitions in the immediately preceding sentence.

## ARTICLE 10. LICENSES:

## 10.01. TO ENTER OFFICE:

Landlord may elect to give Tenant access to the Office, prior to the date it is Ready for Occupancy, for the purpose of permitting Tenant to install and construct Tenant Improvements. In the event Tenant is given access for such purpose, Tenant shall not in any manner interfere with or impede the installation or construction of Landlord Improvements; and all of the

LEASE - 16

provisions of this Lease shall be in full force and effect, provided, however, that Tenant shall not be obligated to pay Minimum Rent, Overage Rent, Dues, and Tenant's Pro Rata Share of Operating Expenses, Real Estate Taxes and Project's Insurance (collectively "**MONTHLY RENT**"), for any period prior to the Commencement Date.

## 10.02. TO ENTER COMMON AREA:

Tenant and all persons permitted in the Office by Tenant may use the accessways, sidewalks, lobby, elevators, stairs, hallways and restrooms in the Common Area ("**OPEN COMMON AREA**"), in common with all other persons and entities entitled to use Open Common Area; subject, however, to the provisions of this Lease and the Rules and Regulations (as such term is defined in Article [28] of this Lease). The permission granted by the immediately preceding sentence is a revocable license, granted upon the condition that any use of the Open Common Area conforms to the provisions of this Lease and the Rules and Regulations. If Tenant is an entity, then Tenant's license to use the Open Common Area is not subject to revocation unless there is a breach of the Rules and Regulations which continues after the expiration of any applicable grace period. However, if Tenant is an entity, the license of any principal, employee, agent, contractor or supplier to use the Open Common Area, is subject to revocation upon any breach of the provisions of this Lease or the Rules and Regulations affecting the Open Common Area.

## 10.03. TO PARK VEHICLES:
Tenant shall have the non-exclusive right to use nine [9] spaces for parking motor vehicles operated by Tenant or its employees. Landlord shall have the right but not the obligation to designate parking spaces for the exclusive use of tenants of the Project and their employees. If the Landlord makes such designation then Tenant and Tenant shall cause its employees to park their vehicles solely in the parking spaces designated by the Landlord for the exclusive use of the Tenant. Parking to the north of the building is currently reserved for the visitors only. Tenant may use additional parking stalls for its visitors in the areas designated for the entire Project after normal working hours and on weekends.

## ARTICLE 11. USE AND OPERATION OF OFFICE:

## 11.01. FAILURE TO DO BUSINESS:
~~Tenant shall: (i) on or before the Outside Commencement Date, open the entire Office for business, adequately furnished, equipped and staffed; and (ii) after the date the Commencement Date, continuously keep the Office open for business, adequately furnished, equipped and staffed. In the event (i) Tenant fails to open the Office for business, adequately furnished, equipped and staffed on or before the Outside Commencement Date; or (ii) after the Outside Commencement Date Tenant fails to continuously keep the Office open for business, adequately furnished, equipped and staffed, on all days and at all times required under this~~

LEASE - 17

~~Lease; then in either of such circumstances Tenant shall pay to Landlord or its designee, 20~~
~~days after demand by Landlord, Rent at the rate of $50.00 for each day in which either of the~~
~~conditions described in clauses (i) or (ii) of this sentence occur.~~

## 11.02. COMPLIANCE WITH THE LAW, ETC.:

Tenant shall (i) comply with all Law governing the Tenant's use or occupancy of the Office; (ii) not conduct any action or permit any action or condition which would (a) violate any Law or the certificate of occupancy or any other Required Permits (as such term is defined in Section [11.03] of this Lease) covering the Office; or (b) which in the reasonable judgment of Landlord constitutes a public or private nuisance, or a trespass; or (c) materially adversely affects the business of the tenants of the Project; or (d) creates any hazardous condition in the Project; (e) violates any work order issued by any insurer or holder of any deed of trust or mortgage encumbering the Project or any part of the Project; or (f) violates any of the encumbrances against the Project. The obligations of Tenant under this Section 11.02 shall include without limitation intended, the construction and installation of any Improvements required to comply with Law or any work order issued by any insurer or holder of any deed of trust or mortgage encumbering the Project or any part of the Project, but only if required as a result of any Improvements or alterations made by Tenant, or Tenant's specific use or method of operations.

## 11.03. REQUIRED PERMITS:

Tenant shall (i) obtain and maintain in full force and effect all licenses, permits, certificates, approvals and other authorizations (collectively **"REQUIRED PERMITS"**) required by Law or the board of fire underwriters or other recognized fire insurance rating organization, in connection with Tenant Improvements or Tenant's use or occupancy of the Office; and (ii) prior to opening the Office for business and thereafter from time to time within ten days after a request from Landlord, deliver to Landlord evidence reasonably satisfactory to Landlord that all Required Permits have been issued and are in full force and effect.

## 11.04. HAZARDOUS SUBSTANCES:

(A) In the Office and Project and in the vicinity of the Office and Project, Tenant shall not: (I) cause or permit the generation, manufacture, refinement, transportation, treatment, storage, handling, installation, removal, disposal, transfer, sale, production or processing of Hazardous Substances (as such term is defined in this Section 11.04) or other dangerous or toxic substances, or solid wastes; (ii) cause or permit the Release (as such term is defined in this Section 11.04) or existence of any Hazardous Substances which might affect the Project; (iii) cause or permit any substances or conditions, which may support a claim or cause of action, whether by any Government or representative thereof, or any other person, under the Comprehensive Environmental Response Compensation and Liability Act of 1980, as amended (**"SUPERFUND ACT"**), the Resource Conservation and Recovery Act of 1976, the Toxic Substances Control Act or any other Law. For the purposes of this Lease the term **"RELEASE"** shall have the following meaning: (i) the definition used in the Superfund Act; and (ii) (if not included within the definition contained in the Superfund Act) the presence of any Hazardous Substance. For the purposes of this Lease the term **"HAZARDOUS SUBSTANCES"** shall have

LEASE - 18

the following meaning: (i) the definition used in the Superfund Act; and (ii) all matter which might adversely affect health, safety or the environment and is subject to any Law regulating its Release, including without limitation intended, petroleum and related by-products, hydrocarbons, radon, asbestos, urea formaldehyde and polychlorinated biphenyl compounds ("PCB's"). Despite the provisions of this Section 11.04, Tenant may stock and use factory packaged retail containers of products designed for office use, such as photocopy toner, cleaning fluids, and correction fluids,  but only if such products are transported, treated, handled, removed, disposed, transferred, and sold in strict compliance with all Law.

(B) Landlord has no actual current knowledge that the Office contains any Hazardous Substance in violation of applicable Law. If the Office contains any Hazardous Substance on the date the Office is Ready for Occupancy, Landlord shall remove or encapsulate the Hazardous Substance in compliance with applicable Law. If the Office contains Hazardous Substances on the date the Office is Ready for Occupancy, the Outside Commencement Date shall be extended one day for each day Tenant is required to cease making Tenant Improvements, Tenant fixturing and/or Tenant stocking of the Office.

## 11.05. AMERICANS WITH DISABILITIES ACT:
Tenant shall comply with all applicable provisions of the Americans with Disabilities Act (42 USC Sec. 12101 et seq.) and all of the applicable regulations, rules, guidelines and technical standards promulgated pursuant to the Americans with Disabilities Act (28 CFR 36), all as amended from time to time (collectively "ADA"). Without limiting the obligation imposed by the preceding sentence, Tenant shall:

(A)    ~~Be solely responsible for the Office's compliance with all applicable provisions of the ADA, including without limitation intended, solely responsible for making any structural and non-structural changes in the Office which may be required by the ADA, except those required as a result of the Landlord Improvements which shall be the sole responsibility of the Landlord;~~

(B)    Not discriminate nor permit anyone in the Office to discriminate, directly or through policies, procedures, standards or other criteria, or through physical barriers or obstacles, against any individual on the basis of disability in the full and equal enjoyment of the goods, services, facilities and privileges available in and/or through the Office; and

(C)    Take such affirmative steps as may be necessary to ensure that disabled individuals are not excluded or denied goods or services or otherwise dealt with differently than individuals who are not disabled.

## 11.05. GENERAL CONDUCT:
Tenant shall use and occupy the Office carefully, and conduct its business in a manner consistent with the operation of a first class commercial office building. Tenant shall treat all customers politely, and promptly and fully address all legitimate complaints of customers in an appropriate fashion. Tenant shall not permit the use of the Office for solicitations,

LEASE - 19

P1389

demonstrations, sales or promotions by persons other than Tenant (and any other persons or entities consented to by Landlord in writing). Tenant shall not conduct or permit any retail, catalog, auction, fire, bankruptcy, distress, liquidation, going-out-of-business, close-out or similar sales in or about the Office.

## 11.06. BUSINESS HOURS:

Tenant shall keep the Office open for business, adequately furnished, equipped and staffed from the Commencement Date through the Termination Date, Monday through Friday excepting any federal, State or religious holidays observed by the Tenant or its principals, at least from 10:00 A.M. through 4:00 P.M. Landlord shall have the right to adopt Rules and Regulations which limit access to and from the Project by requiring among other things, that any or all individuals entering and leaving the Project: (i) sign in and out; (ii) provide photo identification; and/or (iii) provide written evidence of their authorization from the Landlord or tenants of the Project to enter or leave the Project and/or remove property from the Project.

## ARTICLE 12. UTILITIES

**12.01. GENERALLY.** Landlord shall install all Improvements which are required outside the Office and inside the Project, to supply the Utilities, if any, which Landlord is specifically obligated to furnish pursuant to the provisions of Exhibit "E" of this Lease. Except as otherwise provided in Exhibit "E" of this Lease, Tenant shall install all Improvements which are required in the Office to supply all Utilities required or desired for the operation of its business. Tenant shall pay all deposits, assessments and charges for meters, sub-meters, delivery and the provision of all Utilities servicing the Office, except electricity and any water or sewer service provided to the Office by Landlord .

**12.02. LANDLORD CONTROLS SELECTION.** Landlord has advised Tenant that at the present time [Puget Sound Energy] (**"ELECTRIC SERVICE PROVIDER"**) is the utility company selected by Landlord to provide electricity service for the Project. Despite the preceding sentence, if permitted by Law, Landlord shall have the right at any time, and from time to time during the Lease term, to either contract for service from a different company or companies providing electricity service (each such company is referred to as an **"ALTERNATIVE SERVICE PROVIDER"**) or continue to contract for service from the Electric Service Provider.

**12.03. TENANT SHALL GIVE LANDLORD ACCESS.** Tenant shall cooperate with Landlord, the Electric Service Provider, and any Alternate Service Provider at all times and, as reasonably necessary, shall allow Landlord, Electric Service Provider, and any Alternate Service Provider reasonable access to the Project's electric lines, feeders, risers, wiring, and any other machinery within the Office.

**12.04. LANDLORD NOT RESPONSIBLE FOR INTERRUPTION OF SERVICE.** In the absence of Landlord's negligence Landlord shall not be liable or responsible for any loss, damage, or expense Tenant may sustain or incur by reason of any change, failure,

LEASE - 20

interference, disruption or defect in the supply or character of the electric energy supplied by the Electric Service Provider or any Alternate Service Provider, or if electric energy is no longer available or suitable for Tenant's requirements.

12.05. REFUSE. Landlord shall have the right to either (i) impose a uniform system of refuse, trash, rubbish, garbage and waste (collectively **"REFUSE"**) removal for the Project, in which case Tenant shall comply with all Rules and Regulations adopted by Landlord to implement and maintain such system, including without limitation intended, removal of Refuse from the Office; and/or (ii) arrange for Refuse removal by an independent contractor. In either or both events, the Pro Rata Share of the costs shall be borne by Tenant as part of the Operating Costs.

ARTICLE 13.  MAINTENANCE AND REPAIR:

13.01. LANDLORD MAINTENANCE AND REPAIR:
Landlord shall keep in good condition and repair the roof, foundation, concrete floor slab, suspended ceiling, exterior doors, windows, interior doors and walls installed by Landlord, demising and exterior walls (except their interior surface), and Utility systems to the extent not installed or affected by any Improvements or alterations made by the Tenant; and provide janitorial services at the same or greater level of service as the Landlord has customarily provided to tenants of the Building; provided, however, that Landlord shall have no obligation to repair any damage: (i) caused by the acts or negligence of Tenant or any person permitted in the Office by Tenant; (ii) to any Improvements installed or constructed by Tenant; (iii) to any glass or plate glass installed by Tenant; (iv) to any fixtures installed by Tenant; or (v) to any equipment installed by Tenant. Landlord shall have no duty to inspect the Office. Tenant shall give Landlord prompt notice of any condition which might require repair by Landlord. Landlord shall have no liability, whatsoever, unless (i) the loss or damage is not the subject of: (a) a Waiver of Subrogation, or (b) any property or business interruption insurance Tenant may maintain; (ii) Tenant gives Landlord prompt notice of the condition which requires repair by Landlord; and (iii) Landlord fails to perform the required repair before the expiration of the applicable grace period.

