| | |
|---|---|
| 1 | David R. Medlin      (SBN 77417)<br>G. Bradley Hargrave   (SBN 173911) |
| 2 | Joshua A. Rosenthal   (SBN 190284) |
| | MEDLIN & HARGRAVE |
| 3 | A Professional Corporation |
| | One Kaiser Plaza, Suite 1305 |
| 4 | Oakland, CA  94612 |
| | Telephone:   (510) 832-2900 |
| 5 | Facsimile:   (510) 832-2945 |
| | E-mail:   *jrosenthal@mhlawcorp.com* |
| 6 | |
| | Attorneys for Defendants |
| 7 | |

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

| | | |
|---|---|---|
| 10 | James W. Bowman, Jr. and Pacific Real Estate Management Company, Inc., a Washington Corporation, | Case No.: C 07 3140 SI |
| 12 | Plaintiffs,<br>vs. | DECLARATION OF ATTORNEY JOSHUA A. ROSENTHAL IN SUPPORT OF DEFENDANTS' OBJECTION TO EVIDENCE IN SUPPORT OF PLAINTIFFS' MOTION FOR SUMMARY ADJUDICATION |
| 14 | CMG Mortgage Inc., a California Corporation; CMG Mortgage, Inc., d/b/a Pacific Guarantee Mortgage, CMG Mortgage Services, Inc., a California Corporation, CMG Mortgage Services, Inc. d/b/a Pacific Guarantee Mortgage, | |
| 16 | Defendants. | Date:   July 25, 2008<br>Time:   9:00 a.m.<br>Dept:   Courtroom 10<br>Judge:  Honorable Susan Illston |
| 18 | CMG Mortgage Inc., a California Corporation | File date: June 14, 2007<br>Trial date: August 25, 2008 |
| 19 | Counter-Claimant, | |
| 21 | vs. | |
| 22 | James W. Bowman, Jr., an individual, | |
| 23 | Cross-Defendant. | |

**DECLARATION OF JOSHUA A. ROSENTHAL**

I, Joshua A. Rosenthal, declare:

1.      I am an attorney at law duly licensed to practice before this courtand an attorney with

1

1 Medlin & Hargrave, a P.C.

2     2.    On July 5, 2008, I took the deposition of Person Most Knowledgeable of the
3 relationship between plaintiffs and Sierra Pacific Bowman, William Osborn. Attached hereto as
4 Exhibit 23 is a true and correct copy of excerpts from the court reporter's transcript of his
5 deposition.

6     I declare under penalty of perjury under the laws of the United States that the foregoing is
7 true and correct, and if sworn as a witness, I could and would testify competently thereto.

8     Executed at Oakland, California, on July 14, 2008.

10                                                     /s/
                                              Joshua A. Rosenthal

2

DECLARATION OF JOSHUA A. ROSENTHAL IN SUPPORT OF OPPOSITION TO MOTION FOR SUMMARY ADJUDICATION  C 07 3140 SI
M:\CMG\85-0706-02 Bowman\Motion\Plaintiff's MSA 06.23.2008\Opposition\dec of jar in support of obj to ev.wpd

```
 1                UNITED STATES DISTRICT COURT
 2                NORTHER DISTRICT OF CALIFORNIA
 3                   SAN FRANCISCO DIVISION
 4
   JAMES W. BOWMAN, JR. and PACIFIC   )
 5 REAL ESTATE MANAGEMENT COMPANY,    )
   INC., a Washington Corporation,    )
 6                                    )
                     Plaintiffs,      )
 7                                    ) No. C-07-3140-SI
             vs.                      )
 8                                    )
   CMG MORTGAGE, INC., a California   )
 9 Corporation; CMG MORTGAGE, INC.,   )
   d/b/a PACIFIC GUARANTEE MORTGAGE,  )
10 CMG MORTGAGE SERVICES, INC., a     )
   California Corporation; CMG        )
11 MORTGAGE SERVICES, INC., d/b/a     )
   PACIFIC GUARANTEE MORTGAGE, CMG    )
12 FINANCIAL SERVICES, INC., a        )
   California Corporation,            )
13 CHRISTOPHER M. GEORGE, an          )
   individual,                        )
14                                    )
                     Defendants.      )
15 _____)
16
17                     DEPOSITION OF
                       WILLIAM OSBORN
18                 SACRAMENTO, CALIFORNIA
                      JULY 8, 2008
19
20
   ATKINSON-BAKER, INC.
21 COURT REPORTERS
   (800) 288-3376
22 www.depo.com
23 REPORTED BY:  DIANA G. RINCON, CSR 9417
24 FILE NO.:  A205970
25
```

