LAW OFFICES OF
# ALAN F. COHEN

101 MONTGOMERY STREET
SUITE 2050
SAN FRANCISCO, CA 94104
TEL: 415.984.1943
FAX: 415.984.1953
cohenlaw@mindspring.com

July 14, 2008

**Via e-Filing and U.S. Mail**

Honorable Susan Illston
United States District Court
Northern District of California
450 Golden Gate Ave.
Courtroom 10, 19th Floor
San Francisco, CA 94102

> Re: *Bowman et al. v. CMG Mortgage, Inc. et al.* – Case No. 3:07-cv-03140-SI
>
> Plaintiffs' Response to Motion for Protective Order/Modification Re: Subpoena Issued by Plaintiffs on Boliard, Takasugi & McBride

Dear Judge Illston:

Defendants objected by this motion to Plaintiffs' subpoena of documents from their outside accountants. Plaintiffs will respond in turn to each category of documents to which Defendants objects.

1. **Request No. 10**

This Request seeks documents relating to categories of income "earned and derived from the Branches" that Plaintiffs seek to recover under their causes of action for breach of contract. Defendants objected on the ground that they do not believe Plaintiffs are entitled to these amounts, that is, Defendants deny the allegations.

The Court has already decided the issues raised by Defendants' objections in Plaintiffs' favor. In the Court's order granting Plaintiff's Motion to Compel dated July 9, the Court stated "Defendants' objection would require the Court to determine the merits of plaintiffs' claims with regard to this income, and as such is not appropriate. If plaintiffs are correct that they may be entitled to a share of this income, evidence regarding the income would be relevant, and it is undisputed that there is no other way for plaintiffs to obtain the information." As Defendants themselves note in their footnote 1, this Request seeks documents concerning information the same information the Court has already ordered produced.

2. **Request No. 11**

This request seeks documents evidencing capital contributions to Defendants. Plaintiffs' cause of action for breach of fiduciary duty alleges that Defendants wrongfully took money from Plaintiffs in the form of Reserves and security deposits, then mingled that money with Defendants' other funds and used it to operate their business and fund mortgages. In other words, Defendants capitalized their business with Plaintiffs' money. Since this gives rise to a cause of action for breach of fiduciary duty under both the common law and Labor Code § 405, Plaintiffs are entitled to seek all equitable remedies

arising from such breach.

This Request goes to two issues that will have to be decided at trial. Since Plaintiff involuntarily capitalized Defendants' business, he may be a constructive owner, or at least entitled to a constructive trust or equitable lien over a portion of the business. Determining what percentage that portion comprises requires an analysis of what other capital the business has received. Secondly, Plaintiffs are entitled to recover other remedies available to a wronged beneficiary, including any profit made by the trustee through the breach of trust, with interest, and any lost profit that would have accrued to the trust estate. Prob. Code § 16440(a). Measuring these profits requires analyzing what percentage of the business capital used to fund loans can be traced to Plaintiffs. This is sufficient good cause to require Defendants and their accountant to provide the businesses' capital history. Defendants' privacy is sufficiently protected by the stipulated protective order the parties have entered into and the Court has signed.

### 3.  Request Nos. 12-16, 19

These documents seek audit information about Defendants. Plaintiffs allege that Defendants "net branching" arrangement is unlawful under HUD mortgagee guidelines. Plaintiffs also allege that Defendants have harvested the Branch Managers' Reserves, mingled them with Defendants' operating funds, and used them to fund their operations. As a mortgage lender, Defendants are required under the terms of their Department of Corporations Residential Mortgage Lender license to undergo annual audits.

Given the broad scope of discovery, and the difficulty in tracing these funds, Plaintiffs are entitled to learn whether these audits reflect the unlawful practices alleged in the pleadings, whether Defendants have taken any steps to address these practices, and whether Defendants have instead proceeded with these unlawful practices despite notice from their auditors.

Plaintiffs are also entitled to review these audit-related documents to calculate their remedies for Defendants' breach of fiduciary duty. A key problem in this case is following the trail of the Reserves from the time they passed from Plaintiffs, through Defendants' accounts, through their use in Defendants' operations, up to their present form and location. Defendants' counsel has already informed Plaintiffs that Defendants are allegedly having difficulty determining what bank account records will demonstrate this information, even though the Court ordered them to be produced by Order of June 20, 2008.[1] Plaintiffs hope that these additional documents from the auditors will make this inquiry simpler; it may even prove impossible to conduct this inquiry without the audit documents. Again, Plaintiffs have no other means of obtaining this information other than from Defendants and their accountants, and Defendants' proprietary and privacy interests will be protected by the parties' stipulated protective order.

