1  Alan F. Cohen (State Bar No. 194075)
   **LAW OFFICES OF ALAN F. COHEN**
2  101 Montgomery Street, Suite 2050
   San Francisco, CA  94104
3  415.984.1943 (tel.)
   415.984.1953 (fax)
4  cohenlaw@mindspring.com

5
   Angela M. Xavier (State Bar No. 165152)
6  Attorney At Law
   900 Cherry Avenue, Suite 300
7  San Bruno, CA  94066
   Telephone:  (650) 355-0414
8  Facsimile:   (650) 355-0842

9
   Attorneys for Plaintiffs James Bowman and
10 Pacific Real Estate Management Company, Inc.

11                 **UNITED STATES DISTRICT COURT**

12                 NORTHERN DISTRICT OF CALIFORNIA

13                    SAN FRANCISCO DIVISION

14 JAMES W. BOWMAN, JR. and PACIFIC REAL         Case No.: C-07-3140-SI
   ESTATE MANAGEMENT COMPANY, INC., a
15 Washington Corporation,                        **SECOND AMENDED COMPLAINT**

16                 Plaintiffs,

17        v.

18 CMG MORTGAGE, INC., a California
   Corporation; CMG MORTGAGE, INC., d/b/a
19 PACIFIC GUARANTEE MORTGAGE, CMG
   MORTGAGE SERVICES, INC., a California
20 corporation; CMG MORTGAGE SERVICES,
   INC., d/b/a PACIFIC GUARANTEE
21 MORTGAGE,

22                 Defendants.

23 CMG Mortgage Inc., a California Corporation

24                 Counter-Claimant,

25        v.

26 James W. Bowman, Jr., an individual,

27                 Cross-Defendant.

28
                                  1                    CASE NO.: C-07-3140-SI
                        **SECOND AMENDED COMPLAINT**

Plaintiffs JAMES W. Bowman, JR. and PACIFIC REAL ESTATE MANAGEMENT COMPANY, INC. allege:

### JURISDICTION

1.      This Court has original jurisdiction over this civil action pursuant to 28 U.S.C § 1332 (a) (1) because Plaintiffs and Defendants are citizens of different states, and the amount in controversy exceeds the sum of seventy-five thousand dollars ($75,000) exclusive of interests and costs, as required by 28 U.S.C. § 1332(b).  Diversity of citizenship exists.  Plaintiffs are citizens of the State of Washington.  Defendants are citizens of the State of California.

### VENUE

2.      Venue is appropriate in this Court because the Defendants reside in this district, and a substantial amount of the acts and omissions giving rise to this lawsuit occurred in this district.

### INTRADISTRICT ASSIGNMENT

3.      Pursuant to Civil L.R. 3-2(d), this lawsuit should be assigned to the San Francisco or Oakland Division of this Court because a substantial part of the events or omissions which give rise to this lawsuit occurred in Contra Costa County.

### PARTIES

4.      **JAMES W. BOWMAN, JR.**  Plaintiff JAMES W. Bowman, Jr. (Bowman) resides in Pierce County, Washington.  From December, 2003, through January, 2007, Defendant CMG Mortgage, Inc. employed Bowman as a Branch Manager and as a Loan Originator in the State of Washington.

**5.      PACIFIC REAL ESTATE MANAGEMENT COMPANY, INC.**  Plaintiff Pacific Real Estate Management Company, Inc. (PREMCO) is a Washington corporation. Along with Bowman, and as a condition of Bowman's employment, PREMCO entered into contracts with the Defendants under which it leased office space and equipment in Washington and in turn sublet that space and equipment to Defendants.

6.      **CMG MORTGAGE, INC.**  Defendant CMG Mortgage, Inc. (CMG) is a California Corporation with a principal place of business in San Ramon, California.  On

2

**SECOND AMENDED COMPLAINT**

information and belief, CMG operates as a retail mortgage broker and a wholesale mortgage bank. CMG licensed itself in the State of Washington as CMG Mortgage Inc., d/b/a Pacific Guarantee Mortgage and employed Bowman as Branch Manager for CMG's branch offices in Federal Way and Vancouver, Washington. CMG also licensed itself as CMG Mortgage Inc., d/b/a Pacific Trust Lending and employed Bowman as a Loan Originator for the Federal Way and Vancouver, Washington Branch Offices.

7.    **CMG MORTGAGE SERVICES, INC.**  Defendant CMG Mortgage Services, Inc., (CMGS) is a California Corporation with a principal place of business in San Ramon, California. CMGS is a retail mortgage broker. CMGS licensed itself in the State of Washington as CMG Mortgage Services, Inc., d/b/a Pacific Guarantee Mortgage. Defendant CMGS subleased and rented office space and equipment from Plaintiffs Bowman and PREMCO in the State of Washington. CMG and CMGS may be referred to herein as the "Corporate Defendants."

8.    On information and belief, each defendant named herein is in some manner responsible for the wrongs and damages alleged in this complaint. In so acting, each defendant was functioning as the agent, servant, partner and/or employee of the other defendants, and throughout the events alleged in this complaint was acting within the course and scope of his or her authority as principal, agent, servant, partner and/or employee with the permission and consent of the other defendants. Further, on information and belief, the acts alleged herein were authorized and/or ratified by each and every other defendant.

## STATEMENT OF FACTS

### Introduction

9.    Beginning in December, 2003, Plaintiffs and Defendants entered into a series of agreements which established an employment relationship between Bowman and those Defendants.

10.    All of the agreements between Plaintiffs and the Defendants contained a Choice of Law clause in which the parties agreed to the following: "This Agreement shall be governed by and construed under the laws of the State of California, without regard to conflicts of laws

principles." Throughout the course of Plaintiff Bowman's employment, Defendant CMG's headquarters and principal place of business, at 3160 Crow Canyon Road in San Ramon, California served as the Command and Control Center for the management and operations of the two Branch Offices which Plaintiff Bowman managed in Washington.

11.     From its California location, Defendants directed and controlled the Washington Branch Offices, on a continual and systematic basis, regarding the following, but not limited to: (a) Underwriting for loan documents; (b) Network Branch Office Operations; (c) Loan Funding; (d) Audits; (e) Conference Calls; (f) Marketing; (g) Technical Support; (h) Human Resources; (i) Branch Office Accounting; (j) Human Resources; (k) 401(k) plans; (l) corporate policy and procedures.

12.     In March 2006, Defendant CMG presented revised Agreements to Plaintiffs Bowman and PREMCO to sign. The new Agreements would have replaced the existing Agreements between Plaintiffs and Defendants. Plaintiffs did not sign them because they appeared to be one sided in Defendants' favor with many significant terms left to the sole discretion of Defendants. As a result of Plaintiffs' not signing the new Agreements, Defendants terminated the existing Agreements effective as of late January 2007.

**Branch Manager Employment Agreements**

13.     On, or about, December 1, 2003, Plaintiff Bowman and Defendant CMG entered into a written BRANCH MANAGEMENT AND EMPLOYMENT AGREEMENT (Branch Management Agreement). Under this agreement, CMG employed Bowman as a branch manager for the Federal Way Branch Office. A copy of this agreement is attached as **Exhibit A**. Bowman and CMG entered into a second written Branch Management Agreement on or about June 30, 2004. CMG employed Bowman as a Branch Manager for the Vancouver Branch Office. A copy of the Vancouver branch management agreement is attached as **Exhibit B**.

14.     The Branch Management Agreements (drafted by Defendants) expressly state that the relationship between Bowman and CMG is that of an employee and employer.

15.     Paragraph nine (9) of both Branch Management Agreements required CMG to pay Bowman one hundred percent (100%) of the Branch Office Net Profits, defined as "Net

1    Income from operations after Expenses but before taxes." The Agreements further define Net

2    Income as being determined by deducting Expenses from Gross Income. Gross Income is

3    defined as "all income earned and derived from the Branch Office."

4         16.    Defendants breached the Branch Management Agreements in numerous ways.

5    For example:

6        a.    Defendants have failed and refused to pay Bowman wages earned for labor

7             performed during his last month of employment;

8        b.    Defendants deducted from Bowman's wages items improperly classified as

9             "Expenses," including, without limitation, costs and losses of the employer that

10            could not be attributed to Bowman; losses due to overpayment of former

11            employees; and fines and taxes levied on CMG by state regulatory agencies. In

12            general, Defendants unlawfully sought to make Bowman an insurer of their

13            business losses at every opportunity;

14       c.    Defendants failed to account for numerous items improperly charged as Expenses

15            against Gross Income, thus wrongfully reducing Bowman's wages. For example,

16            and without limitation, Defendants overpaid Branch employees, miscalculated

17            benefits contributions, and deducted money to pay a portion of CMG's tax

18            liability in Washington state even though 1) this was a corporate expense to

19            Defendants, not a Branch operating Expense, and 2) the Branch Management

20            Agreement specifically provides that Bowman was to be paid Net Income "after

21            Expenses but before taxes." Despite Bowman's many complaints, Defendants

22            refused to correct its errors and pay him his full wages owed;

23       d.    Defendants failed to include all "income earned and derived from the Branch

24            Office" in its calculation of Gross Income, thus depriving Bowman of earned

25            wages. For example, and without limitation, fees paid by borrowers, service

26            release premiums, yield spread premiums, income generated on the sale of loans,

27            and other revenues all constituted income earned and derived from the Branch

28            Office but were not counted toward Bowman's wages;

**SECOND AMENDED COMPLAINT**

e. Defendants deducted money from Branch revenues to pay matching contributions to employee benefits (such as CMG's 401k program). Some of these employees terminated their employment without vesting into those benefits, meaning that those contributions should have been returned as Gross Income to Bowman's Branches. Defendants did not return these amounts to Bowman either during his employment or when he was terminated.

17. The Branch Management Agreements provide that they shall be governed by and construed under California law, without regard to conflicts of law principles.

### Facilities and Equipment Rental Agreements

18. On or about December 3, 2003, Plaintiffs entered into the first of two written Facilities and Equipment Rental Agreement ("Facilities Agreement") with Defendant CMG relating to the Federal Way Branch Office. A copy of this agreement is attached as **Exhibit C**. On or about July 7, 2004, Plaintiffs entered into a second written Facilities Agreement with CMG for the Vancouver Branch Office. A copy of this agreement is attached as **Exhibit D**. Defendants required Mr. Bowman to enter into these Facilities Agreements as a condition of his employment.

19. Under the Facilities Agreements, Defendants required Plaintiffs to enter into a lease with third parties for the office space for the Federal Way and Vancouver Branches. The Corporate Defendants in turn subleased these facilities from the Plaintiffs and located CMG's Branch Offices there.

20. Defendants required Plaintiffs to advance all costs of operating the Branch Offices, including rent, facilities, equipment, services, and supplies. Pursuant to the Facilities Agreement, each month Bowman submitted to Defendants a list of the actual costs he had incurred.

21. The Facilities Agreements required CMG to pay Plaintiffs a "Rental Fee" of one hundred and twenty five percent (125%) of the actual costs incurred by both of the Branch Offices. The Rental Fees were to be paid on a monthly basis.

22.    Defendants breached the Facilities Agreements by failing to pay on a monthly basis all expenses incurred by Bowman in operating the Branches.  Defendants further breached the Facilities Agreements by failing to pay Bowman the Rental Fees he was owed under the Agreements.

23.    Because Defendants failed to reimburse Plaintiffs for all Branch Office operating costs, Plaintiffs were forced to pay these remaining costs out of their own pockets.  In Bowman's case, this meant not only paying expenses of his employer but doing so with after-tax dollars.

24.    Defendants also required Plaintiffs to pay a "Security Deposit" "to secure any and all obligations of [Plaintiffs], whether arising out of this agreement or otherwise."  This so-called security deposit arrangement is unlawful under California law.  *See* Labor Code § 401 *et seq*. and Labor Code § 2082.  Defendants also failed to segregate and properly account for the security deposits.  Moreover, on information and belief, Defendants wrongfully converted these funds and used them to their own financial benefit.

25.    Defendants breached the Facilities Agreements by failing to refund Plaintiffs' Security Deposits, by failing to pay the interest accrued through the use of Plaintiffs' funds, and by misusing the Security Deposits to pay expenses of Defendants without informing Plaintiffs.

26.    Like the Branch Management Agreements, the Facilities Agreements provide that they shall be governed by and construed under California law, without regard to conflicts of law principles.

## **Marketing Credits**

27.    As part of his compensation as Branch Manager, Plaintiff Bowman accrued so-called Marketing Credits which, pursuant to written and oral promises by Defendants, were to be paid as a bonus for CMG funded marketing campaigns.

28.    Defendants acknowledged that Bowman is owed wages based on the Marketing Credits at the time of his termination from CMG.  CMG's Associate Marketing Director, Kern Lewis, wrote in an email dated January 30, 2007 that Bowman had accrued 15,383 credits, that Bowman had submitted documentation showing eligible marketing expenses (a condition precedent to payments based on the Marketing Credits), and that Bowman was due $12,306 as a

7

**SECOND AMENDED COMPLAINT**

1    result.  Although, on information and belief, Bowman was owed a greater sum than this under

2    the Marketing Credits program, this demonstrates that Defendants knew that Mr. Bowman was

3    owed these wages at the time of termination but refused to pay him.

4        29.    Despite Defendants' promises, and despite performance of all conditions

5    precedent to earning wages based on the Marketing Credits, Defendants have failed and refused

6    to pay Bowman these wages.

7    **Branch Office Reserves**

8        30.    During Plaintiff Bowman's employment, Defendants deducted amounts from the

9    Branch Net Profits as so-called Reserves.  Defendants, including president and chief executive

10   officer Christopher George, represented to Bowman that these Reserves were required by the

11   Department of Housing and Urban Development, and that the Branch Managers were required to

12   maintain these Reserves with Defendants.  On information and belief, Mr. George made the

13   same representation to other Branch Managers.

14       31.    Defendants, including Mr. George, also represented to Bowman that they were

15   taking Reserves from Bowman's wages to ensure against Branch losses. On information and

16   belief, Mr. George made the same representation to other Branch Managers.

17       32.    Defendants' representations were false when made, and Defendants, including

18   Mr. George, knew them to be false.  Defendants deposited the "Reserves" into their bank

19   operating accounts and used them for purposes other than those disclosed to Plaintiffs.  On

20   information and belief, these purposes included providing collateral to obtain and maintain

21   Defendants' lines of credits, reducing Defendants' exposure to losses, meeting HUD licensing

22   requirements, and meeting Defendants' general financial obligations.  Defendants, including

23   Mr. George individually, benefited financially from their deceit at the expense of Bowman and

24   other Branch Managers.

25       33.    Bowman reasonably relied on Defendants' misrepresentations and duly honored

26   Defendants' request for reserves.  He was unaware that Defendants' stated reasons for requesting

27   Reserves were false, or that Defendants were using the Reserves for other wrongful purposes,

28   which Defendants concealed.

34.    Defendants had no right to withhold "Reserves" from employees, including Branch Managers, for any reason, even their purported bases of ensuring against losses or satisfying government regulations.  If such regulations had any application at all, they were applicable to the Corporate Defendants only and did not create a duty belonging to the individual branches and Branch Managers.  An employer may not make its employees an insurer of its business losses.  *See, e.g., Kerr's Catering v. DIR* (1962) 57 Cal.2d 319, 327-328).