13.02. TENANT MAINTENANCE AND REPAIR:
(A) Tenant shall not commit waste, and shall not damage nor permit any other person to damage the Office, the Improvements in the Office and all other property of every nature whatsoever, in or about the Office, including without limitation intended, the windows, glass, doors, walls and Utility components. Tenant shall maintain in good condition and repair all portions of the Office which the Landlord is not required to keep in good condition and repair, (including interior walls, interior doors, fixtures and equipment installed by Tenant; the interior surface of demising and exterior walls, the Tenant's Signs; trade fixtures and floor coverings).

(B) Tenant shall keep the Office free from Refuse (except in appropriate Refuse containers), stains, and objectionable odors. Tenant shall not block or impede access on to or from, any sidewalk, accessway or other Common Area. Tenant shall not use or permit the use of any

LEASE - 21

Common Area for any storage, promotional, distribution or sales purpose, or place or leave any property on the Common Area.

ARTICLE 14. ASSIGNMENTS, SUBLETS, CONCESSIONS AND LICENSES:

14.01. Without the written consent of Landlord, which shall not be unreasonably withheld, Tenant shall not cause or permit any assignment of this Lease or any interest in this Lease (even to another tenant under this Lease), or mortgage, pledge, hypothecate or otherwise encumber this Lease or any interest in this Lease, or the occupancy of the Office or any part thereof by any person other than Tenant, or sublet the Office or any part thereof, or grant any concession or license to use the Office or any part thereof (collectively **"LEASE TRANSFER"**). Lease Transfer shall include any Lease Transfer, whether direct or indirect, voluntary or involuntary, including without limitation intended, by transfer of a majority or controlling interest in an entity, merger, consolidation, dissolution or liquidation of an entity or death, divorce or separation of an individual. Any Lease Transfer effected without the written consent of Landlord shall be void and of no force or effect whatsoever. Landlord shall not be deemed to have unreasonably withheld its consent if Landlord in good faith and for a commercially reasonable reason from a commercial office building landlord's perspective, refuses to grant Landlord's consent. In its determination whether to consent or withhold consent to a Lease Transfer, Landlord shall have the right to consider among other things: (i) the business background and relevant commercial, managerial, and financial experience of the transferee or its principals; (ii) the creditworthiness of the transferee; (iii) the financial resources and net worth of the transferee; (iv) the nature, character and quality of the transferee's business; (v) the effect of the transferee's business on the tenant mix in the Project and the operation of the Project, including by way of example only, the parking of vehicles and the use of the elevators. The requirement for obtaining Landlord's consent to a Lease Transfer shall continue to exist for all subsequent Lease Transfers regardless of the number or nature of consents given to previous Lease Transfer(s).

14.02. Any request for the consent of Landlord to a Lease Transfer shall be accompanied by a detailed financial statement of the proposed transferee, a written statement of the name and addresses of the proposed transferee, a written authorization from the proposed transferee for the procurement of any credit reports Landlord may deem appropriate, and a non-refundable $750.00 fee (paid by certified or cashier's check) to cover the administrative, credit report and legal costs paid or incurred in connection with the request. In addition, Tenant shall furnish Landlord with any other information and documents Landlord may request. Landlord may elect to terminate this Lease upon 30 days notice, provided such notice of termination is given within 30 days after the date Landlord receives a request for Landlord's consent to a Lease Transfer, and all of the documents and information required by and/or requested by Landlord, pursuant to the provisions of this Section 14.02.

14.03. In the event the proposed Lease Transfer provides for any consideration from the transferee which is in excess of the Rent (or the portion of the Rent fairly attributable to the por-

LEASE - 22

tion of the Office in the case of a sublet, concession or license), the consideration in excess of the Rent (or the portion of the Rent fairly attributable to the portion of the Office, in the case of a sublet, concession or license affecting less than the entire Office) shall belong to and be paid to Landlord immediately, and Tenant shall have no rights to such excess consideration whatsoever.

14.04. No Lease Transfer shall operate to relieve any Tenant, or any previous Tenant, or any person or entity ("GUARANTOR") who signs a guaranty (in the form which may be annexed as **Exhibit "F"** to this Lease, or otherwise) of the fulfillment of the obligations of Tenant under this Lease, of its obligations under this Lease or its guaranty, as the case may be, regardless of the number of Lease Transfers and the nature of any modification, extension, renewal or termination of this Lease whatsoever. In the event of a Lease Transfer, all of the provisions of this Lease shall be binding upon the transferee.

14.05. In the event of a Lease Transfer without the written consent of Landlord, Landlord may nevertheless collect the Rent from the transferee, and the collection of such Rent shall not be deemed an acceptance of the transferee or a consent to the Lease Transfer, nor a waiver of any of the provisions of this Article.

14.06. This Lease, Landlord's interest in this Lease and the Rent, may be freely assigned and/or mortgaged, pledged, hypothecated or otherwise encumbered by Landlord.

14.07. The use of the Office authorized by this Lease shall not change by virtue of any Lease Transfer. Without implying any limitation on Landlord's discretion to refuse to consent to a Lease Transfer, Landlord shall always have the right to refuse to consent to any Lease Transfer which provides for or contemplates any change or proposed change in the use of the Office authorized by this Lease.

ARTICLE 15. CASUALTY:

15.01. In the event that all or any part of the Office is damaged or destroyed by fire or other casualty ("CASUALTY"), this Lease shall remain in full force and effect; provided, however, that in the event the damage or destruction is so extensive as to amount to a Total Loss (as such term is defined below) of the Office or the Project, this Lease shall terminate as of the date of the Casualty. In the event this Lease is not terminated pursuant to the provisions of the immediately preceding sentence, Landlord shall repair or restore the Office provided: (i) the entire cost of repair and restoration is paid out of the proceeds of the Project's Insurance; (ii) the holders of any mortgages, deeds of trust, ground and master leases encumbering the Project, consent to the application of the proceeds of the Project's Insurance to the cost of repair and restoration; (iii) the damage or destruction does not result in the termination of any underlying or ground lease; (iv) the damage or destruction was not caused, by any intentional tort, or violation of Law on the part of Tenant or any person permitted in the Office by Tenant; (v) there are at least three years remaining in the term of this Lease or any renewal term then in effect; and (vi) within 90 days after the date of the damage or destruction, Landlord gives

LEASE - 23

Tenant notice of Landlord's intention to repair or restore. In the event Landlord does not give the notice provided for in the immediately preceding clause (vi), Tenant or Landlord may terminate this Lease as of the date of the damage or destruction by notice given within 120 days after the date of the damage or destruction. In the event Landlord elects to repair or restore the Office subject to and in accordance with clauses (i) through (vi) of this Section 15.01, Landlord shall commence and prosecute the completion of such repair or restoration with reasonable diligence, taking into account the amount of time which may be required to effect a settlement with or otherwise collect the insurance proceeds from the insurer(s). In the event this Lease is not terminated as a result of the damage or destruction and Landlord is obligated to repair or restore the Office, Tenant shall reinstall and reconstruct Tenant Improvements within 45 days after the date Landlord gives Tenant notice that the Office is Ready for Occupancy, and reopen the Office for business, adequately furnished, equipped and staffed, within 60 days after the date Landlord gives Tenant notice that the Office is Ready for Occupancy. "**TOTAL LOSS**" shall mean damage or destruction which is not reasonably susceptible of being fully repaired or restored for an amount of money less than 75.00 percent of the actual cost of replacement of the Office or Project as the case may be.

15.02. "**ANCHOR TENANT**"  Intentionally Deleted

15.03. In the event the Office or Project is damaged so substantially that Tenant cannot conduct its business, then the Monthly Rent shall abate from the date that the business is discontinued. In the event that only part of the Office is damaged so substantially that Tenant cannot conduct its business in such portion of the Office, the Monthly Rent shall be abated, by an amount determined by multiplying the Monthly Rent by a fraction, the numerator of which is the square footage of the gross leasable floor area in the Office which is damaged so substantially, and the denominator of which is the square footage of the gross leasable floor area in the Office. In the event Landlord is required to repair or restore the Office, such abatement of Monthly Rent shall continue until 45 days after the date Landlord gives Tenant notice that the Office is Ready for Occupancy. In the event Landlord is not required to repair or restore the Office, such abatement of Monthly Rent shall continue until the earlier of the following dates, (i) the date Tenant reopens the Office for business; or (ii) 45 days after the date of the damage. Despite any other provision of this Lease to the contrary, in no event shall the Monthly Rent be abated for a period in excess of one year.

ARTICLE 16. CONDEMNATION:

16.01. In the event of a condemnation or other lawful taking (including without limitation intended, by purchase or dedication) for any public or quasi-public purpose (collectively "**CONDEMNATION**") of the entire Project or Office, this Lease shall terminate as of the date possession vests in a grantee ("**VESTING**") as a result of the Condemnation. In the event of a Condemnation of less than the entire Project or Office, which destroys the usefulness of the

LEASE - 24

Office for the purpose it was leased, either Landlord or Tenant may elect to terminate this Lease as of the date of the Vesting, by notice given within 30 days after the date of the Vesting.

16.02. In the event of the Condemnation of the entire Common Area, this Lease shall terminate as of the date of the Vesting. No Condemnation of parking spaces shall give Tenant any right to terminate this Lease or obtain any abatement of Rent, provided the number of parking spaces remaining after the date of the Vesting is equal to or in excess of the minimum number required by Law; or within a reasonable time after the date of the Vesting, Landlord provides substitute parking spaces which together with the remaining parking spaces, is equal to, or in excess of the minimum number required by Law.

16.03. In the event any Anchor Tenant terminates its lease as a result of a Condemnation, Landlord shall have the right to terminate this Lease as of the date of the Vesting, by notice given within 30 days after the date Landlord receives notice of the termination of the Anchor Tenant lease.

16.04. In the event of a Condemnation which does not result in the termination of this Lease pursuant to Paragraphs 16.01, 16.02 or 16.03 above, Landlord shall repair or restore the Office to the extent practicable, provided: (i) the entire cost of repair and restoration is paid out of the Condemnation award; (ii) the holders of any mortgages, deeds of trust, ground and master leases encumbering the Project, consent to the application of the Condemnation award to the cost of repair and restoration; (iii) the Condemnation does not result in the termination of any underlying or ground lease; (iv) there are at least 3 years remaining in the term of this Lease or any renewal term then in effect; (v) within 90 days after the date of the Vesting, Landlord gives Tenant notice of Landlord's intention to repair or restore the Office. In the event Landlord does not give the notice provided for in the immediately preceding clause (v), Tenant or Landlord may terminate this Lease as of the date of the Vesting, by notice given within 120 days after the date of the Vesting. In the event Landlord elects to repair or restore the Office, Landlord shall commence and prosecute the completion of such repair or restoration with reasonable diligence, taking into account the amount of time which may be required to effect a settlement with, or otherwise collect the Condemnation award from the Condemnation authority. In the event this Lease is not terminated as a result of a Condemnation, Tenant shall reinstall and reconstruct Tenant Improvements within 45 days after the date Landlord gives Tenant notice that the Office is Ready for Occupancy, and reopen the Office for business, adequately furnished, equipped and staffed within 60 days after the date Landlord gives Tenant notice that the Office is Ready for Occupancy.

16.05. In the event of any Condemnation, whether or not this Lease is terminated, the entire award from the Condemnation shall belong solely to Landlord, without any deduction for the leasehold estate of Tenant. Tenant hereby irrevocably assigns any and all right, title and interest it might otherwise have in and to any Condemnation award to Landlord. Nevertheless, Tenant shall have the right to recover from the Condemnation authority, damages to Tenant's business and the expenses and loss incurred in removing Tenant's trade fixtures, inventory and other personal property.

LEASE - 25

16.06. Despite any other provision of this Lease to the contrary in the event of a Condemnation for a period not in excess of six months, this Lease shall continue in full force and effect; provided, however, that the Monthly Rent shall be equitably abated during the period of the Condemnation.

16.07. In the event of a Condemnation of only part of the Office, the Monthly Rent shall be abated as of the date of the Vesting, by an amount determined by multiplying the respective Rent by a fraction, the numerator of which is the square footage of the gross leasable floor area in the Office which is taken in Condemnation, and the denominator of which is the square footage of the gross leasable floor area in the Office.

## ARTICLE 17. ESTOPPEL CERTIFICATES:

17.01. EXECUTION: Within 60 days after demand by Landlord, Tenant shall complete, execute, acknowledge and deliver to Landlord or its designee, a certificate ("ESTOPPEL CERTIFICATE") representing that: (i) this Lease is unmodified (or stating the modifications); (ii) this Lease is in full force and effect; (iii) there are no defenses or offsets to the performance of the obligations of Tenant under this Lease (or stating those claimed by Tenant); (iv) the date to which Rents have been paid in advance; (v) the amount and balance of the Security Deposit, if any; (vi) there is no breach of Landlord's obligations under this Lease and no event or circumstance which with the passage of time and/or the giving of notice would constitute a default on the part of Landlord (or stating the breaches and defaults claimed by Tenant); (vii) there is no breach of Tenant's obligations under this Lease and no event or circumstance which with the passage of time and/or the giving of notice would constitute a Default on the part of Tenant (or stating those in breach or Default); and (viii) such other information as Landlord or its designee may reasonably require. Any purchaser, lessee, lender or other person or entity to whom an Estoppel Certificate is delivered, shall be entitled to rely upon the contents, regardless of the name of the addressee, if any.