1  point, the conversation kind of ended with him still
2  making a decision of what he wanted to do and us still
3  making a decision what we wanted to do.
4      Q.    Do you recall what the questions were
5  that you had?
6      A.    I did ask him who he was with, and he did
7  indicate that he was -- was currently with CMG, that
8  they had made some changes that he was not agreeable to
9  and was feeling like he was probably going to leave and
10 do something else.
11     Q.    Do you recall what he said those changes
12 were that he didn't like?
13     A.    I didn't know other than he said it
14 was -- there was changes with his agreement, whatever
15 that was.
16     Q.    Do you recall what other questions you
17 asked him?
18     A.    I asked him about production.  I asked
19 him about his employment history, typical questions you
20 would ask anyone you might interview to fill a
21 position.
22     Q.    Can you recall any other questions you
23 asked him?
24     A.    Not -- not directly, no.
25     Q.    Do you recall if you had any questions

1  regarding pipeline loans with CMG?
2       A.    I think the subject normally comes up.  I
3  don't recall any specific discussions, but normally if
4  we were to have issues of that nature come up in a
5  discussion, we would usually direct them that whether
6  you are through closing out loans with your current
7  employer, that was then the time to make a switch.  We
8  would usually talk about -- especially loans that were
9  already at that company needed to stay at that company,
10 those types of conversations, and we usually -- but,
11 you know.
12      Q.    Do you recall if --
13      A.    That was in the past, but that usually is
14 what that is.
15      Q.    Do you recall if you had a conversation
16 like that with Mr. Bowman?
17      A.    Yes.  I believe I did.
18      Q.    Do you think it was that second
19 conversation that you had or was it a different one?
20      A.    I don't know for sure.
21      Q.    Did he tell you anything in regard to
22 pipeline loans that he may have had with CMG?
23      A.    Not at that time, no.
24      Q.    At any time?
25      A.    Yes.  In a subsequent conversation prior

1  to them becoming a branch, it was basically I believe
2  the next call back he wanted to make a change, and he
3  was interested in joining Sierra Pacific.  We asked him
4  to complete our application packet and send the
5  information we required.  At that time, there was some
6  discussion about loans he had, and at that time he had
7  informed me that CMG had terminated him, which I was
8  somewhat surprised at, but he was not in agreement with
9  signing the new agreement apparently that had been
10 proposed to him and they -- the way he explained it to
11 me is his employer had terminated it, and I said,
12 "Well, okay.  Where does that leave you?"  And he says,
13 "Well, they won't take my loans."  That's where it was
14 kind of left.  They had cut him off, and that was the
15 end of it.
16       Q.    Did you understand what he meant when he
17 said they won't take his loans?
18       A.    It was my understanding that they just
19 weren't going to do business with him anymore.
20       Q.    Did you understand that to mean that
21 loans that he had started were loans that he could not
22 close, that they wouldn't allow him to close with them?
23       A.    That was my understanding, yes.
24       Q.    Do you recall when this third
25 conversation took place?

 1       A.      Not exactly, no.  I would have said
 2  probably within -- within maybe a week to two weeks of
 3  his start date.
 4       Q.      Did he give you any details as to --
 5  other than saying they won't take his loans, did he
 6  tell you any more on that topic?
 7       A.      I could -- the only thing I can say is
 8  that the impression that I was left with in
 9  conversation with Jim was that, one, he was surprised
10  at the immediate termination.  He was surprised at the
11  fact that he had just been cut off.  I mean that's the
12  only reaction I can give you is that there was a sense
13  of he was kind of caught off guard.  And he was
14  concerned about not necessarily loans he had in
15  process, but he had obviously originators, have done
16  prequalifications for borrowers, they have things that,
17  you know, they want to know where they're going to go
18  with their business, and so he was obviously very
19  concerned.
20       Q.      Sorry.  I didn't mean to cut you off.
21       A.      That's --
22       Q.      So we got bits and pieces of the second
23  and third conversation.  You believe -- I want to see
24  if I'm getting a timeline to the extent we could.  The
25  first one you believe may have been in or about

22

1  December 2006.  The second conversation was a few weeks
2  after that.  Do you recall whether that was still in
3  December 2006?
4          A.      It would have been still in December.
5          Q.      And the third one, do you think that was
6  in December?  Do you think it was in January?
7          A.      I think it was around the holidays.
8          Q.      Like the third one was maybe the end of
9  December?
10         A.      Somewhere in that time period as well.
11 And again, I can't be exactly but --
12         Q.      So you think the first one probably
13 beginning of December?
14         A.      Early December.
15         Q.      And the second one was maybe middle of
16 December?
17         A.      Yeah.  Right.
18         Q.      Did you do any -- well, did you do any
19 investigation into Mr. Bowman's claim that CMG wouldn't
20 take his loans?  Did you take his word for it?  Did you
21 call CMG or call somebody?
22         A.      No, I did not.
23         Q.      Do you know if anybody at Sierra Pacific
24 attempted to get in touch with CMG regarding these
25 loans?