### 4.  Request Nos. 18 and 21

These Requests seek records evidencing Defendants' practices in accounting for Reserves obtained from <u>all</u> Branch Managers. Plaintiff has alleged a cause of action under California's Business and Professions Code § 17200, the Unfair Competition Law, and intends to amend his complaint to allege claims under Labor Code § 2699, the Labor Code Private Attorney General Act. Under these causes of action, Plaintiff has standing to seek remedies on behalf of himself and all other Branch Managers aggrieved by Defendants' unlawful use of the Reserves.

---

[1] Defendants have not yet produced any documents in response to the Court's two previous Orders compelling production.

Plaintiff must be allowed to conduct discovery into these Reserves in order to prosecute these causes of action. With a current trial date pending on August 25, and discovery about to be cut off, this discovery cannot be postponed any further.

Defendants' practices with regard to these other Reserves are also relevant to showing that Defendants have engaged in a systematic pattern of unlawful and unfair conduct, and that they should be subjected to punitive damages. Given that Plaintiffs have more than made a *prima facie* showing that these practices were unlawful and widespread, they must be entitled to discover all evidence necessary to prove liability for punitive damages at trial.

### 5. Request Nos. 22-26

The Court has already ordered Defendants to produce all bank records demonstrating Defendants' possession and use of Plaintiffs' Reserves. These are simply more specific versions of the Requests the Court has already enforced. They seek documents from specific bank accounts identified in deposition testimony as possibly containing the Reserves and being used to fund loans from these Reserves. See excerpts from Deposition of Paul Chevez attached as Exhibit A. Again, the evidence suggests that Defendants mingled Plaintiffs' Reserves with Defendants' operating funds and used them to fund loans, thereby unjustly enriching themselves, breaching their fiduciary duty to the Branch Managers, violating California's Cash Bond Law and other provisions of the Labor Code.

Plaintiffs must be allowed the opportunity to study these bank records. The documents are relevant to liability, because they will likely indicate whether or not the Reserves have indeed passed through Defendants' operating accounts and into the mortgage funding process. Moreover, these documents are absolutely necessary to determine the proper remedy that should be awarded. The Court and jury will have to determine how Plaintiffs' money has been used and to what extent Defendants have unjustly profited from their breach of trust. The factfinder requires this information in order to determine what amount Plaintiffs should be awarded in the form of profits wrongly taken by Defendants from their misuse of Plaintiffs' Reserves. Without these documents it may be impossible for Plaintiff to determine with any accuracy how the trust has been abused. Did these accounts hold only Plaintiffs' Reserves, or other funds as well? What volume of loans were Defendants able to generate by using Plaintiffs' Reserves? What profit did that generate for Defendants? Plaintiffs must be allowed to review these records to answer these questions and others related to these causes of action.

### 6. Request No. 27

This Request seeks documents setting forth the terms and conditions of any line of credit used by CMG from 2003 to the present. This is relevant because it will help determine how Defendants misused and benefited from the Reserves. Paul Chevez testified in his deposition that CMG funded loans using lines of credit that required that CMG put up some 3% of the loan costs in cash, with the rest funded by the lines of credit. See Exhibit A. If that is the case, the availability of Mr. Bowman's $39,682.24 in Reserves alone could allow Defendants to borrow sufficient money to finance $1,322,741.33 in loans on any given day, multiple times per month.

Plaintiff must be allowed to determine the precise terms of these lines of credit so that they can then determine how his Reserves have been used and what remedies should be awarded. Mr. Chevez's testimony about the 3% cash requirement for funding loans was helpful but somewhat vague, and Plaintiffs are entitled to learn the precise terms of these lines of credit.

      In sum, Plaintiff are only seeking sufficient discovery to allow them to proceed with proving their case. Defendants' own actions, and in particular their breach of fiduciary duty and violation of California's Cash Bond law, require the depth of discovery sought by this subpoena. The parties have entered into a stipulated protective order that protects any concerns that may exist about the privacy of these records. Plaintiffs thank the Court for its continued careful attention to the details of this case.