35.    Defendants' practice of taking "Reserves" from Branch Managers is unlawful under California law.  Labor Code § 402 makes it unlawful for any employer to demand, exact, or accept any cash bond from any employee except in limited circumstances not present here.  Sections 402 *et seq.* impose rigorous limits on an employer's ability to extract a bond from employees.  Among other things, even where the bond is permissible the employer is required to hold the amounts received **in trust** for the employees in a savings account.  The employer may not intermingle the amounts held in trust with the employer's own funds, and may not use the entrusted funds for any other purpose other than that provided by the bond law.  Labor Code §§ 403, 405.  As a matter of law, **Defendants are "guilty of theft, and shall be punished in accordance with the provisions of the Penal Code relating to theft**."  Labor Code § 405.

36.    Defendants' intent and practice of holding employees responsible for expenses incurred in the course and scope of their employment is also unlawful under Labor Code § 2802.

37.    Defendants failed to keep the Reserves received from Bowman and other Branch Managers segregated from other funds and failed to pay interest earned on the reserves to Bowman and other Branch Managers.

## CMG Terminated its Agreements with Plaintiffs Bowman & PREMCO

38.    By Notice of Termination, dated December 18, 2006, Defendants gave Bowman notice that they were terminating him as an employee and that they were also terminating all agreements with him and PREMCO.  The terminations were effective as of January, 2007.

39.    Plaintiff Bowman has attempted, in good faith, to contact Defendants regarding the payment of monies owed to him and PREMCO.  Bowman has requested and demanded payment during telephone conversations and in writing to Defendant.  However, Defendants

have not paid Plaintiffs.  As a result of Defendants' willful nonpayment of wages and other

monies owed, Plaintiff Bowman has suffered, and continues to suffer, extreme economic

hardship in his business and personal life.  Plaintiff PREMCO has, also suffered, and continues

to suffer extreme economic hardship in business.

## CLAIMS FOR RELIEF

### FIRST CAUSE OF ACTION
**[Breach of Federal Way Employment Contract]**
**[By Plaintiff Bowman Against All Defendants]**

40.    Plaintiff realleges and incorporates by reference each and every allegation

contained in paragraphs 1 through 39 above as though fully set forth herein.

41.    As alleged in part above, Plaintiff Bowman entered into an employment

agreement with the Corporate Defendants to be Branch Manager of Defendants' Federal Way

Branch that was partly written, partly oral, and partly implied in fact.

42.    Plaintiff Bowman has performed all conditions and covenants necessary to

receive full payment under the above promises.

43.    Defendants have breached their promises and duties to Plaintiff by wrongfully

failing to pay all of the compensation due and owing under the terms of the various promises.

44.    As a direct and proximate result of the unlawful conduct of Defendants alleged

herein, Plaintiffs have suffered substantial economic damages in excess of the minimum subject

matter jurisdiction of this court, all in an amount according to proof.

45.    As a direct and proximate result of the unlawful conduct of Defendants alleged

herein, Plaintiff is entitled to payment of wages, pre-judgment interest thereon pursuant to Labor

Code § 218.6, penalties provided by the Labor Code and an award of attorneys' fees and costs

pursuant to Labor Code § 218.5, all in an amount according to proof.  If California law is found

to be inapplicable, Plaintiff pleads, in the alternative, Revised Code of Washington (RCW)

§§ 49.48.010 and 49.48.030.  Under RCW § 49.48.030, Plaintiff is entitled to an award of

reasonable attorney's fees.

**SECOND CAUSE OF ACTION**
**[Breach of Vancouver Employment Contract]**
**[By Plaintiff Bowman Against All Defendants]**

46.    Plaintiff realleges and incorporates by reference each and every allegation contained in paragraphs 1 through 45 above as though fully set forth herein.

47.    As alleged in part above, Plaintiff Bowman entered into an employment agreement with the Corporate Defendants to be Branch Manager of Defendants' Vancouver Branch that was partly written, partly oral, and partly implied in fact.

48.    Plaintiff Bowman has performed all conditions and covenants necessary to receive full payment under the above promises.

49.    Defendants have breached their promises and duties to Plaintiff by wrongfully failing pay all of the compensation due and owing under the terms of the various promises.

50.    As a direct and proximate result of the unlawful conduct of Defendants alleged herein, Plaintiffs have suffered substantial economic damages in excess of the minimum subject matter jurisdiction of this court, all in an amount according to proof.

51.    As a direct and proximate result of the unlawful conduct of Defendants alleged herein, Plaintiff is entitled to payment of wages, pre-judgment interest thereon pursuant to Labor Code § 218.6, penalties provided by the Labor Code and an award of attorneys' fees and costs pursuant to Labor Code § 218.5, all in an amount according to proof.  If California law is found to be inapplicable, Plaintiff pleads, in the alternative, Revised Code of Washington (RCW) §§ 49.48.010 and 49.48.030.  Under RCW § 49.48.030, Plaintiff is entitled to an award of reasonable attorney's fees.

**THIRD CAUSE OF ACTION**
**[Breach of Contract – Federal Way Facilities Agreement]**
**[By Both Plaintiffs Against All Defendants]**

52.    Plaintiffs reallege and incorporate by reference each and every allegation contained in paragraphs 1 through 51 above as though fully set forth herein.

53.    As alleged in part above, a Facilities Agreement existed between the Plaintiffs and the Corporate Defendants concerning Defendants' Federal Way Branch.

CASE NO.: C-07-3140-SI
**SECOND AMENDED COMPLAINT**

54.    Plaintiffs have performed all conditions and covenants necessary to receive full payment under the above promises.

55.    Defendants have breached their promises and duties to Plaintiffs by wrongfully failing to pay to all of the compensation due and owing under the Facilities Agreements.

56.    As a direct and proximate result of the unlawful conduct of Defendants alleged herein, Plaintiffs have suffered substantial economic damages in excess of the minimum subject matter jurisdiction of this court, all in an amount according to proof.

57.    Plaintiffs also seek an award of attorneys' fees, costs and interest.

**FOURTH CAUSE OF ACTION**
**[Breach of Contract – Vancouver Facilities Agreement]**
**[By Both Plaintiffs Against All Defendants]**

58.    Plaintiffs reallege and incorporate by reference each and every allegation contained in paragraphs 1 through 57 above as though fully set forth herein.

59.    As alleged in part above, a Facilities Agreement existed between the Plaintiffs and the Corporate Defendants concerning Defendants' Vancouver Branch.

60.    Plaintiffs have performed all conditions and covenants necessary to receive full payment under the above promises.

61.    Defendants have breached their promises and duties to Plaintiffs by wrongfully failing to pay all of the compensation due and owing under the Facilities Agreements.

62.    As a direct and proximate result of the unlawful conduct of Defendants alleged herein, Plaintiffs have suffered substantial economic damages in excess of the minimum subject matter jurisdiction of this court, all in an amount according to proof.

63.    Plaintiffs also seek an award of attorneys' fees, costs and interest.

**FIFTH CAUSE OF ACTION**
**[Breach of Implied Covenant of Good Faith and Fair Dealing]**
**[By Both Plaintiffs Against All Defendants]**

64.    Plaintiffs reallege and incorporate by reference each and every allegation contained in paragraphs 1 through 63 above as though fully set forth herein.

65.    The contractual terms alleged above contained an implied covenant of good faith and fair dealing that obligated Defendants to perform the terms and conditions of the contractual

1    terms fairly and in good faith and to refrain from doing any act that would deprive Plaintiffs of

2    the benefits of the contractual terms.

3    66.    Plaintiffs have performed all conditions and covenants necessary to receive full

4    payment under their contracts with Defendants.

5    67.    By their actions and/or failures to act as alleged above, the Corporate Defendants

6    breached the implied covenant of good faith and fair dealing with the intent and effect of

7    depriving Plaintiffs of the benefits of the contractual terms.

8    68.    As a direct and proximate result of the unlawful conduct of Defendants alleged

9    herein, Plaintiffs have suffered substantial economic damages in excess of the minimum subject

10    matter jurisdiction of this court, all in an amount according to proof.

11    69.    Defendants have breached a contract for wages, meaning that under California

12    law Plaintiff is entitled to recover not only his earned but unpaid compensation, but also pre-

13    judgment interest thereon pursuant to Labor Code § 218.6 and an award of attorneys' fees and

14    costs pursuant to Labor Code § 218.5, all in an amount according to proof.  If California law is

15    found to be inapplicable, Plaintiff pleads, in the alternative, Revised Code of Washington (RCW)

16    §§ 49.48.010 and 49.48.030.  Under RCW § 49.48.030, Plaintiffs are entitled to reasonable

17    attorney's fees.

18    **SIXTH CAUSE OF ACTION**
**[Failure to Pay Wages – Labor Code Statutory Cause of Action]**
19    **[By Plaintiff Bowman Against All Defendants]**

20    70.    Plaintiff realleges and incorporates by reference each and every allegation

21    contained in paragraphs 1 through 69 above as though fully set forth herein.

22    71.    At all times material to this complaint, Labor Code §§ 201, 202, 204, 208, 216,

23    and 218 were in full force and effect and governed the conduct of Defendants.  Section 204

24    required Defendants to pay all wages owed to Mr. Bowman during his employment no later than

25    the conclusion of the pay period in which the wages were earned, which when applied to

26    commission wages means the pay period after all conditions precedent to payment were satisfied.

27    Sections 201, 202, and 208 required Defendants to pay Mr. Bowman at the time and place of

28    discharge.  Section 216 provides that an employer who, having the ability to pay, willfully

refuses to pay wages due and payable after demand has been made, is guilty of a misdemeanor.

Section 218 provides that an employee may sue directly for wages or penalties due him.

72.     As alleged in part above, Defendants owed Mr. Bowman wages that remained unpaid at the time his employment with Defendants terminated.

73.     Despite demands by Mr. Bowman, Defendants willfully refused, and continue to refuse, to pay all wages they owe.

74.     Plaintiff has performed all conditions and covenants necessary to receive full payment of his earned but unpaid commission wages.

75.     As a direct and proximate result of the unlawful conduct of Defendants alleged herein, Plaintiff is entitled to payment of wages, pre-judgment interest thereon pursuant to Labor Code § 218.6, penalties provided by the Labor Code and an award of attorneys' fees and costs pursuant to Labor Code § 218.5, all in an amount according to proof.

## SEVENTH CAUSE OF ACTION
### [Labor Code Waiting Time Penalties]
### [By Plaintiff Bowman Against All Defendants]

76.     Plaintiff realleges and incorporates by reference each and every allegation contained in paragraphs 1 through 75 above as though fully set forth herein.

77.     At all times material to this complaint, Labor Code §§ 201-203 have been in full force and effect and were binding on Defendants.  These sections provide that employers must pay their employees all earned but unpaid wages at the time of termination, for employees whose termination is involuntary or who provide more than 72 hours of notice before resigning, or within 72 hours, for employees whose termination is voluntary but without notice.

78.     Section 203 provides that if an employer willfully fails to pay any wages of an employee who is discharged or quits, the wages of such employee shall continue as from the due date thereof at the same rate until paid or until an action therefor is commenced, for not more than 30 days.

79.     Defendants failed to pay Mr. Bowman all earned but unpaid wages within the time period set forth in Labor Code §§ 201-203.

14

80.    Defendant's failure to timely pay Mr. Bowman following his termination was willful within the meaning of § 203.

81.    More than 30 days have passed since the termination of Plaintiff's employment with Defendants.

### EIGHTH CAUSE OF ACTION
**[Intentional Fraud]**
**[By Both Plaintiffs Against All Defendants]**

82.    Plaintiffs reallege and incorporate by reference each and every allegation contained in paragraphs 1 through 81 above as though fully set forth herein.

83.    On several occasions, Defendants' president, Christopher George, represented to Bowman that Bowman was required to contribute "Reserves" by the Department of Housing and Urban Development, to be held by Defendants.  George told Bowman that if the decision were left up to George, CMG would not require the Branch Managers to pay into Reserves.  On information and belief, George made the same or similar representation to other Branch Managers.  For example, in a conference call held on or about December 16, 2004, George made these representations to a group of Branch Managers.  George also made these representations to Bowman personally.

84.    Defendants, including Mr. George, also represented to Bowman that they were withholding Reserves from Bowman's wages to ensure against Branch losses. On information and belief, Mr. George made the same representation to other Branch Managers.

85.    Defendants' representations were false when made, and Defendants, including Mr. George, knew them to be false.  As alleged above, Defendants deposited the "reserves" into their operating bank accounts and used them for purposes other than those disclosed to Plaintiffs.  Defendants concealed this information and never informed Bowman that his reserves were being commingled with Defendants' operating funds and used for other purposes.  Defendants' actions in extracting these funds from Plaintiffs were illegal, and Defendants' use of these funds was illegal as well.  Labor Code § 402-409.

86.    On information and belief, Defendants' true purposes for taking Reserves from Bowman included providing additional operating capital to fund Defendants' operations,

15

**SECOND AMENDED COMPLAINT**

providing collateral to obtain and maintain Defendants' lines of credits, providing additional funds allowing CMG to operate as a mortgage bank, reducing Defendants' exposure to losses, increasing the funds available to fund loans, and meeting Defendants' general financial obligations. It is entirely possible that these funds were used from time to time to pay wages to employees, including Mr. Bowman himself. Defendants, including Mr. George individually, benefited financially from their deceit at the expense of Bowman and other Branch Managers.

87. Defendants made their false representations with the intent of inducing Bowman to rely upon those representations and act, or refrain from acting, to his detriment.

88. Plaintiffs reasonably relied on Defendants' misrepresentations and agreed to produce the Reserves requested by Defendants. He was unaware that Defendants' stated reasons for requesting reserves were false, or that Defendants were using the reserves for other wrongful purposes, which Defendants concealed. Plaintiffs were induced to surrender security deposits and Reserves to Defendants which they would not have done had they known the true facts.

89. As a result of Defendants' misrepresentations, Plaintiffs have suffered damages, including general, special, and foreseeable economic damages caused by Defendants' securing, withholding and refusing to timely return the Reserves at the time that Bowman's employment with Defendants was terminated.

90. The persons who committed the unlawful acts described herein were officers, directors, and/or managing agents of Defendants acting within the scope of their employment. The unlawful acts described herein were committed with oppression, fraud and/or malice and were authorized, ratified or both by such officers, directors, and/or managing agents. In light of Defendants' willful, knowing, and intentional misrepresentations, Plaintiffs seek an award of punitive and exemplary damages in an amount according to proof.

91. Defendants' misrepresentations concerning the Reserves created a constructive trust over that property, imposing on Defendants all duties of a trustee and entitling Plaintiffs to recover all rights and remedies flowing to a trust beneficiary.

**SECOND AMENDED COMPLAINT**

### NINTH CAUSE OF ACTION
**[Fraud by Concealment]**
**[By Both Plaintiffs Against All Defendants]**

92.     Plaintiffs reallege and incorporate by reference each and every allegation contained in paragraphs 1 through 91 above as though fully set forth herein.