17.02. CONCLUSIVE PRESUMPTION: In the event Tenant fails to complete, sign, acknowledge or deliver any Estoppel Certificate, within 60 days after a demand by Landlord; then the person or entity on whose behalf the Estoppel Certificate was requested shall be entitled to conclusively presume, that: (i) this Lease is unmodified; (ii) this Lease is in full force and effect; (iii) that there are no defenses or offsets to the performance of the obligations of Tenant under this Lease; (iv) Rents have not been paid more than one month in advance; (v) there is no Security Deposit; (vi) there are no outstanding notices of a default by Landlord in the performance of any of its obligations under this Lease; and (vii) there is no breach and no default on the part of Landlord in the performance of any of its obligations under this Lease (and if Landlord is in breach or default, that Tenant has irrevocably waived its right to require performance of such obligation).

LEASE - 26

## ARTICLE 18. SECURITY DEPOSIT; ADVANCE RENT PAYMENT:

18.01. PAYMENT:   At the time of Lease execution, the Tenant shall deposit with the Landlord, the Security Deposit, as security for the fulfillment of all of the obligations of the Tenant under this Lease. The Security Deposit shall not be assigned, transferred, pledged, hypothecated or otherwise encumbered by the Tenant. The Landlord shall not be obligated to pay any interest on the Security Deposit  unless required by valid Law, and may commingle the Security Deposit with any other security deposits made by any other tenants at the Center. "**SECURITY DEPOSIT**" shall mean: (i)  payment equal to two months of Monthly Rent  at the time of the execution of the Lease and thereafter, last month's prepaid rent . ("**PREPAID RENT**").

18.02.  REPLENISHMENT/REFUND:  In the event the Tenant fails to perform any of its obligations under this Lease at the time and in the manner provided for in  this Lease, the Landlord may without notice, immediately apply, all or part of the Security Deposit or Prepaid Rent to compensate the Landlord for all or part of the damages incurred by the Landlord as a result of such default by the Tenant. In such event, within ten days after demand by the Landlord, the Tenant shall make such additional deposit of money as may be required to replenish the Security Deposit (and Prepaid Rent, if applicable) to the amount(s) set forth  in Section 18.01 of this Lease. In the event the Tenant has fulfilled all of its obligations under this Lease, no later than 30 days after the Termination Date, the Security Deposit shall be remitted to the Tenant.

18.03. EXCLUSION FROM LIABILITY FOR REFUND:   In the event the Landlord sells or assigns its interest in this Lease, the Landlord shall automatically be released from all liability for the Security Deposit, upon the delivery or assignment of the Security Deposit to the purchaser or assignee.

## ARTICLE 19. SUBORDINATION:

19.01. AUTOMATIC SUBORDINATION: This Lease is subject and subordinate to all ground or underlying leases, and all deeds of trust, mortgages and security agreements which may now or later encumber the Office or the Project, any part thereof, or interest therein, and all modifications, extensions, renewals, consolidations and replacements thereof, regardless of the dates of such instruments. The provisions of the immediately preceding sentence shall be self-operative and no further instrument of subordination shall be required. Nevertheless, within 20 days after demand by Landlord, Tenant shall sign, acknowledge and deliver any instrument of subordination Landlord or its designee may reasonably require.

19.02. NON-DISTURBANCE AGREEMENTS WITH EXISTING LENDERS: The Landlord shall make reasonable efforts to obtain within 30 days after the date of full execution of this Lease, a non-disturbance and attornment agreement between Tenant and the holders (collectively "**LENDER**") of any mortgages or deeds of trust encumbering Landlord's estate, in which the Lenders agree that despite any default by Landlord in the fulfillment of its obligations under the respective mortgage or deed of trust loan documents, and any

LEASE - 27

foreclosure of the respective mortgage or deed of trust or other action or proceeding, judicial or non-judicial, so long as Tenant performs all of its obligations under this Lease, Tenant's use and occupancy of the Office shall not be disturbed. In such non-disturbance and attornment agreement, Tenant shall: (i) agree to attorn to the Lenders and their successors and assigns if the mortgage or deed of trust is foreclosed or the Lenders or their successors and assigns otherwise succeed to the estate of Landlord, and (ii) acknowledge that this Lease is subject and subordinate to the respective mortgage or deed of trust. Tenant shall pay to Landlord within 15 days after demand, all fees, costs and expenses payable to the Lenders by Landlord in connection with requests for non-disturbance agreements.

19.03. NON-DISTURBANCE AGREEMENTS WITH SUBSEQUENT LENDERS: With respect to any deed of trust or mortgage which does not now encumber the Project, the automatic subordination of this Lease is conditioned on the existence of a written agreement or undertaking however and wherever expressed, on the part of the respective Lender, not to disturb Tenant's possession of the Office and use of the Open Common Areas, so long as the term of this Lease has not expired or terminated and Tenant is not in Default. Tenant shall attorn to the Lenders and their successors in interest.

19.04. LIMITATIONS AND WAIVERS: Under no circumstances shall a Lender be liable for or bound by any of the following:

(A) Any right of the Tenant to any offset, defense (except actual and complete fulfillment of the Tenant's obligations under this Lease), claim, counterclaim, cross-claim, abatement, deduction, or reduction (collectively **"OFFSET"**) of any of the Tenant's obligations under this Lease including the Tenant's obligation to pay any Rent, arising out of any breach of the obligations of the Landlord under the Lease or any applicable law prior to the date the Lender acquired title to the Project.

(B) Any payment of Rent made to or for the account of the Landlord which is made more than 30 days before the date the payment of Rent was due, which relate to a period of time after the date the Lender acquires title to the Project.

(C) Any obligation to pay to Tenant any money owed to the Tenant by any Landlord other than the Lender, including without limitation intended, any obligation to pay Tenant any money for any overcharges collected by any prior Landlord.

(D) Any modification or amendment of this Lease or any waiver of any provision of this Lease, unless the Lender expressly consented in writing.

(E) Any agreed-to or negotiated surrender, cancellation or termination of the Lease, in whole or in part, unless either (i) effected solely by the Tenant pursuant to an express provision of this Lease; or (ii) the Lender expressly consented in writing.

LEASE - 28

(F) Any obligation on the part of the Landlord to construct or install any Improvements or make any alterations.

ARTICLE 20.  LANDLORD DEFAULTS/NOTICES TO LENDERS:

If the Project or any part thereof, is encumbered by any deed of trust or mortgage, and the Rent or this Lease is assigned to the Lender, Tenant shall not terminate this Lease on account of any Default by Landlord, unless and until: (i) Tenant gives the Lender written notice of specifying Default; (ii) a reasonable time elapses after the expiration of the Landlord's grace period, for the cure of the breach giving rise to such default by such Lender; and (iii) such default is not cured within such time.

ARTICLE 21.  ACCESS BY LANDLORD AND OTHERS:

21.01. Landlord shall have the right, but not the obligation, to enter and remain in the Office, on five days prior notice, at all reasonable hours and from time to time: (i) to permit Landlord and its designees to inspect the Office; (ii) to perform maintenance, make repairs, restorations or Improvements to the Office or the Project; (iii) to comply with Law; (iv) to show the Office for sale, lease or financing purposes; (v) upon the request of any trustee, receiver, sheriff, marshal, or court officer purporting to be entitled to take possession of the Office or any of its contents; and (vi) upon the request of any fireman, police officer, building inspector, health inspector or other Government official, purporting to require access for any legitimate purpose. Despite the preceding sentence, Landlord shall have the right to enter the Office at any time, without any notice, in the case of any actual or apparent emergency of any nature whatsoever. In the event Tenant is not present in the Office when there is an actual or apparent emergency, Landlord is entitled to use a master key and/or break and enter into the Office without liability to Tenant. To ensure Landlord will be able to enter the Office, Tenant shall not change or install any lock or alarm without contemporaneously furnishing Landlord or its designee with the  keys, combinations and other devices required to open such lock and disarm such alarm.

21.02. Landlord's right to enter and remain in the Office, and/or to perform any maintenance, repairs, replacements or work, shall not be deemed to: (i) impose any obligation on Landlord to do so; (ii) subject Landlord to any liability to Tenant or any third person based on Landlord's failure or refusal to do so; and (iii) relieve or release Tenant from any obligation to indemnify Landlord as provided for in this Lease.

ARTICLE 22. BANKRUPTCY:

22.01. In the event (i) any action or proceeding is commenced by or against Tenant or any Guarantor, pursuant to any bankruptcy, insolvency, reorganization or arrangement Law; or (ii) any action or proceeding is commenced for the appointment of a receiver, trustee or similar official of all or part of the property of Tenant, or any Guarantor; or (iii) Tenant or any Guarantor makes an assignment for the benefit of creditors  (collectively **"BANKRUPTCY"**); and

LEASE – 29

(A) In the event the Bankruptcy is an action or proceeding commenced by a third party, without the consent or connivance of Tenant, and the Bankruptcy is not terminated, discharged or dismissed within 30 days after commencement; Landlord may elect to terminate this Lease; or

(B) In the event the Bankruptcy is an action or proceeding commenced by Tenant, or a third party with the consent or connivance of Tenant, Landlord may elect to terminate this Lease.

22.02. In the event Tenant or any Guarantor is insolvent as defined by any Law; or any Guarantor terminates. rejects or otherwise disclaims liability under any guaranty of this Lease; then in any of the preceding circumstances the Landlord may elect to terminate this Lease.

22.03. In the event the provisions of this Article of the Lease contravene the Bankruptcy Law, the following provisions shall automatically become effective:

(A) Any and all moneys and other consideration payable or otherwise to be delivered in connection with any Lease Transfer shall be paid or delivered to Landlord and shall belong solely to Landlord, and not constitute property of (i) Tenant or any Guarantor; or (ii) the estate of Tenant or any Guarantor within the meaning of the Bankruptcy Law. In the event any such moneys or other consideration cannot be paid or delivered to Landlord immediately, it shall be held in trust for the benefit of Landlord, and be paid or delivered to Landlord as soon as possible.

(B) Any person or entity to whom this Lease is assigned shall automatically be deemed to have assumed the obligations of Tenant under this Lease, which accrue under this Lease on and after the date of such assignment, and no act on the part of Tenant, its assignee or any other person or entity shall operate to relieve the assignee of such obligations.

22.04. All Rent shall constitute rent for the purposes of Bankruptcy Code Section 502(b) (6), 11 U.S.C. Section 502 (b) (6).

ARTICLE 23. TENANT'S DEFAULT:

23.01. The following events or circumstances shall constitute a default ("**DEFAULT**") in the fulfillment of Tenant's obligations under this Lease:

(A) Tenant shall: (i) breach its obligation to pay any Rent and such breach shall continue for ten days after the date Landlord gives Tenant notice payment is past due; or (ii) breach its obligation to maintain any insurance required by this Lease; or (iii) submit any report or other written statement to Landlord or its designee, which shall contain a wilfully false statement; or (iv) abandon the Office or fail to keep the Office open for business, fully stocked, fixtured and staffed for a period in excess of ten succeeding days for any reason while Force Majeure (as such term is defined in Section [37] of this Lease), or ongoing diligently pursued alterations authorized by this Lease or consented to by Landlord; or (v) fail to perform any of its other obligations under this Lease and such breach shall continue for 30 days after the date Landlord

LEASE - 30

gives Tenant notice performance is past due; provided, however, that if the breach is not reasonably susceptible of being cured within such 30 day period, Tenant gives Landlord notice specifying the Force Majeure within such 30 day period, and Tenant promptly commences the cure and diligently prosecutes the cure to completion, then such 30 day period shall automatically be extended for such period of time as may reasonably be required to cure the breach; provided, however, that in all circumstances the 30 day period shall not be extended to last longer than 90 days.

(B) Any Guarantor shall default in the performance of any of its obligations under a guaranty of this Lease; or

(C) If any person or entity shall attempt to levy or execute upon this Lease or the Office or any property in the Office, under any writ, order, judgment or other process of Law; or

(D) If any Bankruptcy occurs and Landlord's right to terminate this Lease as a result of such Bankruptcy has accrued.

23.02. If any Default occurs, then Landlord may either (i) give Tenant ten days notice to quit and surrender the Office, as a result of the Default, and upon the expiration of such ten day period, (a)Tenant's rights under this Lease shall expire, and (b) Tenant shall immediately quit and surrender the Office to Landlord; or (ii) give Tenant ten days notice of the Default and Landlord's intention to terminate this Lease, and upon the expiration of such ten day period, (a) Tenant shall immediately quit and surrender the Office to Landlord, and (g) this Lease shall be terminated.