1     A.    I do not know.
2     Q.    So I just want to make sure on the --
3  with respect to the second conversation as to whether I
4  have everything that you remember talking to Mr. Bowman
5  about. You talked about the questions you had for him
6  were regarding his production and his employment
7  history. Do you remember the questions that he had for
8  you?
9     A.    Not specifically, no.
10    Q.    Do you have any understanding as to any
11 of the conversations that you had with Jim Bowman as to
12 the things that he didn't like about CMG's new
13 contract, the one he didn't want to sign?
14    A.    No, I don't.
15    Q.    As to the --
16    A.    Specifically, no.
17    Q.    As to the third conversation, I want to
18 make sure I understand everything that you talked about
19 in that conversation. Mr. Bowman said he wanted to
20 make a change to Sierra Pacific because he was
21 terminated by CMG, and he said that CMG would not take
22 his loans. Do you recall anything else you discussed
23 with him in that conversation?
24    A.    Not -- not specifically, other than he
25 wanted to get things done as soon as possible, and I

1  informed him we needed the application package and go
2  through the normal review process, which didn't take
3  long, but it would take a week or so.
4      Q.   Did he tell you at that point when his
5  effective termination date was with CMG?
6      A.   No.  I don't recall.
7      Q.   Did you have any understanding when you
8  talked to him in that third conversation that
9  termination was effective immediately?
10     A.   I don't recall.  It sounded like it, but
11 I don't recall specifically what --
12     Q.   Did you have any discussion with
13 Mr. Bowman in that third conversation as to why he was
14 terminated?
15     A.   Only that he did not want to sign the new
16 agreement.
17     Q.   Can you recall anything else that you
18 discussed in that conversation?
19     A.   No.
20     Q.   Can you recall the next conversation that
21 you had with Mr. Bowman?
22     A.   I believe that once we had received the
23 package, we had reviewed it.  We've done background
24 checks.  We've done all of our normal process.  And we
25 had approved his application, and at that point then it

1  minimum balance?  Is that a way that the minimum
2  balance can be established?
3      A.    Basically what it says is the manager
4  should not take out in the form of income funds that
5  would take that $3,000 -- that would take the balance
6  below $3,000 is what it is indicating.
7      Q.    If a branch is terminated or leaves
8  Sierra Pacific, does that $3,000 stay with Sierra
9  Pacific, or does it go with the departing branch
10 manager?
11     A.    It is paid out -- any balance, positive
12 balance is paid out to the manager, and I believe the
13 agreement spells it out after 60 days if there is no
14 other bills that are needing to be paid by that branch
15 that the balance would be paid out.
16     Q.    Do you know if at any time after signing
17 these agreements Jim Bowman -- the required minimum
18 balance was more than $3,000?
19     A.    Was it more than $3,000?
20     Q.    Yeah.
21     A.    Yes.
22     Q.    How was that established?
23     A.    Well, the manager doesn't have to take it
24 out as income every month.  He can leave it in or take
25 out as he wishes.

```
 1          Q.    Do you know if Sierra Pacific has
 2   required him at any time to keep a minimum balance of
 3   more than $3,000?
 4          A.    No.
 5          Q.    Did you know at the time that Jim Bowman
 6   signed the Exhibit 2, the Sublease, do you know -- did
 7   you know that he was still working as a branch manager
 8   for CMG?
 9          A.    No, I do not.
10          Q.    Did you know at the time he signed the
11   Loan Officer Agreement he was still a branch manager
12   for CMG?
13          A.    No.
14          Q.    Did you know at the time that he signed
15   the Branch Manager Agreement that he was still an
16   officer for CMG?
17          A.    No.
18          Q.    Do you know that now?
19          A.    No.  I don't know.  Are you telling me
20   that now?
21          Q.    Well, let's say for the sake of argument
22   that his termination was effective January 31st, 2007
23   and more than for the sake of argument that was his
24   termination date.
25          A.    I'm not -- I was not aware of that.
```

```
 1        Q.    And just so I'm sure, the only
 2   conversations that you can recall having with
 3   Jim Bowman regarding his termination date from CMG was
 4   the one where he told you he was terminated, but you
 5   didn't have a discussion with him as to when it was
 6   effective?
 7        A.    I do not recall.
 8        Q.    Okay.  Do you know if there are any FHA
 9   requirements regarding exclusive employment with one
10   entity to be an FHA approved mortgagee?
11        A.    Yes.
12        Q.    Would there be a -- would Sierra Pacific
13   have a problem with a loan officer who is employed by
14   two different companies at the same time?
15        A.    Yes, we would.
16        Q.    The mortgage industry has been a little
17   bit shaky for the past year.  Does that sound like a
18   good assessment?
19              MR. EATON:  It's vague and ambiguous.
20              THE WITNESS:  It's in every newspaper and
21   on television.
22        Q.    BY MR. ROSENTHAL:  You are aware that
23   mortgage lenders and mortgage brokers have been dealing
24   with repurchased demands of loans that have been
25   defaults or allegations of fraud?
```