      Respectfully submitted,

      Alan F. Cohen

# Exhibit A

```
 1                  UNITED STATES DISTRICT COURT
 2                 NORTHERN DISTRICT OF CALIFORNIA
 3                    SAN FRANCISCO DIVISION
 4                          ---o0o---
 5    JAMES W. BOWMAN, JR. and
      PACIFIC REAL ESTATE MANAGEMENT
 6    COMPANY, INC., a Washington
      Corporation,
 7
                        Plaintiff,
 8
          vs.                          Case No. C-07-3140-SI
 9
      CMG MORTGAGE, INC., a California
10    Corporation; CMG MORTGAGE, INC.,
      d/b/a PACIFIC GUARANTEE MORTGAGE;
11    CMG MORTGAGE SERVICES, INC., a
      California corporation; CMG
12    MORTGAGE SERVICES, INC., d/b/a
      PACIFIC GUARANTEE MORTGAGE,
13    Inclusive,
14                      Defendants.
      _____/
15
16
17                   DEPOSITION OF PAUL CHEVEZ
18                    Tuesday, March 18, 2008
19
20    Reported by:
      CYNTHIA L. THOMAS
21    CSR 2950
22
23                       NANCY SORENSEN
                     Court Reporting Services
24                 41 Sutter Street, Suite 505
                   San Francisco, California 94104
25                        (415) 986-4624
```

```
 1   A.        I'm discussing the Financial Statements from --
 2   yeah, at the time of his termination.
 3   Q.        Okay.  What other records reflect where the
 4   reserves are now?
 5   A.        I'm not sure I understand the point.
 6   Q.        Well, CMG is holding these reserves somewhere;
 7   is that correct?
 8   A.        Uhm-hmm.
 9   Q.        In a bank account?
10   A.        There's -- well, it's along with, yes, other --
11   other moneys.
12   Q.        Okay.  So what account are these reserves being
13   held in?
14   A.        We have reserves held in several accounts, but
15   I would say the most likely place for the reserves being
16   held are in our GMAC Warehouse Bank called Excess Cash
17   Account.
18   Q.        Are they earmarked in any way?  Is there a --
19   well, let me.  Let me start again.
20             Is there a separate account for the reserves?
21   A.        No.
22   Q.        They are thrown into what sort of an account?
23   Is it a general operating account?
24   A.        It's an operating account, yes.
25   Q.        And where is this bank?
```

1   Q.      Or an escrow or anything like that?

2   A.      No.

3   Q.      Did CMG use Mr. Bowman's deposits or reserves

4   to pay CMG's operating expenses?

5   A.      I don't know exactly the money of his that went

6   in, if it did.  Again I don't know if we received checks

7   or how it was set up.  And I could not tell you that it

8   exactly went to pay or if it went to pay for anything.

9   Again, if his -- any deposit check, any reserve check,

10  along with other checks all go into the operating

11  account, so I couldn't say his exact funds were used for

12  what -- for which purposes.

13  Q.      And it's your practice to put as much of this

14  money from the operating account into the warehouse

15  account.  Is that what you testified to?

16  A.      I think I testified that all -- most of our

17  funds we try to put into the warehouse account, correct.

18  Q.      And would you tell me again what this warehouse

19  account is used for?

20  A.      It's a cash account that we utilize at our

21  warehouse bank to -- if funds are needed for a funding

22  through our Mortgage Banking Division, then those funds

23  are transferred to the title company to help close that

24  loan.  And then again funds come back in when loans are

25  purchased and we receive wires, and after paying off the

```
 1    warehouse bank, what they advanced, the -- if there's
 2    profits left over, it goes into that account also.
 3    Q.      And then you --
 4    A.      It's one account.
 5    Q.      And then you do that over and over again?
 6    A.      We do that over and over again, yes.
 7    Q.      All right.  Thank you.
 8            Are you required to maintain any specific
 9    amount of money in this warehouse account?
10    A.      Are we required to?  I don't believe so, no.
11    Q.      And my question is both as to either a
12    government regulation or the requirements of any
13    investors or other entities you do business with.
14    A.      No.
15    Q.      Okay.  The more money that you put into the
16    warehouse account, the better able you are to make loans;
17    is that correct?
18    A.      I don't know if I'd classify it that way, but
19    if --
20    Q.      Maybe you --
21    A.      -- we have funds available in there to help
22    fund loans, you know.
23    Q.      Well, maybe you could state it a little more
24    artfully than I can.
25    A.      Okay.
```