93.     On several occasions, Defendants' president, Christopher George, represented to Bowman that Bowman was required to contribute "Reserves" by the Department of Housing and Urban Development, to be held by Defendants.  George told Bowman that if the decision were left up to George, CMG would not require the Branch Managers to pay into Reserves.  On information and belief, Mr. George made the same or similar representation to other Branch Managers.  For example, in a conference call held on or about December 16, 2004, George made these representations to a group of Branch Managers.  George also made these representations to Bowman personally.

94.     Defendants, including Mr. George, also represented to Bowman that they were withholding Reserves from Bowman's wages to ensure against Branch losses. On information and belief, Mr. George made the same representation to other Branch Managers.

95.     Defendants' representations concealed their true purposes for requiring these reserves.  As alleged above, Defendants deposited the "reserves" into their operating bank accounts and used them for purposes other than those disclosed to Plaintiffs.  Defendants concealed this information and never informed Bowman that his reserves were being commingled with Defendants' operating funds and used for other purposes.  Defendants' actions in extracting these funds from Plaintiffs were illegal, and Defendants' use of these funds was illegal as well.  Labor Code § 402-409.

96.     On information and belief, Defendants' true purposes for taking Reserves from Bowman included providing additional operating capital to fund Defendants' operations, providing collateral to obtain and maintain Defendants' lines of credits, providing additional of funds allowing CMG to operate as a mortgage bank, reducing Defendants' exposure to losses, increasing the funds available to fund loans, and meeting Defendants' general financial obligations.  It is entirely possible that these funds were used from time to time to pay wages to

17

1   employees, including Mr. Bowman himself.  Defendants and Mr. George individually benefited

2   financially from their deceit at the expense of Bowman and other Branch Managers.

3       97.    By virtue of George's position of authority and trust, Defendants, including their

4   president George, were under a duty to disclose the true facts to Bowman and the Branch

5   Managers.  Moreover, since he did speak to Bowman about these facts and Bowman's associated

6   rights, George was bound not only to tell the truth but also not to suppress or conceal facts within

7   his knowledge that materially qualified his statements.  One who speaks at all to certain facts

8   must make a full and fair disclosure of the related facts.  *See, e.g., Brownlee v. Vang (1965)* 235

9   Cal.App.2d 465, 477.

10      98.    Defendants made their false representations and concealed pertinent facts with the

11  intent of inducing Bowman to rely upon those representations and act, or refrain from acting, to

12  his detriment.

13      99.    Plaintiffs reasonably relied on Defendants' representations and, in ignorance of

14  the facts Defendants had concealed, agreed to produce the Reserves requested by Defendants.

15  He was unaware that Defendants' stated reasons for requesting Reserves were false, or that

16  Defendants were using the reserves for other wrongful purposes, which Defendants concealed.

17  Plaintiffs were induced to surrender security deposits and Reserves to Defendants which they

18  would not have done had they known the true facts.

19      100.   As a result of Defendants' concealment and suppression of facts, Bowman has

20  suffered damages, including general, special, and foreseeable economic damages caused by

21  Defendants' securing, withholding and refusing to timely return the Reserves at the time

22  Bowman's employment with Defendants was terminated.

23      101.   The persons who committed the unlawful  acts described herein were officers,

24  directors, and/or managing agents of Defendants acting within the scope of their employment.

25  The unlawful acts described herein were committed with oppression, fraud and/or malice and

26  were authorized, ratified or both by such officers, directors, and/or managing agents.  In light of

27  Defendants' willful, knowing, and intentional concealment, Plaintiffs seek an award of punitive

28  and exemplary damages in an amount according to proof.

18

CASE NO.: C-07-3140-SI

**SECOND AMENDED COMPLAINT**

102.    Defendants' concealment of the true facts concerning the Reserves created a constructive trust over that property, imposing on Defendants all duties of a trustee and entitling Plaintiffs to recover all rights and remedies flowing to a trust beneficiary.

### TENTH CAUSE OF ACTION
**[Conversion]**
**[By Both Plaintiffs Against All Defendants]**

103.    Plaintiffs reallege and incorporate by reference each and every allegation contained in paragraphs 1 through 102 above as though fully set forth herein.

104.    As alleged above, Defendants have taken possession of ascertainable sums of money belonging to Plaintiffs.  These sums include, but are not limited to, the wages, unreimbursed expenses, and Reserves belonging to Bowman and the security deposits belonging to Bowman and PREMCO.

105.    By failing to surrender these ascertainable sums when they were owed and at no time later than Bowman's termination, Defendants wrongfully exercised dominion and control over Plaintiffs' property, and, thus converted the property to their own use.

106.    Plaintiffs are entitled to be paid these sums and have been denied the possession, use, and enjoyment of their property.

107.    As a direct and proximate result of Defendant's alleged conduct, Plaintiffs have been damaged in an amount to be proven at trial.

108.    As a direct and proximate cause of Defendants' alleged conduct, Plaintiffs are entitled to special damages, damages for emotional distress suffered, and for compensation for time and money expended in the pursuit of the converted property, as provided by Cal. Civil Code § 3336, all in an amount to be proven at trial.

109.    The persons who committed the unlawful  acts described herein were officers, directors, and/or managing agents of Defendants acting within the scope of their employment. The unlawful acts described herein were committed with oppression, fraud and/or malice and were authorized, ratified or both by such officers, directors, and/or managing agents.  In light of Defendants' willful, knowing, and intentional acts, Plaintiffs seek an award of punitive and exemplary damages in an amount according to proof.

19

## ELEVENTH CAUSE OF ACTION
### [Breach of Fiduciary Duty]
### [By Both Plaintiffs Against All Defendants]

110.    Plaintiffs reallege and incorporate by reference each and every allegation contained in paragraphs 1 through 109 above as though fully set forth herein.

111.    A fiduciary relationship existed between Defendants, on the one hand, and Plaintiffs, on the other.  The fiduciary nature of this relationship was established both by statute and by common law when, among other things, Defendants demanded and extracted a cash bond (the security deposits and Reserves) from Plaintiffs.  Labor Code §§ 400-410 expressly create a fiduciary duty in Defendants to hold the security deposits and Reserves in trust for Plaintiffs and not to use them for any forbidden purpose.  Moreover, the confidential nature of the relationship between Defendants and Plaintiffs also created a fiduciary relationship between the parties.

112.    By virtue of the trust relationship imposed on Defendants as a matter of law, Defendants owed numerous duties to Plaintiffs, including the duty of loyalty, the duty to avoid conflicts of interest, the duty to preserve trust property, the duty to make trust property productive, the duty to dispose of improper investments, and the duty to report and account.

113.    Defendants breached their fiduciary duties to Plaintiffs by, among other things, unlawfully obtaining the security deposits and Reserves from Plaintiffs and other Branch Managers, misrepresenting the true purposes for demanding these funds from Plaintiffs, failing to segregate the corpus of the trust, intermingling Plaintiffs' entrusted funds with Defendants' own operating funds, failing to report and account to Plaintiffs, failing to make the trust property productive, misusing the entrusted funds for Defendants' own unlawful purposes, profiting from the entrusted funds for Defendants' sole benefit and at Plaintiff's expense, and refusing to return the entrusted funds to Plaintiff despite numerous demands.

114.    As a direct and proximate result of Defendant's alleged conduct, Plaintiffs have been damaged in an amount to be proven at trial.

115.    As a direct and proximate cause of Defendants' breach of their fiduciary duties, Plaintiffs are entitled to general, special damages, and punitive damages.  In addition, Plaintiffs

are entitled to recover any loss or depreciation in value of the entrusted funds and other

remedies, including an amount equal to that which would have been earned but for Defendants'

failure to make the trust property productive; any profit that would have accrued to Plaintiffs but

for Defendants' breach; interest; **and any and all profits obtained by Defendants through the**

**use of the entrusted funds**.

116.    The persons who committed the unlawful  acts described herein were officers,

directors, and/or managing agents of Defendants acting within the scope of their employment.

The unlawful acts described herein were committed with oppression, fraud and/or malice and

were authorized, ratified or both by such officers, directors, and/or managing agents.  In light of

Defendants' willful, knowing, and intentional acts, Plaintiffs seek an award of punitive and

exemplary damages in an amount according to proof.

117.    Plaintiffs request that the Court enjoin Defendants from committing further

breaches of trust and compel Defendants to redress their breaches to date.

118.    Plaintiffs also request that the Court remove Defendants as trustees over the

entrusted property, appoint a receiver or temporary trustee to take possession of the trust

property and to administer the trust if necessary and at Defendants' expense, impose an equitable

lien or constructive trust as necessary, trace trust property and recover Plaintiffs' property or its

proceeds, and impose such other remedies as appropriate and available under law or equity, all at

Defendants' sole expense.

## TWELFTH CAUSE OF ACTION
### [Aiding and Abetting Breach of Fiduciary Duty]
### [By Both Plaintiffs Against All Defendants]

119.    Plaintiffs reallege and incorporate by reference each and every allegation

contained in paragraphs 1 through 118 above as though fully set forth herein.

120.    A fiduciary relationship existed between the Corporate Defendants, on the one

hand, and Plaintiffs, on the other.  The fiduciary nature of this relationship was established both

by statute and by common law when, among other things, Defendants demanded and extracted a

cash bond (the security deposits and Reserves) from Plaintiffs.  Labor Code §§ 400-410

expressly create a fiduciary duty in Defendants to hold the security deposits and Reserves in trust for Plaintiffs and not to use them for any forbidden purpose. Moreover, the confidential nature of the relationship between Defendants and Plaintiffs also created a fiduciary relationship between the parties.

121.    By virtue of the trust relationship imposed on Defendants as a matter of law, Defendants owed numerous duties to Plaintiffs, including the duty of loyalty, the duty to avoid conflicts of interest, the duty to preserve trust property, the duty to make trust property productive, the duty to dispose of improper investments, and the duty to report and account.

122.    Defendants breached their fiduciary duties to Plaintiffs by, among other things, unlawfully obtaining the security deposits and Reserves from Plaintiffs and other Branch Managers, misrepresenting the true purposes for demanding these funds from Plaintiffs, failing to segregate the corpus of the trust, intermingling Plaintiffs' entrusted funds with Defendants' own operating funds, failing to report and account to Plaintiffs, failing to make the trust property productive, misusing the entrusted funds for Defendants' own unlawful purposes, profiting from the entrusted funds for Defendants' sole benefit and at Plaintiff's expense, and refusing to return the entrusted funds to Plaintiff despite numerous demands.

123.    Defendants, Christopher George, and on information and belief other officers, directors, employees, partners, agents, subsidiaries, and parents of the Corporate Defendants aided and abetted in the breach of fiduciary duty to their own individual advantage and financial gain.

124.    As a direct and proximate result of Defendants' alleged conduct, Plaintiffs have been damaged in an amount to be proven at trial.

125.    As a direct and proximate cause of Defendants' aiding and abetting the breach of fiduciary duties, Plaintiffs are entitled to general, special damages, and punitive damages. In addition, Plaintiffs are entitled to recover any loss or depreciation in value of the entrusted funds, including an amount equal to that which would have been earned but for Defendants' failure to make the trust property productive; any profit that would have accrued to Plaintiffs but for

Defendants breach; interest; **and any and all profits obtained by Defendants through the breach of trust**.

126.    The persons who committed the unlawful acts described herein were officers, directors, and/or managing agents of Defendants acting within the scope of their employment. The unlawful acts described herein were committed with oppression, fraud and/or malice and were authorized, ratified or both by such officers, directors, and/or managing agents.  In light of Defendants' willful, knowing, and intentional acts, Plaintiffs seek an award of punitive and exemplary damages in an amount according to proof.

127.    Plaintiffs request that the Court enjoin Defendants from committing further breaches of trust and compel Defendants to redress their breaches to date.

128.    Plaintiffs also request that the Court remove Defendants as trustees over the entrusted property, appoint a receiver or temporary trustee to take possession of the trust property and to administer the trust if necessary and at Defendants' expense, impose an equitable lien or constructive trust as necessary, trace trust property and recover Plaintiffs' property or its proceeds, and impose such other remedies as appropriate and available under law or equity, all at Defendants' sole expense.

## THIRTEENTH CAUSE OF ACTION
### [Failure to Reimburse Expenses – Labor Code § 2802]
### [By Plaintiff Bowman Against All Defendants]

129.    Plaintiff realleges and incorporates by reference each and every allegation contained in paragraphs 1 through 128 above as though fully set forth herein.

130.    At all times material to this complaint, Labor Code § 2802 was in full force and effect and applied to Defendants.  Section 2802 requires an employer to:

indemnify his or her employee for all necessary expenditures or losses incurred by the employee in direct consequence of the discharge of his or her duties, or of his or her obedience to the directions of the employer, event though unlawful, unless the employee, at the time of obeying the directions, believed them to be unlawful.

131.     As alleged in part above, Plaintiff Bowman expended and lost money in direct consequence of the discharge of his duties.

132.     Defendants have never properly and fully indemnified Plaintiff for the interest expenditures he incurred in the course and scope of his employment.

133.     As a direct and proximate result of Defendants' failure to indemnify Mr. Bowman, he has been damaged in an amount subject to proof at trial.   Pursuant to Labor Code § 2802, Mr. Bowman is entitled to reimbursement and indemnification, interest and attorney's fees and costs, all in an amount subject to proof.

### FOURTEENTH CAUSE OF ACTION
**[Unfair Competition Law – Bus. & Prof. Code § 17200]**
**[By Both Plaintiffs Against All Defendants]**

134.     Plaintiffs reallege and incorporate by reference each and every allegation contained in paragraphs 1 through 133 above as though fully set forth herein.

135.     At all times material to this complaint, Business & Professions Code § 17200 was in full force and effect and was binding on Defendants.  Section 17200 may be referred to in this complaint as the Unfair Competition Law or UCL.

136.     Section 17200 makes it unlawful for any "person" to engage in any unlawful, unfair, or fraudulent business practice.

137.     Defendants' actions and failures to act alleged above, including, without limitation, their failure to pay wages to Bowman, their use of unfair and unlawful employment contracts to obtain advantages over their competitors, their imposition of unlawful terms and conditions on their employees; their unlawful acquisition and use of Reserves and security deposits; their misrepresentations and concealments; all of these were unfair, unlawful, and fraudulent within the meaning of the UCL.

138.     Defendants' acts constitute a continuing and ongoing unfair, unlawful, and fraudulent activity prohibited by the UCL and justify the issuance of an injunction, restitution and other equitable relief pursuant to Business and Professions Code § 17203 both as to the

company and its managing agents and officers. All remedies are cumulative pursuant to Business and Professions Code section 17205.

139.    On information and belief, each Defendant committed the unlawful, unfair, and/or fraudulent acts alleged herein directly and personally, or conspired or aided and abetted in the commissions of those acts.