23.03. Despite the termination of this Lease and/or the expiration of Tenant's rights under this Lease, Tenant shall remain liable for the fulfillment of all of its obligations under this Lease, including without limitation intended, its obligations to pay Rent; subject, however, to reduction to a lesser sum of money as provided in Article 24 of this Lease.

ARTICLE 24. RIGHT TO REENTER AND RE-LET:

24.01. In the event Tenant is obligated to quit and surrender the Office to Landlord pursuant to Article 23 of this Lease, or this Lease is terminated, Landlord shall have the right to re-enter and repossess the Office, and remove all persons and property in the Office, by any summary or plenary action or proceeding, or by force, without any liability whatsoever. Landlord may at the expense of Tenant, Office, sell or discard any property in the Office, without any liability to Tenant whatsoever. The word "re-enter" shall be broadly construed and shall not have its technical legal meaning. Tenant waives any right it may have at Law, to notice of Landlord's intention to enter. No re-entry or repossession of the Office by Landlord, shall operate to terminate the Lease, unless Landlord gives explicit notice of termination (which notice may be given before or after re-entry and repossession); or constitute an acceptance by Landlord of a surrender, unless Landlord gives explicit notice of its acceptance.

LEASE - 31

24.02. Despite re-entry and repossession by Landlord after a Default, Tenant shall remain liable for the performance of all of its obligations under this Lease, including without limitation intended, its obligations to pay Rent. All costs and expenses incurred by Landlord in re-entering, repossessing and re-letting the Office, and moving, storing, selling or discarding the property in the Office, including without limitation intended; Litigation Expenses; moving expenses; brokerage, warehouse and sales fees; and the costs of refurbishing the Office and making it ready for occupancy by another tenant; shall be  paid to Landlord by Tenant within ten days after demand by Landlord.

24.03. In the event Landlord re-enters and repossesses the Office without terminating this Lease, Landlord may nevertheless make such alterations and refurbish the Office to the extent that Landlord deems appropriate, and re-let the Office or any part of the Office, on such terms as Landlord may deem appropriate. The rents received by Landlord from any such re-letting (without termination of this Lease) shall be applied: first, to the payment of all Rent due, which represents costs and expenses incurred by Landlord; second, to payment of all other Rent due and unpaid; and third, any rent remaining shall be held by Landlord to be applied to the Rent which becomes due in the future under this Lease. If the  rents from such re-letting are insufficient to pay the Rent due under this Lease as the Rent becomes due, Tenant shall pay the deficiency to Landlord or its designee, on or before the first day of each calendar month for which there will be a deficiency.

24.04. Landlord shall have no obligation to re-enter or re-let the Office, or otherwise mitigate damages unless Tenant and all other occupants have vacated the Office and Tenant has given Landlord notice specifying Tenant has permanently abandoned the Office. Landlord's obligation to mitigate damages shall be qualified as follows:

(A) Landlord shall not be obligated to make any effort to mitigate damages except to the extent the effort would be commercially reasonable for a landlord in circumstances similar to the Landlord;

(B) Landlord shall have no obligation to pay for any renovations, repairs or alterations requested by any prospective tenant;

(C) Landlord shall have no obligation to lease the Office at less than fair market rent and additional rent;

(D) Landlord shall have no obligation to lease the Office if Landlord has other suitable space for lease or Landlord expects the Landlord will have other suitable space for lease in the following three months;

(E) Landlord shall have no obligation to lease the Office if the prospective tenant or the lease acceptable to the proposed tenant is not reasonably satisfactory to the landlord in every material respect, including the business background and creditworthiness of the tenant, the compatibility

LEASE - 32

of the replacement tenant and its use with the other tenants in the Project and the other tenants' uses and lease provisions;

(F) Landlord shall have no obligation to seek a replacement tenant by any means the landlord does not generally employ for leasing vacant space in the Project.

24.05. In the event this Lease is terminated by Landlord after a Default, Tenant shall within ten days after demand by Landlord, pay to Landlord as liquidated damages, all the Rent required to be paid pursuant to Article [8] of this Lease, from the Termination Date through the latest date the term of this Lease would have otherwise expired, less any amount of money which Tenant proves is the fair market rent and additional rent for the Office in the condition the Tenant left it in, with the resulting figure discounted to present value at the rate of interest payable on unpaid money judgments in the State in which the Project is located. The amount of Rent due during each Lease Year or partial Lease Year after the Termination Date, shall be equal to (or prorated based upon) the mean average Rent for the preceding three Lease Years (or such lesser number of Lease Years [or calendar months] which may have run during the term of this Lease).

ARTICLE 25. WAIVER BY TENANT:

25.01. Tenant hereby waives any right it may have at Law to redeem this Lease or its interest in this Lease after a Default.

25.02. Tenant hereby waives any homestead rights or exemptions it may have, which might exempt any property of Tenant from a levy or execution, to satisfy any outstanding obligations of Tenant under this Lease.

ARTICLE 26. NO WAIVER BY LANDLORD:

26.01. No act or omission on the part of Landlord shall constitute a waiver of any right of Landlord or relieve Tenant from the performance of any obligation under this Lease, unless Landlord expressly grants a waiver in a writing signed by Landlord. No waiver of any right or obligation on any one or more occasions shall constitute a waiver with respect to any other occasions.

26.02. No acceptance of money by Landlord in an amount less than the amount of Rent due shall constitute an acceptance of such lesser amount in full payment. It shall merely constitute a payment on account of the amount of Rent due, not an accord and satisfaction, regardless of any endorsement or limitation on any check or other document. Acceptance of payment of Rent on account, shall be without prejudice to the exercise of any other rights or remedies Landlord may have.

LEASE - 33

## ARTICLE 27. ATTORNMENT:

Unless and until Landlord, or the holder of a mortgage or deed of trust or the landlord under any ground or underlying lease encumbering the Office or Project, shall elect to terminate this Lease, this Lease shall remain in full force and effect, despite the fact that: (i) any mortgage or deed of trust encumbering the Office or Project is foreclosed or the Office or Project or any part of the Project is sold under a power of sale; or (ii) any deed is given in lieu of the foreclosure of any such mortgage or deed of trust; or (iii) any ground or underlying lease to which this Lease is subordinated, is terminated; or (iv) any action or proceeding is commenced by Landlord, or any holder of a deed of trust or mortgage or the landlord under any ground or other underlying lease encumbering the Office or Project. Tenant shall attorn to Landlord, or its successor (including without limitation intended, any purchaser of the Office or Project at foreclosure), or any holder of any mortgage or deed of trust, or any landlord under any ground or other underlying lease encumbering the Office or Project.

## ARTICLE 28. RULES AND REGULATIONS:

Tenant shall comply with all reasonable rules and regulations ("**RULES AND REGULATIONS**") adopted, amended and repealed, by Landlord, at any time and from time to time, for the use, operation and occupancy of the Project, including without limitation intended, the Open Common Area and the Office. A copy of the Rules and Regulations in effect on the date this Lease was delivered to Tenant is annexed as **Exhibit "G "** to this Lease. Any act or omission by Tenant, in breach of the Rules and Regulations shall constitute a breach by Tenant in the performance of its obligations under this Lease. Landlord shall give Tenant notice of the adoption of any new Rules and Regulations, or the modification or repeal of any existing Rules and Regulations, and any such adoption, modification or repeal shall be binding upon Tenant as if incorporated in this Lease by reference, ten days after notice thereof is given to Tenant.

## ARTICLE 29. CONTROL OF COMMON AREA:

The Common Area shall at all times be subject to the exclusive control and management of Landlord, including without limitation intended, the power to limit, control and direct pedestrian and vehicular traffic and parking. Landlord shall have the right to use or limit the use of the Common Area for any purpose whatsoever, that Landlord deems appropriate for the Project, including without limitation intended, any improvements, shows, displays, demonstrations, promotions, and kiosks; and to prevent the dedication of any part of the Project or the accrual of any prescriptive or other rights in favor of the public or any other persons. Landlord shall also have the right to remove and/or exclude from the Common Area, any person who fails to comply with any Rule or Regulation, or uses or occupies the Common Area for any purpose not specifically authorized by this Lease or the Rules and Regulations or by Landlord in a writing signed by Landlord; provided, however, that if Tenant is an entity, Tenant shall not be removed or excluded from the Common Area (but any offending principal, employee, agent, contractor or supplier may be excluded) unless Tenant's breach of the Rules and Regulations continues after the expiration of any applicable grace period.

LEASE - 34

ARTICLE 30.  CONTROL OF PROJECT:

30.01. Landlord shall have the right at any time, and from time to time, to (i) make any additional Improvements, in or about the Project or any part thereof; (ii) to alter, delete and enlarge any existing Improvements; (iii) to enlarge or decrease the size of the Project by adding additional land and/or Improvements, or subdividing, selling or otherwise reducing the land and/or Improvements comprising the Project; provided, however that in no event shall any such activity unreasonably disrupt the business of Tenant in the Office, or unreasonably impair access to and from the Office. No site plan furnished to Tenant shall in any manner limit the rights of Landlord under this Article. Without limiting the rights of the Landlord under this Section 30.01, Tenant acknowledges that Landlord shall have the right to construct or permit the construction of. an additional office building with a parking garage on the Northeasterly portion of the Project.

30.02. Despite the preceding Section 30.01, if Landlord is engaged in any necessary repairs, replacements, or any expansion or renovation of the Project or any substantial portion of the Project, then Landlord shall not be liable for and Tenant shall have no rights arising from any temporary obstruction of access to or from the Office, or diminution of Tenant's ability to use the Office, unless the obstruction or diminution could have readily been avoided without incurring any unusual or extraordinary expense, which extraordinary expense shall include without limitation intended, the payment of overtime or other premium compensation.

30.03. If the operation of Tenant's authorized business is disrupted by Landlord repairs, replacements, expansion or renovation, to such a degree that operation of Tenant's business is not feasible, and such disruption continues for 48 consecutive hours or longer after Tenant gives Landlord notice of such interference and Tenant's cessation of business as a result; then the Monthly Rent shall abate for the lesser of the following periods of time: (i) the period of such disruption following the giving of such notice; or (ii) the period of time Tenant ceases its authorized business as a result of such disruption.

ARTICLE 31.  SIGNS:

31.01. SIGNS WITH LANDLORD APPROVAL: Prior to the Commencement Date, Tenant shall install, and throughout the term of this Lease maintain, a sign on the front door of the Office or immediately adjacent to the front door, in accordance with the requirements specified in **Exhibit "H"** of this Lease. Except as otherwise provided in this Section 31.01, without the prior consent of the Landlord, Tenant shall not install or permit the installation or maintenance of any permanent or temporary sign, price, billboard, advertisement, circular, lettering, placard, poster, pennant, flag, awning, name, insignia, trademark, logo, decoration, banner, descriptive or similar item (collectively **"SIGN"**), which is visible from the exterior of the Office. Any Sign installed or maintained contrary to the  provisions of this Section 31.01, may be removed by Landlord without notice and without any liability.

LEASE – 35

32.02. SIGNS INSTALLED BY LANDLORD APPROVAL: Landlord shall insert Tenant's name in: (i) the directory located on the first floor lobby of the building in which the Office is located; and (ii) if the Office is located above the first floor, in the directory located in the immediate vicinity of the elevators on the floor(s) on which the Office is located.

## ARTICLE 32. INDEMNIFICATION

32.01. INDEMNIFICATION BY TENANT: Tenant shall indemnify and hold Landlord, Landlord's predecessors in interest, all persons and entities designated by Landlord who have any interest in the Project, and all persons acting on their behalf, harmless, from and against any and all liabilities, costs, damages and expenses (including without limitation intended, attorneys' fees, disbursements, and amounts paid in settlement of claims), (collectively "CLAIMS") incurred as a result of, or in connection with the use, operation or occupancy of the Office or the Project by Tenant, or any person or entity permitted in the Office by Tenant (including without limitation intended, any act or omission by Tenant or any person or entity permitted in the Office by Tenant, or in the Project at the request of, or on account of the business of Tenant); except for on a comparative basis for any Claims arising out of the negligence or other tortious conduct of Landlord, its employees, agents, contractors and suppliers; or any breach of Landlord's obligations under this Lease; or any violation of Law by Landlord, its employees, agents, contractors and suppliers.

32.02. INDEMNIFICATION BY LANDLORD: Landlord shall indemnify and hold Tenant, Tenant's predecessors in interest, all persons and entities occupying the Office in accordance with this Lease, and all persons acting on their behalf, harmless, from and against any and all Claims, incurred as a result of, or in connection with the negligence or other tortious conduct of Landlord, its employees, agents, contractors and suppliers; or any breach of Landlord's obligations under this Lease; or any violation of Law by Landlord, its employees, agents, contractors and suppliers; except on a comparative basis for any Claims arising out of the negligence or other tortious conduct of Tenant, its employees, agents, contractors and suppliers; or any breach of Tenant's obligations under this Lease; or any violation of Law by Tenant, its employees, agents, contractors and suppliers.