1   Q.      It's in CMG's interest to maximize the amount
2   of money it has in the warehouse account; is that
3   correct?
4   A.      I would say yes, it is.
5   Q.      Okay.  And why is that?
6   A.      Because it -- we have the availability as we're
7   funding loans to not have to wire out of our own local
8   operating account.  They can utilize the funds from the
9   warehouse bank's account, and then the warehouse bank
10  sends it all in one wire.
11  Q.      It's one -- I'm not understanding this one wire
12  business.
13  A.      Sure.
14  Q.      What do you mean by that?
15  A.      One wire at a title.  So if I can give an
16  example, if we're funding a loan to a title company and
17  the loan amount is a hundred thousand dollars -- and
18  again this is just an example -- the warehouse bank will
19  usually advance $99,000 off of our line of credit, and
20  then take the rest of the money that needs to be wired to
21  title to close the loan, including the broker's
22  commission or other fees or anything that needs to be
23  sent to title to close the loan.  They take that from our
24  cash account, our operating account there, combine it
25  together and send one wire.

```
 1              So if the title company needs $102,000 to close
 2    that transaction, they'll advance $99,000 from our line
 3    of credit, and they'll take 3,000 from that cash account
 4    and put it together and wire out $102,000 to the title
 5    company.
 6    Q.       Does the amount of money you have in the
 7    warehouse account affect your line of credit?
 8    A.       No, I don't believe it does.
 9    Q.       Okay.  What is the line of credit secured by?
10    A.       A personal guarantee by Mr. George, and the --
11    the security instruments for the loans themselves.
12    Q.       Those would be the mortgages?
13    A.       Yes.
14    Q.       Is that correct?
15    A.       Right.
16    Q.       It sounds to me like CMG is using Mr. Bowman's
17    reserve to fund loans.  Is that correct?
18    A.       No, I don't think that's correct.
19    Q.       Why not?
20    A.       I think that we have -- again, it's -- it's
21    hard to say what exact dollars is used for what, but I
22    would say we have sufficient cash to fund our loans.  We
23    have sufficient reserves or excess cash, or whatever you
24    want to call it, for the reserves of the branches.
25    Q.       We, meaning CMG?
```

```
1    A.        CMG.  I'm sorry.  Yes.
2    Q.        So what you're saying is regardless of whether
3    you have the reserves or not, you have sufficient funds?
4    Is that what your point was?
5    A.        I believe so, yes.
6    Q.        Okay.  It also sounds to me like CMG is using
7    Mr. Bowman's reserves to pay operating expenses.  Is that
8    correct?
9    A.        Again, I would go the same answer I used last
10   time.
11   Q.        Okay.  Which is that CMG has enough resources
12   that it does not need to apply those reserves.  Is that
13   correct?
14   A.        What I'm seeing is I don't think that we
15   definitively said if you gave us a check for $10,000,
16   that we spent that $10,000 on operating expenses.  I
17   think what I've said is that we have sufficient amount --
18   sufficient funds to cover reserves and utilize funds to
19   operate our business.
20   Q.        Okay.  Are your funds in these operating -- in
21   the operating account segregated in any way from the
22   reserve funds placed in the operating account?
23   A.        No.
24             MR. ROSENTHAL:  You mean CMG funds, I'm
25   assuming.
```

1    BY MR. COHEN:

2    Q.        For your?

3    A.        Your funds.

4    Q.        Yes.

5    A.        Not my personal, yes.

6    Q.        Right.  Although you mentioned that Mr. George

7    provides a personal guarantee; is that correct?

8    A.        For securing the warehouse lines.

9    Q.        Right.

10   A.        Yes.

11   Q.        I'm assuming that you do not make a similar

12   guarantee?

13   A.        I do not do that, no.  No, thank you.

14             MR. BOWMAN:  Come on, Paul.

15   BY MR. COHEN:

16   Q.        This personal guarantee by the -- by an

17   individual, is that a standard practice in your industry?

18   A.        I don't know standard practice in the industry.

19   I do know that the warehouse line that we have requested

20   a personal guarantee from Mr. George, which he had

21   signed.

22   Q.        And that's GMAC; is that correct?

23   A.        That is GMAC.  He also -- actually we also have

24   a warehouse line with a company called Natty Mac, and he

25   has a personal guarantee with them also.