140.    Pursuant to Business and Professions Code § 17203, Plaintiffs request restitution and/or disgorgement of all wages and other amounts wrongfully retained by Defendants in violation of Business and Professions Code § 17200 *et seq.* Further, Plaintiffs request attorneys' fees and costs pursuant to Code of Civil Procedure § 1021.5 upon proof they have acted in the public interest as set forth in the Private Attorney General Act.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiffs pray for judgment against Defendants as follows:

1.  For compensatory (special) damages, on all but the Seventh and Fourteenth Causes of Action;

2.  For general damages, including, without limitation, for physical harm and mental and emotional distress according to proof, as applicable, on the Eighth through Twelfth Causes of Action;

3.  For punitive damages on the Sixth, Eighth, Ninth, Tenth, Eleventh, and Twelfth Causes of Action);

4.  For applicable penalties provided by the Labor Code;

5.  For restitution and/or reimbursement on the Thirteenth and Fourteenth Causes of Action;

6.  For injunctive relief;

7.  For disgorgement of all ill-gotten gains and monies obtained by Defendants;

8.  For appointment of a receiver or temporary trustee if necessary;

9.  For an accounting;

10. For imposition of an equitable lien or constructive trust;

CASE NO.: C-07-3140-SI

**SECOND AMENDED COMPLAINT**

1  11. For an award of interest, including prejudgment interest, at the legal rate;

2  12. For an award of attorneys' fees;

3  13. For costs of suit incurred; and

4  14. For such other and further relief as the Court deems appropriate.

5

6                                                 LAW OFFICES OF ALAN F. COHEN

7

8  Dated: July 17, 2008                                By  /S/_____

9                                                 Alan F. Cohen

10                                                 Attorney for Plaintiffs

11

12  Dated: July 17, 2008                                By  /S/_____

13                                                 Angela M. Xavier
                                               Attorney for Plaintiffs

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

CASE NO.: C-07-3140-SI

**SECOND AMENDED COMPLAINT**

1

## DEMAND FOR JURY TRIAL

2

3          Plaintiffs hereby demand trial by jury on all issues.

4

5    Dated: July 17, 2008                              By  /S/_____
                                                          Alan F. Cohen
6                                                         Attorney for Plaintiffs

7

8

9    Dated: July 17, 2008                              By  /S/_____
                                                          Angela M. Xavier
10                                                        Attorney for Plaintiffs

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

                                                                    CASE NO.: C-07-3140-SI
**SECOND AMENDED COMPLAINT**

# Exhibit A

#455

# BRANCH MANAGEMENT AND EMPLOYMENT AGREEMENT

This Branch Management and Employment Agreement (hereinafter referred to as "Agreement") is entered into as of the Effective Date, as that term is defined herein, by and between CMG Mortgage, Inc., a California corporation doing business as Pacific Guarantee Mortgage (hereinafter referred to as "PGM"), and Jim Bowman (hereinafter referred to as "Branch Manager").

## RECITALS

WHEREAS PGM and Branch Manager desire to reduce to writing their understanding and agreement pursuant to which Branch Manager will assist PGM in the management, administration and supervision of activities of its staff and employees, and the activities of all unlicensed assistants and support personnel, at PGM's branch office located at 2505 South 320th Street, Suite 260 Federal Way, WA 98003 ("Branch Office"); and,

WHEREAS PGM and Branch Manager also desire to reduce to writing the terms and conditions of Branch Manager's employment with PGM;

In consideration of the covenants, agreements and representations contained herein, PGM and Branch Manager agree as follows:

1.    **PGM.**  PGM represents that PGM is duly licensed by all applicable governmental authorities and is doing business as a mortgage broker under the name Pacific Guarantee Mortgage.  Concurrently with the execution of this Agreement, PGM will obtain the necessary branch license for the Branch Office.

2.    **Employment at Will.**  PGM employs Branch Manager and Branch Manager accepts employment with PGM as branch manager of PGM's Branch Office.  Either PGM or Branch Manager may terminate this Agreement in accordance with the provisions of paragraph 19 herein, or with or without cause, at any time on thirty (30) days notice to the other pursuant to the notice provisions of paragraph 12 herein.  The rights and duties set forth in this paragraph may not be modified in any way except pursuant to the terms of paragraph 21 (e) herein.

3.    **Licensed Status.**  Branch Manager represents that he/she holds all such licenses as required by state and/or federal law to conduct mortgage brokerage activity at PGM's Branch Office, and that he/she has a minimum of three (3) years of full time experience in mortgage brokerage activity gained during the immediately preceding five (5) year period.  Branch Manager further represents that while this Agreement is in effect he/she will maintain in good standing each and every such license.

4.    **Devotion to PGM's Business.**  During the term of this Agreement, all of Branch Manager's time and attention dedicated to mortgage loan brokerage and/or origination, shall be devoted solely to the business of PGM at the Branch Office.  During the term of this Agreement, Branch Manager shall not engage in any other business duties or pursuits whatsoever, or directly or indirectly render any services of a business, commercial or professional nature to any other person or organization, whether for compensation or otherwise, without the prior written consent

of PGM. During the term of this Agreement, Branch Manager shall not, directly or indirectly, either as an employee, employer, consultant, agent, principal, partner, stockholder, corporate officer, director, or in any other individual or representative capacity, engage or participate in any business that is in competition in any manner whatsoever with the business of PGM

**5.     Duties of Branch Manager.** Branch Manager shall do and perform all services, acts, or things necessary or advisable to fulfill his/her duties as such, subject to the direction of PGM and to the policies established by it. Pursuant thereto, PGM and Branch Manager intend for Branch Manager to assist PGM in administering reasonable supervision over the activities of all licensed activity at Branch Office, and over the activities of unlicensed assistants and support personnel, assigned to PGM's Branch Office. "Reasonable supervision" includes, as appropriate, the establishment of policies, rules, procedures and systems to review, oversee, inspect and manage:

a)     transactions requiring a license;

b)     documents which may have a material effect upon the rights or obligations of a party to every such transaction;

c)     filing, storage and maintenance of all documents created in connection with every such transaction;

d)     the handling of trust funds, (Branch Manager agrees not to establish or use a trust account unless approved by PGM, in advance, and in writing);

e)     advertising of any service for which a license is required, (Branch Manager agrees that all advertising material must be approved by PGM, in advance, and in writing);

f)     familiarizing licensed employees, and unlicensed assistants and support personnel, with the requirements of federal and state laws relating to the prohibition of discrimination;

g)     familiarizing licensed employees with the requirements of federal and state laws relating to disclosures to be given in connection with mortgage loan transactions;

h)     regular and consistent reports of licensed activities of all employees;

i)     ensuring that in every transaction Branch Manager, and every employee associate involved in each such transaction, honors all affirmative obligations owed to each client, as required by federal law, state law and/or ethical practices, including but not limited to: the duty of utmost *care, integrity, honesty and loyalty;* the duty to disclose all material loan terms or any other material facts that may affect the decision to borrow and to encumber real property; the duty to maintain *confidentiality,* except to the extent that information must be disclosed to a potential lender in order to permit the lender to make an informed and considered

decision to extend credit; and the duty to recommend a *competitive* loan product in the right class of loans (e.g., "A", "A-", "B", "C", etc.) when considering the borrower's income and credit history, financial standing and net worth (including the capacity to repay the loan), personal and financial needs, the loan terms requested at the time of application, the type and location of the proposed real property security, the purpose for obtaining the loan, and any time limits the borrower has imposed to receive the loan in question;

j)     assist in ensuring that all independent contractors serving the Branch Office are properly licensed by any applicable state licensing authority and in good standing throughout the duration of their employment (including such things as timely payment of annual licensing fees and assessments and compliance with continuing education requirements);

k)     assist in ensuring that Branch Office and its employees function in compliance with all applicable state and federal employment laws including, but not limited to the Federal Fair Labor Standards Act.

Additionally, subject to PGM policies and procedures, Branch Manager shall be responsible for the general management of the Branch Office, consistent with the intent of this Agreement and sound business practices, including but not limited to:

a)     recruiting of employees and support staff;

b)     creation, maintenance and monitoring of relationships with suppliers, vendors, lenders, real estate agents and other settlement service providers to ensure courtesy, efficient, legal and ethical conduct of business;

c)     accurate reporting to PGM, in such form and such manner as PGM may require, of all mortgage loan transactions and related financial information as necessary to carry out the terms and covenants of this Agreement;

d)     maintenance of any and all records and other data at the Branch Office for such periods and in such manner as state and/or federal law may require;

e)     locating, securing and arranging for the lease of Branch Facilities as necessary to conduct the business of the Branch Office;

f)     maintenance of all mortgage loan files originated by Branch Office (whether closed, cancelled, withdrawn or denied) on site, or as PGM may otherwise approve, in writing, for such period of time as required by state and/or federal law. All mortgage loan files are to be delivered to PGM upon termination of this Agreement; and;

g)     primary responsibility to ensure that all employees of Branch Office are covered under the scope of all applicable state licensing requirements for loan originators

MAR-27-2006 MON 12:42 PM Pacific Guarantee Mrtg.     FAX NO. 5109707930     P. 04

Case 3:07-cv-03140-SI     Document 83     Filed 08/22/2008     Page 32 of 64

and are duly licensed and in good standing throughout the duration of their
employment (including such things as timely payment of annual licensing fees
and assessments and compliance with continuing education requirements).

6.     **Duties of PGM.** PGM shall assume responsibility for all accounting and the
disbursement of all funds for the operation of the Branch Office. PGM shall forward to Branch
Manager a monthly statement of income and expenses of the Branch Office, determined in
accordance with the provisions of paragraph 9 below. In addition, PGM shall have those other
and further duties and responsibilities set forth on Schedule A attached hereto and incorporated
herein. The parties understand and agree that said schedule is subject to amendment by PGM by
notice given in accordance with the provisions of paragraph 11 below. Any such amendment
shall become a part of this Agreement thirty (30) days after notice.

7.     **Compliance with Laws, Regulations and Policies.** PGM and Branch Manager
each acknowledge that state and federal law impose certain obligations on PGM with regard to
the supervision, employment and compensation of any person who acts on behalf of PGM in
furtherance of licensed activity. PGM shall review and supervise the activities of Branch
Manager as required by law, and as more particularly set forth above, Branch Manager shall
assist PGM in carrying out its supervisory obligations. However, this Agreement shall not be
construed as, and is not intended as, PGM's relinquishment of overall responsibility for the
supervision of the acts of salesperson associates licensed to PGM. Branch Manager agrees to
comply with all federal, state and local laws, rules, regulations, policies and procedures to which
PGM and/or Branch Manager are subject as a result of engaging in mortgage brokerage activity,
including without limitation, those of HUD and guidelines of Fannie Mae, Freddie Mac and
other investors. Branch Manager agrees to provide to borrowers and potential borrowers such
disclosures, in such form and in such manner as PGM, in its sole discretion, shall require from
time to time. The parties understand and agree that changes in federal, state and/or local laws,
rules, regulations, policies and procedures may necessitate, in PGM's sole discretion, future
amendment of this Agreement in order to maintain full compliance. Accordingly, such
amendments may be made by notice given in accordance with the provisions of paragraph 11
below. Any such amendment shall become a part of this Agreement thirty (30) days after notice.

8.     **Errors and Omissions Insurance.** PGM shall obtain and keep in place
professional liability insurance in such amounts and subject to such deductibles, endorsements,
exceptions and exclusions as PGM, in its sole discretion, shall deem appropriate. The
proportionate costs of such insurance attributable to PGM's Branch Office shall be considered an
expense of operations in the calculation of Net Profits, as that term is defined herein.

9.     **Compensation.** As compensation for the services to be rendered by Branch
Manager hereunder, PGM shall pay Branch Manager one hundred percent (100%) of all Net
Profits realized from the operation of the Branch Office. The term "Net Profits," as used herein,
shall mean Net Income from operations after Expenses but before taxes, in conformity with
mortgage industry accounting practices, all as determined according to sound accounting
principles. Net Income shall be determined by deducting Expenses from Gross Income. The
term "Gross Income" shall mean all income earned and derived from the Branch Office. The

MAR-27-2006 MON 12:42 PM Pacific Guarantee Mrtg.     FAX NO. 5109707930     P. 05

Case 3:07-cv-03140-SI     Document 93     Filed 08/22/2008     Page 33 of 64

term "Expenses" shall mean all operating expenses of the Branch Office, including those items of Expense identified elsewhere in this Agreement and including but not limited to the following:

a)     rent, copiers, office supplies, telephone service and utilities;

b)     commissions, salaries, payroll costs and expenses, and benefits of all employees and loan agents, including but not limited to commissions paid to Branch Manager in his/her capacity as a loan agent;

c)     all costs incurred by PGM in connection with the repurchase, by reason of fraud, of any loans originated by the Branch Office. Such costs may include, without limitation, disputes or settlements involving demands to repurchase loans;

d)     loss or costs, including reasonable attorneys' fees arising out of suits, actions, audits, foreclosures, or legal proceedings of any nature, arising out of the activities or operations of the Branch Office;

e)     all costs incurred by PGM in connection with Early Pay-offs or Early Payment Defaults, by reason of fraud, of any loans originated by the Branch Office;

f)     all costs (including up-front fees) to lock and/or extend locked loans; and,

g)     monthly shortages resulting from, but not limited to, non-collection of fees paid for credit reports, appraisals, etc.

Additionally, as set forth in Schedule B, which schedule is incorporated herein, there shall be other fees and expenses associated with Branch Office loan activity which shall be treated as Expenses. The parties understand and agree that Schedule B is subject to amendment by PGM by notice given in accordance with the provisions of paragraph 11 below. Any such amendment shall become a part of this Agreement thirty (30) days after notice.

Net Profits for any one month shall be paid to Branch Manager, or Branch Manager's designee, on the 30th day following the last day of that month. All such payments to Branch Manager shall be considered an Expense of the Branch Office.

10.     **No solicitation.** After termination of this Agreement, Branch Manager shall not solicit PGM's prospective or existing clients or customers based upon PGM-generated leads obtained during the term of this Agreement, nor may he/she solicit any client or customer with existing contractual obligations to PGM. Furthermore, after termination of this Agreement, Branch Manager shall not solicit Branch Office personnel in accordance with paragraph 21(v) of this Agreement.

Nothing contained in this paragraph is intended to preclude Branch Manager from purchasing and/or developing, at his/her own cost and expense, customer lists which shall be considered the separate property of Branch Manager and not subject to the provisions of this paragraph 10.

MAR-27-2006 MON 12:42 PM Pacific Guarantee Mrtg.        FAX NO. 5109707930                    P. 06

Case 3:07-cv-03140-SI    Document 93    Filed 08/22/2007    Page 34 of 64

11.     **Notices.** Any notice required or permitted under this Agreement shall be in writing, delivered to the party at the address set forth for such party below, and shall be deemed effectively delivered upon (i) personal delivery, (ii) one (1) day after deposit for overnight delivery with Federal Express or a comparable national express courier, or (iii) two (2) days after deposit in the United States mail, by first-class mail, postage prepaid. Notices shall be delivered to the parties at the following addresses:

*If to PGM:*                            *If to Branch Manager:*

Christopher M. George                  Jim Bowman
Pacific Guarantee Mortgage             Pacific Guarantee Mortgage
c/o CMG Mortgage Services, Inc.        2505 South 320th Street, Suite 260
3160 Crow Canyon Road, Suite 350       Federal Way, WA 98003
San Ramon, CA 94583

A party may designate another address for notice purposes upon written notice thereof pursuant to the provisions of this paragraph.