## ARTICLE 33. SURRENDER OF THE OFFICE:

33.01. On or prior to the Termination Date, Tenant shall surrender the Office, broom clean, in good condition and repair (except for reasonable wear and tear, and damage caused by Casualty covered or required to be covered by the Project's Insurance) and deliver all keys, combinations and other lock opening devices for all locks and alarms in and about the Office, to Landlord. Within five days after the Termination Date, Tenant shall remove all property of Tenant, including without limitation intended, all trade fixtures and furnishings, and repair all damage which may result from the removal of such property. Despite the provisions of the immediately preceding sentence Tenant shall not remove: (i) any property of Tenant, in the event Landlord has given Tenant notice of any default by Tenant, in the performance of any of

LEASE - 36

its obligations under this Lease, and such notice remains outstanding; and (ii) any property of Tenant which is attached to any wall or floor, in the event Landlord has given Tenant notice not to remove same. If Tenant made any improvements or alterations without Landlord's consent, at the request of Landlord Tenant shall remove the improvements or alterations on or before the Termination Date and restore the Office to the condition which existed before the improvements or alterations were made without Landlord's consent.

33.02. In the event Tenant fails to remove any property of Tenant or any person or entity permitted in the Office by Tenant, within five days after the Termination Date, then such property shall be deemed abandoned by Tenant, and may be removed, stored or sold by Landlord without notice or liability to, and at the sole expense of Tenant.

ARTICLE 34. LIMITATIONS OF LANDLORD'S LIABILITY:

34.01. Landlord shall have no obligation or liability for the fulfillment of any obligation of the Landlord under this Lease, which accrues prior to or after the date Landlord is the owner or ground lessee of the real property comprising the Project.

34.02. Landlord shall have no obligation or liability for the fulfillment of any obligation of the Landlord under this Lease unless Landlord fails to perform any of its obligations under this Lease and such breach shall continue for 30 days after the date Tenant gives Landlord notice specifying Landlord's breach of its obligations; provided, however, that if the breach is not reasonably susceptible of being cured within such 30 day period, Landlord gives Tenant notice specifying the reason(s) for the delay within such 30 day period, and Landlord promptly commences the cure and diligently prosecutes the cure to completion, then such 30 day period shall automatically be extended for such period of time as may reasonably be required to cure the breach; provided, however, that in all circumstances the 30 day period shall not be extended to last longer than 90 days.

34.03. In the event Landlord breaches its obligations under this Lease and fails to cure the breach prior to the expiration of the applicable grace period, or Landlord is otherwise liable to Tenant as a result of any act or omission by Landlord or any person or entity acting on behalf of Landlord, Tenant shall look solely to the ownership or leasehold interest of Landlord in the Project, for the recovery of any damages incurred by Tenant. Tenant shall not seek to restrain Landlord, or levy, execute or otherwise seek to enforce any order, judgment or claim against any other assets of Landlord; nor against Landlord's principals, agents, or employees or any of their assets.

ARTICLE 35. DISPUTES BY TENANT:

In the event Tenant disputes the amount or propriety of any demand by Landlord, for the payment of any Rent, Tenant shall immediately pay the amount demanded by Landlord, and simultaneously with payment, give Landlord specific notice of the nature of the Rent and amount disputed by Tenant.

LEASE - 37

P1407

## ARTICLE 36.  SECURITY INTEREST/FINANCING STATEMENTS:

~~Landlord shall have a continuing security interest under the Uniform Commercial Code (or its counterpart), as adopted in the jurisdiction in which the Project is located, in all the property of Tenant in the Office, to secure the performance of all of the obligations of Tenant under this Lease. Landlord shall have the right, at the sole cost and expense of Tenant, to sign and file financing and continuation statements to perfect such security interest, without the signature of Tenant.~~

## ARTICLE 37.  FORCE MAJEURE:

In the event that Landlord or Tenant is delayed or prevented from the performance of any of their respective obligations  under this Lease, because of any strike, lockout, labor trouble, inability to procure materials, failure of power, Law, riot, insurrection, war, act of God, or similar cause wholly outside the control of, and brought about by a force or persons or entities wholly unrelated to the party delayed or unable to perform (collectively **"FORCE MAJEURE"**); the performance of such act shall be excused for the period of any such delay; provided notice specifying the Force Majeure is promptly given to the other party under this Lease and if such notice is not given promptly, then delay shall be excused only to the extent delay occurs after notice specifying Force Majeure is given to the other party under this Lease. Despite the provisions of the immediately preceding sentence to the contrary, the provisions of this Article shall not excuse Tenant from its obligations to pay all Rent.

## ARTICLE 38.  HOLDING OVER:

In the event Tenant holds possession of the Office, (i) after the Termination Date or after the date Tenant's right to possession of the Office ends, and (ii) without the written consent of Landlord; then Landlord may elect by notice, to either:

38.01. Make Tenant a tenant from month-to-month, at double the Minimum Rent  provided for in this Lease, but subject to all other obligations of Tenant under this Lease, and all other provisions of this Lease, prorated or adjusted to a month-to-month tenancy; or

38.02. Treat Tenant as a trespasser, and recover possession of the Office from Tenant by any means provided for in this Lease or by Law; including seeking recovery of damages incurred by the Landlord as a result of Tenant's failure or refusal to surrender possession (including any damages incurred by Landlord as a result of Landlord's failure to timely deliver possession to any other tenant).  In the event Landlord accepts payment of Monthly Rent for any period after the Termination Date or Tenant's right to possession of the Office ends, then Landlord shall be deemed to have made the election provided for in Section 38.01 of this Lease.

LEASE - 38

## ARTICLE 39. TITLE EXCEPTIONS:

This Lease is subject to all recorded and unrecorded mortgages, deeds of trust, security agreements, ground and other underlying leases, easements, restrictions, covenants and Law, now in existence or later created.

## ARTICLE 40. BROKERS:

The parties to this Lease ("**WARRANTOR**") represent and warrant to each other ("**WARRANTEE**"), that no broker, finder or other person is entitled to any money or other consideration (including without limitation intended, broker's or finder's fee or commission), on account of the acts of the Warrantor or any person acting on its behalf, and the execution or delivery of this Lease, or the leasing of the Office. Warrantor shall indemnify and hold the Warrantee harmless, from and against any and all liabilities, costs, damages and expenses (including without limitation intended, Litigation Expenses), incurred by the Warrantee, as a result of any claim made by any person or entity, which is inconsistent with the representation and warranty made by the Warrantor in the first sentence in this Article. However, Landlord agrees to pay Robert Elhard of Prudential Northwest Realty Associates a leasing commission in an amount equivalent to 2.5% of the aggregate net minimum rent due for the first five year term of the Lease.

## ARTICLE 41. QUIET ENJOYMENT:

Provided and for so long as Tenant shall fulfill all of its obligations under this Lease, Tenant shall quietly enjoy the Office without molestation by Landlord or any person or entity claiming the Office in compliance with the Law, subject to the provisions of this Lease and all mortgages, deeds of trust, other security agreements, ground and other underlying leases to which this Lease may be subordinate.

## ARTICLE 42. NO PARTNERSHIP/JOINT VENTURE:

This Lease and the relationship of Landlord and Tenant shall not create a partnership or joint venture.

## ARTICLE 43. REMEDIES CUMULATIVE:

Each remedy and right of Landlord in this Lease shall be cumulative and shall be in addition to all rights and remedies granted in this Lease or by Law. The exercise of any one or more of such remedies as a result of a default shall not preclude the exercise of any other remedies as a result of such default.

LEASE - 39

## ARTICLE 44. NOTICES:

Any notice, request, demand, approval, consent or other communication (collectively **"COMMUNICATION"**) concerning this Lease or any transaction or matter arising in connection with this Lease, including any contemplated by any of the exhibits to this Lease, shall be in writing and given to the party to which it is directed, at the address specified in the first paragraph of this Lease. Such address may be changed by a Communication given in accordance with the provisions of this Article which specifies that the Communication gives notice of one or more changed addresses for the purposes of giving notice to a party pursuant to this Lease. Any Communication shall be (i) delivered personally and a signed receipt obtained: or (ii) sent by certified mail, return receipt requested; or (iii) sent by Federal Express or similar nationally recognized courier service which promises next business day delivery. Any Communication shall be deemed given on (i) the date personally delivered to the other party and a signed receipt obtained; or (ii) three days after deposit, postage prepaid, in any United States Postal Service branch or official depository; or (iii) the next business day after delivery to and acceptance by Federal Express or similar nationally recognized overnight courier service promising next business day delivery; whichever event shall occur earliest. Any Communication given by any management agent of the Project or attorney for Landlord shall be deemed a Communication given by Landlord.

## ARTICLE 45. ATTORNEYS' FEES:

In the event of a default by a party under this Lease, any Litigation Expenses incurred by the party entitled to performance under this Lease, in the exercise or enforcement of any of the rights or remedies of such party under this Lease or the Law, shall be paid by the party in default to the party entitled to performance (and if payable to Landlord shall be paid as Rent), within ten days after demand by the party entitled to payment.

## ARTICLE 46. LANDLORD'S RIGHT TO PERFORM TENANT'S OBLIGATIONS:

In the event that (i) there is a Default, or (ii) Tenant breaches any of its obligations under this Lease and there is an actual or apparent emergency; then in either case, Landlord shall have the right at the sole cost and expense of Tenant, to elect to perform any such obligation, without notice to Tenant in the case of any actual or apparent emergency, and in the absence of any actual or apparent emergency without any notice except any notice of breach or potential default required by this Lease.

## ARTICLE 47: RECORDING:

Tenant shall not record this Lease. At the request of Landlord or Tenant, the parties shall at the sole cost and expense of the party making the request, execute, acknowledge and deliver a memorandum of this Lease, in form suitable for recording.

LEASE - 40

ARTICLE 48. DISCRETION:

Whenever the consent, approval or permission of a party under this Lease is sought from the other party under this Lease, or the satisfaction, discretion, or designation of a party under this Lease is provided for by this Lease, the party whose consent, approval or permission is sought and the party whose satisfaction, discretion or designation is provided for, shall not unreasonably withhold, delay, condition or exercise its consent, approval, permission, satisfaction, discretion or designation. Landlord shall not be obligated to perform any act unless this Lease specifically imposes upon Landlord an obligation to do so by the use of the word "shall."

ARTICLE 49: TIME OF THE ESSENCE:

Time shall be of the essence for the performance of all of the obligations of Tenant under this Lease.

ARTICLE 50: MISCELLANEOUS:

50.01. SUCCESSORS: The rights and obligations of Landlord and Tenant under this Lease, shall inure to the benefit of and be binding upon Landlord and Tenant and all persons and entities who succeed to the respective rights and obligations of Landlord or Tenant, in accordance with the provisions of this Lease.

50.02. MODIFICATION: This Lease cannot be changed orally. It can only be changed in writing and the writing must be signed by the party against whom the change is sought to be enforced.

50.03. ENTIRE AGREEMENT: This Lease is signed by Landlord and Tenant as a final expression of all the terms of their agreement and as a complete and exclusive statement of its terms.

50.04. COUNTERPARTS: This Lease may be signed in counterparts with the same force and effect as if all required signatures were contained in a single original instrument.

50.05. LANDLORD'S SIGNATURE: Despite the statements, promises, acts or omissions of any person or entity, this Lease shall not be binding upon Landlord, unless and until this Lease (or a counterpart) is signed by both Landlord and Tenant.

50.06. CAPTIONS: The captions in this Lease were inserted for the convenience of reference only. They do not in any manner define, limit or describe the provisions of this Lease or the intentions of Landlord or Tenant.

50.07. GENDER/SINGULAR/PLURAL: Whenever masculine, feminine, neuter, singular or plural terms are used in this Lease, they shall be construed to read in whatever form is appropriate

LEASE - 41

to make this Lease applicable to all persons, entities, acts and transactions.

50.08. RULE OF CONSTRUCTION NEGATED: In the event it shall be necessary to construe this Lease, the rule of construction that an instrument should be construed against the party who prepared the instrument, shall be disregarded.

50.09. PARTIAL INVALIDITY: In the event that a court of competent jurisdiction declares that one or more provisions of this Lease are invalid or unenforceable, the remaining provisions of this Lease shall nevertheless remain in full force and effect. However, in the event that such declaration results in any reduction of any Rent, Landlord shall have the right to terminate this Lease 30 days after the date that notice of termination is given by the Landlord.

50.10. EXHIBITS INCORPORATED: The exhibits annexed to this Lease are hereby incorporated by reference in their entirety with the same force and effect as if they were set forth in this Lease in their entirety.

50.11. COVENANTS: All of the obligations of Tenant under this Lease shall constitute material covenants.

50.12. JOINT AND SEVERAL LIABILITY: Each person and entity which is a Landlord or Tenant (if more than one) shall be singularly and collectively liable for the full performance of all of the obligations of the respective party under this Lease.

50.13. TENANT'S REVIEW/ATTORNEY: Tenant acknowledges that prior to signing this Lease, Tenant has been given an adequate opportunity to (i) review this Lease; and (ii) consult with an attorney.