12.     **Indemnity.**

a) Branch Manager shall indemnify, defend, and hold PGM, its officers, directors, shareholders and affiliates, and their respective successors and assigns, harmless from and against any and all liability, claims, losses, costs, expenses, penalties, fines, forfeitures, judgments, or damages, including reasonable attorneys' fees and court costs, arising out of or in connection with any fraud or willful misconduct of Branch Manager.

b) PGM shall indemnify Branch Manager for all that Branch Manager loses in direct consequence of the discharge of his/her duties as such, or which result from his/her obedience to the directions of PGM, even though unlawful, unless Branch Manager, at the time of obeying such directions believed them to be unlawful. However, this paragraph shall not, in any respect, release or exempt Branch Manager from his/her duties under paragraph 7 of this Agreement, nor from his/her independent obligation(s) pursuant to his/her status as a licensed real estate broker/salesperson.

13.     **Mandatory Negotiation, Mediation and Arbitration.** The parties will attempt in good faith to resolve through negotiation any dispute, claim or controversy arising out of or relating to this Agreement. Either party may initiate negotiations by providing written notice in letter form to the other party, in accordance with the provisions of paragraph 11 above. Such notice shall set forth the subject of the dispute and the relief requested. The recipient of such notice will respond in writing within five days with a statement of its position on and recommended solution to the dispute. If the dispute is not resolved by this exchange of correspondence, the representatives of each party with full settlement authority will meet at a mutually agreeable time and place within ten days of the date of the initial notice in order to exchange relevant information and perspectives, and to attempt to resolve the dispute. If the

MAR-27-2006 MON 12:42 PM Pacific Guarantee Mrtg.    FAX NO. 5109707930    P. 07

Case 3:07-cv-03140-SI    Document 89    Filed 06/22/2009    Page 35 of 64

dispute is not resolved by these negotiations, the matter will be submitted to JAMS, or its successor, for mediation in accordance with the terms of this paragraph 13.

Either party may commence mediation by providing to JAMS and the other party a written request for mediation, pursuant to the provisions of paragraph 11 above. Such request shall set forth the subject of the dispute and the relief requested. The parties will cooperate with JAMS and with one another in selecting a mediator from JAMS' panel of neutrals, and in scheduling the mediation proceedings. The parties covenant that they will participate in the mediation in good faith, and that they will share equally in its costs. All offers, promises, conduct and statements, whether oral or written, made in the course of the mediation by any of the parties, their agents, employees, experts and attorneys, and by the mediator or any JAMS employees, are confidential, privileged, and inadmissible for any purpose, including impeachment, in any arbitration or other proceeding involving the parties, provided that evidence that is otherwise admissible or discoverable shall not be rendered inadmissible or non-discoverable as a result of its use in the mediation.

Either party may initiate arbitration in accordance with this paragraph 13 by filing a written demand for arbitration at any time following the initial mediation session or 45 days after the date of filing the written request for mediation, whichever occurs first. The mediation may continue after the commencement of arbitration if the parties so desire. Unless otherwise agreed by the parties, the mediator shall be disqualified from serving as arbitrator in the case. It is the intent of the parties to this Agreement that any and every dispute, claim or controversy arising out of or relating to this Agreement or the breach, termination, enforcement, interpretation or validity thereof, which can not be resolved by negotiation and/or mediation, be resolved by binding arbitration. This includes, but is not limited to the determination of the scope or applicability of this agreement to arbitrate. Arbitration shall be conducted in San Francisco, California, before a sole arbitrator, in accordance with the laws of the State of California for agreements made in and to be performed in California. The arbitration shall be administered by JAMS pursuant to its Comprehensive Arbitration Rules and Procedures. Judgment on the Award may be entered in any court having jurisdiction. The arbitrator shall, in the Award, allocate all of the costs of the arbitration and the mediation, including the fees of the arbitrator and the reasonable attorneys' fees of the prevailing party, against the party who did not prevail.

The provisions of this paragraph 13 may be enforced by any court having jurisdiction, and the party seeking enforcement shall be entitled to an award of all costs, fees and expenses, including attorneys' fees, to be paid by the party against whom enforcement is ordered.

14.    **Proprietary Information.** All loan files, records, documents, lists, rate sheets, product guidelines, investor/secondary market information, databases, trade secrets (as defined in paragraph 21(q)), manuals (including policies and procedures), training manuals, forms, marketing materials, hardware and software obtained from PGM, and similar items relating to the business of PGM, (collectively "Proprietary Information") whether prepared by Branch Manager or otherwise, coming into the possession of the Branch Office, its personnel and/or Branch Manager during the term of this Agreement shall be, and remain, the exclusive property of PGM.

MAR-27-2006 MON 12:43 PM Pacific Guarantee Mrtg.          FAX NO. 5109707930          P. 08

Case 3:07-cv-03140-SI     Document 89-3     Filed 08/22/2008     Page 36 of 64

Nothing contained in this paragraph is intended to preclude Branch Manager from purchasing, at his/her own cost and expense, databases, marketing materials, hardware and/or software, which shall be considered the separate property of Branch Manager and not subject to the provisions of this paragraph 14.

    **15.**    **Branch Facilities.** "Branch Facilities" shall include, but not be limited to office space, furnishing and business equipment. Branch Manager shall arrange for the execution by PGM of a month-to-month lease for appropriate Branch Facilities for a Fair Market Rent. "Fair Market Rent" shall mean a fixed monthly amount that does not vary with the volume or the value of mortgage loans originated by the Branch Office, and that is no more than the fair market rent paid by other similar businesses for comparable facilities in the geographic area in which the Branch Office is located.

    **16.**    **Name.** The Branch Office shall conduct business under the name Pacific Guarantee Mortgage, or such other name as PGM shall approve in advance, in writing. Branch Manager acknowledges and agrees that the name Pacific Guarantee Mortgage, and any and all derivations thereof, including but not limited to PGM trade names, trademarks and/or logos used in the conduct of the business of the Branch Office, are proprietary and belong exclusively to PGM. Upon termination of this Agreement for any reason, Branch Manager shall cease to use, in any manner, the name Pacific Guarantee Mortgage, and all derivations thereof, together with all PGM trade names, trademarks and logos, and during the term of this Agreement, shall acquire no license, proprietary rights to, or interest in them, or in any derivations thereof.

    **17.**    **Solicitation of Mortgage Loans in Other States.** Branch Manager shall limit solicitation of mortgage loan activity by Branch Manager and Branch Office personnel to the state in which the Branch Office is located, unless Branch Manager first receives the prior written approval of PGM. Such approval shall be subject to reasonable conditions, including but not limited to the requirement that PGM and all affected Branch Office personnel currently hold such licenses as necessary for the subject state and that Branch Manager and the affected personnel demonstrate a thorough familiarity with such state's laws and regulations related to loan solicitation and mortgage loan origination.

    **18.**    **Authority to Contract.** Branch Manager shall have no authority to enter into any agreement in the name of PGM. Branch Manager agrees to indemnify and hold PGM harmless from and against any and all liability arising out of any agreement entered into without the prior written consent of PGM. This covenant of indemnity shall include all costs of defense, including reasonable attorney's fees, for any such claim asserted.

    **19.**    **Events of Default/Termination.** This Agreement shall terminate upon any of the following events or for any of the following causes:

    a) Immediately following notice of a material breach of any covenant, condition, representation of contractual obligation of a party, given by the party that is or could be adversely affected thereby; provided said breach remains uncured for a period of ten (10) days following such written notice of said breach;

MAR-27-2006 MON 12:43 PM Pacific Guarantee Mrtg.          FAX NO. 5109707930                    P. 09

Case 3:07-cv-03140-SI   Document 83   Filed 08/22/2008   Page 37 of 64

b) Immediately in the event of insolvency, bankruptcy or receivership of either party; or,

c) Immediately in the event of Branch Manager's fraud or intentional breach of duty to a client.

Upon termination of this Agreement for any reason, Branch Manager shall promptly return to PGM all originals and copies of all Proprietary Information obtained by Branch Manager from PGM. Branch Manager acknowledges and agrees that all such materials are the sole and exclusive property of PGM, and agrees not to utilize such materials for any purpose other than as contemplated by this Agreement, or at all upon termination.

**20.     Status of Loans in Process at Termination.** Except in the case of termination for Branch Manager's fraud or intentional breach of duty to a client, and subject to any applicable law to the contrary, any mortgage loans which are in process or which have been originated by the Branch Office, up to and including any mortgage loans originated through 5:00 p.m., on the day of termination of this Agreement, shall be processed, submitted and closed by PGM. Branch Manager shall receive compensation related thereto in accordance with the terms of this Agreement, as if such loans had been closed prior to termination, provided that all loan files and other PGM property have been returned to PGM. All rights of Branch Manager to compensation under this Agreement shall immediately terminate in the event of termination of this Agreement by reason of Branch Manager's fraud or intentional breach of duty to a client.

**21.     Miscellaneous.**

**a. Effective Date.** The "Effective Date" of this Agreement shall be the date that it is signed by PGM.

**b. Assignment.** PGM shall have the right to assign its rights and duties under this Agreement to any party without the consent of Branch Manager. Any such assignee of PGM shall be an intended third-party beneficiary of the representations, warranties, covenants, agreements and remedies contained herein. Branch Manager shall have no right to assign his/her rights or duties under this Agreement without PGM's prior written consent, which may be withheld by PGM in its sole discretion.

**c. Choice of Law.** This Agreement shall be governed by and construed under the laws of the State of California, without regard to conflicts of laws principles.

**d. Integration.** This Agreement is the entire agreement between the parties regarding the subject matter and supersedes any prior oral or written agreement among them regarding the subject matter contained herein.

**e. Amendment.** Except as set forth herein, this Agreement may not be amended or modified orally and no provision of this Agreement may be waived or amended except in a writing which makes reference to this Agreement and which is signed by PGM.

Page 9 of 12

MAR-27-2006 MON 12:43 PM Pacific Guarantee Mrtg.        FAX NO. 5109707930         P. 10

Case 3:07-cv-03140-SI   Document 89   Filed 08/22/2008   Page 38 of 64

**f. Severability.** If a court of competent jurisdiction finds any provision in this Agreement to be invalid, illegal, or otherwise unenforceable, that determination will not affect any other provision of this Agreement. The invalid provision will be severed from this Agreement and all remaining provisions will continue to be of full force and effect.

**g. Interpretation.** Any ambiguities in this Agreement will not be strictly construed against the drafter of the language concerned but will be resolved by applying the most reasonable interpretation under the circumstances giving full consideration to the intentions of the parties at the time of contracting. This Agreement will not be construed against any party by reason of its preparation.

**h. No Third Party Beneficiaries.** Except as expressly set forth in paragraph 21 (b), above, this Agreement has been made by, and is made solely for the benefit of Branch Manager and PGM, and PGM's successors and permitted assigns. Except as expressly set forth in paragraph 21 (b), above, nothing in this Agreement is intended to confer any rights or remedies under or because of this Agreement on any persons or entities other than the parties to it and their respective successors and permitted assigns. Nothing in this Agreement is intended to relieve or discharge the obligation or liability of any third person or entity to any party to this Agreement.

**i. Waiver.** No waiver of any provision of this Agreement or consent to any action shall constitute a waiver of any other provision of this Agreement or consent to any other action. No waiver or consent shall constitute a continuing waiver or consent, or commit a party to provide a future waiver.

**j. Further Assurances.** Branch Manager shall execute and deliver any and all additional papers, documents and other assurances and shall do any and all acts and things reasonably necessary in connection with his/her performance of his/her obligations hereunder to carry out the intent of this Agreement.

**k. Captions.** All captions and headings in this Agreement are for reference only and may not be used in the interpretation of this Agreement or any related document.

**l. Counterparts.** This Agreement may be executed in counterparts, each of which shall constitute an original, but all of which together shall constitute one and the same instrument. The parties agree that a signed copy of this Agreement transmitted by one party to the other by facsimile transmission shall be binding upon the sending party to the same extent as a signed original of this Agreement.

**m. Attorneys' Fees.** In the event that any action or arbitration is brought by either party to enforce the terms of this Agreement, the prevailing party shall be entitled to reasonable attorneys' fees and costs.

**n. Venue.** PGM and Branch Manager agree that the proper venue for any legal action brought under this Agreement is either the County of Contra Costa, California or the United States District Court for the Northern District of California, as appropriate.

MAR-27-2006 MON 12:43 PM Pacific Guarantee Mrtg.     FAX NO. 5109707930          P. 11

Case 3:07-cv-03114-SI   Document 89   Filed 08/22/2008   Page 39 of 64

**o. Survival Upon Termination.** Branch Manager's representations, warranties, covenants and other obligations and agreements contained in this Agreement, including without limitation Branch Manager's indemnification obligations, shall survive any termination of this Agreement.

**p. Non-exclusive Remedies.** No remedy under this Agreement is exclusive of any other available remedy, but each remedy is cumulative and is in addition to other remedies given under this Agreement or existing in law or in equity.

**q. Confidentiality.** Each party understands, acknowledges and agrees that certain trade secrets and customer lists exist which are wholly owned and controlled by the other. These shall be referred to herein collectively as "trade secrets" and consist of information and materials that are valuable and not generally known by such party's competitors. All trade secrets, however maintained, shall be and remain the exclusive property of the originator thereof. Each party agrees not to disclose any of the other's trade secrets, directly or indirectly, or use them in any way, either during the term of this Agreement or at any time thereafter, except as required in the course of performance of this Agreement.

**r. Offset.** Amounts past due and owing by Branch Manager to PGM under this Agreement may, at PGM's option and in its sole discretion, be offset by PGM against any payments or other indebtedness then or thereafter owed by PGM to Branch Manager.

**s. Statute of Limitations.** Any action arising under this Agreement or because of its breach must be commenced within one year after the cause of action accrues.

**t. No Partnership or Joint Venture Intended.** PGM and Branch Manager intend that, to the maximum extent permissible by law, this Agreement shall not be construed as a partnership and/or joint venture.

**u. Regulatory Compliance.** PGM and Branch Manager recognize the importance of full compliance at all times with all state and federal laws, rules and regulations governing mortgage loan origination. Accordingly, notwithstanding anything to the contrary contained elsewhere herein, the parties recognize and agree that PGM retains the right to amend this Agreement as necessary, in its reasonable discretion, to ensure full compliance with all state and federal laws, rules and regulations. Any such amendment shall become a part of this Agreement thirty (30) days after notice thereof is given in accordance with paragraph 11 above.

**v. Anti-Poaching.** Branch Manager agrees not to solicit or in any way entice to leave, interview, hire or contract, either directly or indirectly, with any employees or independent contractors affiliated with PGM, or any of its affiliates, during the term of this Agreement, and for a period of two (2) years following termination of this Agreement.

**w. Jury Trial.** Pursuant to the provisions of paragraph 14 above, Branch Manager and PGM each agree to waive trial by jury in any action or proceeding arising out of this Agreement.

Page 11 of 12

MAR-27-2006 MON 12:43 PM Pacific Guarantee Mrtg.    FAX NO. 5109707930    P. 12

Case 3:07-cv-03140-SI   Document 89   Filed 08/22/2008   Page 40 of 64

    **x. Condition Precedent.** It is understood and agreed that the respective rights, duties and obligations of the parties hereto are expressly made subject to and conditioned upon the completion of the transaction by and between PGM and RBC, which transaction is expected to conclude on or about June 30, 2003. PGM will notify Jim Bowman once said transaction is concluded.