50.14. OBLIGATIONS SURVIVE: The termination or expiration of this Lease shall not relieve Tenant from performance of its obligations under this Lease, which have accrued prior to the Termination Date, or are expressly or impliedly required to be performed after the Termination Date. Without in any way limiting the general application of the provisions of the immediately preceding sentence, the obligations of Tenant under the Article of this Lease captioned [AINDEMNIFICATION@] shall survive the termination or expiration of this Lease.

ARTICLE 51: RIDER: Intentionally Deleted

((((((((((((((((((((((((((((((((((((((

LEASE - 42

P1412

IN WITNESS WHEREOF, Landlord and Tenant have signed this Lease as of the date first set forth in the first paragraph of this Lease.

TENANT:                              Witness/Attest:
PACIFIC REAL ESTATE MANAGEMENT COMPANY, INC.

By:_____
James Bowman
Signature
Title: President                     Signature

TENANT:                              Witness/Attest:
PACIFIC REAL ESTATE MANAGEMENT COMPANY, INC.

By:_____
Signature                            Signature
Title:_____

TENANT:                              Witness/Attest:

By:_____
Signature                            Signature

Name:_____
Personally

LANDLORD:                            Witness/Attest:
PRIMESTAR INVESTMENT CORP.

By:_____
Signature
Title: President                     Signature

LEASE - 43

P1413

Exhibit 1

## 500 WEST EIGHTH BUILDING
## OFFICE BUILDING LEASE

**Effective Date:** June 4, 2004

CLARK COUNTY, a municipal corporation,
PO Box 5000, Vancouver, Washington 98668,
hereafter referred to as the "Lessor" and

Lessee: Pacific Real Estate Management Co., Inc.
500 West Eighth St., Suite 100, Vancouver, WA 98660
hereafter referred to as the "Lessee"

## AGREEMENT:

1. **Premises Leased:** For and in consideration of the terms, covenants and conditions contained herein, Lessor hereby leases to the Lessee, and Lessee hereby leases from the Lessor, the following described premises:

Suite No. 100, approximately 3210 square feet, of the 500 WEST EIGHTH STREET BUILDING, located at 500 West 8th Street, Vancouver, Washington 98660, together with a total of 3 assigned parking spaces, as shown on Exhibit "A", attached hereto, and by reference made a part hereof.

2. **Term:** The term of this lease shall be 60 months commencing June 4, 2004, through November 30, 2009

3. **Base Rent:** The base rental for the leased premises shall be the sum of Four Thousand Twelve Dollars and Fifty Cents ($4,012.50) per month beginning December 1, 2004 and each month thereafter, payable monthly in advance on the first day of each month and every calendar month, throughout the term of the lease, such rent to be payable at the office of the Lessor or Lessor's agent. Lessee is to complete, at their sole expense, demising of the space, carpeting, painting and interior modifications (see attached floor plans). Lessee shall occupy as of June 4, 2004 for purposes of construction. In exchange for improvements completed by Lessee, Lessor shall credit 5 months of rent, July 1, 2004 through November 30, 2004. Rent shall commence December 1, 2004.

3.2 **Rental Adjustment:** All consumers index for the CPI, not to exceed 3% annual increase.

3.2 **Tenants Proportionate Share:** "Tenants Proportionate Share" as used herein means the area of the premises, divided by the total area of the Building (not including basement storage space), with area determined using one of the methods of building measurement defined by the Building owners and Managers Association (BOMA). Tenant's proportionate share as of the lease commencement date shall be 8.025 percent.

3.3 **Additional Rent-Operating Expense Adjustment:** N/A

P1436

4. **LESSEE'S COVENANTS:** The Lessee covenants and agrees to fulfill all of the conditions set forth in this article.

4.1 **Use:** The Lessee will use and occupy the premises for General Offices and for no other purposes; and Lessee will, at Lessee's own expense, repair any damage caused by the Lessee or any of Lessee's employees or agents or licensees or invitee.

4.2 **Assignment:** The Lessee will not assign this lease or any interest hereunder, and will not permit any assignment hereof by operation of law, and will not sub-rent or sublet said premises or any portion thereof and will not permit the use or occupancy of said premises by other than the Lessee and his agents and employees of the Lessee, without first obtaining the written consent of the Lessor, which will not be unreasonably withheld.

4.3 **Alterations:** The Lessee will make no alterations in or additions to said premises without first obtaining the written consent of the Lessor, and all additions, improvements and fixtures (except the movable office furniture of the Lessee) made or added either by the Lessee or Lessor shall be and remain the property of the Lessor. Lessor shall not withhold such consent from Lessee to make any commercially reasonable alterations.

4.4. **Prohibited Use:** The Lessee will not use or permit in said premises anything that will increase the rate of fire insurance thereon or prevent the Lessor's taking advantage of any ruling of the Washington Insurance Rating Bureau, or its successors, which would allow the Lessor to obtain reduced rates for long term insurance policies; or maintain anything that may be dangerous to life or limb; or in any manner deface or injure said building or any portion thereof; or overload the floors; or permit any objectionable noise or odor to escape or to be emitted from said premises; or permit anything to be done upon said premises in any way tending to create a nuisance or to disturb any other tenants of the building, or to injure reputation of the building; or to use or permit the use of said premises for lodging or sleeping purposes, or for any immoral or illegal purposes; and that Lessee will comply at Lessee's own cost and expense with all orders, notices, regulations or requirements of any municipality, state or other government authority respecting the use of said premises.

4.5 **Liability for Injury or Damage:** The Lessor shall not be liable to the Lessee for damage to person or property resulting from the negligence of a co-tenant or anyone else other than the Lessor, or for any damage to person or property resulting from any condition of the premises or other cause, including but not limited to damage by water, not resulting from the negligence of the Lessor.

4.6 **Vacation or Abandonment:** Upon vacation or abandonment of the premises by the Lessee without the written consent of the Lessor endorsed hereon, the Lessor may forthwith enter upon the premises or any portion thereof and relet and otherwise exercise control over the same and that for the purpose of such re-letting the said Lessor is authorized at the cost of the Lessee to make any reasonable repairs, changes alterations or additions in or to said demised premises which may be necessary in the opinion of the Lessor for the purpose of such re-letting and that such entry and control shall not release the Lessee from the obligations herein, but Lessee shall nevertheless remain liable and

P1437

continue bound, unless the Lessor, at Lessor's election, shall cancel the lease, and in that event cancellation shall be effected and Lessor and Lessee released from all obligations thereunder thereafter to accrue, upon the mailing of such notice of cancellation by Lessor to Lessee at Lessee's last known address. If the Lessor elects to so relet the demised premises, the Lessor may relet the premises upon such terms and conditions and for such rental term as the Lessor shall see fit, and any right or estate of the lessee hereunder shall then be subject to the right or estate of the new Lessee; provided that the Lessee hereunder shall not be released from any obligation herein; except that any payment of rent by the new Lessee shall reduce the rental obligation of the Lessee hereunder as provided in Part 5.2.3. hereof.

**4.7 Passkeys:** The Lessor shall not be liable for the consequences of admitting by passkeys or refusing to admit to said premises the Lessee or any of the Lessee's agents or employees or other persons claiming the right of admittance. Managing agent shall keep one passkey in the office and notify tenant by phone of its intent to enter, except for emergencies.

**4.8 Signs:** No sign, picture, advertisement or notice shall be displayed, inscribed, painted or affixed to any of the glass or woodwork of the premises hereby demised, except such as shall be approved by the Lessor and shall be painted by a sign painter designated by the Lessor; that no signs or devices shall be hung on or placed against the windows of said premises nor on the exterior wall of the building. The tenant is responsible for the cost of the suite sign. The sign must match the signage throughout the building. The only signage Clark County is responsible for is the small billboard in the main lobby.

**4.9 Mechanical Devices:** The Lessee shall not, without Lessor's written consent, operate or install any electrical equipment or operate or install any machinery or mechanical device on said premises other than that normal to office use.

**4.10 Electrical Installations:** No electric wiring, telegraph call boxes, or telegraphic, telephonic, or other electrical apparatus, including air conditioning equipment, shall be installed, maintained or operated on said premises except with the approval of and in a manner satisfactory to the Lessor; and that in no event shall the Lessee overload the electrical circuits from which the Lessee obtains current.

**4.11 Awnings:** No awnings shall be attached to the outside of any windows of the premises hereby leased.

**4.12 Windows:** The Lessee shall not allow anything to be placed on the outside window ledges of said premises; and nothing shall be thrown by the Lessee or others out of the windows of said building.

**4.13 Floor Coverings:** The Lessee, or any other person, shall not lay linoleum or other similar floor covering or attach or fix any covering to the walls or ceilings of the premises or any part thereof with paste material save and excepting one which may be easily removed with water. The use of cement or similar adhesive material is expressly prohibited. The tacking or fastening of any such material to the baseboard or molding is

P1438

expressly prohibited. Prior to termination of this lease, Lessee, at its own expense, may remove such floor, wall or ceiling coverings or materials, and upon doing so will restore the floor, wall or ceiling to the condition in which it existed at the time Lessee took possession under this lease, reasonable wear excepted. In the event Lessee removes such coverings and fails to restore the floor, walls or ceiling to that condition, Lessee on demand shall pay Lessor the cost of such restoration. If such covering is not removed prior to the termination of this lease, the covering shall become and remain the property of Lessor.

4.14 **Inspection:** The Lessor and Lessor's agents, janitors, workmen and engineers may retain and use a passkey to the premises described herein to enable them to examine said premises from time to time with reference to any emergency or for the general maintenance of said premises, or for the purposes of exhibiting the same (but only after notice of termination has been given as to the latter).

4.15 **Surrender:** At the expiration or sooner termination of this lease, the Lessee will surrender and deliver up said premises to the Lessor, or those having the Lessor's estate therein, in the same condition as the Lessee now receives said premises, ordinary wear and tear and damage, fire and the elements alone excepted.

5. **MUTUAL COVENANTS:** It is further mutually covenanted and agreed between the parties as follows:

5.1 **Suit:** If any suit or action or appeal thereof is instituted by either party for the enforcement of any covenant contained in this lease, the prevailing party shall recover, in addition to costs and disbursement, such attorney's fees as the court may adjudge reasonable to be allowed in such suit or action or appeal thereof.

5.2 **Default, etc.:**

5.2.1. **Default Remedies:** If the rent shall be in arrears for the period of five (5) days there shall be a late charge of $100.00; if paid late after the 10th of the month the late charge shall be $200.00; or if the Lessee fails to keep or perform any of the covenants or conditions of this lease; or if the leasehold interest of the Lessee shall be attached or levied on under execution; or if a petition is filed by Lessee for an arrangement with his creditors under Chapter 11 of the Bankruptcy Act; or if the Lessee shall be declared bankrupt or insolvent according to law; or if any assignment of the Lessee's property shall be made for the benefit of creditors, or otherwise, then, and in any of said events, the Lessor may, at the Lessor's option, at once, without notice to the Lessee or any other person, terminate this lease, and upon the termination of said lease at the option of the Lessor, as aforesaid, or at the expiration of this lease, and upon the termination of said lease by its terms, the Lessee will at once surrender possession of said premises to the Lessor and remove all of the Lessee's effects there from; and if such possession be not immediately surrendered, the Lessor may forthwith enter into and on said premises and repossess them as of the Lessor's former estate and expel the Lessee, or those claiming under the Lessee, and remove the effects of any of them, forcibly if necessary and lock said premises, without being deemed guilty in any manner of trespass and without prejudice to any remedies which might otherwise be used for arrears of rent or preceding

breach of covenant; (and in such events the Lessee expressly waives the service of any notice of intention so to terminate this lease or to retake the premises, and waives service of any demand for payment of rent or for possession, and of any and every other notice or demand prescribed by any law of the State of Washington).

5.2.2. **Payment of Lessor's Damages - Acceleration:**  Although this lease may be terminated or canceled as hereinbefore provided, the Lessee's obligation to pay rent and adjusted rent shall continue just as though this lease were in full force and effect, subject to credit as hereinafter provided in part 5.2.3.  Furthermore, if the Lessee shall fail to pay rent or additional rent, even after the Lessee's eviction or the termination or cancellation of this lease by the Lessor, the Lessor may declare an acceleration of the rent due or to become due for the original term of this lease or any extension thereof, in which event, all of the rent which is due or which would have been due in periodic monthly installments for the period of the original term of this lease or any extension thereof shall become due and payable immediately.  Such acceleration shall not become effective until twenty (20) days following the date that the Lessor either: (1) deposits a notice of such acceleration in the United States mail, addressed to the Lessee at the address of the demised premises, or the Lessee's last known address; or (2) the Lessor actually notifies the Lessee of such acceleration.  Actual delivery of a notice to an agent or employee of the Lessee at the demised premises, or the deposit of notice in the U.S. Mail if the Lessee does not appear to be regularly and continuously occupying the demised premises, shall be deemed notice to the Lessee of such acceleration.  The notice shall state the date upon which such acceleration shall become effective.  If at any time prior to the date upon which such acceleration becomes effective, the Lessee pays the Lessor all delinquent amounts of rent and additional rent and the Lessor's reasonable attorney's fees for the cost of preparation of the notice and the Lessor's costs of delivery of the notice, then in those events the notice shall not become effective to accelerate rent and additional rent.  Nothing herein shall be construed as limiting the right of the Lessor to declare acceleration as to other or further defaults.