    IN WITNESS WHEREOF, the undersigned have executed this Agreement at San Ramon, California.

Dated:_____

Dated:_____12/1/03_____

**CMG Mortgage Services, Inc., doing business as Pacific Guarantee Mortgage**

**Branch Manager**

By: _____

By: _____

    Christopher M. George, President

    Jim Bowman

Page 12 of 12

**Exhibit B**

MAR-27-2006 MON 12:44 PM Pacific Guarantee Mrtg.      FAX NO. 5109707930                 P. 17

Case 3:07-cv-03140-SI   Document 93-4   Filed 08/27/2008   Page 42 of 64

457

# BRANCH MANAGEMENT AND EMPLOYMENT AGREEMENT

This Branch Management and Employment Agreement (hereinafter referred to as "Agreement") is entered into at San Ramon, California as of the Effective Date, as that term is defined herein, by and between CMG Mortgage, Inc., a California corporation doing business as Pacific Guarantee Mortgage (hereinafter referred to as "PGM"), and _James W Bowman_ (Name) (hereinafter referred to as "Branch Manager").

## RECITALS

WHEREAS PGM and Branch Manager desire to reduce to writing their understanding and agreement pursuant to which Branch Manager will assist PGM in the management, administration and supervision of the activities of PGM's employees assigned to PGM's branch office located at 500 West 8th Street, Suite 100, Vancouver, WA 98660 ("Branch Office"); and,

WHEREAS PGM and Branch Manager also desire to reduce to writing the terms and conditions of Branch Manager's employment with PGM;

In consideration of the covenants, agreements and representations contained herein, PGM and Branch Manager agree as follows:

1.     **PGM.** PGM represents that PGM is duly licensed by all applicable governmental authorities and is doing business as a mortgage broker under the name Pacific Guarantee Mortgage. Concurrently with the execution of this Agreement, PGM will obtain the necessary branch license for the Branch Office.

2.     **Employment at Will.** PGM employs Branch Manager and Branch Manager accepts employment with PGM as branch manager of PGM's Branch Office on an at-will basis. Either PGM or Branch Manager may terminate this Agreement with or without cause, and with or without the giving of any reasons therefore, at any time on thirty (30) days notice to the other pursuant to the notice provisions of paragraph 11 herein. The rights and duties set forth in this paragraph may not be modified in any way except pursuant to the terms of paragraph 21 (e) herein.

3.     **Licensed Status.** Branch Manager represents that he/she holds all such licenses as required by state and/or federal law to conduct mortgage brokerage activity at PGM's Branch Office, and that he/she has a minimum of three (3) years of full time experience in mortgage brokerage activity gained during the immediately preceding five (5) year period. Branch Manager further represents that while this Agreement is in effect he/she will maintain in good standing each and every such license.

4.     **Devotion to PGM's Business.** During the term of this Agreement, all of Branch Manager's time and attention dedicated to mortgage loan brokerage and/or origination shall be devoted solely to the business of PGM at the Branch Office. During the term of this Agreement, Branch Manager shall not engage in any other business duties or pursuits whatsoever, or directly

BMA.DOC.01Rev. 6-7-04.doc

1 of 11

MAR-27-2006 MON 12:44 PM Pacific Guarantee Mrtg.      FAX NO. 5109707930      P. 18

Case 3:07-cv-03140-SI   Document 99   Filed 08/27/2008   Page 346 of 264

or indirectly render any services of a business, commercial or professional nature to any other person or organization, whether for compensation or otherwise, without the prior written consent of PGM. During the term of this Agreement, Branch Manager shall not, directly or indirectly, either as an employee, employer, consultant, agent, principal, partner, stockholder, corporate officer, director, or in any other individual or representative capacity, engage or participate in any business that is in competition in any manner whatsoever with the business of PGM

5.      **Duties of Branch Manager.** Branch Manager shall do and perform all services, acts, or things necessary or advisable to fulfill his/her duties as such, subject to the direction of PGM and to the policies established by it. Pursuant thereto, PGM and Branch Manager intend for Branch Manager to assist PGM in administering reasonable supervision over the activities of all licensed activity at Branch Office, and over the activities of all employees assigned to PGM's Branch Office. "Reasonable supervision" includes, as appropriate, the establishment of policies, rules, procedures and systems to review, oversee, inspect and manage:

a)      transactions requiring a license;

b)      documents which may have a material effect upon the rights or obligations of a party to every such transaction;

c)      filing, storage and maintenance of all documents created in connection with every such transaction;

d)      the handling of trust funds. (Branch Manager agrees not to establish or use a trust account without the prior written approval of PGM);

e)      advertising of any service for which a license is required. (Branch Manager agrees that all advertising material must receive written approval from PGM prior to publication);

f)      familiarizing licensed employees ("Loan Agents"), and unlicensed assistants and support personnel, with the requirements of federal and state laws relating to the prohibition of discrimination;

g)      familiarizing Loan Agents with the requirements of federal and state laws relating to disclosures to be given in connection with mortgage loan transactions;

h)      regular and consistent reports of licensed activities of all employees;

i)      ensuring that in every transaction Branch Manager, and every Loan Agent and employee involved in each such transaction, honors all affirmative obligations owed to each client, as required by federal law, state law and/or ethical practices, including but not limited to: the duty of utmost *care, integrity, honesty and loyalty*; the duty to disclose all material loan terms or any other material facts that may affect the decision to borrow and to encumber real property; the duty to maintain *confidentiality*, except to the extent that information must be disclosed to

MAR-27-2006 MON 12:44 PM Pacific Guarantee Mrtg.     FAX NO. 5109707930          P. 19

Case 3:07-cv-03140-SI     Document 34     Filed 08/22/2008     Page 44 of 64

a potential lender in order to permit the lender to make an informed and considered decision to extend credit; and the duty to recommend a *competitive* loan product in the right class of loans (e.g., "A", "A-", "B", "C", etc.) when considering the borrower's income and credit history, financial standing and net worth (including the capacity to repay the loan), personal and financial needs, the loan terms requested at the time of application, the type and location of the proposed real property security, the purpose for obtaining the loan, and any time limits the borrower has imposed to receive the loan in question;

j)  assist in ensuring that all Loan Agents serving the Branch Office are properly licensed by any applicable state licensing authority and in good standing throughout the duration of their employment (including such things as timely payment of annual licensing fees and assessments and compliance with continuing education requirements);

k)  assist in ensuring that the Branch Office and its employees function in compliance with all applicable state and federal employment laws including, but not limited to the Federal Fair Labor Standards Act.

Additionally, subject to PGM policies and procedures, Branch Manager shall be responsible for the general management of the Branch Office, consistent with the intent of this Agreement and sound business practices, including but not limited to:

l)  recruiting of employees and support staff;

m)  creation, maintenance and monitoring of relationships with suppliers, vendors, lenders, real estate agents and other settlement service providers to ensure courteous, efficient, legal and ethical conduct of business;

n)  accurate reporting to PGM, in such form and such manner as PGM may require, of all mortgage loan transactions and related financial information as necessary to carry out the terms and covenants of this Agreement;

o)  maintenance of any and all records and other data at the Branch Office for such periods and in such manner as state and/or federal law may require;

p)  locating, securing and arranging for the lease of Branch Facilities as necessary to conduct the business of the Branch Office;

q)  maintenance of all mortgage loan files originated by Branch Office (whether closed, cancelled, withdrawn or denied) on site, or as PGM may otherwise approve, in writing, for such period of time as is required by state and/or federal law. All mortgage loan files are to be delivered to PGM upon termination of this Agreement; and,

r)  primary responsibility for ensuring that all Loan Agents of the Branch Office are duly licensed and in good standing throughout the duration of their employment

MAR-27-2006 MON 12:44 PM Pacific Guarantee Mrtg.     FAX NO. 5109707930     P. 20

Case 3:07-cv-03140-SI     Document 94     Filed 08/22/2008     Page 45 of 64

(including such things as timely payment of annual licensing fees and assessments and compliance with continuing education requirements).

6.     **Duties of PGM.**  PGM shall assume responsibility for all accounting and the disbursement of all funds for the operation of the Branch Office.  PGM shall forward to Branch Manager a monthly statement of income and expenses of the Branch Office, determined in accordance with the provisions of paragraph 9 below.

7.     **Compliance with Laws, Regulations and Policies.**  PGM and Branch Manager each acknowledge that state and federal law impose certain obligations on PGM with regard to the supervision, employment and compensation of any person who acts on behalf of PGM in furtherance of licensed mortgage brokerage activity.  PGM shall review and supervise the activities of Branch Manager as required by law, and as more particularly set forth above, Branch Manager shall assist PGM in carrying out its supervisory obligations.  However, this Agreement shall not be construed as, and is not intended as, PGM's relinquishment of overall responsibility for the supervision of the acts of Loan Agents and other employees assigned to the Branch Office.  Branch Manager agrees to comply with all federal, state and local laws, rules, regulations, policies and procedures to which PGM and/or Branch Manager are subject as a result of engaging in mortgage brokerage activity, including without limitation, those of HUD and guidelines of Fannie Mae, Freddie Mac and other investors.  Branch Manager agrees to provide to borrowers and potential borrowers such disclosures, in such form and in such manner as PGM, in its sole discretion, shall require from time to time.  The parties understand and agree that changes in federal, state and/or local laws, rules, regulations, policies and procedures may necessitate, in PGM's sole discretion, future amendment of this Agreement in order to maintain full compliance.  Accordingly, such amendments may be made by notice given in accordance with the provisions of paragraph 11 below.  Any such amendment shall become a part of this Agreement thirty (30) days after notice.

8.     **Errors and Omissions Insurance.**  PGM shall obtain and keep in place professional liability insurance in such amounts and subject to such deductibles, endorsements, exceptions and exclusions as PGM, in its sole discretion, shall deem appropriate.  The proportionate costs of such insurance attributable to PGM's Branch Office shall be considered an expense of operations in the calculation of Net Profits, as that term is defined herein.

9.     **Compensation.**  As compensation for the services to be rendered by Branch Manager hereunder, PGM shall pay Branch Manager one hundred percent (100%) of all Net Profits realized from the operation of the Branch Office.  The term "Net Profits," as used herein, shall be determined by deducting Expenses from Gross Income, in conformity with mortgage industry accounting practices and in accordance with sound accounting principles.  The term "Gross Income" shall mean all income earned and derived from the Branch Office.  The term "Expenses" shall mean all operating expenses of the Branch Office, including those items of Expense identified elsewhere in this Agreement and including but not limited to the following:

a)     rent, copiers, office supplies, telephone service and utilities;

MAR-27-2006 MON 12:45 PM Pacific Guarantee Mrtg.     FAX NO. 5109707930     P. 21

Case 3:07-cv-03140-SI    Document 39    Filed 08/22/2008    Page 46 of 64

b)    commissions, salaries, payroll costs and expenses, and benefits of all employees, including but not limited to commissions paid to Branch Manager in his/her capacity as a Loan Agent;

c)    all costs incurred by PGM in connection with the repurchase, by reason of fraud, of any loans originated by the Branch Office. Such costs may include, without limitation, disputes or settlements involving demands to repurchase loans;

d)    loss or costs, including reasonable attorneys' fees and court costs arising out of suits, actions, audits, foreclosures, or legal proceedings of any nature, related directly or indirectly to the activities or operations of the Branch Office;

e)    all costs incurred by PGM in connection with Early Pay-offs or Early Payment Defaults, by reason of fraud, of any loans originated by the Branch Office;

f)    all costs (including up-front fees) to lock and/or extend locked loans; and,

g)    monthly shortages resulting from, but not limited to, non-collection of fees paid for credit reports, appraisals, etc.

Additionally, as set forth in Schedule A, which schedule is incorporated herein, there shall be other fees and expenses associated with Branch Office loan activity which shall be treated as Expenses. The parties understand and agree that Schedule A is subject to amendment by PGM by notice given in accordance with the provisions of paragraph 11 below. Any such amendment shall become a part of this Agreement thirty (30) days after notice.

Net Profits for any one month shall be paid to Branch Manager on the 30th day following the last day of that month. All such payments to Branch Manager shall be considered an Expense of the Branch Office.

10.    **No solicitation.** After termination of this Agreement, Branch Manager shall not solicit PGM's prospective or existing clients or customers based upon PGM-generated leads obtained during the term of this Agreement, nor may he/she solicit any client or customer with existing contractual obligations to PGM. Furthermore, after termination of this Agreement, Branch Manager shall not solicit Branch Office personnel in accordance with paragraph 21(s) of this Agreement.

Nothing contained in this paragraph is intended to preclude Branch Manager from purchasing and/or developing, at his/her own cost and expense, customer lists which shall be considered the separate property of Branch Manager and not subject to the provisions of this paragraph 10.

11.    **Notices.** Any notice required or permitted under this Agreement shall be in writing, delivered to the party at the address set forth for such party below, and shall be deemed effectively delivered upon (i) personal delivery, (ii) one (1) day after deposit for overnight delivery with Federal Express or a comparable national express courier, or (iii) two (2) days after

BMA.DOC.01Rev. 6-7-04.doc

MAR-27-2006 MON 12:45 PM Pacific Guarantee Mrtg.        FAX NO. 5109707930        P. 22

Case 3:07-cv-03140-SI        Document 30        Filed 08/27/2008        Page 47 of 64

deposit in the United States mail, by first-class mail, postage prepaid. Notices shall be delivered to the parties at the following addresses:

*If to PGM:*

Teresa Ones
Pacific Guarantee Mortgage
c/o CMG Mortgage, Inc.
3160 Crow Canyon Road, Suite 350
San Ramon, CA 94583

*If to Branch Manager:*

Jim Bowman

Pacific Trust Lending
500 West 8th Street
Suite 100
Vancouver, WA 98660

A party may designate another address for notice purposes upon written notice thereof pursuant to the provisions of this paragraph.

12.  **Indemnity.**

a) Branch Manager shall indemnify, defend, and hold PGM, its officers, directors, shareholders, parents, subsidiaries and affiliates, and their respective successors and assigns, harmless from and against any and all liability, claims, losses, costs, expenses, penalties, fines, forfeitures, judgments, or damages, including reasonable attorneys' fees and court costs, arising out of or in connection with any fraud, willful misconduct or knowing violation of law of Branch Manager.

b) PGM shall indemnify Branch Manager for all that Branch Manager loses in direct consequence of the discharge of his/her duties as such, or which result from his/her obedience to the directions of PGM, even though unlawful, unless Branch Manager, at the time of obeying such directions believed them to be unlawful. However, this paragraph shall not, in any respect, release or exempt Branch Manager from his/her duties under paragraph 5 of this Agreement, nor from his/her independent obligation(s) pursuant to his/her licensed status.

13.  **Mandatory Negotiation, Mediation and Arbitration.** The parties will attempt in good faith to resolve through negotiation any dispute, claim or controversy arising out of or relating to this Agreement. Either party may initiate negotiations by providing written notice in letter form to the other party, in accordance with the provisions of paragraph 11 above. Such notice shall set forth the subject of the dispute and the relief requested. The recipient of such notice will respond in writing within five (5) days with a statement of his/her/its position on and recommended solution to the dispute. If the dispute is not resolved by this exchange of correspondence, the representatives of each party with full settlement authority will meet at a mutually agreeable time and place within ten (10) days of the date of the initial notice in order to exchange relevant information and perspectives, and to attempt to resolve the dispute. If the dispute is not resolved by these negotiations, the matter will be submitted to JAMS, or its successor, for mediation in accordance with the terms of this paragraph 13.