5.2.3. **Mitigation of Damages:**  The Lessee shall receive a credit for rental income actually received by the Lessor upon a relating of the demised premises, but only as hereinafter provided.  Upon a reletting of the demised premises by the Lessor any rental income received during the original term of this lease herein or any extension herein provided, if any, shall be applied as follows:

(1) First, to the Lessor's reasonable legal expenses, costs and attorney's fees actually incurred after judgment;
(2) Second, to the Lessor's reasonable legal expenses, costs and attorney's fees arising but not yet reduced to judgment;
(3) Third, to the Lessor's reasonable costs arising after judgment in making the premises suitable for other tenants; except for reasonable wear and tear;
(4) Fourth, to the Lessor's reasonable costs in making the premises suitable for other tenants not yet reduced to judgment;
(5) Fifth, to Lessor's reasonable costs incurred after judgment, in making the premises suitable for other tenants;
(6) Sixth, the Lessor's reasonable costs, not yet reduced to judgment in reletting the premises;

P1440

(7) Seventh, the Lessor's reasonable costs incurred after judgment, in reletting the premises;

(8) Eighth, to the Lessor's reasonable costs of repair of any damage by Lessee;

(9) Ninth, to any reasonable additional rent arising before or after judgment;

(10) Tenth, to reasonable rent due from Lessee;

(11) Eleventh, to any other reasonable amount due Lessor by Lessee;

(12) Twelfth, to any other reasonable damage suffered by the Lessor because of the Lessee's breach;

(13) Thirteenth, to any other reasonable amount awarded the Lessor;

(14) Fourteenth, to satisfy any reasonable judgment obtained by the Lessor against the Lessee;

(15) Fifteenth, to reimburse the Lessee for reasonable rent paid by the Lessee for any period during which the premises were relet.

If the Lessor is awarded a judgment against the Lessee by a court which remains unsatisfied, it is the intent of this lease that the Lessee have credited in partial satisfaction of such judgment any income from a reletting of the premises during the original term of this lease or any extension thereto, provided for herein, if any, but only after first applying such income to and fully satisfying those items numbered (1), (3), (5), (7), (9), (10), (11), and (12), above. Further, if such judgment has been satisfied or if there is no judgment, it is the intent of this lease that the Lessee be repaid from the income of the reletting of the demised premises during the original term of this lease herein or extension thereto, if any, any amounts paid by the Lessee for rent during the period of such reletting, but only after first applying such income to and fully satisfying those items numbered (1) through (13) above.

5.3 **Insolvency and Damages:** In the event the Lessee shall be adjudged as bankrupt, or file a petition for an arrangement with his creditors under Chapter 11 of the Bankruptcy Act, or shall voluntarily offer to creditors terms of composition, or in case a receiver shall be appointed to take charge of and conduct the affairs of the Lessee, then, and upon the happening of any such events, and unless the trustee in bankruptcy or receiver or such creditors shall immediately thereafter assume and shall fulfill the Lessee's obligations hereunder, the Lessor may, without notice to Lessee or to anyone else, terminate this lease, and, in the event of such termination, Lessor shall have and shall be allowed, as a provable claim in such bankruptcy or creditor's or receivership proceeding, damages for Lessee's such breach of this lease, in an amount equal to the rent reserved in this lease for the residue of the term thereof, less the fair rental value of the premises for the residue of said term, after deducting from such fair rental value the reasonable cost and expense incurred by Lessor in releasing said premises, if re-leased during the remainder of said term.

5.4 **Light and Air:** This lease does not grant any rights of access to light and air over property.

5.5 **Alterations and Repairs:** In the event the Lessor, during the term of this lease, shall be required by the City of Vancouver, the order or decree of any court, or any other governmental authority, to repair, alter, remove, reconstruct, or improve any part of the demised premises or of the building of which said premises are a part, then such

repairing, alteration, removal, reconstruction or improvement may be made by and at the expenses of the Lessor without any interference or claim for damages by the Lessee, but there shall be only such an abatement or adjustment of rent as shall be in proportion to the interference with the Lessee's occupation of the premises; and the Lessor and Lessor's agents and employees shall have the right from time to time during the term of this lease to enter into and upon said premises for the purpose of maintaining said premises and making such alterations and repairs and doing such other things thereto and to the equipment or building in which said premises are located, as may become necessary or advisable, without any interference or claim for damages by the Lessee. However, such entries shall be reasonably scheduled to interfere as little as possible with Lessee's normal business operations.

5.6 **Damage to Premises:** In case the leased premises, or the building in which they are located, shall be destroyed or damaged by fire or other casualty and thus make the premises or building untenantable, the Lessor may at Lessor's option, exercised within thirty (30) days from the happening of the casualty, elect to terminate this lease or to repair said damages. If the Lessor does not so elect to repair said damages, or the building containing said premises shall have been wholly destroyed, the lease may be terminated by either party as of the date of such damage. If the Lessor elects to repair said damages, the Lessor shall, at its own expense, repair the damages to said leased premises and the Lessee shall be entitled to an abatement of the rent, or a fair and just proportion thereof, according to the nature of the damage sustained, until said premises have been made fit for occupancy and use.

If the Lessor becomes obligated to repair or reconstruct the premises or the building in which they are located, the Lessor shall be relieved of such obligation and the Lessor may terminate this lease if the Lessor is unable to obtain the necessary labor or materials, after making a diligent effort to obtain such labor or materials, or if the Lessor is unable to perform such obligation due to any cause beyond its control, including, but not limited to, strikes, lockouts and labor disturbances, acts of civil or military authorities, restrictions by municipal authorities, restrictions by municipal ordinances or federal of state statutes, and military activity.

Nothing contained herein shall cause the Lessor to be responsible to Lessee or any third party for loss or damage occasioned by the destruction of Lessee's fixtures, equipment or furnishings, the responsibility for which (including the obligation to insure) shall remain with the Lessee.

5.7 **Eminent Domain:** If the premises or the building in which the same are located, or any part thereof, shall be taken or acquired by any municipal or other corporation having the right of eminent domain, either under said right or by purchase without the exercise of said right, the Lessor may at its option terminate this lease without paying any consideration to the Lessee, except that any unearned rental in it's possession shall be refunded.

5.8 **Holding Over:** If the Lessee shall hold over after the expiration of the term of this lease, and shall not have agreed in writing with the Lessor upon the terms and provisions of a new lease prior to such expiration, the Lessee shall remain bound by all of the terms,

P1442

covenants and agreements hereof, except that the tenancy shall be one from month to month, and the monthly rental shall be the market rate in the Vancouver, Washington/Portland, Oregon metropolitan area at the time of such holding over by the Lessee.

5.9 **Electric Service:** The Lessor shall furnish electric current and lamps for light in such quantity and of such wattage as in the Lessor's opinion shall be necessary; and if the tenant demands additional electric service, it is understood that the same shall be paid for at the public utility's regular scheduled rate.

5.10 **Heat, Janitorial Service:** Heat will be furnished in accordance with the regular schedule of the building, normally Monday through Friday, 8 am to 6 pm and janitor service will be provided to the Lessee on a twice weekly schedule; but failure to furnish light or heat or janitorial service, when such failure is caused by accidents, strikes or other causes beyond the reasonable control of the Lessor, shall not make for an abatement of rent, nor release the Lessee from the prompt fulfillment of any of the covenants of the Lessee under this lease or render the Lessor liable for damages therefore. Tenant is responsible for breakdown and/or removal of all recyclables, except for occasional small cardboard boxes, which can be left in the suite and marked for "recycle."

5.11 **Air Conditioning:** The monthly rental rate herein stipulated includes air conditioning to be provided by the Lessor and it is understood and agreed that such air conditioning will be furnished in accordance with the regular schedule of the building, normally Monday through Friday, 8 am to 6 pm, but that failure to furnish air conditioning, when such failure is caused by accidents, strikes or other causes beyond the reasonable control of the Lessor, shall not make for an abatement of rent, nor release of Lessee from the prompt fulfillment of any of the covenants of the Lessee under this lease or render the Lessor liable for damages therefore.

5.12 **Furniture and Bulky Articles:** Safes, furniture or bulky articles shall be moved in or out of said premises only at such hours and in such manner as shall least inconvenience other tenants, and as the Lessor shall decide; and that no safe or other article of over 1,000 pounds shall be moved into said premises without the consent of the Lessor, the Lessor to have the right to fix the position of any article of weight in said premises. In Lessor's sole opinion, any damage to walls, floor or fixtures shall be promptly repaired by Lessee.

5.13 **Regulations:** The Lessor, for the proper maintenance of said building, the rendering of good service, and the providing of safety, order and cleanliness may make and enforce regulations appropriate for such purposes but not in enlargement of or inconsistent with the terms, covenants and conditions of this lease.

6. **Waiver:** The covenants of this lease are continuing covenants and the waiver, whether express or implied, by the Lessor of breaches of said covenants shall not be deemed a waiver of subsequent breaches thereof.

7. **Modification:** This lease may not be modified except by endorsement in writing attached to this lease, dated and signed by all the parties hereto, and Lessor shall not be

P1443

bound by any oral or written statement of any servant, agent or employee modifying this lease.

8. **Parties Affected:** The rights, liabilities and remedies provided for herein shall extend to the heirs, legal representatives, successors and, so far as the terms of this lease permit, assigns of the parties hereto; and the words "Lessor" and "Lessee" and their accompanying verbs or pronouns, wherever used in this lease, shall apply equally to all persons, firms or corporation which may be or become parties hereto.

9. **Rent Reserve:** Notwithstanding the provisions of paragraph 2 of this lease, First month's rent in the amount of $4,012.50 shall be paid upon the execution of this lease. Security deposit in the amount of $4,012.50 shall be paid upon the possession of the premises.

10. **Possession of Premises:** Lessee shall have the right of possession of the leased premises on or about –June 4, 2004, but no damage shall accrue if Lessor is unable to deliver said premises to the Lessee on that date.

11. **Proration:** First month's rent shall be prorated from the time the leased premises is made available to the Lessor to the end of the month, whether earlier or later than the effective date of this lease.

**Additional Provisions:** Lessee to occupy adjacent premises as modifications to space are completed. Tenant shall be allowed one (1) signboard on exterior sign at their own expense.

12. **Other Conditions.** Under terms mutually agreed to by Lessor and Lessee, Lessee shall have the option to renew lease. Notice to renew must be received in writing ninety (90) days prior to expiration.

IN WITNESS WHEREOF, the parties have executed this instrument in duplicate this _____ day of _____ , 2004, and corporate signature being by authority of the Board of Directors.

**CLARK COUNTY**

By: _____
Doug Johnston
Property Manager

**LESSEE**

By: _____  President

By: Pacific Real Estate Management

(Corporate Seal)

STATE OF WASHINGTON)
                  ) ss.
COUNTY OF ~~CLARK~~
        King          )

On this day personally appeared before me DOUG JOHNSTON, to me known to be the person named in and who executed the above and foregoing Lease and acknowledged to me that he signed the same as his free and voluntary act and deed as authorized agent for the Lessor for the uses and purposes therein mentioned.

GIVEN under my hand and official seal this _____ day of _____, 2004.


_____
Notary Public in and for the State
of Washington, residing at Vancouver


STATE OF WASHINGTON)
                  ) ss.
COUNTY OF ~~CLARK~~
        King          )

On this day personally appeared before me James W. Bowman JR. to me known to be the person named in and who executed the above and foregoing Lease and acknowledged to me that he signed the same as his free and voluntary act and deed as authorized agent for the Lessor for the uses and purposes therein mentioned.

GIVEN under my hand and official seal this 2nd day of July, 2004.


M. J. Yoon
_____
Notary Public in and for the State
of Washington, residing at ~~Vancouver~~
                          Tacoma



500 W. 8th Street
Parking Diagram
"Exhibit A"

Suite 100

revised 5/04

Suite 100/320 W. 8TH ST.
500 W. 8TH ST.

SIZES ARE APPROXIMATE



# EXHIBIT 3

**EXHIBIT FILED UNDER SEAL AND SUBMITTED SEPARATELY WITH DEFENDANTS' ADMINISTRATIVE MOTION TO FILE UNDER SEAL**

# EXHIBIT 4

# EXHIBIT FILED UNDER SEAL AND SUBMITTED SEPARATELY WITH DEFENDANTS' ADMINISTRATIVE MOTION TO FILE UNDER SEAL

# EXHIBIT 5

# EXHIBIT FILED UNDER SEAL AND SUBMITTED SEPARATELY WITH DEFENDANTS' ADMINISTRATIVE MOTION TO FILE UNDER SEAL

# EXHIBIT 6

## Jim Bowman

**From:** Jim Bowman [jimbowman@pacifictrustlending.com]
**Sent:** Wednesday, October 18, 2006 3:54 PM
**To:** 'Annie Chih'
**Subject:** RE: 10/30/06 Commission Report

Hi Annie,

I own branch 455 and 457. Please, send me the commission report for both branches each pay period. Thank you.