Either party may commence mediation by providing to JAMS and the other party a written request for mediation, pursuant to the provisions of paragraph 11 above. Such request shall set forth the subject of the dispute and the relief requested. The parties will cooperate with

6 of 11

MAR-27-2006 MON 12:45 PM Pacific Guarantee Mrtg.          FAX NO. 5109707930          P. 23

Case 3:07-cv-03140-SI    Document 30    Filed 08/22/2008    Page 48 of 64

JAMS and with one another in selecting a mediator from JAMS' panel of neutrals, and in scheduling the mediation proceedings. The parties covenant that they will participate in the mediation in good faith, and that they will share equally in its costs. All offers, promises, conduct and statements, whether oral or written, made in the course of the mediation by any of the parties, their agents, employees, experts and attorneys, and by the mediator or any JAMS employees, are confidential, privileged, and inadmissible for any purpose, including impeachment, in any arbitration or other proceeding involving the parties, provided that evidence that is otherwise admissible or discoverable shall not be rendered inadmissible or non-discoverable as a result of its use in the mediation.

Either party may initiate arbitration in accordance with this paragraph 13 by filing a written demand for arbitration at any time following the initial mediation session or forty-five (45) days after the date of filing the written request for mediation, whichever occurs first. The mediation may continue after the commencement of arbitration if the parties so desire. Unless otherwise agreed by the parties, the mediator shall be disqualified from serving as arbitrator in the case. It is the intent of the parties to this Agreement that any and every dispute, claim or controversy arising out of or relating to this Agreement or the breach, termination, enforcement, interpretation or validity thereof, which can not be resolved by negotiation and/or mediation, be resolved by binding arbitration. This includes, but is not limited to the determination of the scope or applicability of this agreement to arbitrate. Arbitration shall be conducted in San Francisco, California, before a sole arbitrator, in accordance with the laws of the State of California for agreements made in and to be performed in California. The arbitration shall be administered by JAMS pursuant to its Comprehensive Arbitration Rules and Procedures. Judgment on the Award may be entered in any court having jurisdiction. Branch Manager may seek to obtain a waiver of the costs associated with the initiation and maintenance of the arbitration, to the extent such costs: 1) are in excess of the costs of bringing and maintaining an equivalent court action; and, 2) to the extent such costs exceed Branch Manager's ability to pay. The arbitrator shall, in the Award, allocate all of the costs of the arbitration and the mediation, including the fees of the arbitrator and the reasonable attorneys' fees of the prevailing party, against the party who did not prevail.

The provisions of this paragraph 13 may be enforced by any court having jurisdiction, and the party seeking enforcement shall be entitled to an award of all costs, fees and expenses, including attorneys' fees, to be paid by the party against whom enforcement is ordered.

14.    **Proprietary Information.** All loan files, records, documents, lists, rate sheets, product guidelines, investor/secondary market information, databases, trade secrets (as defined in paragraph 21(o)), manuals (including policies and procedures), training manuals, forms, marketing materials, hardware and software obtained from PGM, and similar items relating to the business of PGM. (collectively "Proprietary Information") whether prepared by Branch Manager or otherwise, coming into the possession of the Branch Office, its personnel and/or Branch Manager during the term of this Agreement shall be, and remain, the exclusive property of PGM.

Nothing contained in this paragraph is intended to preclude Branch Manager from purchasing, at his/her own cost and expense, databases, marketing materials, hardware and/or

software, which shall be considered the separate property of Branch Manager and not subject to the provisions of this paragraph 14.

15. **Branch Facilities.** "Branch Facilities" shall include, but not be limited to office space, office furniture, telephone systems and business equipment. Branch Manager shall arrange for the execution by PGM of a month-to-month lease for appropriate Branch Facilities for a Fair Market Rent. "Fair Market Rent" shall mean a fixed monthly amount that does not vary with the volume or the value of mortgage loans originated by the Branch Office, and that is no more than the fair market rent paid by other similar businesses for comparable facilities, under comparable terms and conditions, in the geographic area in which the Branch Office is located.

16. **Name.** The Branch Office shall conduct business under the name Pacific Guarantee Mortgage, or such other name as PGM shall approve in advance, in writing. Branch Manager acknowledges and agrees that the name Pacific Guarantee Mortgage, and any and all derivations thereof, including but not limited to PGM trade names, trademarks and/or logos used in the conduct of the business of the Branch Office, are proprietary and belong exclusively to PGM. Upon termination of this Agreement for any reason, Branch Manager shall cease to use, in any manner, the name Pacific Guarantee Mortgage, and all derivations thereof, together with all PGM trade names, trademarks and logos, and during the term of this Agreement, shall acquire no license, proprietary rights to, or interest in them, or in any derivations thereof.

17. **Solicitation of Mortgage Loans in Other States.** Branch Manager shall limit solicitation of mortgage loan brokerage activity by Branch Manager and Branch Office personnel to the state in which the Branch Office is located, unless Branch Manager first receives the prior written approval of PGM. Such approval shall be subject to reasonable conditions, including but not limited to the requirement that PGM and all affected Branch Office personnel currently hold such licenses as are necessary for the subject state and that Branch Manager and the affected personnel demonstrate a thorough familiarity with such state's laws and regulations related to loan solicitation and mortgage loan origination. Notwithstanding the foregoing, Branch Manager and the Branch Office may utilize PGM's National Service Center, in PGM's sole discretion.

18. **Authority to Contract.** Branch Manager shall have no authority to enter into any agreement in the name of PGM. Branch Manager agrees to indemnify and hold PGM harmless from and against any and all liability arising out of any agreement entered into without the prior written consent of PGM. This covenant of indemnity shall include all costs of defense, including reasonable attorney's fees, for any such claim asserted.

19. **Events of Default/Termination.** Without limiting the at-will nature of Branch Manager's employment, this Agreement shall terminate immediately upon any of the following events or for any of the following causes:

a) following notice of a material breach of any covenant, condition, representation of contractual obligation of a party, given by the party that is or could be adversely affected thereby, provided said breach remains uncured for a period of ten (10) days following such written notice of said breach;

MAR-27-2006 MON 12:45 PM Pacific Guarantee Mrtg.　　　FAX NO. 5109707930　　　P. 25

Case 3:07-cv-03140-SI   Document 98-9   Filed 08/22/2008   Page 50 of 64

b) in the event of insolvency, bankruptcy or receivership of either party; or,

c) in the event of Branch Manager's fraud, intentional breach of duty to a client or knowing violation of law.

Upon termination of this Agreement for any reason, Branch Manager shall promptly return to PGM all originals and copies of all Proprietary Information obtained by Branch Manager from PGM. Branch Manager acknowledges and agrees that all such materials are the sole and exclusive property of PGM, and agrees not to utilize such materials for any purpose other than as contemplated by this Agreement, or at all upon termination.

20.　　**Status of Loans in Process at Termination.** Except in the case of termination for Branch Manager's fraud, intentional breach of duty to a client or knowing violation of law, and subject to any applicable law to the contrary, any mortgage loans which are in process or which have been originated by the Branch Office, up to and including any mortgage loans originated through 5:00 p.m., on the day of termination of this Agreement, shall be processed, submitted and closed by PGM. Branch Manager shall receive compensation related thereto in accordance with the terms of this Agreement, as if such loans had been closed prior to termination, provided that all loan files and other PGM property have been returned to PGM. All rights of Branch Manager to compensation under this Agreement shall immediately terminate in the event of termination of this Agreement by reason of Branch Manager's fraud, intentional breach of duty to a client or knowing violation of law.

21.　　**Miscellaneous.**

a) **Effective Date.** The "Effective Date" of this Agreement shall be the date that it is signed by PGM.

b) **Assignment.** PGM shall have the right to assign its rights and duties under this Agreement to any party without the consent of Branch Manager. Any such assignee of PGM shall be an intended third-party beneficiary of the representations, warranties, covenants, agreements and remedies contained herein. Branch Manager shall have no right to assign his/her rights or duties under this Agreement without PGM's prior written consent, which may be withheld by PGM in its sole discretion.

c) **Choice of Law.** This Agreement shall be governed by and construed under the laws of the State of California, without regard to its conflicts of laws principles.

d) **Integration.** This Agreement is the entire agreement between the parties regarding the subject matter and supersedes any prior oral or written agreement among them regarding the subject matter contained herein. However, this Agreement shall not amend or supersede the terms and conditions of any Loan Origination or other Employment Agreement in effect between Branch Manager and PGM.

9 of 11

BMA.DOC.01Rev. 6-7-04.doc

e) **Amendment.** Except as set forth herein, this Agreement may not be amended or modified orally and no provision of this Agreement may be waived or amended except in a writing which makes reference to this Agreement and which is signed by PGM.

f) **Severability.** If a court of competent jurisdiction finds any provision in this Agreement to be invalid, illegal, or otherwise unenforceable, that determination will not affect any other provision of this Agreement. The invalid provision will be severed from this Agreement and all remaining provisions will continue to be of full force and effect.

g) **Interpretation.** Any ambiguities in this Agreement will not be strictly construed against the drafter of the language concerned but will be resolved by applying the most reasonable interpretation under the circumstances giving full consideration to the intentions of the parties at the time of contracting. This Agreement will not be construed against any party by reason of its preparation.

h) **No Third Party Beneficiaries.** Except as expressly set forth in paragraph 21 (b), above, this Agreement has been made by, and is made solely for the benefit of Branch Manager and PGM, and PGM's successors and permitted assigns. Except as expressly set forth in paragraph 21 (b), above, nothing in this Agreement is intended to confer any rights or remedies under or because of this Agreement on any persons or entities other than the parties to it and their respective successors and permitted assigns. Nothing in this Agreement is intended to relieve or discharge the obligation or liability of any third person or entity to any party to this Agreement.

i) **Waiver.** No waiver of any provision of this Agreement or consent to any action shall constitute a waiver of any other provision of this Agreement or consent to any other action. No waiver or consent shall constitute a continuing waiver or consent, or commit a party to provide a future waiver.

j) **Further Assurances.** Branch Manager shall execute and deliver any and all additional papers, documents and other assurances and shall do any and all acts and things reasonably necessary in connection with his/her performance of his/her obligations hereunder to carry out the intent of this Agreement.

k) **Captions.** All captions and headings in this Agreement are for reference only and may not be used in the interpretation of this Agreement or any related document.

l) **Counterparts.** This Agreement may be executed in counterparts, each of which shall constitute an original, but all of which together shall constitute one and the same instrument. The parties agree that a signed copy of this Agreement transmitted by one party to the other by facsimile transmission shall be binding upon the sending party to the same extent as a signed original of this Agreement.

m) **Survival Upon Termination.** Branch Manager's representations, warranties, covenants and other obligations and agreements contained in this Agreement, including without limitation Branch Manager's indemnification obligations, shall survive any termination of this Agreement.

MAR-27-2006 MON 12:46 PM Pacific Guarantee Mrtg.      FAX NO. 5109707930                    P. 27

Case 3:07-cv-03406SI   Document 9-9   Filed 06/22/2008   Page 32 of 64

**n) Non-exclusive Remedies.** No remedy under this Agreement is exclusive of any other available remedy, but each remedy is cumulative and is in addition to other remedies given under this Agreement or existing in law or in equity.

**o) Confidentiality.** Each party understands, acknowledges and agrees that certain trade secrets and customer lists exist which are wholly owned and controlled by the other. These shall be referred to herein collectively as "Trade Secrets." As used herein, the term "Trade Secrets" shall have that meaning attributed to it by California Civil Code Section 3426.1 and at common law. All Trade Secrets, however maintained, shall be and remain the exclusive property of the originator thereof. Each party agrees not to disclose any of the other's Trade Secrets, directly or indirectly, or use them in any way, either during the term of this Agreement or at any time thereafter, except as required in the course of performance of this Agreement.

**p) Statute of Limitations.** Any action arising under this Agreement or because of its breach must be commenced within one year after the cause of action accrues.

**q) No Partnership or Joint Venture Intended.** PGM and Branch Manager intend that, to the maximum extent permissible by law, this Agreement shall not be construed as a partnership and/or joint venture.

**r) Regulatory Compliance.** PGM and Branch Manager recognize the importance of full compliance at all times with all state and federal laws, rules and regulations governing mortgage loan origination. Accordingly, notwithstanding anything to the contrary contained elsewhere herein, the parties recognize and agree that PGM retains the right to amend this Agreement as necessary, in its reasonable discretion, to ensure full compliance with all state and federal laws, rules and regulations. Any such amendment shall become a part of this Agreement thirty (30) days after notice thereof is given in accordance with paragraph 11 above.

**s) Anti-Poaching.** Branch Manager agrees not to solicit or in any way entice to leave, interview, hire or contract, either directly or indirectly, with any employees or independent contractors affiliated with PGM, or any of its affiliates, during the term of this Agreement, and for a period of two (2) years following termination of this Agreement.

**t) Signatures.** The undersigned persons represent that they are authorized and have the legal capacity to enter into this Agreement.

Dated: _____

**CMG Mortgage, Inc., doing business as Pacific Guarantee Mortgage**

By: _____
   Christopher M. George, President

Dated: 6/30/04

**Branch Manager**

By: _____

Name (print): James W Bowman

11 of 11

**Exhibit C**

MAR-27-2006 MON 12:43 PM Pacific Guarantee Mrtg.          FAX NO. 5109707930          P. 13

Case 3:07-cv-03048-SI   Document 89-5   Filed 07/17/2008   Page 54 of 64
Case 3:07-cv-03048-SI   Document 9-5   Filed 08/22/2007   Page 2 of 5

## FACILITIES AGREEMENT

This Facilities and Equipment Rental Agreement ("Agreement") is entered into effective July 1, 2003, by and between CMG Mortgage Services, Inc., a California corporation doing business as Pacific Guarantee Mortgage ("PGM") and Jim Bowman and Pacific Real Estate Management (collectively "Provider"), at San Ramon, California.

Whereas, PGM is engaged in business as a mortgage broker;

Whereas, PGM intends to operate a branch office at 2505 South 320th Street, Suite 260 Federal Way, WA 98003 (the "Branch Office");

Whereas, PGM desires to secure facilities, equipment, services, supplies and office space sufficient to operate the Branch Office; and,

Whereas, Provider desires to provide such facilities, equipment, services, supplies and office space,

Now, therefore, in consideration of the mutual covenants and agreements contained herein, and for other good and valuable consideration, the receipt and sufficiency of which is hereby acknowledged, it is hereby agreed as follows:

### Article I
### Items Supplied by Provider

**1.1 Office Space.** Provider, as master tenant, hereby subleases to PGM the Leased Premises described and identified in the Master Lease attached hereto as Exhibit A.