Jim Bowman, Manager
Pacific Trust Lending
2505 S. 320th St. Suite 260
Federal Way, WA 98003

**OFC: 253-839-9088**
**FAX: 253-839-9093**

TOLL FREE: 866-958-7878

-----Original Message-----
**From:** Annie Chih [mailto:achih@cmgmortgage.com]
**Sent:** Wednesday, October 18, 2006 2:01 PM
**To:** Jim Bowman
**Subject:** 10/30/06 Commission Report
**Importance:** High

Hello,

My name is Annie Chih with CMG Mortgage, Inc. Beginning October 1, 2006, I am processing all of your commissions. Please continue to send your brokered files to my attention at the San Ramon office. It is not necessary to send me files for any banked loans, please just fax your closed loan form to me at 925-983-3184 or email to achih@cmgmortgage.com.

Attached is a copy of your branch commission report for the 10/30/06 pay period. Please review and email me if you have any corrections or questions by 12:00 PM on Friday October 20, 2006. Please be aware that I am currently working on reviewing the year to date totals for accuracy and some information may be incorrect. I expect it to be completed before the next pay period.

Thank you for your cooperation and understanding during the transitional period. Should you have any questions or concerns please feel free to contact me. I look forward to working with you.

12/18/2007

P325

# EXHIBIT 7

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

SAN FRANCISCO DIVISION

---o0o---

JAMES W. BOWMAN, JR. and
PACIFIC REAL ESTATE MANAGEMENT
COMPANY, INC., a Washington
Corporation,

          Plaintiff,

vs.                    Case No. C-07-3140-SI

CMG MORTGAGE, INC., a California
Corporation; CMG MORTGAGE, INC.,
d/b/a PACIFIC GUARANTEE MORTGAGE;
CMG MORTGAGE SERVICES, INC., a
California corporation; CMG
MORTGAGE SERVICES, INC., d/b/a
PACIFIC GUARANTEE MORTGAGE,
Inclusive,

          Defendants.

_____/

DEPOSITION OF PAUL CHEVEZ

Tuesday, March 18, 2008

Reported by:
CYNTHIA L. THOMAS
CSR 2950

NANCY SORENSEN
Court Reporting Services
41 Sutter Street, Suite 505
San Francisco, California 94104
(415) 986-4624

1

1    Q.      Okay.  Well, you said that Human Resources

2    handles certain things.  What sort of things are you

3    referring to?

4    A.      If there was any type of labor dispute or

5    anything like that, Human Resources would handle it.  It

6    wouldn't be something I would be involved in.

7    Q.      Has Human Resources been involved in handling

8    Mr. Bowman's dispute?

9    A.      I think recently Human Resources has looked at

10   it, yes.

11   Q.      Okay.  What makes you believe that Human

12   Resources has looked at this suit?

13   A.      Because Lorraine from our Human Resources

14   Department asked me if I have a copy of the Complaint.

15   Q.      How many conversations have you had with

16   Lorraine about this suit?

17   A.      I believe that was the extent of the

18   conversation.

19   Q.      When did she ask you for a copy of the

20   Complaint?

21   A.      Probably a few weeks ago.

22   Q.      Have there been any other lawsuits brought by

23   any other employees against CMG?

24   A.      Again that's, I believe, more of a Human

25   Resource question.  Not that I can think of off the top

1   of my head.

2   Q.      Can you tell us what the marketing credits are

3   that the branches are eligible for?

4   A.      I don't know exactly how that is handled, no.

5   Q.      Do you know what they are?

6   A.      My understanding of is that there is a credit

7   for loans that are funded through our Mortgage Banking

8   Division, but I don't know anything else.  That's just

9   what I've heard about the marketing credits.

10  Q.      How are these credits accounted for?  Do you

11  know?

12  A.      No, I do not know.

13  Q.      Isn't that an accounting function?

14  A.      Well, when you said "accounted for," I don't

15  know.  Does that mean how is it tracked?  How is it -- I

16  guess that was a vague question.  I wasn't quite sure.

17  Q.      Do the credits translate to a monetary value?

18  A.      The credits could translate to a monetary

19  value, yes.  There would be a book transfer from the

20  Accounting Department -- in the Accounting Department, if

21  given the information from the Marketing Department.

22  Q.      What would that transfer look like as you just

23  described what that process would be?

24  A.      My belief would be that it would show as a

25  contra expense account, so kind of a negative expense on

200

1    the Financial Statements.

2    Q.       Is that something you could possibly explain to

3    me so I'll understand it, or?

4    A.       I'm sorry.  What a con -- so if an expense

5    shows up as a positive number on a Financial Statement,

6    it would be a negative number, so it wouldn't be taken

7    away from revenue.  It would technically be added to the

8    net of the branch.

9    Q.       When would it be added to the branch's net?

10   A.       Normally, I believe if the Marketing Department

11   has submitted it to Accounting, then it would be.  I have

12   not been very involved in the marketing -- any marketing

13   credits for the branches.

14   Q.       Who would be involved in this accounting of a

15   book transfer?

16   A.       I believe the Marketing Department would be

17   involved in the actual credit in defining or determining

18   how much the credit is, and then Patricia would be doing

19   the entry for the credit.

20   Q.       Is this entry or transfer something that you

21   have ever discussed with Patricia?

22   A.       The one for the marketing credit in general or

23   for Mr. Bowman, or?

24   Q.       Let's start with in general.

25   A.       In general, we've probably discussed marketing

201

1   credits, but not real conversation about it, not

2   definitions or anything.

3   Q.        Okay. And what about as to Mr. Bowman?

4   A.        I did ask Patricia, after learning about the

5   Complaint, if Mr. Bowman had an outstanding marketing

6   credit, and I believe her answer was yes.

7   Q.        When was this?

8   A.        I don't know the exact time, but it was

9   probably after the review of the Complaint.

10  Q.        Are we talking about this year?

11  A.        This year, yes.

12  Q.        2008?

13  A.        2008, yes.

14  Q.        So within the last month or months?

15  A.        Last few months.

16  Q.        Was this something that you asked on your own

17  initiative or were you asked to look into the matter?

18  A.        I think it's something I asked on my own

19  initiative.

20  Q.        Okay. What did you do after you received this

21  information?

22  A.        I know that I've given -- I've talked to

23  Mr. George about that.

24  Q.        So you told Mr. George that Patricia Mitchell

25  had told you that Mr. Bowman had some credit for

# EXHIBIT 17



**C·M·G**
MORTGAGE, INC.

# EMPLOYMENT APPLICATION
*CMG Mortgage is an Equal Opportunity Employer*

**Please Print all information CLEARLY**        Date: 12/3/03

Name ___Bowman___ ___James___ ___W___
          Last                    First                            Middle

Present Address (Physical Location, No PO boxes, please)
___3623 42ND Av NE TACOMA___ ___WA___ ___98422___
     Street                              City             State        Zip

Permanent Address if different from above:

_____
     Street                    City              State        Zip

Daytime Phone (253) 839-9087          Evening Phone (253) 405-1827

Date of Birth: ___3/1/64___   Ⓜ  F     Social Security Number: 539 82 5988

**EMPLOYMENT DESIRED**

Position applying for: ___Manager___

Have you every applied to or worked for CMG Mortgage, Inc. before?        Yes_____   No_✗_

If yes, when? _____

Do you have any friends or relatives working for CMG Mortgage, Inc?      Yes_✗_   No_____

If yes, state name (s) and relationship ___FORMER COLLEAGUES OF PLM/RPC___

_____

Why are you applying for work at CMG Mortgage, Inc.? ___NEW BRANCH___

**PERSONAL INFORMATION**

If hired, would you have a reliable means of transportation to and from work?      Yes_✓_   No_____

Are you at least 18 years old?      Yes_✓_   No_____
(If under 18, hire is subject to verification that you are of minimum legal age.)

If hired, can you present evidence of U.S. citizenship or proof of your legal right
to live and work in the United States?      Yes_✓_   No_____

Are you able to perform the essential functions of the job for which you
are applying, either with or without reasonable accommodation?      Yes_✓_   No_____

If no, describe the functions that cannot be performed_____

Have you ever been convicted of a criminal offense (felony or serious misdemeanor)? Yes_____    No _____
(Convictions for marijuana-related offenses that are more than two years old need not be listed.)

If yes, state nature of the crime (s), when and where convicted and disposition of the case.

_____

_____

(Note: No applicant will be denied employment solely on the grounds of conviction of a criminal offense. The nature of the offense, the date of the offense, the surrounding circumstances and the relevance of the offense to the position(s) applied for may, however, be considered.)

## EDUCATION, TRAINING AND EXPERIENCE

|  | Name and Address | Years Completed | Graduate? | Diploma or Degree |
|---|---|---|---|---|
| High School | JFK Burien WA | 4 | Yes |  |
| College/University | U of W, Seattle WA | 5 | Yess | B.S PSYCH/BS BE |
| Business College |  |  |  |  |
| Trade/Vocational |  |  |  |  |

## EMPLOYMENT HISTORY

List below all present and past employment starting with your most recent employer (last five years is sufficient). Account for all periods of unemployment. You must complete this section even if attaching a resume.

| Employer Name PACIFIC TRUST LENDING | Type of Business MORTGAGE |
|---|---|
| Address 2505 S. 328th St, #260 Fed WA 98003 | Phone 253-839-9088 |
| Your Position & Duties Manager | Supervisors Name Me |
| Dates of Employment FROM 9/15/05 TO PRESENT | Salary STARTING 8,500/mo ENDING + commissions |
| Reason for Leaving Net Branch | |
| Can we contact this employer for a reference? YES / NO | |

| Employer Name Mortgage Market | Type of Business Mortgage |
|---|---|
| Address Federal Way WA | Phone |
| Your Position & Duties Manager / Regional Supervisor | Supervisors Name Melissa Stephlin |
| Dates of Employment FROM 11/97 TO 9/99 | Salary STARTING Cev Base + commis sion ENDING |
| Reason for Leaving Net Branch | |
| Can we contact this employer for a reference? YES / NO | |

## EMPLOYEMENT HISTORY (cont)

| Employer Name | | Type of Business | | |
|---|---|---|---|---|
| Address | | | Phone | |
| Your Position & Duties | | | Supervisors Name | |
| Dates of Employment FROM          TO | | Salary STARTING | ENDING | |
| Reason for Leaving | | | | |
| Can we contact this employer for a reference? | | YES | NO | |

## REFERENCES
List below three persons not related to you who have knowledge of your work performance within the last three years.

Name _Steve Knudtsen_____

Address_____
          Street                          City              State          Zip

Telephone No. (____)_____ Number of Years Acquainted __6___

Occupation _loan officer_____

How do they have knowledge of your work performance? _Co-worker_____

Name_____

Address_____
          Street                          City              State          Zip

Telephone No. (____)_____ Number of Years Acquainted_____

Occupation _____

How do they have knowledge of your work performance?_____

Name_____

Address_____
          Street                          City              State          Zip

Telephone No. (____)_____ Number of Years Acquainted_____

Occupation _____

How do they have knowledge of your work performance?_____

## EMERGENCY INFORMATION

Please give us two people that we can contact in the event of an emergency:

Name: Kristine Bauman          Relationship Wife

Phone 253-927 2497    Cell 253-C40-8314    Pager

Address Same

Name: Nora Bauman             Relationship Mother

Phone 253 839 9237 Cell          Pager

Address

- - - - - - - - - - - -

### Please Read Carefully, Initial Each Paragraph and Sign Below

I hereby certify that I have not knowingly withheld any information that might adversely affect my chances for employment and that the answers given by me are true and correct to the best of my knowledge. I further certify that I, the undersigned applicant, have personally completed this application. I understand that any omission or misstatement of material fact on this application or on any document used to secure employment shall be grounds for rejection of this application or for immediate discharge if I am employed, regardless of the time elapsed before discovery. _____

I hereby authorize CMG Mortgage, Inc. to thoroughly investigate my references, work record, education and other matters related to my suitability for employment and, further, authorize the references I have listed to disclose to CMG Mortgage, Inc. any and all letters, reports and other information related to my work records, without giving me prior notice of such disclosure. In addition, I hereby release CMG Mortgage, Inc., my former employers and all other persons, corporations, partnerships and associations from any and all claims, demands or liabilities arising out of or in any way related to such investigation or disclosure. _____

I understand that nothing contained in the application, or conveyed during any interview that may be granted or during my employment, if hired, is intended to create an employment contract between me and CMG Mortgage, Inc. In addition, I understand and agree that if I am employed, my employment is for no definite or determinable period and may be terminated at any time, with or without prior notice, at the option of either myself or CMG Mortgage, Inc., and that no promises or representations contrary to the foregoing are binding on CMG Mortgage, Inc. unless made in writing and signed by me and CMG's designated representative.

Applicant's Signature: _____

Print Name: Tim Bauman

Date: 12/3/08