**1.2 Facilities and Equipment.** Provider hereby agrees to provide to PGM the facilities and equipment identified in Exhibit B attached hereto and incorporated herein, which shall include one or more of the following, as reasonably necessary to conduct the business of the Branch Office in a responsible business manner:

a.     Office furniture, including desks, chairs and tables;
b.     Office equipment, including computers, printers and typewriters;
c.     Facsimile machines and photocopiers;
d.     Common area and reception furniture; and,
e.     Telephone equipment and handsets.

**1.3 Services and Supplies.** Provider hereby agrees to provide to PGM the services and supplies identified in Exhibit C attached hereto and incorporated herein, which shall include the following:

C:\My Documents\New Net Branches\Jim Bowman\Facilities-Net CA-06.12.03.doc

Page 1 of 4

a.  All computer, printer and typewriter supplies, including but not limited to software and hardware maintenance and upgrade, printer toner and supplies, and typewriter ribbons and supplies;

b.  Facsimile and photocopier supplies, including but not limited to toner and paper; and,

c.  Maintenance and repair of items (a) - (e), inclusive, of the preceding paragraph 1.2, as reasonably needed.

**1.4 Changes in Items Supplied.** The parties reserve the right to increase, decrease or modify the facilities, equipment, services and supplies which are the subject of this Agreement.

**1.5 Insurance.** PGM shall obtain and maintain, at its sole cost and expense, such fire, theft, liability, hazard and other insurance on the Leased Premises and the facilities, equipment, services and supplies which are a subject of this Agreement, as reasonably necessary to provide coverage for all risks of loss or damage and all liability for use thereof.

**1.6. Facilities.** All office space, facilities, equipment, services, supplies and insurance referred to in sections 1.1 through 1.5, inclusive, of this Article I shall be referred to herein, collectively, as the "Facilities."

## Article II
## Security Deposit

**2.1 Security Deposit.** As a material consideration for PGM's agreement to enter into this Agreement, Provider agrees concurrently with the execution of this Agreement to deposit with PGM a security deposit in the sum of $ 10,724.00 . This security deposit is intended to secure any and all obligations of Jim Bowman and/or Pacific Real Estate Mgt to PGM, whether arising out of this Agreement or otherwise. Said security deposit, to the extent not used in accordance with the provisions of this Article II, shall be returned to Provider, without interest, within sixty (60) days following the termination of this Agreement.

**2.2 Use of Security Deposit.** By signature below Jim Bowman and Pacific Real Estate Mgt each authorize and instruct PGM, at its option and in its sole discretion, to use all, or any part of the security deposit, to satisfy any indebtedness now or hereafter owed by Jim Bowman and/or Pacific Real Estate Mgt to PGM, to the maximum extent permitted by law.

## Article III
## Term of Agreement

**3.1 Term.** The term of this Agreement shall be one (1) month from the above date and shall continue for successive one (1) month terms unless written notice of an election not to so renew for a successive one (1) month term is given by one party to the other party at least thirty (30) days prior to the commencement of the next successive one (1) month term.

C:\My Documents\New Net Branches\Jim Bowman\Facilities-Net CA-06.12.03.doc

Page 2 of 4

## Article IV
### Rental

**4.1 Rent.** As rent for the Facilities provided by Provider, PGM shall pay a monthly Rental Fee equal to one hundred twenty-five percent (125%) of Provider's actual cost of providing the Facilities which are the subject of this Agreement, in accordance with a schedule to be provided by Provider. As soon as commercially reasonable following the close of each month, Provider shall provide to PGM a schedule which itemizes, in accordance with generally accepted accounting principles, all costs incurred by Provider that month in providing the Facilities. The monthly Rental Fee for each month shall be due on the 15th day following PGM's receipt of such schedule.

## Article V
### Miscellaneous

**5.1 Choice of Law.** This Agreement shall be governed by and construed under the laws of the State of California, without regard to conflicts of laws principles.

**5.2 Integration.** This Agreement is the entire agreement between the parties regarding the subject matter and supersedes any prior oral or written agreement among them regarding the subject matter contained herein.

**5.3 Venue.** The parties agree that the proper venue for any legal action brought under this Agreement is either the County of Contra Costa, California or the United States District Court for the Northern District of California, as appropriate.

**5.4 Statute of Limitations.** Any action arising under this Agreement or because of its breach much be commenced within one year after the cause of action accrues.

**5.5 No Partnership or Joint Venture Intended.** Provider and PGM intend that, to the maximum extent permissible by law, this Agreement shall not be construed as a partnership and/or joint venture.

**5.6 Arbitration.** Any dispute, claim or controversy arising out of or relating to this Agreement or the breach, termination, enforcement, interpretation or validity thereof, including determination of the scope or applicability of this arbitration provision, shall be determined by arbitration in San Francisco, California, before a sole arbitrator, in accordance with the laws of the State of California for agreements made in and to be performed in that state. The arbitration shall be administered by JAMS pursuant to its Streamlined Arbitration Rules and Procedures.

C:\My Documents\New Net Branches\Jim Bowman\Facilities-Net CA-04.12.03.doc

Page 3 of 4

MAR-27-2006 MON 12:44 PM Pacific Guarantee Mrtg.        FAX NO. 5109707930        P. 16

Case 3:07-cv-03140-SI    Document 95    Filed 08/22/2008    Page 57 of 64

IN WITNESS WHEREOF, the undersigned have executed this Agreement at San Ramon, California.

PGM:

Dated: _____

**CMG Mortgage Services, Inc., doing business as Pacific Guarantee Mortgage**


By: _____
    Christopher M. George, President


Provider

Dated: _12/1/03_____

Provider

Dated: _12/1/03_____

By: _____
    Jim Brian Bowman
    *Branch Manager*

PACIFIC REAL ESTATE MANAGEMENT, INC.

By: _____ President

# Exhibit D

457

## FACILITIES AND EQUIPMENT RENTAL AGREEMENT

This Facilities and Equipment Rental Agreement ("Agreement") is entered into effective July 7, 2004, by and between CMG Mortgage, Inc., a California corporation doing business as Pacific Guarantee Mortgage ("PGM") and James Bowman and Pacific Real Estate Management, Inc.  (collectively "Provider"), at San Ramon, California.

Whereas, PGM is engaged in business as a mortgage broker;

Whereas, PGM intends to operate a branch office at 500 West 8th Street, Suite 100, Vancouver, WA  98660 (the "Branch Office");

Whereas, PGM desires to secure facilities, equipment, services, supplies and office space sufficient to operate the Branch Office; and,

Whereas, Provider desires to provide such facilities, equipment, services, supplies and office space,

Now, therefore, in consideration of the mutual covenants and agreements contained herein, and for other good and valuable consideration, the receipt and sufficiency of which is hereby acknowledged, it is hereby agreed as follows:

### Article I
### Items Supplied by Provider

**1.1    Office Space.**  Provider, as master tenant, hereby subleases to PGM the Leased Premises described and identified in the Master Lease attached hereto as Exhibit A.

**1.2    Facilities, Equipment Services and Supplies.**  Provider hereby agrees to provide to PGM the facilities, equipment, services and supplies identified in Exhibit B attached hereto and incorporated herein, which shall include one or more of the following, as reasonably necessary to conduct the business of the Branch Office in a responsible business manner:

a.    Office furniture, including desks, chairs and tables;
b.    Office equipment, including computers, printers and typewriters;
c.    Facsimile machines and photocopiers;
d.    Common area and reception furniture; and,
e.    Telephone equipment and handsets.
f.    All computer, printer and typewriter supplies, including but not limited to software maintenance and upgrade, printer toner and supplies, and typewriter ribbons and supplies;
g.    Facsimile and photocopier supplies, including but not limited to toner and paper; and,
h.    Maintenance and repair of items (a) - (g), as reasonably needed.

**1.3    Changes in Items Supplied.**  The parties reserve the right to increase, decrease or

modify the facilities, equipment, services and supplies which are the subject of this Agreement.

     **1.4    Insurance.** PGM shall obtain and maintain, at its sole cost and expense, such fire, theft, liability, hazard and other insurance on the Leased Premises and the facilities, equipment, services and supplies which are a subject of this Agreement, as reasonably necessary to provide coverage for all risks of loss or damage and all liability for use thereof.

     **1.5    Facilities.** All office space, facilities, equipment, services, supplies and insurance referred to in sections 1.1 through 1.5, inclusive, of this Article I shall be referred to herein, collectively, as the "Facilities."

**Article II**
**Security Deposit**

     **2.1    Security Deposit.** As a material consideration for PGM's agreement to enter into this Agreement, Provider agrees concurrently with the execution of this Agreement to deposit with PGM a security deposit in the sum of $_____. This security deposit is intended to secure any and all obligations of Provider, whether arising out of this Agreement or otherwise. Said security deposit, to the extent not used in accordance with the provisions of this Article II, shall be returned to Provider, without interest, within sixty (60) days following the termination of this Agreement.

     **2.2    Use of Security Deposit.** By signature below, Provider authorizes and instructs PGM, at its option and in its sole discretion, to use all, or any part of the security deposit, to satisfy any indebtedness now or hereafter owed by Provider to PGM, to the maximum extent permitted by law.

**Article III**
**Term of Agreement**

     **3.1    Term.** The term of this Agreement shall be one (1) month from the above date and shall continue for successive one (1) month terms unless written notice of an election not to so renew for a successive one (1) month term is given by one party to the other party at least fifteen (15) days prior to the commencement of the next successive one (1) month term.

**Article IV**
**Rental**

     **4.1    Rent.** As rent for the Facilities provided by Provider, PGM shall pay a monthly Rental Fee equal to one hundred and twenty five percent (125%) of Provider's actual cost of providing the Facilities which are the subject of this Agreement. As soon as commercially reasonable following the close of each month, Provider shall provide to PGM, in writing, a request for payment of a sum equal to the total of one hundred and twenty five percent (125%) of all costs incurred by Provider that month in providing the Facilities. The monthly Rental Fee for each month shall be due on the 15th day following PGM's receipt of such request. Each such

CMG001934

request shall be supported by a schedule, or other equivalent records, which need not be provided to PGM each month, but shall be available for inspection by PGM on reasonable notice during normal business hours. Such schedule, or other equivalent records, shall be prepared by Provider in accordance with generally accepted accounting principles and maintained for a period of not less than seven (7) years.

## Article V

**5.1     Mandatory Negotiation, Mediation and Arbitration.**  The parties will attempt in good faith to resolve through negotiation any dispute, claim or controversy arising out of or relating to this Agreement.  Either party may initiate negotiations by providing written notice in letter form to the other party.  Such notice shall set forth the subject of the dispute and the relief requested.  The recipient of such notice will respond in writing within five (5) days with a statement of his/her/its position on and recommended solution to the dispute.  If the dispute is not resolved by this exchange of correspondence, the representatives of each party with full settlement authority will meet at a mutually agreeable time and place within ten (10) days of the date of the initial notice in order to exchange relevant information and perspectives, and to attempt to resolve the dispute.  If the dispute is not resolved by these negotiations, the matter will be submitted to JAMS, or its successor, for mediation in accordance with the terms of this section 5.1.

Either party may commence mediation by providing to JAMS and the other party a written request for mediation.  Such request shall set forth the subject of the dispute and the relief requested.  The parties will cooperate with JAMS and with one another in selecting a mediator from JAMS' panel of neutrals, and in scheduling the mediation proceedings.  The parties covenant that they will participate in the mediation in good faith, and that they will share equally in its costs.  All offers, promises, conduct and statements, whether oral or written, made in the course of the mediation by any of the parties, their agents, employees, experts and attorneys, and by the mediator or any JAMS employees, are confidential, privileged, and inadmissible for any purpose, including impeachment, in any arbitration or other proceeding involving the parties, provided that evidence that is otherwise admissible or discoverable shall not be rendered inadmissible or non-discoverable as a result of its use in the mediation.

Either party may initiate arbitration in accordance with this section 5.1 by filing a written demand for arbitration at any time following the initial mediation session or forty-five (45) days after the date of filing the written request for mediation, whichever occurs first.  The mediation may continue after the commencement of arbitration if the parties so desire.  Unless otherwise agreed by the parties, the mediator shall be disqualified from serving as arbitrator in the case.  It is the intent of the parties to this Agreement that any and every dispute, claim or controversy arising out of or relating to this Agreement or the breach, termination, enforcement, interpretation or validity thereof, which can not be resolved by negotiation and/or mediation, be resolved by binding arbitration.  This includes, but is not limited to the determination of the scope or applicability of this agreement to arbitrate.  Arbitration shall be conducted in San Francisco, California, before a sole arbitrator, in accordance with the laws of the State of California for agreements made in and to be performed in California.  The arbitration shall be

administered by JAMS pursuant to its Comprehensive Arbitration Rules and Procedures. Judgment on the Award may be entered in any court having jurisdiction.

Provider may seek to obtain a waiver of costs associated with the initiation and maintenance of the arbitration, to the extent such costs: 1) are in excess of the costs of bringing and maintaining an equivalent court action; and, 2) to the extent such costs exceed Provider's ability to pay. The arbitrator shall, in the Award, allocate all of the costs of the arbitration and the mediation, including the fees of the arbitrator and the reasonable attorneys' fees of the prevailing party, against the party who did not prevail.

The provisions of this section 5.1 may be enforced by any court having jurisdiction, and the party seeking enforcement shall be entitled to an award of all costs, fees and expenses, including attorneys' fees, to be paid by the party against whom enforcement is ordered.

## Article VI
## Miscellaneous

**6.1    Choice of Law.** This Agreement shall be governed by and construed under the laws of the State of California, without regard to conflicts of laws principles.

**6.2    Integration.** This Agreement is the entire agreement between the parties regarding the subject matter and supersedes any prior oral or written agreement among them regarding the subject matter contained herein.

**6.3    Statute of Limitations.** Any action arising under this Agreement or because of its breach much be commenced within one year after the cause of action accrues.

**6.4    No Partnership or Joint Venture Intended.** Provider and PGM intend that, to the maximum extent permissible by law, this Agreement shall not be construed as a partnership and/or joint venture.

CMG001936

**6.5     Signatures.**  The undersigned persons represent that they are authorized and have the legal capacity to enter into this Agreement.

PGM:

Dated:_____

**CMG Mortgage, Inc., doing business as Pacific Guarantee Mortgage**

By: _____
     Christopher M. George, President

Provider:

Dated: _____

**Pacific Real Estate Management, Inc.**

By: _____
     Branch Manager

By: _____
  James Bowman
  Pacific Real Estate Management, Inc.

Dated: _____

**PGM Facilities Agreement**
**Exhibit "B"**

| Item | Estimated Monthly Expenses |
|---|---|
| Office Rent/Lease | 1500 00 |
| Office furniture (including desks, chairs and tables) | |
| Office equipment, including computers, printers and typewriters | |
| Facsimile machines and photocopiers | 750 00 |
| Common area and reception furniture | |
| Telephone equipment and handsets | |
| Supplies - Computer, printer, typewriter | |
| Supplies - Facsimile and photocopiers including not limited to toner and paper | 750 00 |
| Maintenance and repair of all equipment | 200 00 |
| Software supplies and maintenance & upgrades | |
| Other - List | |
| Other - List | |
| Other - List | |
| **Sub Total** | 32 00 |
| **Plus 25% (of Sub Total)** | 800 |
| **Estimated Total Monthly Payment** | 4000 00 |

CMG001938